Holly A. House (SB# 136045)
hollyhouse@paulhastings.com
Sophie J. Sung (SB# 279056)
sophiesung@paulhastings.com
PAUL HASTINGS LLP
55 Second Street
Twenty-Fourth Floor
San Francisco, CA  94105-3441
Telephone: (415) 856-7000
Facsimile: (415) 856-7100

Richard L. Brophy (*pro hac vice* pending)
rbrophy@armstrongteasdale.com
David W. Harlan (*pro hac vice* pending)
dharlan@armstrongteasdale.com
Charles W. Steese (*pro hac vice* pending*)*
csteese@armstrongteasdale.com
Mark A. Thomas (*pro hac vice* pending)
mathomas@armstrongteasdale.com
Zachary C. Howenstine (*pro hac vice* pending)
zhowenstine@armstrongteasdale.com
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd, Suite 1800
St. Louis, MO  63105
Telephone:  (314) 621-5070
Facsimile:  (314) 621-5065

Attorneys for Plaintiff
CAVE CONSULTING GROUP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CAVE CONSULTING GROUP, INC., | CASE NO. _____ |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| OPTUMINSIGHT, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Cave Consulting Group, Inc. ("CCGroup") alleges as follows for its Complaint against Defendant OptumInsight, Inc. ("OptumInsight"):

**Parties**

1.      Plaintiff CCGroup is a California corporation with a principal place of business in San Mateo, California.

2.      Defendant OptumInsight is a Delaware corporation with a principal place of business in Minnetonka, Minnesota.  OptumInsight is registered to do business and is doing business in the State of California.  In 2003, OptumInsight—named Ingenix at the time—acquired Symmetry Health Data Systems, Inc.  For purposes of this Complaint, all three entities will be referred to collectively as "OptumInsight."

**Jurisdiction & Venue**

3.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, 1338(a), 1367 and 2201.

4.      The Court has personal jurisdiction over OptumInsight because it engaged in substantial conduct giving rise to this lawsuit in California.  This conduct includes, *inter alia,* the assertion of baseless claims for patent infrincgement against CCGroup in this Court in Case No. 5:11-cv-0469-EJD.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because a substantial number of the events or omissions giving rise to CCGroup's claims occurred in this District.

**I.      INTRODUCTION**

6.      This is an action for monetary damages and injunctive relief under Section 2 of the Sherman Act, Section 4 of the Clayton Act, the Lanham Act, and the laws of California.  These counts arise from OptumInsight's unlawful and anti-competitive campaign to illegally monopolize or attempt to monopolize the market for episode grouper software.

7.      Episode grouper software is specialized software that is used to organize medical claims data into "episodes of care"—each one a collection of all the medical services a patient

received during the management of a particular medical condition.  Episodes of care are inputs to a variety of software tools that are used to analyze and improve the manner in which healthcare services are provided to patients.

8.     To monopolize or attempt to monopolize the market for episode grouper software, OptumInsight unlawfully obtained a portfolio of patents on episode grouper technology by committing fraud on the United States Patent and Trademark Office (USPTO).  Specifically, and as set forth in detail below, OptumInsight obtained these patents by repeatedly concealing material facts from the USPTO and at the same time making affirmative misstatements to the USPTO regarding its prior efforts to commercialize the patented inventions.

9.     With the competitive benefits conferred by this patent portfolio, OptumInsight actively suppressed competition by advertising, threatening to enforce, enforcing and licensing its ill-gotten portfolio against others in the marketplace.  OptumInsight did so with full knowledge that its enforcement activities and statements in the marketplace were based on fraudulently obtained patents and were, therefore, objectively baseless.

10.    Using its fraudulently obtained patent portfolio, and by engaging in the foregoing anticompetitive activities, OptumInsight suppressed competition and, thereby, obtained and maintained a monopoly in the market for episode groupers.  At the very least, OptumInsight's misuse of its patent portfolio presented, and still presents, a dangerous possibility that OptumInsight will succeed in obtaining an improper monopoly in the market for episode grouper software.

11.    OptumInsight's enforcement campaign included institution of a more than four-year litigation against CCGroup, one of only two other competitors in the market, for infringement of its fraudulently-obtained patents.  OptumInsight withdrew all but two of its patents from suit once CCGroup uncovered its inequitable conduct, by which time CCGroup had already incurred substantial legal fees and expenses defending against OptumInsight's baseless claims.  At trial, the jury found that CCGroup did not infringe OptumInsight's remaining asserted claim.

Case No.                                                                                        COMPLAINT

12.     Even before OptumInsight brought its baseless infringement claims, CCGroup was unable to effectively compete with OptumInsight in the market for episode grouper software due to the dominant market share OptumInsight obtained as a result of the perceived strength of its patent portfolio.

13.     Through the foregoing illegal campaign of patent enforcement, OptumInsight gained control of 85%-90% of the market for episode grouper software.

14.     This lawsuit seeks to restore competition to the affected market and to compensate CCGroup for the injuries OptumInsight's anticompetitive, monopolistic conduct has caused.

15.     CCGroup seeks compensation for injuries resulting from OptumInsight's pursuit of baseless patent infringement litigation and for other competitive injury to CCGroup resulting from OptumInsight's anticompetitive behavior.

## II.     THE HEALTHCARE INFORMATICS INDUSTRY AND THE RELEVANT GROUPER SOFTWARE MARKET

16.     This lawsuit generally relates to the field of healthcare informatics—a field that relies on information technology and analytical software to evaluate, and ultimately improve, the services that healthcare practitioners provide to patients.

17.     The most frequently-used healthcare informatics products evaluate either the *quality* of care being provided to patients (i.e., how well practitioners follow established treatment patterns) or the *efficiency* of that care (i.e., how cost-effectively practitioners are able to provide the care appropriate to heal a patient).

