UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAVE CONSULTING GROUP, INC., <br>        Plaintiff, <br><br>    v. <br><br> OPTUMINSIGHT, INC., <br>        Defendant. | Case No.  15-cv-03424-JCS <br><br> **ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** <br> Re: Dkt. No. 56 |

## I.      INTRODUCTION

Plaintiff Cave Consulting Group, Inc. ("CCGroup") alleges that Defendant OptumInsight, Inc. wrongfully and in bad faith sought to enforce patents that it obtained through fraud on the United States Patent and Trademark Office ("USPTO").  CCGroup's First Amended Complaint asserts antitrust claims under the *Walker Process* and *Handgards* doctrines, a Lanham Act claim for false or misleading representations of patent status, and a malicious prosecution claim under California common law.  OptumInsight moves to dismiss.  The Court held a hearing on January 8, 2016, and thereafter took supplemental briefing on preclusion issues.  The Court agrees with OptumInsight that CCGroup's allegations do not satisfy the pleading standard for inequitable conduct claims set forth in *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009), among other deficiencies discussed below.  OptumInsight's Motion is therefore GRANTED, and the First Amended Complaint is DISMISSED with leave to amend.  CCGroup may file a Second Amended Complaint no later than May 13, 2016.[1]

## II.      ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

CCGroup's allegations are generally taken as true at the pleading stage.  *Parks Sch. of Bus.*

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court <br> Northern District of California

*v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  This section summarizes the allegations but should not be construed as resolving any factual issues that might be disputed.

Both parties in this case are in the business of providing software, known as "episode of care groupers" or simply "groupers," used to group medical claims data based on discrete periods of treatment in order to better evaluate the quality and efficiency of medical care.  1st Am. Compl. ("FAC," dkt. 39) ¶¶ 21−28.  From 2005 through 2014, only three groupers existed in the national market, including OptumInsight's "ETG" product, CCGroup's "Cave Grouper," and a product sold by non-party Truven Health Analytics, Inc., formerly known as MedStat Group, Inc. ("MedStat").  *Id.* ¶ 28.  OptumInsight controlled eighty-five to ninety percent of the market during that period.  *Id.* ¶ 30.  OptumInsight (including its predecessors Ingenix, Inc. and Symmetry Health Data Systems Inc.) obtained its dominant market share through actual and threatened enforcement of a portfolio of patents, including two families: the "Dang Patents" and the "Seare Patents."  *Id.* ¶¶ 31−33.[2]

### A.    Symmetry and the '897 Patent

Dennis Dang, among others, formed Symmetry Health Data Systems Inc. ("Symmetry") in 1993, and "[b]y early 1994 . . . had developed a software grouping methodology, which Symmetry began advertising for sale under the trade name 'Episode Treatment Groups' or 'ETGs.'"  *Id.* ¶¶ 43−44.  On June 12, 1994, Symmetry responded to a request for proposal from Aetna, a large insurance company, by offering to license the ETG software to Aetna and providing a description of the software, sample reports generated by the software, and pricing information.  *Id.* ¶¶ 45−46.  Symmetry's response constituted an offer of sale describing the invention, and therefore triggered a one-year period to file a patent application under the then-existing version of 35 U.S.C. § 102(b).  *Id.* ¶ 47.[3]

---

[2] The Dang Patents include U.S. Patent Nos. 5,835,897; 6,370,511; 7,620,560; 7,725,333; 7,774,216; 7,979,290; 8,121,869; 8,296,165; and 8,700,433.  The Seare Patents include U.S. Patent Nos. 7,222,079 and 7,774,252.  This Order refers to these patents using the last three digits of each number (e.g., the '897 patent).

[3] At the time, that statute read as follows: "A person shall be entitled to a patent unless-- . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."  35 U.S.C. § 102 (prior to amendment in 2015).

United States District Court
Northern District of California

More than one year after responding to Aetna's RFP, Symmetry filed a patent application for its grouping methodology. *Id.* ¶ 48. "When [Symmetry's patent counsel David Rosenbaum] and Dang filed the patent application, they deliberately withheld from the USPTO all of the information in their possession regarding Symmetry's early efforts to commercialize Dang's invention, including Dang's offer to sell his inventive methodology to Aetna." *Id.* ¶ 49. In response to that application, the USPTO issued the '897 patent in 1998. *Id.* ¶ 51. CCGroup asserts that disclosure of the offer to Aetna "would have rendered the claims of the '897 patent unpatentable," because those claims "read on Dang's grouping methodology and, by extension, the ETG grouping software Symmetry offered for sale to Aetna." *Id.* ¶¶ 50−51.

### B.   Symmetry-MedStat Litigation

Immediately after the '897 patent was issued, Symmetry sued MedStat for infringing that patent. *Id.* ¶ 47(2)[4] (citing *Symmetry Health Data Sys., Inc. v. The MedStat Grp. Inc.*, No. 2:98-CV-02032-EHC (D. Ariz.)). "Rosenbaum, Symmetry's patent prosecution counsel, served as litigation counsel in the MedStat litigation." *Id.* Symmetry stated in sworn interrogatory responses that Dang conceived of the invention "at least as early September 1993" and that, at that time, it was "sufficiently complete to enable one of ordinary skill in the art to reduce the claimed invention to practice." *Id.* ¶¶ 48(2)−49(2). Dang confirmed that position in sworn testimony in both the MedStat litigation and later litigation against Cave Group. *Id.* ¶ 51(2). According to Cave Group, Symmetry took the position that the invention occurred in 1993 "in order to predate prior art cited by MedStat," specifically a patent issued from a 1994 application by Jerry Seale. *Id.* ¶ 52(2). The MedStat litigation ultimately settled in 2000. *See id.* ¶ 56.

### C.   Reexamination of the '897 Patent

Earlier in 2000, before the MedStat case settled, Symmetry initiated a non-adversarial USPTO reexamination of the '897 patent and disclosed the sales offer to Aetna, in an attempt to cure the previous non-disclosure in its initial application. *Id.* ¶¶ 56−58. To avoid invalidating the

---

[4] The First Amended Complaint includes two sets of paragraphs numbered 47 through 53. *See* FAC at 10−12. This Order, like OptumInsight's Motion, indicates citations to the second set of paragraphs with "(2)" after the paragraph number. *See* Mot. at 5 n.2.

United States District Court
Northern District of California

patent under § 102(b), Dang, Rosenbaum, and others "worked together to contrive a story that would deceive the USPTO regarding the importance of the Aetna offer and the conception date for Dang's invention," with that plot being reflected in their contemporary communications. *Id.* ¶ 68. They "manufactured a later conception date of August 1994"—shortly after the June 1994 RFP response—"for purposes of their proceedings before the USPTO." *Id.* ¶ 61. Rosenbaum, Dang, and another Symmetry employee "executed sworn declarations stating that Dang's invention was not fully conceived and ready for patenting until August 1994," which CCGroup alleges is "false," and Rosenbaum submitted the declarations to the USPTO. *Id.* ¶¶ 62−64. Symmetry withheld from the USPTO the litigation materials in which Symmetry had asserted a 1993 conception date, which CCGroup alleges "were material to the patentability of the '897 patent and all of the other patents that ultimately issued from the original application for the '897 patent." *Id.* ¶ 67. By representing that the invention was conceived in 1994, the declarants "intentionally deceived the USPTO," and Symmetry was aware of their "false claims" and "deliberate non-disclosure." *Id.* ¶ 69, 72.

### D.   Ingenix-Symmetry Litigation

"In April of 2001, while the reexamination of the '897 patent was pending, OptumInsight (then known as Ingenix) sued Symmetry for infringement of Seare's U.S. Patent No. 6,223,164." *Id.* ¶ 73 (citing *Ingenix, Inc. v. Symmetry Health Data Systems, Inc.*, No. 0:01-cv-00704 (D. Minn.)). Rosenbaum again assisted as Symmetry's litigation counsel. *Id.* ¶ 74. OptumInsight's counsel included Peter Lancaster[5] of the Dorsey & Whitney firm, and Kevin McMahon and Steven Glazer of the Weil Gotshal firm. *Id.* ¶¶ 75–76.