18.     One of the key inputs to these tools is historical patient treatment information. This information is generally extracted from health insurance claim forms that physicians and other healthcare providers prepare when requesting payment for the services they provide.

19.     These records are generally referred to as "claim data," "claim line items," or "claim data records."  Every day, tens of thousands of these claim data records are generated by physicians and other healthcare practitioners throughout the country.  This claim data is warehoused by insurance companies, the Federal Government, and other entities that evaluate and attempt to improve the care provided by the healthcare industry.

20.     In order to be useful as an input to most healthcare informatics tools, these vast collections of claim data must first be gathered, validated, and organized into discrete bundles called "episodes of care."

21.     Each episode of care is meant to represent the collection of services provided to a patient during management of a particular instance of a medical condition.  One example of an episode of care would be the grouping of all claim data records that relate to the evaluation, treatment, and aftercare for a patient's broken arm.

22.     A special type of software generally referred to as an "episode of care grouper" or simply a "grouper" is used to import collections of claims data, validate that data, and group it into discrete episodes of care.

23.     The relevant product market for purposes of this Complaint is the market for episode of care grouper software (the "Grouper Software Market").

24.     During the period from 2005 until at least the end of 2014, there were only three products available in the Grouper Software Market.  OptumInsight offered a grouper tool known as the "Episode Treatment Groups" or "ETG" grouper; CCGroup offered a competing grouper tool known as the "Cave Grouper"; and Truven Heath Analytics Inc.—then known as The MedStat Group, Inc.—offered a third competing grouper tool known as "Medical Episode Groups" or MEGs.

25.     All three competitors offered their grouper software to customers on a nationwide basis.  As a result, the scope of the relevant geographic market for purposes of this Complaint is nationwide.

26.     In the period from 2005 until at least the end of 2014, OptumInsight was by far the dominant competitor, serving at least 85%-90% of the Grouper Software Market.

27.     OptumInsight obtained its dominant position in the Grouper Software Market by advertising, threatening to enforce, and enforcing a portfolio of patents that covered methodologies for constructing episodes of care.

28.     This patent portfolio conferred a key competitive strength that allowed OptumInsight to erect artificial barriers to entry and expansion in the Grouper Software Market

and permitted OptumInsight to establish its ETG grouper software as the *de facto* standard for grouping claims data into episodes of care.

### III.   OPTUMINSIGHT'S ANTI-COMPETITIVE CONDUCT

29.    Over the past two decades, OptumInsight has fraudulently obtained at least eleven patents from the USPTO including, but not limited to, U.S. Patent Nos. 5,835,897; 6,370,511; 7,620,560; 7,725,333; 7,774,216; 7,979,290; 8,121,869; 8,296,165; and 8,700,433 ("the Dang Patents") and U.S. Patent Nos. 7,222,079 and 7,774,252 ("the Seare Patents").

30.    As detailed below, OptumInsight deliberately withheld material information— including its own offer to sell its invention more than a year before filing for patent applications—at times when that material information was known to OptumInsight and OptumInsight had a duty to disclose that information and prior art to the USPTO.  Moreover, OptumInsight made numerous affirmative misrepresentations to the USPTO that were material to the patentability of its various patent applications and that were not only false, but that OptumInsight knew to be false.

31.    These false representations and omissions were intended to induce and did induce reliance by the patent examiners charged with determining whether to grant OptumInsight's patent claims.  But for OptumInsight's material false statements and omissions, the patents in its patent portfolio would not have issued.

32.    These multiple misrepresentations and omissions by OptumInsight constitute fraud on the USPTO that renders the entirety of OptumInsight's patent portfolio invalid and unenforceable.

33.    After improperly obtaining patents from the USPTO, OptumInsight advertised, threatened to enforce, and enforced its ill-gotten patents against competitors and customers in the marketplace.  By doing so, OptumInsight was able to obtain, maintain or, at a bare minimum, posed a dangerous probability of obtaining, a monopoly in the market for episode grouper software.

34.     In furtherance of this scheme, in 2011 OptumInsight initiated a patent infringement lawsuit against CCGroup.  In that lawsuit, OptumInsight asserted eight of the patents it had fraudulently obtained from the USPTO.  These asserted patents spanned two patent families—one based on an original patent application filed by Mr. Dennis Dang (the Dang Patents) and another based on an original application filed by Mr. Jerry Seare (the Seare Patents).

35.     OptumInsight's objectively baseless assertion of its patent portfolio forced CCGroup to expend significant resources over the course of four years of litigation.  When CCGroup eventually exposed OptumInsight's misconduct before the USPTO—based on materials in OptumInsight's own possession long before it brought its infringement claims against CCGroup—OptumInsight subjected CCGroup to another year of debilitating litigation expense before eventually withdrawing the entire Dang patent family and all but one claim of the Seare family from the litigation.

36.     OptumInsight's eleventh-hour, unilateral withdrawal of almost all of its infringement allegations evidences the breadth of OptumInsight's fraud and the severity of the unenforceability problem that plagues the Dang and Seare patents.  OptumInsight's persistent and costly assertion of these patents against CCGroup, in light of the circumstances by which they were obtained and the manner in which they were enforced, is a key part of the pattern of anticompetitive conduct perpetrated by OptumInsight.

37.     OptumInsight should be held responsible for its misconduct in obtaining patents fraudulently, for subjecting CCGroup to the unnecessary expense of a protracted patent litigation, and for OptumInsight's use of its patent portfolio to reap anticompetitive benefits in the marketplace.

38.     OptumInsight's anticompetitive conduct has harmed competition in the Grouper Software Market by, among other things, affecting prices and reducing competition, quality, innovation and consumer choice.