Symmetry counterclaimed that Seare derived his invention from Dang's work. *Id.* ¶ 77. The Seare '164 patent's filing date was June 23, 1994, and Symmetry argued that Dang conceived the '897 patent in September of 1993—contradicting the position Symmetry took in the reexamination and reverting to the date it asserted in its litigation against MedStat. *Id.* ¶¶ 79–80. Symmetry disclosed dated source code to support the 1993 date, and asserted in a brief opposing

---

[5] Lancaster also represents OptumInsight in the present action, in which he is OptumInsight's lead counsel. *See* Reply (dkt. 65) at 10.

summary judgment that "Mr. Dang's undisputed testimony is that he first conceived of the invention, which is now known as ETGs, in the summer of 1993." *Id.* ¶ 82 (quoting the brief) (emphasis omitted).  Lancaster, McMahon, and Glazer received or knew of the source code and the brief, *id.* ¶ 83, and "were also provided with the interrogatory responses and other materials from the earlier MedStat litigation that identified September 1993 as the actual conception date for Dang's invention." *Id.* ¶ 90.

Separate litigation between OptumInsight and Symmetry also occurred in the District of Arizona.  *See id.* ¶ 93 (citing *Symmetry Health Data Systems, Inc. v. Ingenix, Inc.*, No. CIV 00-1411 (D. Ariz.)).  Symmetry sued OptumInsight for infringing the '897 patent, and OptumInsight counterclaimed that the '897 patent was unenforceable on account of inequitable conduct.  *Id.*

**E.    Interference Proceeding, Acquisition of Symmetry, and Subsequent Representations Regarding the Patents**

In addition to its infringement lawsuit, OptumInsight also provoked a USPTO interference proceeding between the '897 Dang patent and the then-pending application for what became the '079 Seare patent, with OptumInsight asserting that Seare "first invented the episode grouping methodology claimed in those applications." *See id.* ¶ 92.  OptumInsight's application for the '079 patent included, verbatim, the first claim of the '897 patent.  *Id.* ¶ 94.  "Through its attorneys McMahon and Glazer, OptumInsight represented to the USPTO that the ['897] Dang patent and the Seare application [resulting in the '079 patent] are directed to the same invention." *Id.*

In May of 2003, OptumInsight purchased all the outstanding stock of Symmetry, and thus acquired Symmetry's intellectual property.  *Id.* ¶ 95.  To resolve the interference, OptumInsight decided unilaterally that the Seare application for the '079 patent had priority over the '879 patent—now also owned by OptumInsight—without the issue being decided by a finder of fact.  *Id.* ¶¶ 96–97.  Later, in 2007, Symmetry merged into OptumInsight.  *Id.* ¶ 100.

According to CCGroup, "Symmetry's corporate knowledge, including that of its agents Rosenbaum, Dang, and [co-founder Mitchell] Portnoy, was imputed to OptumInsight as the purchaser of all of Symmetry's outstanding stock." *Id.*  Based on that knowledge, and OptumInsight's own knowledge obtained during litigation, CCGroup alleges that OptumInsight's

United States District Court
Northern District of California

1   and its agents' representations to the USPTO during the interference were knowingly false.  *Id.*

2   ¶¶ 99–105.

3          OptumInsight on multiple later occasions acknowledged to the public and a potential client

4   "that Dang's ETG software was introduced to the market" and/or conceived in 1993, which,

5   CCGroup alleges, contradicts the position OptumInsight took in the interference.  *Id.* ¶ 98.

6   Neither OptumInsight nor Symmetry has ever disclosed the 1993 conception date to the USPTO,

7   including during prosecution of at least eight additional patents based on Dang's original

8   application.  *Id.* ¶¶ 107–11.  CCGroup alleges that "[b]ecause all of the Dang patents rely on

9   Dang's original application, and because the claims are all related, each of them is invalid and

10  unenforceable in light of the material misrepresentations and omissions before the USPTO

11  regarding Dang's conception date and related June 12, 1994 offer to sell the ETG software to

12  Aetna." *Id.* ¶ 113.  CCGroup also alleges that OptumInsight and its attorneys committed fraud on

13  the USPTO by prosecuting the Seare patents, because they knew that Dang invented his

14  methodology and software earlier, and that the USPTO would not have issued the Seare patents if

15  OptumInsight had disclosed that prior art.  *See id.* ¶¶ 114–22.

16         **F.     Minnesota OptumInsight-CCGroup Litigation**

17         On January 11, 2011, OptumInsight filed a complaint against CCGroup in the District of

18  Minnesota for infringement of two Seare patents and five Dang patents.  *Id.* ¶ 123 (citing *Ingenix,*

19  *Inc. v. Cave Consulting Grp., LLC*, No. 11-cv-00077-DWF-FLN (D. Minn.)).  CCGroup alleges

20  that OptumInsight and its attorneys, including Lancaster and Devan Padmanabhan of Dorsey &

21  Whitney, knew that both patent families were invalid and unenforceable due to inequitable

22  conduct.  *Id.* ¶¶ 125–30.

23         OptumInsight did not serve the complaint on CCGroup, and ultimately dismissed the

24  Minnesota lawsuit without prejudice on June 20, 2011.  *Id.* ¶ 131.  CCGroup nevertheless

25  "received numerous inquiries from customers and potential customers regarding OptumInsight's

26  allegations of infringement."  *Id.* ¶ 134.  CCGroup asked OptumInsight to dismiss its claims with

27  prejudice "to ensure that OptumInsight's public allegations . . . would not tarnish CCGroup's

28  reputation and ability to compete in the marketplace, but OptumInsight refused.  *Id.* ¶¶ 132–33.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div style="margin-left:2em">

G.   **Declaratory Judgment Action**

"To clear the pall that OptumInsight's allegations had cast over CCGroup's business, on July 11, 2011, CCGroup filed a declaratory judgment action in the Northern District of California to resolve OptumInsight's infringement claims." *Id.* ¶ 135 (citing *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 5:11-cv-00469-EJD (N.D. Cal.) (hereinafter, "*Cave I*")).[6] OptumInsight, again represented by Dorsey & Whitney attorneys including Lancaster and Padmanabhan, filed counterclaims asserting that CCGroup infringed the patents at issue in the Minnesota complaint, as well as an additional Dang patent issued in the intervening period. *Id.* ¶¶ 136–37. Based on information obtained from earlier litigation, "Padmanabhan, Lancaster, OptumInsight, and Dorsey & Whitney knew before those counterclaims were filed that the Dang and Seare patents are invalid and unenforceable." *Id.* ¶ 138.

The *Cave I* litigation continued for three years, and required CCGroup "to undertake a costly claim construction, extensive fact discovery, and an in-depth review of the asserted patents and prior art." *Id.* ¶ 140. "Two years into the litigation . . . OptumInsight . . . produc[ed] over 25,000 pages of confidential documents from its prior litigations involving the Dang and Seare patent portfolios." *Id.* ¶ 146. Those documents form the basis for CCGroup's allegations summarized above regarding OptumInsight's alleged inequitable conduct, and CCGroup filed a second amended complaint in *Cave I* asserting that the Dang patents were invalid and unenforceable due to that conduct. *See id.* ¶¶ 147–50. Nearly one year later, OptumInsight dismissed its counterclaims based on the Dang patent family, although it continued to assert infringement of the Seare patents. *Id.* ¶¶ 152–53.