**A.  <u>OptumInsight's Fraud on the USPTO</u>**

       *1.  OptumInsight Concealed its Early Commercialization
          of Dang's Invention from the USPTO*

Case No.                                                                                                    COMPLAINT

39.     In 1993, Dennis Dang and his associate, Mitchell Portnoy, formed Symmetry Health Data Systems Incorporated ("Symmetry") in order to develop software for grouping medical claims data into episodes of care.

40.     By early 1994, Dang, Portnoy, and Dan Gardiner (a computer programmer hired to assist with software development) (collectively, "the inventors") had developed a software grouping methodology, which Symmetry began advertising for sale under the trade name "Episode Treatment Groups" or "ETGs." This product later became known as Symmetry ETG.

41.     On May 13, 1994, Aetna, a large health insurance provider, asked Symmetry to respond to a request for proposal for provider risk and profiling software.

42.     On June 12, 1994, Symmetry responded to Aetna's request for proposal by offering to license its newly-developed ETG software to Aetna ("the Aetna RFP Response"). Along with its licensing offer, Symmetry gave Aetna a document that described Symmetry's ETG software, a number of sample reports based on previously-processed raw claims data, and full pricing information for a license to the ETG software.

43.     Because the Aetna RFP Response represented an offer to sell Dang's invention, the Aetna RFP Response started the clock on the one-year statutory period under 35 U.S.C. § 102(b) for Dang to file a patent application for his invention.

44.     More than a year after Symmetry delivered the RFP Response to Aetna, Symmetry's patent prosecution counsel, Mr. David Rosenbaum, filed a patent application with the Patent Office on Dang's grouping methodology.

45.     When Rosenbaum and Dang filed the patent application, they withheld from the USPTO all of the information in their possession regarding Symmetry's early efforts to commercialize Dang's invention, including Dang's offer to sell his inventive methodology to Aetna.

46.     On November 10, 1998, without notice of Symmetry's June 12, 1994 offer for sale to Aetna, the Patent Office issued U.S. Patent No. 5,835,897 ("the '897 patent") with claims that read on Dang's grouping methodology and, by extension, the ETG grouping software Symmetry offered for sale to Aetna more than a year before Dang filed his patent application.

> 2. *Once the First Dang Patent Issued, Symmetry Filed Suit and Claimed an Invention Date of **September 1993** to Avoid Invalidating Prior Art*

47.     On November 10, 1998, the same day the '897 patent issued, Symmetry filed suit against The MedStat Group, Inc. ("MedStat"), for infringing the newly-issued '897 patent. (*Symmetry Health Data Systems, Inc. v. The MedStat Group Inc.*, Case No. 2:98-CV-02032-EHC (D. Ariz.)).  Rosenbaum, Symmetry's patent prosecution counsel, served as litigation counsel in the MedStat litigation.

48.     During discovery in that litigation, Symmetry represented <u>under oath</u> in an interrogatory response that Dang conceived of the invention claimed in the '897 Patent "at least as early as September of 1993."

49.     Symmetry also represented under oath that Dang's conception in September of 1993 was sufficient at that time to enable one skilled in the art to reduce Dang's invention to practice.

50.     Dang confirmed through sworn testimony in the MedStat litigation that Symmetry's interrogatory response was correct, that he conceived of the invention claimed in the '897 patent in September of 1993, and that the invention was sufficiently conceived to enable one skilled in the art to reduce the invention to practice.

51.     Symmetry's patent prosecution counsel, Rosenbaum, was present at Dang's deposition when Dang testified that he conceived of his invention in September of 1993.

52.     Symmetry adopted this September 1993 conception date for Dang's invention in the MedStat litigation in order to predate invalidating prior art cited by MedStat.  Specifically, Symmetry avoided invalidation by U.S. Patent No. 5,557,514—a patent issued from a June 23, 1994 application by Jerry Seare.

53.     These sworn statements also confirmed that Dang's invention was fully conceived and ready for patenting by the time Symmetry offered to license the technology to Aetna on June 12, 1994—more than a year before the filing date of the '897 patent.

54.     Dang's admission during the MedStat litigation that he conceived of his invention

in September 1993 also confirmed that Symmetry's 1994 RFP Response to Aetna was an invalidating prior offer for sale under 35 U.S.C. § 102(b).

   3.   *In Subsequent USPTO proceedings, Symmetry Switched its Invention Date to **August 1994** to Avoid the On-Sale Bar of 35 U.S.C. § 102(b)*

55.    On March 27, 2000, several months before the parties settled the MedStat Litigation, Symmetry initiated a reexamination of its '897 patent.

56.    During the reexamination, Rosenbaum disclosed to the USPTO, for the first time, Symmetry's June 12, 1994 sales offer to Aetna.

57.    To ensure that the Aetna RFP Response would not invalidate the '897 patent, Dang, Rosenbaum and other Symmetry personnel needed to manufacture a different conception date from the one they provided in the MedStat litigation.  Although the September 1993 conception date they relied on in litigation helped them to avoid prior art, that conception date, in light of the early offer to license Dang's invention to Aetna, would have invalidated the '897 patent under Section 102(b).

58.    To avoid this problem, Dang, Rosenbaum and other Symmetry Personnel withheld the litigation materials from the USPTO and instead manufactured a later conception date of August 1994 for purposes of their proceedings before the USPTO.

59.    By adopting this later conception date, Symmetry was able to argue to the Patent Office that the June 12, 1994 offer to Aetna was not an invalidating "offer for sale" under 35 U.S.C. § 102(b) because the invention was not yet "ready for patenting," purportedly saving the '897 patent and all related pending applications from invalidation.

60.    Symmetry did <u>not</u> provide the USPTO with Symmetry's sworn interrogatory responses or Dang's sworn deposition testimony from the MedStat litigation—evidence which clearly identified Dang's conception date as "at least as early as September 1993" and conclusively established the Aetna offer as an invalidating § 102(b) offer for sale.