Judge Davila granted partial summary judgment for OptumInsight, holding that Symmetry's response to Aetna's RFP in 1994 was not prior invalidating art as to the Seare patents because it was not made public. *Cave I*, 2015 WL 740379, at *13 (N.D. Cal. Feb. 20, 2015). He declined to grant summary judgment for either party on other issues relating to the validity of the

</div>

---

[6] The Court takes judicial notice that Cave Consulting initially filed a claim in January of 2011 alleging that OptumInsight infringed a patent owned Cave Consulting, and filed an amended complaint in July adding claims for declaratory judgment of non-infringement and invalidity of OptumInsight's patents. *See Cave I* dkts. 1 (Complaint), 23 (First Amended Complaint).

United States District Court
Northern District of California

1    Seare patents because material facts remained disputed.  *Id.* at *12–14.  There is no indication that

2    CCGroup made any argument in *Cave I* regarding inequitable conduct related to the Seare patents.

3           OptumInsight withdrew the '252 Seare patent "[o]n the eve of trial."  FAC ¶ 154.  At trial,

4    a jury determined that CCGroup did not infringe the remaining '079 Seare patent.  *Id.* ¶ 157.  Post-

5    trial motions remain pending as of the date of this Order.  *See Cave I* dkts. 379, 383.

6          **H.**    **Alleged Damages and Claims**

7          CCGroup alleges that "OptumInsight's fraud on the USPTO, and its resulting possession

8    and baseless assertion of the Dang and Seare patent families, has enabled OptumInsight to acquire

9    and maintain monopoly power or, in the alternative, created a dangerous probability of

10   OptumInsight obtaining monopoly power, in the Grouper Software Market."  FAC ¶ 160.  Since

11   CCGroup introduced its competing software in 2005, it has lost customers due to the perceived

12   strength of OptumInsight's patents, and has incurred litigation expenses as a result of

13   OptumInsight's efforts to enforce the patents through alleged sham litigation.  *See id.* ¶¶ 163, 165,

14   167.

15         The First Amended Complaint includes four claims.  First, under the doctrine of *Walker*

16   *Process Equipment Inc. v. Food Machinery and Chemical Corporation*, 382 U.S. 172 (1965),

17   CCGroup alleges that OptumInsight violated Section 2 of the Sherman Act by monopolizing or

18   attempting to monopolize the market for grouper software through fraud on the USPTO in

19   connection with prosecution of the Dang and Seare patents.  FAC ¶¶ 179–85.  Second, under the

20   doctrine of *Handgards v. Ethicon*, 601 F.2d 986 (9th Cir. 1979), CCGroup alleges that

21   OptumInsight monopolized or attempted to monopolize the market through bad faith use of sham

22   litigation to enforce Dang and Seare patents that OptumInsight knew were invalid or

23   unenforceable.  FAC ¶¶ 186–92.  Third, CCGroup asserts that OptumInsight violated the Lanham

24   Act, 15 U.S.C. § 1125(a)(1)(B), through false or misleading statements that its ETG software was

25   "patented" or covered by specific Dang patents, despite OptumInsight's alleged knowledge that

26   the patents were not enforceable.  FAC ¶¶ 193–200.  Finally, CCGroup brings a malicious

27   prosecution claim under California law, asserting that OptumInsight acted without probable cause

28

United States District Court
Northern District of California

8

1    in bringing infringement counterclaims in the *Cave I* action when it allegedly knew that the

2    patents at issue were invalid and unenforceable.  *Id.* ¶¶ 201–09.

3    **III.    ANALYSIS**

4         **A.    Legal Standard**

5         A complaint may be dismissed for failure to state a claim on which relief can be granted

6    under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss

7    under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp.*

8    *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage

9    is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading

10   which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim

11   showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

12        In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

13   takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

14   non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

15   Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

16   would support a valid theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

17   1990).  A complaint must "contain either direct or inferential allegations respecting all the material

18   elements necessary to sustain recovery under some viable legal theory."  *Bell Atl. Corp. v.*

19   *Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

20   1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

21   of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

22   (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked

23   assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

24   Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient

25   factual allegations to "allow[] the court to draw the reasonable inference that the defendant is

26   liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 570).

27        Rule 9(b) of the Federal Rules of Civil Procedure sets a heightened pleading standard for

28   claims based on fraud.  "In alleging fraud or mistake, a party must state with particularity the

United States District Court
Northern District of California

9

1    circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The Ninth Circuit has held

2    that in order to meet this standard, a "complaint must specify such facts as the times, dates, places,

3    benefits received, and other details of the alleged fraudulent activity." *Neubronner v. Milken*, 6

4    F.3d 666, 672 (9th Cir. 1993); *see also McMaster v. United States*, 731 F.3d 881, 897 (9th Cir.

5    2013).  The Federal Circuit has similarly held that "in pleading inequitable conduct in patent

6    cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the

7    material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart*

8    *Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009).  The heightened standard does not apply to

9    "[m]alice, intent, knowledge, and other conditions of a person's mind." Fed.R.Civ.P. 9(b).

**B.    Effect of Non-Invalidity Determination in *Cave I***

10

11    One preliminary issue is whether CCGroup is precluded from asserting invalidity of the

12    Seare patents based on its failure to successfully do so in the *Cave I* litigation.  OptumInsight

13    asserts that, in that litigation, "OptumInsight won the validity issue; Cave lost." Mot. at 27.

14    CCGroup responds that inequitable conduct as to the Seare patents "has never been litigated by the

15    parties." Opp'n at 29.

16    In its Motion and Reply, OptumInsight appears to make three distinct arguments: (1) that

17    the doctrine of claim preclusion applies to defenses that CCGroup raised or could have raised in

18    *Cave I*; (2) that the doctrine of issue preclusion applies to Judge Davila's determination that the

19    Aetna RFP response does not constitute invalidating prior art; and (3) that regardless of formal

20    preclusion doctrines, "[c]laims and issue on which OptumInsight *actually* achieved success cannot

21    possibly be claims as to which no 'reasonable litigant could realistically expect success.'" *See*

22    Reply at 14–17 (citation omitted); *see also* Mot. at 25–27.

23    Because OptumInsight's clearest articulation of its arguments was in its Reply, and the

24    parties' briefing of these issues was therefore not as thorough as it might have been, the Court

25    ordered the parties to file simultaneous supplemental briefs after the hearing to address questions

26    of preclusion in more detail.  OptumInsight's supplemental brief argues that: (1) "merger and

27    claim-splitting" doctrines, also known as claim preclusion, bar CCGroup's antitrust claims, Def.'s

28    Supp'l Br. (dkt. 73) at 4−9; (2) the doctrine of compulsory counterclaims bars the claims, *id.* at

United States District Court
Northern District of California

10

9−15; (3) issue preclusion applies, *id.* at 15−16; and (4) OptumInsight "need not prove claim or issue preclusion to establish that [CCGroup's] antitrust claims lack merit, because [CCGroup's] burden in this antitrust case is far heavier than the burden of showing that it was entitled to win in *Cave I*," *id.* at 16. CCGroup contends that issue preclusion does not apply because: (1) Judge Davila's non-invalidity ruling was not necessary to the ultimate judgment of non-infringement, Pl.'s Supp'l Br. (dkt. 74) at 5−7; (2) the inquiry in *Cave I* concerned a different issue with a higher burden of proof, *id.* at 7−11; (3) CCGroup neither had nor will have any practical opportunity for appellate review of Judge Davila's non-invalidity decision, *id.* at 11−12; and (4) giving preclusive effect to that decision would be inequitable because Judge Davila applied an incorrect legal standard, *id.* at 12−14. CCGroup also argues that claim preclusion does not apply because the Supreme Court and Ninth Circuit have held that antitrust claims are not compulsory counterclaims in infringement cases. *Id.* at 14−15 (citing *Mercoid v. Mid-Continent Inv. Co.*, 320 U.S. 661, 671 (1944); *Hydranautics v. FilmTec Corp.,* 70 F.3d 533, 536 (9th Cir. 1995)).