61.    Instead, Dang, Portnoy, Gardiner (all Symmetry employees) and Rosenbaum intentionally deceived the USPTO by submitting sworn affidavits that misrepresented Dang's conception date as <u>almost a year later, in August 1994</u>.  These claims directly contradicted

-9-

1   Symmetry's interrogatory responses and Dang's deposition testimony in the Symmetry litigation

2   with MedStat.

3       62.   Relying on these material misrepresentations and omissions by Symmetry, and

4   without any of the information evidencing Dang's actual conception in September of 1993, the

5   Patent Office issued a reexamination certificate for the claims of the '897 Patent on February 19,

6   2002.

7       *4.   In its Next Litigation, Symmetry Reverted **Back to a September 1993** Conception
        Date to Argue that Seare Derived His Invention from the '897 Patent*

8

9       63.   In April of 2001, while the reexamination of the '897 Patent was pending,

10  OptumInsight (then known as Ingenix) sued Symmetry for infringement of Seare's U.S. Patent

11  No. 6,223,164.  (*Ingenix, Inc. v. Symmetry Health Data Systems, Inc.*, No. 0:01-cv-00704 (D.

12  Minn.)).

13      64.   As in the MedStat litigation, Symmetry's prosecution counsel, Rosenbaum,

14  assisted as litigation counsel.

15      65.   Symmetry responded to OptumInsight's infringement allegations by

16  counterclaiming that Seare and the other inventors derived—or stole—their invention from Dang.

17      66.   To substantiate its derivation claim, Symmetry had to show that Dang's

18  conception came <u>before</u> the filing date of Seare's patent application.

19      67.   Because the Seare patent has a filing date of June 23, 1994, Symmetry could not

20  use the August 1994 conception date it had recently provided to the USPTO in sworn affidavits

21  during its reexamination proceedings.

22      68.   Symmetry therefore changed Dang's conception date for the '897 patent from

23  August 1994 **_back_** <u>to September 1993</u> for purposes of this new litigation against OptumInsight.

24      69.   To support its renewed claim to a 1993 conception date in the litigation, Symmetry

25  disclosed dated source code that had not previously been disclosed to the USPTO.

26      70.   Ignoring the sworn statements its representatives made to the USPTO just the

27  previous year, Symmetry represented to the district court in briefing that "Mr. Dang's <u>undisputed</u>

28  <u>testimony</u> is that he first conceived of the invention, which is now known as ETGs, <u>in the summer</u>

Case No.                                                                                    COMPLAINT

1  of 1993" and that "Mr. Dang conceived of the invention during the summer of 1993, that the

2  conception was communicated to Mr. Portnoy during the summer of 1993 and to Mr. Gardiner by

3  at least November 1993."

4       71.    These representations directly contradicted the sworn affidavits that Dang,

5  Portnoy, Gardiner and Rosenbaum had submitted to the USPTO during reexamination to support

6  a conception date of August 1994—the date Symmetry used to avoid invalidity under § 102(b) in

7  light of its June 1994 sales offer to Aetna.

8       72.    Additionally, the dated source code and representations in briefing used to

9  reestablish a 1993 conception date were never produced to the USPTO in the then-pending

10 reexamination proceedings or in any subsequent prosecutions based on the original Dang

11 application.

12      73.    These sworn statements and evidence of a September 1993 conception date,

13 submitted confidentially to the court in the litigation between Symmetry and OptumInsight (and

14 only later made public through CCGroup's amended complaint discussed below), were never

15 disclosed by OptumInsight to the USPTO.

16      *5.  OptumInsight Acquired Symmetry in 2003 and Adopted the Material*
           *Misrepresentations and Omissions Regarding Dang's Conception Date*
17

18      74.    Around the same time it sued Symmetry for patent infringement, OptumInsight

19 also provoked an interference between the '897 patent and the application that later issued as the

20 '079 patent to determine whether Dang or Seare first invented the episode grouping methodology

21 claimed in those applications.

22      75.    OptumInsight provoked the interference by copying, word-for-word, claim 1 of the

23 '897 patent into the Seare application.

24      76.    In 2003, before any ruling on the merits of the interference, OptumInsight

25 purchased Symmetry and all of its intellectual property, including the '897 patent and related

26 continuation applications (i.e., the entire Dang patent family).

27      77.    The issue raised by the interference of whether Dang or Seare invented first was

28 never resolved by a factfinder.

Case No.                                            COMPLAINT

78.     Instead, OptumInsight resolved the interference by deciding for itself that the Seare patent would have priority.

79.     In deciding priority in favor of the Seare patent, whose application was filed on June 23, 1994, OptumInsight ignored the documents and prior sworn statements from Dang, Rosenbaum, Portnoy and Gardiner evidencing Dang's conception in September 1993.

80.     Instead, OptumInsight represented to the USPTO that Dang conceived of his invention in August of 1994.

81.     When OptumInsight made these representations to the USPTO, it had full knowledge that they were false as a result of the dated source code, sworn statements, testimony and other materials Symmetry had offered in the litigation between Symmetry and OptumInsight.

82.     Despite this knowledge, OptumInsight, through its counsel, represented to the USPTO that it had conducted "a thorough investigation of the relevant facts" and certified that Seare was entitled to priority.

83.     OptumInsight did this to ensure the continued validity of the Dang patent family and withheld from the USPTO with any of the source code, interrogatory responses, briefing or sworn testimony establishing that Dang actually conceived of his invention in September of 1993.

84.     Despite its continued prosecution of applications in the Dang patent family, OptumInsight has never disclosed any information to the USPTO regarding Dang's sworn claim to a 1993 conception date.

85.     Since the issuance of the original '897 Patent in 1998, OptumInsight has applied for, and the USPTO has issued, at least eight other patents based on Dang's original application from 1995, some of which were pending applications at the time of the acquisition and some of which were continuations filed later by OptumInsight.