### 1. Claim Preclusion

"The general concept of claim preclusion [also known as res judicata] is that when a final judgment is rendered on the merits, another action may not be maintained between the parties on the same 'claim,' and defenses that were raised or could have been raised in that action are extinguished." *Hallco Mfg. Co., Inc. v. Foster*, 256 F.3d 1290, 1295 (Fed. Cir. 2001) (citing Restatement (Second) of Judgments §§ 18–19).[7] "Claim preclusion requires (1) an identity of parties or their privies, (2) a final[8] judgment on the merits of the first suit, and (3) the later claim to be based on the same set of transactional facts as the first claim such that the later claim should

---

[7] Where a "claim preclusion issue is particular to patent law, [courts] analyze it under applicable Federal Circuit law." *Hallco*, 256 F.3d at 1294.
[8] As to both claim preclusion and issue preclusion, "the law is well settled that the pendency of an appeal has no affect [sic] on the finality or binding effect of a trial court's holding." *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983) (citing *Deposit Bank v. Frankfort*, 191 U.S. 499 (1903); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4433 (1981)); *see also, e.g., Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1381 (Fed. Cir. 1999); *Cygnus Telecomm. Tech., LLC v. Am. Int'l Telephonics, LLC*, 569 F. Supp. 2d 1035, 1038 (N.D. Cal. 2008). The Court applies the same rule to the pending post-trial motions in *Cave I* and holds that the judgment in that case is sufficiently final for the purposes of either preclusion doctrine.

11

1    have been litigated in the prior case." *Bowers Inv. Co., LLC v. United States*, 695 F.3d 1380, 1384

2    (Fed. Cir. 2012).

3          This doctrine requires a close identity of *claims*.  The Federal Circuit has held, for

4    example, that where a prior judgment established "both that [a] patent was valid and that [a party]

5    infringed," claim preclusion does not bar an invalidity defense when the same party is later sued

6    for infringing the same patent with a different device unless the second allegedly infringing device

7    is "essentially the same" as the earlier device found to infringe.  *See Hallco*, 256 F.3d at 1295–96

8    (summarizing *Foster v. Hallco Mfg. Co.*, 947 F.2d 469 (Fed. Cir. 1991)).  Even if the invalidity

9    defense would rest on the same basic facts in the second case as in the first, the defense is not

10   precluded under this doctrine if the *claims* are not substantially the same.  "While defenses to a

11   'claim' are extinguished by application of the doctrine of claim preclusion, the facts related to the

12   defense do not in themselves constitute the transaction or 'claim.'"  *Foster*, 947 F.2d at 479.

13         While there is overlap on some issues, all of CCGroup's claims in this case—two antitrust

14   claims, a false advertising claim, and a malicious prosecution claim—rely on key alleged facts that

15   fall outside the scope of the claims in *Cave I*, such as OptumInsight's market dominance and its

16   alleged efforts to enforce and advertise its patents.  The cases cited in OptumInsight's Reply and

17   supplemental brief do not fit the facts of this case.  *See, e.g.*, *Cummins, Inc. v. TAS Distrib. Co.*,

18   *Inc.*, 700 F.3d 1329, 1336 (Fed. Cir. 2012) (applying principles of Illinois res judicata law not

19   applicable to the present case, which has no connection to Illinois); *Roche Palo Alto LLC v.*

20   *Apotex, Inc.*, 531 F.3d 1372, 1380 (Fed. Cir. 2008) (applying claim preclusion in a second suit

21   asserting infringement of the same patent by "essentially the same" product as in a previous

22   infringement suit); *Crystal Imp. Corp. v. AVID Identification Sys., Inc.*, 582 F. Supp. 2d 1166 (D.

23   Minn. 2008) (holding that claim preclusion barred the second of two antitrust actions, with no

24   suggestion that an earlier infringement action barred either of the antitrust actions).  The Court

25   concludes that claim preclusion does not apply here.

26                    **2.  Compulsory Counterclaims**

27         Although related to the doctrine of claim preclusion, OptumInsight distinctly raises for the

28   first time in its supplemental brief the argument that CCGroup's present claims were compulsory

United States District Court
Northern District of California

counterclaims in *Cave I.*  Def.'s Supp'l Br. at 9−15.  Generally speaking, a counterclaim is compulsory if it "(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction," subject to certain exceptions.  Fed. R. Civ. P. 13(a).  "A counterclaim which is compulsory but is not brought is thereafter barred."  *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974).  The issue is complicated by the Supreme Court's decision in *Mercoid v. Mid-Continent Investment Company*, 320 U.S. 661 (1944), which some courts (including the Ninth Circuit) have construed as holding that antitrust claims are not compulsory counterclaims in patent cases, while other courts have disagreed.

OptumInsight incorrectly asserts that "the Federal Circuit has noted, 'the majority of courts . . . have held that antitrust claims are compulsory counterclaims.'"  *Id.* at 9 (quoting *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1067 n.4 (Fed. Cir. 1998) (en banc)) (ellipsis in original).  OptumInsight is correct that the quoted language appears in the Federal Circuit's opinion, and OptumInsight accurately notes that that the Circuit quotes a district court decision for that language.  *See id.*  What OptumInsight omits, however, is that the language at issue appears in a parenthetical phrase in a "*compare . . . with*" citation string intended to illustrate a split of authority.  *See Nobelpharma*, 141 F.3d at 1067 n.4.  The Federal Circuit itself noted only that antitrust claims based on patent prosecution are "*typically* raised as a counterclaim," *id.* at 1067 (emphasis added)—but whether such counterclaims are compulsory was not before the court, and the footnote now quoted by OptumInsight references not only the Northern District of Illinois decision[9] that found treating antitrust counterclaims as compulsory to be the majority position, but also decisions of the Fifth and Ninth Circuits that reached the opposite result.  The Federal Circuit's footnote reads, in full, as follows:

> Compare *Tank Insulation Int'l, Inc. v. Insultherm, Inc.,* 104 F.3d 83, 88 & n. 5, 41 USPQ2d 1545, 1549 & n. 5 (5th Cir.), *cert. denied,* [522] U.S. [907], 118 S.Ct. 265, 139 L.Ed.2d 191 (1997), *and Hydranautics v. FilmTec Corp.,* 70 F.3d 533, 536–37, 36 USPQ2d 1773, 1775 (9th Cir.1995) ("A claim that patent infringement litigation violated an antitrust statute is a permissive, not a

---

[9] *USM Corp. v. SPS Techs., Inc.*, 102 F.R.D. 167, 169−70 (N.D. Ill. 1984).

mandatory, counterclaim in a patent infringement case, and is not barred in a subsequent suit by failure to raise it in the infringement suit." (citing *Mercoid Corp. v. Mid–Continent Inv. Co.,* 320 U.S. 661, 669–71, 64 S.Ct. 268, 273–74, 88 L.Ed. 376, 60 USPQ 21, 26–27 (1944))) *with Burlington Indus., Inc. v. Milliken & Co.,* 690 F.2d 380, 389, 217 USPQ 662, 668 (4th Cir.1982) (stating that *Mercoid* "has been read narrowly in this respect, and its continuing validity is open to serious question." (citing *United States v. Eastport S.S. Corp.,* 255 F.2d 795, 805 (2d Cir.1958); *Martino v. McDonald's Sys., Inc.,* 432 F.Supp. 499, 505 (N.D.Ill.1977), *aff'd,* 598 F.2d 1079 (7th Cir.1979))), *and USM Corp. v. SPS Techs., Inc.,* 102 F.R.D. 167, 170–71, 225 USPQ 715, 717 (N.D.Ill.1984) ("Notwithstanding *Mercoid,* **the majority of courts**, when faced with this issue, **have held that antitrust claims are compulsory counterclaims** under Rule 13(a) if the antitrust claim arises out of the same transaction or occurrence as the original claim. The Seventh Circuit has expressly refused to decide the issue." (citations omitted)).