86.     This includes the '560 patent, the '216 patent, the '333 patent, and the '290 patent—all of which issued after OptumInsight acquired Symmetry, and all of which OptumInsight subsequently enforced against CCGroup.

87.     These four patents were all prosecuted by attorneys in the same firm that represented OptumInsight in its litigation against Symmetry.  As such, those attorneys were privy

-12-

to the source code, briefing, sworn testimony, and interrogatory responses proving that Dang actually conceived of his invention in September of 1993.

88.     Despite the foregoing, OptumInsight and its counsel prosecuted the remainder of the Dang patent portfolio without ever disclosing the testimony, documents, or pleadings establishing that Dang conceived of his invention at least as early as September 1993.  Until as recently as April of 2014, OptumInsight continued to obtain patents from the USPTO for which it had not disclosed any of the evidence of Dang's September 1993 conception date.

89.     OptumInsight continued to engage in these deceptive practices before the Patent Office to ensure that nothing jeopardized the Dang patent portfolio—a portfolio that it has licensed to numerous companies for well over a decade and has improperly relied on to obtain and maintain its substantial share of the Grouper Software Market.

90.     Because all of the Dang patents rely on Dang's original patent application for priority, and because the claims are all related, each of them is invalid and unenforceable in light of the repeated material misrepresentations and omissions before the USPTO regarding Dang's conception date and related June 12, 1994 offer to sell the ETG Software to Aetna.

*6.  OptumInsight Also Committed Inequitable Conduct
in its Prosecution of the Seare Patent Family*

91.     After acquiring Symmetry, OptumInsight continued to prosecute applications in its own Seare patent family.  In the years following the acquisition, OptumInsight procured at least two additional Seare patents from the USPTO—U.S. Patent Nos. 7,222,079 and 7,774,252.

92.     OptumInsight and its counsel conducted their patent prosecution efforts with full knowledge of evidence—gained, at least, through its litigation with Symmetry—proving that Dang had actually invented the grouping methodology claimed in the Seare patents before Seare.

93.     This evidence includes the Aetna RFP Response, which represented an offer to sell Dang's already-conceived invention on June 12, 1994 (before Seare's earliest priority date of June 23, 1994), as well as the source code, interrogatory responses and sworn testimony produced during litigation, all of which establishes Dang's conception in late 1993.

Case No.                                                                                                    COMPLAINT

94.     Despite full knowledge of Dang's earlier invention, OptumInsight prosecuted its Seare patent applications without ever disclosing to the USPTO the Aetna RFP Response, source code, interrogatory responses, briefing, sworn testimony, or any other evidence in its possession that established Dang's priority conception in 1993.

95.     OptumInsight had an obligation to disclose the foregoing materials to the USPTO because those materials represented anticipating prior art under at least 35 U.S.C. § 102(g). Those materials were prior art under Section 102(g) because they evidenced first invention by another (namely, Dang) who did not subsequently abandon, suppress, or conceal that invention.

96.     As OptumInsight was well aware, Dang did not keep his invention from the public but instead publicized his invention by, among other things, obtaining patents on that invention.

97.     The documents and other evidence that OptumInsight withheld from the USPTO during prosecution of the Seare patent portfolio was material because the Seare patents would not have issued had the USPTO been aware of Dang's earlier invention.

98.     In light of the foregoing, the decision of the inventors, other OptumInsight personnel and prosecution counsel to withhold evidence of Dang's earlier invention during its subsequent prosecution of the Seare patents constitutes fraud on the USPTO that renders the Seare patents unenforceable.

**B.  OptumInsight's Sham Litigation Against CCGroup**

99.     On January 11, 2011, OptumInsight initiated a lawsuit in Minnesota against CCGroup in which it asserted infringement of two patents from its Seare portfolio and five patents from its Dang portfolio.  *(Ingenix, Inc. v. Cave Consulting Group, LLC*, Case No. 11-cv-00077-DWF-FLN).

100.    Despite making these public allegations of infringement against CCGroup, OptumInsight did not pursue its claim against CCGroup.  On June 20, 2011, four months after filing suit, and without ever serving the Complaint, OptumInsight dismissed its lawsuit without prejudice.

101.    After learning that OptumInsight did not intend to move forward with the litigation, CCGroup requested that OptumInsight agree to a dismissal with prejudice to ensure

1  that OptumInsight's public allegations of infringement would not tarnish CCGroup's reputation

2  and ability to compete in the marketplace.

3      102.    Despite these requests, OptumInsight refused to dismiss its case with prejudice and

4  also refused to give CCGroup any assurances that OptumInsight would not pursue infringement

5  allegations again in the future.

6      103.    During this period, CCGroup received numerous inquiries from customers and

7  potential customers regarding OptumInsight's allegations of infringement.

8      104.    To clear the pall that OptumInsight's allegations had cast over CCGroup's

9  business, on July 11, 2011, CCGroup filed a declaratory judgment action in the Northern District

10  of California to resolve OptumInsight's infringement claims.  (*Cave Consulting Group, Inc. v.*

11  *OptumInsight, Inc*., 5:11-cv-00469-EJD)

12      105.    On August 31, 2011, OptumInsight filed counterclaims against CCGroup that

13  affirmatively accused CCGroup of infringing the patents it had earlier asserted in its Minnesota

14  complaint and named one new Dang patent that it had since obtained from the USPTO.

15      106.    For the next three years, CCGroup defended against OptumInsight's accusations of

16  infringement of the Dang and Seare patents.  The litigation required CCGroup to undertake a

17  costly claim construction, extensive fact discovery, and an in-depth review of the asserted patents

18  and prior art.

19      107.    During the litigation, OptumInsight continued its pattern of presenting arguments

20  and facts in litigation that directly contradicted those offered to the USPTO.