*Nobelpharma*, 141 F.3d at 1067 n.4 (bold emphasis added to designate the portion quoted in OptumInsight's brief). It is not accurate to suggest that the Federal Circuit took a position one way or the other on whether OptumInsight's preferred treatment of these claims is the majority view.

The Federal Circuit has in fact suggested that whether a claim was a compulsory counterclaim in a previous action is an issue of regional circuit law. *Genentech, Inc. v. Regents of the Univ. of Cal.*, 143 F.3d 1446, 1456 (Fed. Cir. 1998) (applying Seventh Circuit law), *vacated on other grounds*, 527 U.S. 1031 (1991); *see also* Def.'s Supp'l Br. at 13 (discussing *Genentech*). Accordingly, Ninth Circuit precedent applies to the case at hand. The Ninth Circuit—as noted in the *Nobelpharma* footnote set forth above—has held that a "claim that patent infringement litigation violated an antitrust statute is a permissive, not a mandatory, counterclaim in a patent infringement case, and is not barred in a subsequent suit by failure to raise it in the infringement suit." *Hydranautics*, 70 F.3d at 536–37 (citing *Mercoid*, 320 U.S. at 671).

Although OptumInsight attempts to distinguish *Hydranautics* on its facts, Def.'s Supp'l Br. at 11, the rule in that case could not have been stated more clearly. *See also Destiny Tool v. SGS Tools Co.*, 344 F. App'x 320, 323 (9th Cir. 2009) ("The Fifth and Ninth Circuits have strictly followed *Mercoid* in refusing to hold *any antitrust claim* compulsory in the underlying patent infringement lawsuit." (emphasis added)). The only case that OptumInsight cites that was decided after *Hydranautics* within the Ninth Circuit was not a patent case, and held only that *Hydranautics*

should not be extended outside the realm of patent law.  *MGA Entm't, Inc. v. Mattel, Inc.*, No. SACV 11-01063 DOC (RNBx), 2012 WL 569389, at *17−18 (C.D. Cal. Feb. 21, 2012).  As this Court is bound by Ninth Circuit precedent on the issue,[10] the Court holds that CCGroup's antitrust claims were not compulsory counterclaims to OptumInsight's infringement claims in *Cave I*.

### 3.  Issue Preclusion

"The doctrine of issue preclusion prevents relitigation of all 'issues of fact or law that were actually litigated and *necessarily* decided' in a prior proceeding.'"  *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) (emphasis added; citation omitted); *see also* Reply at 16 (quoting *Robi*).  Or, as phrased in the Restatement of Judgment, the doctrine applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, *and the determination is essential to the judgment*."  Restatement (Second) of Judgments § 27 (emphasis added).

The judgment in *Cave I* reads as follows:

> The issues in this action having been tried and the jury having rendered a verdict in favor of Plaintiff and against Defendant (Docket Item No. 366);
>
> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of Plaintiff. The Clerk shall close this file.

*Cave I* dkt. 370 (April 6, 2015).  The jury's verdict form indicates that judgment was entered on the basis that OptumInsight infringed CCGroup's patent and CCGroup did not infringe OptumInsight's '079 patent.  *Cave I* dkt. 366 (April 3, 2015).

---

[10] OptumInsight has cited no authority for the proposition that the determination of compulsory counterclaims is a matter of uniform Federal Circuit law, nor any decision in which the Federal Circuit actually decided the significance of the Supreme Court's *Mercoid* decision.  OptumInsight suggests that the Ninth Circuit's approach in *Hydranautics* creates a special rule for patent cases, which would then bring the issue within the Federal Circuit's realm of authority.  That approach would not change the outcome.  If the question is one of Federal Circuit law, the Federal Circuit has not set forth a clear rule, and the Court finds the Ninth Circuit's interpretation of *Mercoid* persuasive absent more recent Supreme Court precedent altering the rule set forth in that case.  The Court acknowledges, however, that there is a split of authority on the issue.  *See* Def.'s Supp'l Br. at 13−14 (collecting cases from outside the Ninth Circuit holding that antitrust claims are or can be compulsory counterclaims in infringement actions).

United States District Court
Northern District of California

There is no question that at least one question of the Seare patents' validity—whether the Aetna RFP response constituted invalidating prior art—was "actually litigated and determined" in *Cave I* by OptumInsight's motion for summary judgment and Judge Davila's order granting that motion.  *See Cave I*, 2015 WL 740379, at *12–13.  That determination was not, however, necessary to the judgment, which was in CCGroup's favor because the jury determined that CCGroup did not infringe the only remaining Seare patent.  A hypothetical illustration in an official comment to the Restatement is directly on point:

> A, as owner of a trademark, brings an action against B for infringement. B denies the validity of the trademark and denies infringement. The court finds that the trademark is valid, but that B had not infringed it, and gives judgment for B. Thereafter A brings an action against B alleging that since the rendition of the judgment B infringed the trademark. B is not precluded from defending this action on the ground that the trademark is invalid.

Restatement (Second) of Judgments § 27, comment h, illustration 14.  One court has cited this example approvingly in the context of both trademark and patent infringement cases, although it reached the opposite result because, unlike in this case and the Restatement example, the same party had prevailed on both issues.  *See Zip Dee, Inc. v. Dometic Corp.*, 905 F. Supp. 535, 538 (N.D. Ill. 1995).  The Federal Circuit has similarly held in a case where it upheld a non-infringement verdict that "the district court's resolution of the issue of invalidity was not necessary to the judgment," and "[f]or that reason, the court's invalidity ruling will have no collateral estoppel effect in any possible future dispute between the parties."  *Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1344 (Fed. Cir. 2000).[11]

Because the jury found no infringement, CCGroup—like "B" in the comment illustration—is not barred from litigating the issue of the Seare patents' invalidity.  The Court need not determine the extent to which CCGroup's present assertion that the Seare patents were obtained through inequitable conduct overlaps with Judge Davila's decision regarding the Aetna

---

[11] OptumInsight attempts to distinguish the trademark law at issue in the Restatement example from the patent law at issue here, but does not address *Zip Dee* or *Hill-Rom*, both of which involved patent claims.  *See* Def.'s Supp'l Br. at 15.  Moreover, the distinctions OptumInsight identifies between the two areas of law have no bearing on whether the non-invalidity of a patent is essential to a judgment of non-infringement.

16

1   RFP response, because that decision was ultimately not necessary to the judgment and thus lacks

2   preclusive effect.[12]

3        OptumInsight suggests for the first time in its supplemental brief that the determination

4   was in fact relevant to the judgment, because CCGroup's prayer for relief in *Cave I* sought

5   declarations of invalidity, and CCGroup received no such declaration in the judgment.  Def.'s

6   Supp'l Br. at 15−16.  The judgment actually entered, however, is simply "in favor of Plaintiff"—

7   CCGroup—with no reference to CCGroup's failure to prevail on its invalidity argument.  *See*

8   *Cave I* dkt. 370.  OptumInsight cites no authority for the proposition that *Hill-Rom* and the

9   Restatement example above do not apply if the non-infringing party's prayer for relief sought a

10  declaration of invalidity.  Because the judgment in *Cave I* includes no reference to the request for

11  declaratory relief, the Court is not persuaded that the inclusion of that request in CCGroup's *Cave*

12  *I* complaint alters the analysis above.

13             **4.  Reasonable Litigant Standard**

14       As discussed in more detail below, certain claims in this case may require CCGroup to

15  prove that "no reasonable litigant could realistically expect success on the merits."  *See Prof'l Real*

16  *Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993) (hereinafter, "*PRE*").