21      108.    For example, during claim construction, OptumInsight asserted that the invention

22  claimed in the Dang patents did not require "shifting" or "resetting" functionality:

> Cave attempts to justify its proposed construction through the premise "that
> resetting and shifting were necessary components of a dynamic time window."
> Cave Brief at 22.  The evidence does not support this position.  To the contrary,
> the intrinsic record, including the evidence cited by Cave, demonstrates that
> "resetting" and "shifting," while certainly elements of an embodiment of Dang's
> invention, are not "necessary components of a dynamic time window."

23

24

25

26

27      109.    OptumInsight made these arguments in claim construction despite the fact that

28  Dang had earlier submitted a sworn affidavit to the USPTO in which he adopted the exact

1   opposite position while attempting to distinguish his claimed invention from the methodology

2   taught and offered for sale in the Aetna RFP Response:

3       Symmetry could not have delivered a product to Aetna because the concept of
        dynamic windows, and its use to accomplish shifting of episodes based upon
4       complications or comorbidities, was not made until August, 1994 . . . I did not
        believe that the response to the RFP was an offer-for-sale because the RFP
5       Response described a developmental version of the ETG Program that did not
        include my August 1994 concepts of episodes with dynamic windows for shifting.
6

7       110.   These and other contradictory positions taken by OptumInsight further evidence

8   the vexatious and objectively baseless nature of its patent infringement litigation against

9   CCGroup.

10      111.   Two years into the litigation, over objection and after extensive meet and confer

11  efforts by CCGroup, OptumInsight responded to a series of CCGroup's discovery requests by

12  producing over 25,000 pages of confidential documents from its prior litigations involving the

13  Dang and Seare patent portfolios.

14      112.   After conducting an exhaustive review of those materials, CCGroup's counsel first

15  uncovered the documents, sworn testimony and other evidence that OptumInsight and its

16  predecessor, Symmetry, had been hiding from the USPTO for well over a decade of prosecuting

17  the Dang and Seare patents.

18      113.   The documents that CCGroup uncovered made plain that OptumInsight had

19  obtained its Dang and Seare patents through the pattern of fraudulent misconduct before the

20  USPTO discussed above.

21      114.   On May 22, 2013, CCGroup filed a Second Amended Complaint to add

22  allegations that OptumInsight had obtained its patents through inequitable conduct and that the

23  patents were invalid and unenforceable.

24      115.   Rather than withdraw its infringement allegations in light of the evidence

25  CCGroup had uncovered—information that had been produced from OptumInsight's own files—

26  OptumInsight continued to press its claims that CCGroup infringed the Dang and Seare patents.

27  For the next eleven months, OptumInsight forced CCGroup to continue to litigate its defense

28  against the Dang and Seare patents.

116.    Almost a year later, on April 24, 2014, having forced CCGroup to incur significant and unnecessary additional litigation costs, OptumInsight finally dismissed the entire Dang patent family from the lawsuit.

117.    Although OptumInsight withdrew the Dang patents from suit, it continued to press its claim that CCGroup infringed the two Seare patents.

118.    On the eve of trial, OptumInsight withdrew yet another of its patents from suit—this time the '252 Patent, one of the two asserted Seare patents.

119.    OptumInsight kept its remaining Seare patent in suit and ultimately forced CCGroup to defend itself against accusations of infringement of that patent at trial at great expense to CCGroup.

120.    Through this one remaining claim, OptumInsight asserted infringement based on theories, claim constructions and arguments that directly contradicted representations it had earlier made to the USPTO during patent prosecution.

121.    Notwithstanding OptumInsight's litigation tactics, the jury ultimately returned a verdict in CCGroup's favor on infringement of the '079 Seare patent.

122.    By that point, CCGroup had incurred significant legal fees and expenses in defending against OptumInsight's accusations of infringement of the Dang and Seare patents as well as harm to its reputation and loss of business.

## IV.    OPTUM'S PREDATORY AND ANTICOMPETITIVE CONDUCT HAS INJURED CCGROUP AND COMPETITION

123.    Acquiring the Dang and Seare patent portfolios through fraud on the USPTO provided OptumInsight with an unfair and unlawful competitive advantage in the Grouper Software Market.

124.    OptumInsight's fraud on the USPTO, and its resulting possession and baseless assertion of the Dang and Seare patent families, has enabled OptumInsight to acquire and maintain monopoly power or, in the alternative, created a dangerous probability of OptumInsight obtaining monopoly power, in the Grouper Software Market.

125.    This unlawful conduct has injured CCGroup and competition in this market.

-17-

126.     CCGroup has made substantial investments to develop its Cave Grouper software, which began competing directly with Optunsight's ETG Grouper at least as early as 2005.

127.     Through its unlawful attempts to enforce its fraudulently-obtained patents, OptumInsight forced CCGroup to incur litigation expenses to defend against baseless claims alleging infringement of the Dang and Seare patents.

128.     By asserting the fraudulently obtained Dang and Seare patents and pursuing these sham litigation tactics, OptumInsight has sought to force CCGroup and other competitors to exit the Grouper Software Market.

129.     OptumInsight's assertion of its fraudulently-obtained patent monopoly, and its public and private claims regarding the strength and breadth of its patent portfolio, have also harmed CCGroup and other competitors of OptumInsight by deterring customers from purchasing episode grouper software from competitors, like CCGroup, that do not have a license to OptumInsight's patent portfolio.  This deterrent effect has enabled OptumInsight to further bolster its position in the marketplace by coercing customers into licensing OptumInsight's ETG Grouper and related products and services, including downstream analytical tools and consulting services, from OptumInsight or its licensed resellers rather than from CCGroup or other competitors.

130.     OptumInsight has also asserted infringement of the unenforceable Dang and Seare patent portfolio to force competitors, including Truven—the third competitor in the Grouper Software Market—to license those patents.