17  OptumInsight asserts that it need not establish any formal preclusion doctrine as to those claims,

18  because the very fact that it litigated the '079 patent to trial without that patent being found invalid

19  demonstrates the reasonableness of the claim.[13]  This argument has appeal—if, as CCGroup now

20  alleges, the inequitable conduct underlying the Seare patents was so clear that OptumInsight's

21  attorneys must have known they could not succeed, it is odd that CCGroup would have declined to

22  vigorously raise that argument in *Cave I*.  Absent any formal preclusion doctrine, however,

23  CCGroup was not required to do so.  The Court cannot assume that the judge and jury in *Cave I*

24

25  [12] OptumInsight seeks to reserve its right to raise an issue preclusion defense if the non-
26  infringement verdict in *Cave I* is altered as a result of post-judgment motions or an appeal.  Def.'s
    Supp'l Br. at 16.  The Court expresses no opinion on the potential effect of such a contingency at
27  this time.
    [13] CCGroup's sham litigation argument is based solely on the validity and enforceability of
28  OptumInsight's patents.  CCGroup does not argue that, if the patents are valid and enforceable,
    OptumInsight could not make a good faith argument that CCGroup infringed the '079 patent.

United States District Court
Northern District of California

were made aware of all the facts OptumInsight's lawyers allegedly knew when they filed their

infringement claims, and thus cannot now conclude at the pleading stage that OptumInsight's

decision to bring those claims was reasonable as a matter of law.  The Court declines to speculate

as to CCGroup's litigation tactics in the previous case.  *See Twombly*, 550 U.S. at 556 ("[A] well-

pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely." (citation and internal quotation

marks omitted)).

<p style="text-align:center">* * *</p>

Because the Court does not find that CCGroup's failure to demonstrate invalidity of the

Seare patents in *Cave I* has any preclusive effect—whether through claim preclusion, through the

compulsory counterclaim doctrine, through issue preclusion, or as an inherent bar to meeting

*PRE*'s "no reasonable litigant" standard—the Court does not reach the parties' arguments as to

whether one or two definitively non-frivolous counterclaims in *Cave I* (according to

OptumInsight, counterclaims based on the Seare patents) would bar CCGroup from recovery

based on other allegedly unreasonable counterclaims (i.e., those based on the Dang patents).  *See*

Mot. at 25–27.

### C.    *Walker Process* and *Handgards* Claims

In 1965, the Supreme Court held in *Walker Process* that a patent obtained through fraud on

the Patent Office can provide a basis for claims under the Sherman Act.  *See generally Walker*

*Process*, 382 U.S. 172.  The Federal Circuit more recently and succinctly summarized the standard

for such a claim:

> *Walker Process* set forth two conditions for antitrust liability based
> on the fraudulent procurement of a patent. First, the plaintiff must
> show that the defendant procured the relevant patent by knowing
> and willful fraud on the PTO or (in the case of an assignee) that the
> defendant maintained and enforced the patent with knowledge of the
> fraudulent manner in which it was obtained. Second, the plaintiff
> must prove all the elements otherwise necessary to establish a
> Sherman Act monopolization charge. *Walker Process*, 382 U.S. at
> 174, 176–77, 86 S. Ct. 347; see also *id.* at 179, 86 S. Ct. 347
> (Harlan, J., concurring). With the first condition, the Court made
> clear that the invalidity of the patent was not sufficient; a showing of
> intentional fraud in its procurement was required. *Id.* at 176–77, 86
> S. Ct. 347; *id.* at 179, 86 S. Ct. 347 (Harlan, J., concurring). With

<div style="text-align:center">United States District Court<br>Northern District of California</div>

<div style="text-align:center">18</div>

the second condition, the Court incorporated the rules of antitrust law generally. As Justice Harlan stated in his concurring opinion, "as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play." *Id.* at 180, 86 S. Ct. 347 (Harlan, J., concurring).

*Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012).

The Ninth Circuit recognized a related basis for liability in *Handgards*, 601 F.2d 986. *Handgards* itself was "not a *Walker Process* case" because the plaintiff did "not contend that [the defendant] sought to enforce a fraudulently-procured patent," and instead argued that the defendant "prosecuted infringement actions in bad faith, that is, with knowledge that the patents, though lawfully-obtained, were invalid." *Id.* at 994. Inspired by *Walker Process*, the Ninth Circuit held that a plaintiff could pursue antitrust remedies for bad faith infringement actions—even if not based on fraud on the patent office—so long as the jury is "instructed that a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence." *Id.* at 996.

As illustrated in *Handgards* itself, not all *Handgards* claims are also *Walker Process* claims: a *Handgards* claim can be based on bad faith litigation to enforce a patent known to be invalid for reasons other than fraud on the USPTO. Conversely, not all *Walker Process* claims arise from bad faith litigation: "enforcement actions are not a sine qua non of monopolizing by patent fraud." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984). Here, however, both parties' arguments address only a theory of monopolization through infringement actions brought in bad faith because OptumInsight allegedly knew that its patents were fraudulently obtained—thus basing both claims on the same operative facts. *See generally* Mot.; Opp'n; Reply. The Court follows the parties' lead and consolidates the two tests for the purpose of the present motion.

As discussed below, the Court holds that CCGroup's First Amended Complaint fails to adequately plead the specific claims of the patents at issue that are implicated by the alleged misconduct. Because it is possible for that defect to be cured by amendment, the Court DISMISSES both of CCGroup's antitrust claims with leave to amend.

### 1. Inequitable Conduct

The heightened pleading standard of Rule 9(b) applies to allegations of inequitable conduct, and Federal Circuit law governs "the question of whether inequitable conduct has been pleaded with particularity under Rule 9(b)." *Exergen*, 575 F.3d at 1326. "[I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO," rather than "simply aver[] the substantive elements of inequitable conduct." *Id.* at 1326–27. Those elements are that an individual associated with prosecuting a patent application (1) "made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) . . . did so with a specific intent to deceive the PTO." *Id.* at 1327 n.3.[14]

"Moreover, although 'knowledge' and 'intent' may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328–29. "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." *Id.* at 1329 n.5. At the pleading stage, it need *not* be "the *single most reasonable* inference able to be drawn"—unlike on the merits, where a "clear

---

[14] The Federal Circuit previously held that "inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a *Walker Process* counterclaim." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998). Since then, the Federal Circuit has narrowed if not closed the gap between basic inequitable conduct and *Walker Process* fraud, by setting forth a stringent pleading standard for inequitable conduct in *Exergen* and a stringent standard for success on the merits in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Both parties appear to agree that *Exergen* and *Therasense* govern CCGroup's *Walker Process* claim. *See* Mot. at 16–17; Opp'n at 9–11. For the purpose of this Order, the Court assumes without deciding that *Exergen* and *Therasense* have effectively harmonized the standards for *Walker Process* fraud and other assertions of inequitable conduct. *See Cornucopia Prods., LLC v. Dyson, Inc.*, 881 F. Supp. 2d 1086, 1099 n.4 (D. Ariz. 2012) ("*Therasense*, however, raised inequitable conduct to match the standard for Walker Process claims based on omission."); *but see Nalco Co. v. Turner Designs, Inc.*, No. 13-CV-02727 NC, 2014 WL 645365, at *6 (N.D. Cal. Feb. 19, 2014) (acknowledging that the *Therasense* inequitable conduct standard is "arguably" identical to *Walker Process* fraud, but nevertheless maintaining a formal distinction between the two).

United States District Court
Northern District of California

1    and convincing evidence" standard applies to inequitable conduct claims.  *Id.* (citation and internal

2    quotation marks omitted).

3          OptumInsight's Motion erroneously relies a "most reasonable inference" standard for

4    intent to deceive the USPTO, based on the Federal Circuit's decision in *Therasense*.  Mot. at 16.