131.     OptumInsight's campaign of sham legal action against CCGroup and others has saddled CCGroup and other competitors with debilitating legal fees and fostered customer apprehension, making it more difficult for those competitors to compete against OptumInsight.

132.     The foregoing and other anticompetitive effects from OptumInsight's unlawful conduct have harmed and will continue to harm competition at least in the Grouper Software Market.

Case No.                                                                                                    COMPLAINT

## V.   OPTUM'S FRAUDLENT CONCEALMENT OF ITS ANTICOMPETITIVE ACTS

133.   The misrepresentations and omissions set forth above evidence a pattern of concealment that was effective in keeping the public from learning of OptumInsight's anticompetitive and fraudulent activities.

134.   OptumInsight's fraudulent activities remained secret until OptumInsight was forced to produce its confidential prior litigation materials in response to discovery requests served by CCGroup in the regular course of fact discovery in the patent infringement lawsuit by OptumInsight that CCGroup was forced to defend.

135.   Over objections, in response to document requests served by CCGroup, on March 8, 2013 and July 30, 2013, OptumInsight produced large volumes of confidential materials from its prior litigations involving the Dang and Seare patent portfolios.

136.   CCGroup's counsel conducted a detailed analysis of these voluminous materials and, for the first time, discovered that OptumInsight had acquired its patents through fraud on the USPTO.

137.   These discoveries came from interrogatory responses, sworn deposition testimony, sealed briefings, source code and other documents—buried within OptumInsight's voluminous production—that evidenced Dang's conception in September of 1993, not August 1994 as OptumInsight had repeatedly represented publicly to the USPTO.

138.   CCGroup's lack of awareness of OptumInsight's fraudulent activities was not the result of any lack of diligence by CCGroup.  To the contrary, CCGroup's review of OptumInsight's extensive document production uncovered OptumInsight's fraudulent behavior.

139.   Until OptumInsight produced its confidential litigation materials in 2013, CCGroup had no way of knowing, or learning through the exercise of due diligence, that OptumInsight had engaged in anticompetitive conduct through its enforcement of a fraudulently obtained patent portfolio.  Moreover, none of the public information reasonably available to CCGroup, including the materials OptumInsight filed publicly with the USPTO, reflected the

1   September 1993 conception date later uncovered in the confidential materials OptumInsight

2   produced to CCGroup.

3      140.   In further efforts to conceal its fraud, when OptumInsight eventually produced its

4   prior litigation materials from the Symmetry and MedStat litigations, Optum continued its efforts

5   to keep these documents secret by designating those materials as confidential, attorneys'-eyes-

6   only materials under the Court's protective order.  These documents and testimony remain

7   confidential to this day.  CCGroup is able to acknowledge their existence in this Complaint

8   because the same allegations appear publicly in CCGroup's Second Amended Complaint filed in

9   the prior patent infringement litigation.

10      141.   Based on the foregoing, OptumInsight fraudulently concealed its anticompetitive

11   conduct from CCGroup until at least July of 2013 and continues to conceal that conduct from the

12   USPTO and the general public today.

13      **COUNT ONE**

14

15   ***Walker Process*:**
**Monopolization and Attempted Monopolization in Violation of**
**§ 2 of the Sherman Act, 35 U.S.C. § 2**

16

17      142.   CCGroup incorporates by reference the other paragraphs of this Complaint.

18      143.   OptumInsight has monopolized the Grouper Software Market, a nationwide

19   market in which OptumInsight is actively engaged in interstate commerce.

20      144.   By fraudulent misrepresentations and omissions to the USPTO in connection with

21   the prosecution of the Dang and Seare patents, and its efforts to enforce those fraudulently-

22   obtained patents, OptumInsight obtained and/or maintained its monopoly of the Grouper Software

23   Market in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

24      145.   In the alternative, OptumInsight has attempted to monopolize the Grouper

25   Software Market with the specific intent to do so through its fraudulent misrepresentations and

26   omissions to the USPTO in connection with the prosecution of the Dang and Seare patents, and

27   its efforts to enforce those fraudulently-obtained patents, creating a dangerous probability that

28   OptumInsight will obtain a monopoly in the market, in violation of Section 2 of the Sherman Act.

146.     As a direct and proximate result of OptumInsight's unlawful conduct, competition in the Grouper Software Market has been severely harmed through price control, less innovation, lower quality, and fewer options for customers.

147.     As a direct and proximate result of OptumInsight's unlawful conduct, CCGroup has been harmed in an amount to be established at trial.  CCGroup's damages include the attorneys' fees and costs it incurred in defending against OptumInsight's baseless claims for infringement of the Dang and Seare patents, as well as the anticompetitive harm it has suffered as a result of OptumInsight's unlawful acquisition and maintenance (or attempted acquisition and maintenance) of a monopoly in the Grouper Software Market, including loss of past and future profits and loss of past and future customers and customer goodwill.

148.     OptumInsight's unlawful conduct will continue unless enjoined, resulting in irreparable injury to CCGroup for which it has no adequate remedy at law.

### COUNT TWO

***Handgards*:**
**Monopolization and Attempted Monopolization in Violation of**
**§ 2 of the Sherman Act, 35 U.S.C. § 2**

149.     CCGroup incorporates by reference the other paragraphs of this Complaint.

150.     OptumInsight has monopolized the Grouper Software Market, a nationwide market in which OptumInsight is actively engaged in interstate commerce.

151.     OptumInsight obtained and maintained this monopoly by sham legal actions asserting infringement of the Dang and Seare patents, knowing those patents to be invalid, against CCGroup and others, in violation of Section 2 of the Sherman Act.

152.     In the alternative, OptumInsight has attempted to monopolize the Grouper Software Market with the specific intent to do so through sham legal actions asserting infringement of the Dang and Seare patent portfolios against CCGroup and others, creating a dangerous probability that OptumInsight will obtain a monopoly in the market, in violation of Section 2 of the Sherman Act.