5    In context, however, that standard applies to evaluating "indirect and circumstantial *evidence*" of

6    deception—i.e., a judgment on the merits.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d

7    1276, 1290 (Fed. Cir. 2011) (en banc) (emphasis added) (considering an appeal from a bench

8    trial).  "Although *Therasense* raised the bar for proving inequitable conduct on the merits, it did

9    not change the [*Exergen*] standard for pleading inequitable conduct."  *Nalco Co. v. Turner

10   Designs, Inc.*, No. 13-CV-02727 NC, 2014 WL 645365, at *3 (N.D. Cal. Feb. 19, 2014) (citing,

11   *e.g.*, *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011)).

12         The only challenge that OptumInsight brings regarding CCGroup's Rule 9(b) "who, what,

13   when, where, and how" pleading is that CCGroup has failed to allege which specific claims and

14   limitations of the '897 patent were unpatentable due to having allegedly been conceived before the

15   offer to sell to Aetna.  *See* Mot. at 23.  In *Exergen*, the Federal Circuit held insufficient a pleading

16   which "fails to identify which claims, and which limitations in those claims, the withheld

17   references are relevant to, and where in those references the material information is found—i.e.,

18   the "what" and "where" of the material omissions."  *Exergen*, 575 F.3d at 1329.  CCGroup's First

19   Amended Complaint includes broad allegations that disclosing the RFP response during the initial

20   application "would have rendered the claims of the '897 patent unpatentable," and that materials

21   withheld during the reexamination "were material to the patentability of the '897 patent and all of

22   the other patents that ultimately issued from the original application for the '897 patent."  FAC

23   ¶¶ 50–51, 67.  Other than the conclusory assertion that "the claims are all related" and therefore all

24   unenforceable, *see id.* ¶ 113, the First Amended Complaint does not specify which claims were

25   implicated by the various materials withheld from the USPTO during the application,

26   reexamination, and/or interference proceedings.  CCGroup's Opposition lists a number of specific

27   claims for several of the documents at issue, Opp'n at 12, but assertions in a brief cannot replace

28

United States District Court
Northern District of California

21

1    necessary allegations absent from pleading.[15]  The Court therefore DISMISSES CCGroup's

2    *Walker Process* and *Handgards* claims with leave to amend.

3          OptumInsight also argues that CCGroup has not adequately alleged intent to deceive the

4    USPTO regarding the '897 patent because such intent is not the "single most reasonable

5    inference" arising from the allegations.  Mot. at 24.  As previously discussed, that is not the

6    correct standard at the pleading stage.  CCGroup alleges that Dang and Rosenbaum failed to

7    disclose to the USPTO an offer to sell the same invention that they sought to patent, which would

8    have rendered their claims unpatentable.  FAC ¶¶ 49–51.  During the reexamination, they and

9    others submitted false declarations asserting a later conception date, despite Dang's sworn

10   litigation testimony that he conceived the invention in 1993.  *Id.* ¶¶ 48(2)–51(2), 62–64.  Their

11   contemporary communications revealed that they intended to deceive the USPTO regarding the

12   conception date.  *Id.* ¶ 68.  Taking those and other factual allegations as true and drawing

13   reasonable inferences in CCGroup's favor for the limited purpose of resolving a challenge to the

14   pleadings, the Court finds that Dang's and Rosenbaum's specific intent to defraud the USPTO "is

15   plausible and . . . flows logically from the facts alleged."  *See Exergen*, 575 F.3d at 1329 n.5.

16                    **2.   Knowledge of Fraud During Enforcement of Patent**

17         The parties dispute whether OptumInsight should be treated as an assignee, and thus

18   whether CCGroup must plausibly allege that OptumInsight "maintained and enforced the patent

19   with knowledge of the fraudulent manner in which it was [allegedly] obtained."  *See Ritz Camera*,

20   700 F.3d at 506.  CCGroup argues that because OptumInsight acquired Symmetry, OptumInsight

21   should be treated as the original patent holder and not subject to that requirement.  Opp'n at 14–

22

23

24   ───────────────────

     [15] CCGroup suggests that it is excused from the requirement to plead specific patent claims and
25   limitations because the false affidavits were allegedly *per se* material to the USPTO's decision.
     Opp'n at 12–13.  The case it cites for that proposition does not state such a rule, and in fact
26   discusses the individual patent claim specifically cited in the pleading at issue.  *See Spectrum
     Pharm., Inc v. Sandoz Inc.*, No. 2:12-CV-00111-GMN, 2013 WL 5492667, at *3 (D. Nev. Sept.
27   30, 2013) ("Specifically, Defendant alleges that the prosecuting attorney routinely certified to the
     USPTO that the claim that ultimately issued as claim 13 was a dependent claim . . . .").  Absent
28   authority to the contrary, the Court follows the requirements set by the Federal Circuit in *Exergen*,
     even where CCGroup asserts *per se* materiality.

1    18.  Because CCGroup has not adequately alleged inequitable conduct, the present Order does not

2    reach this issue.

3                   **3.  *Noerr-Pennington***

4        To base liability on OptumInsight's infringement claims, CCGroup must establish that

5    OptumInsight's claims fall outside the scope the *Noerr-Pennington* doctrine, which otherwise

6    immunizes efforts to petition government—including the courts—based on the First Amendment.

7    *Walker Process* is itself an exception to *Noerr.  Nobelpharma*, 141 F.3d at 1071.

8        A separate exception is the "sham litigation" rule.  In *PRE*, the Supreme Court set forth the

9    standard required for a plaintiff to establish sham litigation:

10              We now outline a two-part definition of "sham" litigation. First, the
                lawsuit must be objectively baseless in the sense that no reasonable
11              litigant could realistically expect success on the merits. If an
                objective litigant could conclude that the suit is reasonably
12              calculated to elicit a favorable outcome, the suit is immunized under
                *Noerr*, and an antitrust claim premised on the sham exception must
13              fail.

14              Only if challenged litigation is objectively meritless may a court
                examine the litigant's subjective motivation. Under this second part
15              of our definition of sham, the court should focus on whether the
                baseless lawsuit conceals "an attempt to interfere directly with the
16              business relationships of a competitor," [*E. R.R. Presidents
                Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)]
17              (emphasis added), through the "use [of] the governmental process—
                as opposed to the outcome of that process—as an anticompetitive
18              weapon," [*City of Columbia v. Omni Outdoor Advertising, Inc.*, 499
                U.S. 365, 380 (1991)] (emphasis in original).

19
                This two-tiered process requires the plaintiff to disprove the
20              challenged lawsuit's legal viability before the court will entertain
                evidence of the suit's economic viability. Of course, even a plaintiff
21              who defeats the defendant's claim to *Noerr* immunity by
                demonstrating both the objective and the subjective components of a
22              sham must still prove a substantive antitrust violation. Proof of a
                sham merely deprives the defendant of immunity; it does not relieve
23              the plaintiff of the obligation to establish all other elements of his
                claim.

24   *PRE*, 508 U.S. at 60–61 (paragraph breaks added).

25        According to the Federal Circuit:

26
                *PRE* and *Walker Process* provide alternative legal grounds on which
27              a patentee may be stripped of its immunity from the antitrust laws;
                both legal theories may be applied to the same conduct. Moreover,
28              we need not find a way to merge these decisions. Each provides its

                                             23

1   own basis for depriving a patent owner of immunity from the
    antitrust laws; either or both may be applicable to a particular party's
2   conduct in obtaining and enforcing a patent.

3   *Nobelpharma*, 141 F.3d at 1071.

4   CCGroup alleges that attorneys representing OptumInsight in litigation and USPTO

5   proceedings received or knew of "source code, briefing, sworn testimony, and interrogatory

6   responses proving that Dang conceived of his ['897 patent] invention in September of 1993."

7   *E.g.*, FAC ¶ 110.  Without the missing allegations discussed above regarding which specific

8   claims and limitations the allegedly incriminating documents pertained to, the Court cannot

9   determine whether it is plausible that the patents were obtained through fraud, much less whether

10  it is plausible that the attorneys knew of the fraud or knew that no reasonable litigant could expect

11  success on their infringement claims.  Pending amendment, the Court declines to further address

12  whether CCGroup's knowledge allegations are sufficient to meet the *Walker Process* and/or *PRE*

13  exceptions to *Noerr*.