153.     As a direct and proximate result of OptumInsight's unlawful conduct, competition in the Grouper Software Market has been severely harmed through price control, less innovation, lower quality, and fewer options for customers.

154.     As a direct and proximate result of OptumInsight's unlawful conduct, CCGroup has been harmed in an amount to be established at trial.  CCGroup's damages include the attorneys' fees and costs it incurred in defending against OptumInsight's baseless claims for infringement of the Dang and Seare patents, as well as the anticompetitive harm it has suffered as a result of OptumInsight's unlawful acquisition and maintenance (or attempted acquisition and maintenance) of a monopoly in the Grouper Software Market, including loss of past and future profits and loss of past and future customers and customer goodwill.

155.     OptumInsight's unlawful conduct will continue unless enjoined, resulting in irreparable injury to CCGroup for which it has no adequate remedy at law.

## COUNT THREE

**False Advertising:**
**Violations of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)**

156.     CCGroup incorporates by reference the other paragraphs of this Complaint.

157.     OptumInsight made false or misleading statements of fact in the marketplace, to customers and potential customers of OptumInsight and CCGroup, regarding the strength and breadth of the patent protection OptumInsight enjoys for its episode grouper software.

158.     These false or misleading statements actually deceived, and/or were likely to deceive, a substantial segment of those customers and potential customers into believing that the Dang and Seare patents were enforceable and that they preclude competitors from legally offering competing episode grouper software.

159.     OptumInsight's false or misleading statements were material in that they were likely to influence these customers and potential customers to do business with OptumInsight, rather than CCGroup or another competitor of OptumInsight.

160.     OptumInsight caused these false or misleading statements to enter interstate commerce.

161.    OptumInsight's false or misleading statements were likely to cause and did cause injury to CCGroup, at least through the diversion of sales of episode grouper software from CCGroup to OptumInsight and/or through the negative impact on the goodwill associated with the Cave Grouper and CCGroup generally.

## COUNT FOUR

### Malicious Prosecution

162.    CCGroup incorporates by reference the other paragraphs of this Complaint.

163.    OptumInsight initiated and continued to prosecute a civil lawsuit against CCGroup.   That lawsuit was based on allegations that CCGroup infringed eight patents from OptumInsight's Dang and Seare patent families.

164.    During the course of that litigation, OptumInsight voluntarily dismissed all six of the Dang patents from suit.  OptumInisght also voluntarily dismissed from suit all but one claim from the Seare patent family.  The remaining claim was tried to a jury, which found in CCGroup's favor on non-infringement.

165.    Each of the claims for patent infringement originally brought by OptumInsight against CCGroup was resolved in CCGroup's favor.

166.    The patents underlying OptumInsight's claims were invalid and unenforceable.

167.    OptumInsight knew or had reason to know that the patents at issue in the patent infringement litigation were invalid and unenforceable.

168.    OptumInsight acted without probable cause in initiating and/or continuing its claims for patent infringement against CCGroup.

169.    On information and belief, OptumInsight commenced and continued to prosecute the patent infringement litigation for the purpose of forcing a settlement, obtaining a verdict, or for another purpose which had no relation to the merits of their claims.  In commencing and prosecuting the patent infringement litigation, OptumInsight acted with malice.

Case No.                                                                          COMPLAINT

170.    The malicious actions of OptumInsight forced CCGroup to defend meritless claims, and caused CCGroup to suffer injury, damage, loss, and harm in an amount to be proven at trial or otherwise.

### Prayer for Relief

On motion or after a trial by jury, CCGroup requests that the Court grant the following relief:

1.  Enter judgment in favor of CCGroup declaring that OptumInsight has attempted to monopolize and has monopolized the grouper software market in violation of Section 2 of the Sherman act, 15 U.S.C. § 2.

2.  Permanently enjoin OptumInsight, its respective officers, agents, servants, directors, and employees, and all persons in active concert or participation with each, from monopolizing and attempting to monopolize the relevant markets under Section 16 of the Clayton Act, 15 U.S.C. § 26;

3.  Permanently enjoin OptumInsight from enforcing or attempting to enforce the Dang and Seare patent portfolios;

4.  Award CCGroup actual and compensatory damages, including but not limited to, lost profits and attorneys' fees and costs, trebled as provided by law, plus interest;

5.  Award CCGroup punitive and exemplary damages as the law shall permit or the jury shall find, plus interest;

6.  Award CCGroup its attorneys' fees and costs incurred in this action, with interest; and

7.  Award CCGroup such other and further relief as the Court finds just and proper.

### JURY DEMAND

CCGroup asserts its right to, and demands, a trial by jury pursuant to Fed. R. Civ. P. 38.

Case No.                                                                                                    COMPLAINT

1    DATED:  July 24, 2015                         PAUL HASTINGS LLP
                                                   Holly A. House
2                                                  Sophie J. Sung

3

4
                                                   By:_____/s/ Holly A. House_____
5                                                             Holly A. House

6                                                  Richard L. Brophy (*pro hac vice* pending)
                                                   David W. Harlan (*pro hac vice* pending)
7                                                  Charles W. Steese (*pro hac vice* pending)
                                                   Mark A. Thomas (*pro hac vice* pending)
8                                                  Zachary C. Howenstine  (*pro hac vice* pending)
                                                   ARMSTRONG TEASDALE LLP
9                                                  7700 Forsyth Blvd, Suite 1800
                                                   St. Louis, MO  63105
10                                                 Telephone:  (314) 621-5070
                                                   Facsimile:  (314) 621-5065
11

12                                                 Attorneys for Plaintiff
                                                   CAVE CONSULTING GROUP, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.                                                                      COMPLAINT