14              **4.  Antitrust Elements**

15  A *Walker Process* plaintiff must also establish "all the elements otherwise necessary to

16  establish a Sherman Act monopolization charge," based on "the rules of antitrust law generally."

17  *Ritz Camera*, 700 F.3d at 506.

18  OptumInsight's only argument pertaining to antitrust law and not specific to patent

19  doctrines or knowledge of sham litigation is that "[a]ntitrust liability is ordinarily based on the

20  filing of an abusive *lawsuit* as a whole, not merely individual *claims*, much less claims asserted as

21  counterclaims," and that CCGroup "must establish harm beyond that caused by assertion of the

22  Seare patent already ruled to be valid."  Mot. at 25 (capitalization altered; quoting in part from a

23  heading).  As discussed above, the Court holds that *Cave I* lacks preclusive effect as to the validity

24  of either Seare patent.  However, as also discussed above, the Court cannot determine which if any

25  of OptumInsight's infringement claims were plausibly baseless unless and until CCGroup

26  provides more specific allegations regarding the claims implicated by the allegedly incriminating

27  materials withheld from the USPTO.  The Court declines at this time to decide what effect one or

28  more *non*-frivolous infringement counterclaims would have on CCGroup's ability to recover here.

OptumInsight suggests in a footnote that counterclaims, even those allegedly brought in bad faith, can never form a basis for antitrust liability. Mot. at 31 n.7. The case that it cites does not stand for that proposition. Instead, the Seventh Circuit held that "simply defending oneself in a proceeding brought by another"—in that case, a patent interference proceeding provoked by the antitrust plaintiff—is not actionable. *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271–72 (7th Cir. 1984). Here, OptumInsight did not "simply defend [it]self," but instead affirmatively asserted counterclaims for infringement. The Court declines to hold that, assuming all other *Walker Process* and *Handgards* elements are satisfied, a dominant market participant (OptumInsight) can assert allegedly frivolous counterclaims with impunity merely because a competitor (CCGroup) chose to file a non-frivolous lawsuit against it—particularly where, as here, the competitor's lawsuit has proven meritorious. Moreover, CCGroup plausibly alleges that OptumInsight's earlier filed-but-not-served Minnesota lawsuit caused CCGroup competitive harm by sowing doubt among its customers as to whether its products infringed OptumInsight's patents. *See* FAC ¶¶ 132–34.

### D.   Lanham Act Claim

Section 43(a) of the Lanham Act prohibits any "false or misleading description [or] representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of . . . goods services, or commercial activities." 15 U.S.C. § 1125(a). "[B]efore a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith." *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999). "Obviously, if the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out." *Id.* CCGroup asserts that OptumInsight engaged in such conduct by representing that its products were "patented," or in one instance by representing that they were covered by the '897 and '511 patents, when in fact OptumInsight allegedly knew "that the Dang and Seare patents are invalid and unenforceable." FAC ¶¶ 195–96.

United States District Court
Northern District of California

1   OptumInsight correctly observes that a mere claim that a product is "patented" is not false

2   or misleading unless *no* patent covers the product, which CCGroup has not explicitly alleged.

3   Mot. at 28.  Further, and also encompassing OptumInsight's more specific representation

4   regarding the '897 and '511 patents, CCGroup must allege the claims and limitations rendered

5   invalid or unenforceable to satisfy the *Exergen* pleading standard discussed above.  Both of these

6   deficiencies could be cured by amendment.  The Lanham Act claim is therefore DISMISSED with

7   leave to amend.[16]

8   ### E.   Malicious Prosecution Claim

9   CCGroup's final claim asserts malicious prosecution under California common law,

10   alleging that "OptumInsight knew or had reason to know that the patents at issue in the patent

11   infringement litigation were invalid and unenforceable," and that OptumInsight therefore "acted

12   without probable cause in initiating and/or continuing its claims for patent infringement against

13   CCGroup."  FAC ¶¶ 206–07.  For the reasons discussed above, CCGroup has not adequately

14   alleged which claims and limitations of the patents at issue were invalid and/or unenforceable

15   under the *Exergen* standard.  Further, at least one California appellate court has held "that a civil

16   action for malicious prosecution will not lie while an appeal in the underlying action is pending."

17   *Friedman v. Stadum*, 171 Cal. App. 3d 775, 778–79 (1985).  The same reasoning applies to the

18   post-judgment motions pending in *Cave I*.  CCGroup is correct, however, that all of

19   OptumInsight's infringement claims in that case were dismissed with prejudice except for the '079

20   patent.

21   The malicious prosecution claim is therefore DISMISSED for failure to plausibly allege

22   bad faith based on patent invalidity and unenforceability.  CCGroup may amend this claim if it can

23   meet the pleading standard set forth in *Exergen* with respect to its underlying allegations of

24

---

25   [16] OptumInsight also argues for the first time in its Reply that *Zenith* only recognized Lanham Act liability for two categories of misrepresentations related to patents: "(1) that a specific party
26   infringes specific patents, and (2) that a specific party cannot manufacture a noninfringing product."  Reply at 18.  Although those were the two types of statements specifically considered in
27   *Zenith*, there is no indication that the holding was limited to only those categories, and OptumInsight does not identify any authority endorsing that narrow reading of the case.  The Court concludes that *Zenith* does not restrict Lanham Act claims based on misrepresentation of
28   patents except to require a showing of bad faith.

invalidity or unenforceability, except that CCGroup may not claim malicious prosecution of the '079 patent while post-judgment motions or any subsequent appeal remain pending in *Cave I*.

### F.    Attorneys' Fees as Damages

OptumInsight argues that CCGroup cannot seek attorneys' fees from *Cave I* as damages because it withdrew a motion for attorneys' fees in that case.  Mot. at 29–30.  OptumInsight cites the Ninth Circuit's decision in *Port of Stockton v. Western Bulk Carrier KS*, 371 F.3d 1119, 1120 (9th Cir. 2004) for the proposition that a party who fails to bring a timely motion for attorneys' fees in one case cannot bring a second case to recover fees from the first case.  *See id.*

The *Port of Stockton* decision rests on Rule 54 of the Federal Rules of Civil Procedure, which provides that "'[c]laims for attorneys' fees and related nontaxable expenses shall be made by motion *unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial*.'"  *Port of Stockton*, 371 F.3d at 1120–21 (quoting Fed. R. Civ. P. 54(d)(2)(A)) (emphasis added; emphasis in original omitted).  The Ninth Circuit specifically considered whether "Rule 54's 'substantive law' exception" applied to the contract claims at issue, and held that it did not.  *Id.* at 1121.

In contrast, it is well established that antitrust plaintiffs bringing claims that previous litigation constituted unlawful anticompetitive conduct can recover the cost of their defense in that litigation as damages.  *See, e.g.*, *Handgards*, 601 F.2d at 997 ("In a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which 'flows' from the antitrust wrong."); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1088  ("The Manufacturers are entitled to a jury on their antitrust claim because their patent litigation attorneys' fees are cognizable damages where the patent litigation itself was part of an unlawful scheme.").  Under such circumstances, attorneys' fees fall within the "substantive law exception" to Rule 54 because the prior litigation itself constituted prohibited conduct, and fees thus may be recovered as damages in a subsequent action.

/ / /

/ / /

United States District Court
Northern District of California

**IV.     CONCLUSION**

For the reasons stated above, each claim of the First Amended Complaint is DISMISSED with leave to amend.  CCGroup may file a Second Amended Complaint no later than May 13, 2016.

**IT IS SO ORDERED.**

Dated: April 22, 2016

_____
JOSEPH C. SPERO
Chief Magistrate Judge