Holly A. House (SB# 136045)
Sophie J. Sung (SB# 279056)
hollyhouse@paulhastings.com
sophiesung@paulhastings.com
Paul Hastings LLP
55 Second Street
Twenty-Fourth Floor
San Francisco, CA 94105-3441
Telephone: (415) 856-7000
Facsimile: (415) 856-7100

Richard L. Brophy (*pro hac vice*)
David W. Harlan (*pro hac vice*)
Charles W. Steese (*pro hac vice*)
Mark A. Thomas (*pro hac vice*)
Zachary C. Howenstine (*pro hac vice*)
rbrophy@armstrongteasdale.com
dharlan@armstrongteasdale.com
csteese@armstrongteasdale.com
mathomas@armstrongteasdale.com
zhowenstine@armstrongteasdale.com
Armstrong Teasdale LLP
7700 Forsyth Blvd. Suite 1800
St. Louis, MO 63105
Telephone:  (314) 621-5070
Facsimile:  (314) 621-5065

Attorneys for Plaintiff
CAVE CONSULTING GROUP, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CAVE CONSULTING GROUP, INC., | Case No. 3:15-cv-03424-JCS |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| OPTUMINSIGHT, INC., | |
| Defendant. | |

Plaintiff Cave Consulting Group, Inc. ("CCGroup") alleges as follows for its Second

Amended Complaint against Defendant OptumInsight, Inc. ("OptumInsight"):

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Overview**

1.      OptumInsight has repeatedly sued CCGroup for infringement of patents that were obtained through fraud.  To obtain, maintain, and grow its patent portfolio, OptumInsight took positions before the U.S. Patent and Trademark Office that were directly contradictory to positions it took in patent infringement litigation.  OptumInsight has never disclosed to the USPTO the positions it took in litigation because that information would render its patents invalid and unenforceable.

2.      Over the past 15 years, OptumInsight has used its ill-gotten portfolio to obtain a monopoly in the market for episode grouping software and exclude others from meaningfully competing.  By licensing these invalid and unenforceable patents, OptumInsight has also obtained millions of dollars in revenue.  This fraudulent enforcement campaign would have continued but for CCGroup's discovery of OptumInsight's fraud—from confidential litigation documents that OptumInsight knowingly concealed from the public and its licensees.

3.      This action therefore seeks to hold OptumInsight liable under federal antitrust laws and the laws of California for unlawfully monopolizing or attempting to monopolize the nationwide market for episode grouper software, through the assertion of fraudulently-obtained patents and other sham litigation tactics.

**Parties**

4.      Plaintiff CCGroup is a California corporation with a principal place of business in San Mateo, California.

5.      Defendant OptumInsight is a Delaware corporation with a principal place of business in Minnetonka, Minnesota.  OptumInsight is registered to do business and is doing business in the State of California.  In 2003, OptumInsight—named Ingenix at the time—acquired Symmetry Health Data Systems, Inc.   In 2007, OptumInsight and Symmetry merged, with OptumInsight being the surviving entity.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT

**Jurisdiction & Venue**

6.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, 1338(a), 1367 and 2201.

7.      The Court has personal jurisdiction over OptumInsight because it engaged in substantial conduct giving rise to this lawsuit in California.  This conduct includes, *inter alia,* the assertion of baseless claims for patent infringement against CCGroup in this Court in Case No. 5:11-cv-0469-EJD (referred to here as "*Cave I*").

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because a substantial number of the events or omissions giving rise to CCGroup's claims occurred in this District.

**Introduction**

9.      This is an action for monetary damages and injunctive relief under Section 2 of the Sherman Act, Section 4 of the Clayton Act, the Lanham Act, and the laws of California.  These counts arise from OptumInsight's unlawful and anti-competitive campaign to illegally monopolize or attempt to monopolize the market for episode grouper software.

10.      Episode grouper software is specialized software that is used to organize medical claims data into "episodes of care"—each one a collection of all the medical services a patient received during the management of a particular medical condition.  Episodes of care are inputs to a variety of software tools that are used to analyze and improve the manner in which healthcare services are provided to patients.

11.      To monopolize or attempt to monopolize the market for episode grouper software, OptumInsight unlawfully obtained a portfolio of patents on episode grouper technology by committing fraud on the United States Patent and Trademark Office (USPTO).  Specifically, and as set forth in detail below, OptumInsight obtained these patents by repeatedly concealing material facts from the USPTO and at the same time making affirmative misstatements to the USPTO regarding its prior efforts to commercialize the patented inventions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12.     With the competitive benefits conferred by this patent portfolio, OptumInsight actively suppressed competition by advertising, threatening to enforce, enforcing and licensing its ill-gotten portfolio against others in the marketplace.  OptumInsight did so with full knowledge that its enforcement activities and statements in the marketplace were based on fraudulently obtained patents and were, therefore, objectively baseless.

13.     OptumInsight engaged in further sham litigation by taking positions during its enforcement campaign regarding the scope of its patents that directly contradicted the positions it took before the USPTO when obtaining its patent portfolio.

14.     Using its fraudulently obtained patent portfolio, and by engaging in the foregoing anticompetitive activities, OptumInsight suppressed competition and, thereby, obtained and maintained a monopoly in the market for episode groupers.  At the very least, OptumInsight's misuse of its patent portfolio presented, and still presents, a dangerous possibility that OptumInsight will succeed in obtaining an improper monopoly in the market for episode grouper software.

15.     OptumInsight's enforcement campaign included institution of a more than four-year litigation against CCGroup, one of what OptumInsight contends are its only two other competitors in the market, for infringement of its fraudulently-obtained patents.  OptumInsight withdrew all but two of its patents from suit once CCGroup uncovered its inequitable conduct, by which time CCGroup had already incurred substantial legal fees and expenses defending against OptumInsight's baseless claims.  At trial, the jury found that CCGroup did not infringe OptumInsight's remaining asserted claim.

16.     Even before OptumInsight brought its baseless infringement claims, CCGroup was unable to effectively compete with OptumInsight in the market for episode grouper software due to the dominant market share OptumInsight obtained as a result of the perceived strength of its patent portfolio.

17.     Through the foregoing illegal campaign of patent enforcement, OptumInsight gained control of 85%-90% of the market for episode grouper software.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT                - 4 -

18.     This lawsuit seeks to restore competition to the affected market and to compensate CCGroup for the injuries OptumInsight's anticompetitive, monopolistic conduct has caused.

19.     CCGroup seeks compensation for injuries resulting from OptumInsight's pursuit of baseless patent infringement litigation and for other competitive injury to CCGroup resulting from OptumInsight's anticompetitive behavior.

**The Healthcare Informatics Industry & the Relevant Grouper Software Market**

20.     This lawsuit generally relates to the field of healthcare informatics—a field that relies on information technology and analytical software to evaluate, and ultimately improve, the services that healthcare practitioners provide to patients.

21.     The most frequently-used healthcare informatics products evaluate either the *quality* of care being provided to patients (i.e., how well practitioners follow established treatment patterns) or the *efficiency* of that care (i.e., how cost-effectively practitioners are able to provide the care appropriate to heal a patient).

22.     One of the key inputs to these tools is historical patient treatment information. This information is generally extracted from health insurance claim forms that physicians and other healthcare providers prepare when requesting payment for the services they provide.

23.     These records are generally referred to as "claim data," "claim line items," or "claim data records."  Every day, tens of thousands of these claim data records are generated by physicians and other healthcare practitioners throughout the country.   This claim data is warehoused by insurance companies, the Federal Government, and other entities that evaluate and attempt to improve the care provided by the healthcare industry.

24.     In order to be useful as an input to most healthcare informatics tools, these vast collections of claim data must first be gathered, validated, and organized into discrete bundles called "episodes of care."

25.     Each episode of care is meant to represent the collection of services provided to a patient during management of a particular instance of a medical condition.  One example of an episode of care would be the grouping of all claim data records that relate to the evaluation, treatment, and aftercare for a patient's broken arm.

26.     A special type of software generally referred to as an "episode of care grouper" or simply a "grouper" is used to import collections of claims data, validate that data, and group it into discrete episodes of care.

27.     The relevant product market for purposes of this Complaint is the market for episode of care grouper software (the "Grouper Software Market").

28.     OptumInsight has represented that during the period from 2005 until at least the end of 2014, there were only three products available in the Grouper Software Market. OptumInsight offered a grouper tool known as the "Episode Treatment Groups" or "ETG" grouper; CCGroup offered a competing grouper tool known as the "Cave Grouper"; and Truven Heath Analytics Inc.—then known as The MedStat Group, Inc.—offered a third competing grouper tool known as "Medical Episode Groups" or MEGs, under license from OptumInsight.

29.     Grouper software is offered to customers on a nationwide basis.  As a result, the scope of the relevant geographic market for purposes of this Complaint is nationwide.

30.     In the period from 2005 until at least the end of 2014, OptumInsight was by far the dominant competitor, serving at least 85%-90% of the Grouper Software Market.

31.     OptumInsight obtained its dominant position in the Grouper Software Market by advertising, threatening to enforce, and enforcing a portfolio of patents that covered methodologies for constructing episodes of care.

32.     This patent portfolio conferred a key competitive strength that allowed OptumInsight to erect artificial barriers to entry and expansion in the Grouper Software Market

and permitted OptumInsight to establish its ETG grouper software as the *de facto* standard for grouping claims data into episodes of care.

## OptumInsight's Anti-Competitive Conduct

33.     Over the past two decades, OptumInsight has fraudulently obtained at least eleven patents from the USPTO including, but not limited to, U.S. Patent Nos. 5,835,897; 6,370,511; 7,620,560; 7,725,333; 7,774,216; 7,979,290; 8,121,869; 8,296,165; and 8,700,433 ("the Dang Patents") and U.S. Patent Nos. 7,222,079 and 7,774,252 ("the Seare Patents").

34.     As detailed below, OptumInsight (and its predecessor Symmetry) deliberately withheld material information—including its own offer to sell its invention more than a year before filing for patent applications—at times when that material information was known to OptumInsight and OptumInsight had a duty to disclose that information and prior art to the USPTO.  Moreover, OptumInsight and Symmetry made numerous affirmative misrepresentations to the USPTO that were material to the patentability of its various patent applications and that were not only false, but that they knew to be false.

35.     These false representations and omissions were intended to induce and did induce reliance by the patent examiners charged with determining whether to grant OptumInsight's patent claims.   But for these material false statements and omissions, the patents in OptumInsight's patent portfolio would not have issued.

36.     These multiple misrepresentations and omissions constitute fraud on the USPTO that renders the entirety of OptumInsight's patent portfolio invalid and unenforceable.

37.     After improperly obtaining patents from the USPTO, OptumInsight and Symmetry advertised, threatened to enforce, and enforced the ill-gotten patents against competitors and customers in the marketplace.  By doing so, OptumInsight was able to obtain, maintain or, at a

bare minimum, posed a dangerous probability of obtaining, a monopoly in the market for episode grouper software.

38.     In furtherance of this scheme, in 2011 OptumInsight initiated a patent infringement lawsuit against CCGroup.  In that lawsuit, OptumInsight asserted eight of the patents fraudulently obtained from the USPTO.  These asserted patents spanned two patent families—one based on an original patent application filed by Mr. Dennis Dang and another based on an original application filed by Mr. Jerry Seare.

39.     OptumInsight's objectively baseless assertion of its patent portfolio forced CCGroup to expend significant resources over the course of four years of litigation.  When CCGroup eventually exposed OptumInsight's misconduct before the USPTO—based on materials in OptumInsight's own possession long before it brought its infringement claims against CCGroup—OptumInsight subjected CCGroup to another year of debilitating litigation expense before eventually withdrawing the entire Dang patent family and all but one claim of the Seare family from the litigation.

40.     OptumInsight's eleventh-hour, unilateral withdrawal of almost all of its infringement allegations evidences the breadth of OptumInsight's fraud and the severity of the unenforceability problem that plagues the Dang and Seare patents.  OptumInsight's persistent and costly assertion of these patents against CCGroup, in light of the circumstances by which they were obtained and the manner in which they were enforced, is a key part of the pattern of anticompetitive conduct perpetrated by OptumInsight.

41.     OptumInsight should be held responsible for its misconduct in obtaining patents fraudulently, for subjecting CCGroup to the unnecessary expense of a protracted patent litigation, and for OptumInsight's use of its patent portfolio to reap anticompetitive benefits in the marketplace.

42.     OptumInsight's anticompetitive conduct has harmed competition in the Grouper Software Market by, among other things, affecting prices and reducing competition, quality, innovation, and consumer choice.

**OptumInsight's Fraud on the USPTO**

*OptumInsight Concealed Its Early Commercialization of Dang's Invention from the USPTO*

43.     In 1993, Dennis Dang and his associate, Mitchell Portnoy, formed Symmetry Health Data Systems Incorporated ("Symmetry") in order to develop software for grouping medical claims data into episodes of care.

44.     By early 1994, Dang, Portnoy, and Dan Gardiner (a computer programmer hired to assist with software development) had developed a software grouping methodology, which Symmetry began advertising for sale under the trade name "Episode Treatment Groups" or "ETGs."  This product later became known as Symmetry ETG.

45.     On May 13, 1994, Aetna, a large health insurance provider, asked Symmetry to respond to a request for proposal (the "Aetna RFP") for provider risk and profiling software.

46.     The Aetna RFP included a number of clear instructions and parameters for prospective vendors, including instructions regarding the form and content of responses.

47.     The Aetna RFP clearly stated that prospective vendors would be required to demonstrate that their software products included the features and functions outlined in the Aetna RFP.  According to the Aetna RFP, prospective vendors who were selected for evaluation would be required to make this demonstration on July 6 and 7, 1994.

48.     The Aetna RFP also included a list of contract specifications that outlined terms and conditions to be incorporated into the final agreement between Aetna and the vendor.  The Aetna RFP asked prospective vendors to indicate whether or not they could meet each of the specifications.

49.     In a section titled "Aetna Use of Proposal Ideas," the Aetna RFP stated that Aetna would "have the right to use any or all ideas presented in any Proposal received in response to this RFP unless the [prospective vendor] presents a statement of objection in the Proposal."

50.     In connection with the Aetna RFP, Symmetry and Aetna entered into a Non-Disclosure Agreement.  Under the Agreement, each party agreed to maintain the confidentiality of information marked "Confidential." Nothing in the Agreement required either party to maintain the confidentiality of information not marked "Confidential."  The Aetna RFP was marked "Confidential."

51.     On June 8, 1994, Symmetry applied for registration of the trademark "EPISODE TREATMENT GROUPS" with the U.S. Patent and Trademark Office.  Symmetry told the USPTO, under oath, that it had begun using the mark in commerce on May 31, 1994, in connection with sales of "computer software for health analysis and health care."  Symmetry's application was eventually abandoned for administrative reasons.

52.     Later, in October 2001—during the pendency of the Symmetry/Ingenix Litigation—Symmetry again applied for registration of "EPISODE TREATMENT GROUPS," again for use with sales of "computer software for data processing in the field of health care." This time, however, Symmetry changed its first use in commerce to August 1994.  David Rosenbaum filed the 2001 application attesting to the August 1994 date, and Mitchell Portnoy signed a declaration swearing that it was true.

53.     On June 12, 1994, Symmetry responded to Aetna's request for proposal by submitting a 54-page document describing Symmetry's ETG software ("the Aetna RFP Response," attached hereto as Exhibit A).  The Aetna RFP Response was an offer to license the ETG software to Aetna.  Along with its licensing offer, the Aetna RFP Response provided a detailed description of Symmetry's ETG software, a number of sample reports based on

previously-processed raw claims data, and full pricing information for a license to the ETG software.

54.     The Aetna RFP Response explained that the ETG software was "recently developed and available," and that the software was "a newly released product."

55.     The Aetna RFP Response explained that Symmetry had "recently provided ETG grouped data to Aetna's Health Information Consulting (HIC) for one of their clients," and that Symmetry "intends to shortly deliver the ETG grouper software for the balance of HIC's business."

56.     Under the heading "Developmental History and Characteristics of Episode Treatment Groups," the Aetna RFP Response identified "two characteristics which Symmetry believed crucial for the proper profiling of providers" that were lacking in prior profiling systems. Those characteristics were: (a) the ability to identify a unit of analysis that "encompass[ed] all care including physician and ancillary services" provided to a patient, and (b) the ability "to sufficiently account for differences in patient severity (case mix)."

57.     The Aetna RFP Response explained that the ETG software achieved the objective of encompassing all care provided to an individual over the course of treatment for a single illness.

58.     According to the Aetna RFP Response, the ETG software accomplished this objective through the use of a "flexible algorithm-based method" to determine the length of each episode.  The Response explained:

> Unlike some other methodologies which set a pre-determined episode length based upon illness, ETG's take an altogether different approach. An episode begins when a management record for a particular illness is first detected.  An episode ends when the *absence of recurring claims for a specified period of time is detected*. Using this method of episode definition, an ETG will capture all related activity for each episode so long as the patient is treated.  (emphasis in original)

59.     This is the concept that would come to be known as the "dynamic time window."

60.     The Aetna RFP Response explains that the ETG software accomplished the second stated objective: "ETGs successfully account for patient severity (casemix)."

61.     Under the heading "Case Mix Adjustment," the Aetna RFP Response explained that "ETGs have been developed to account for differences in patient severity.  Differences in patients' diagnoses, age, complicating conditions, comorbidities and major surgeries have been factored into the definition of ETGs. . . .   Individual groups are **clinically homogeneous**." (emphasis in original)

62.     As explained throughout the Aetna RFP Response, the ETG software accounted for patient severity by "shifting" from one ETG to another upon receipt of claims data indicating changes such as comorbidities, complications, and surgeries.

63.     The Aetna RFP Response described the process by which the ETG methodology had been developed to account for case mix and to yield clinical homogeneity.  According to the description, following the initial clinical-based development of ETGs, the developers had run the software on over 30 million records to test the statistical assumptions.  Where appropriate, the developers had revised ETGs to further define them according, for example, to complications, comorbidities, surgical procedures, and patient age.  "Iterative analysis continued until acceptable clinical and statistical homogeneity was displayed for each ETG."

64.     In a deposition on October 15, 2013, Dang confirmed that the Aetna RFP Response taught the "dynamic time window" concept and that the ETG software included that functionality at the time the Aetna RFP Response was submitted.

65.     In a deposition on October 15, 2013, Dang confirmed that the Aetna RFP Response taught the "shifting" concept, including shifting based on comorbidity, surgery, and complication, and that the ETG software included that functionality at the time the Aetna RFP Response was submitted.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT

- 12 -

66.     Thus, the ETG software offered for sale and described in the Aetna RFP Response used dynamic time windows and shifting to accomplish the "two characteristics which Symmetry believed crucial for the proper profiling of providers."

67.     At the time that Symmetry submitted the Aetna RFP Response, the ETG software was fully functional and capable of operating as described in the Aetna RFP Response.

68.     The Aetna RFP Response included language expressly agreeing to the terms and conditions of the Aetna RFP, including the provision that Aetna could use any ideas in Proposals.

69.     The Aetna RFP Response was not marked "Confidential."  As a result, Aetna had no obligation to maintain the confidentiality of the information contained therein.

70.     The Aetna RFP Response did not include a "statement of objection" regarding Aetna's use of ideas presented in the Response. As a result, Aetna had the right to use any or all ideas presented in the Aetna RFP Response.

71.     Because the ETG software described in the Aetna RFP Response was offered for sale, that Response started the clock on the one-year statutory period under 35 U.S.C. § 102(b) for Dang to file a patent application for his invention.

72.     Because Aetna was under no obligation of confidentiality to Symmetry regarding the ETG software described and offered for sale in the Aetna RFP Response, and Aetna was free to use any of the ideas in the Response, the Response represented an offer for sale and a printed publication under Section 102.

73.     More than a year after Symmetry delivered the RFP Response to Aetna, Symmetry's patent prosecution counsel, Mr. David Rosenbaum, filed a patent application with the Patent Office on Dang's grouping methodology.

74.     When Rosenbaum and Dang filed the patent application, they deliberately withheld from the USPTO all of the information in their possession regarding Symmetry's early

efforts to commercialize Dang's invention, including Dang's offer to sell his inventive methodology to Aetna.

75.     Because the Aetna RFP Response was evidence that Dang's invention was on sale in the United States more than one year before the date of application, disclosing it to the USPTO would have rendered the claims of the '897 patent unpatentable.

76.     On November 10, 1998, without notice of Symmetry's June 12, 1994 offer for sale to Aetna, the Patent Office issued U.S. Patent No. 5,835,897 ("the '897 patent") with claims that read on Dang's grouping methodology and, by extension, the ETG grouping software Symmetry offered for sale to Aetna more than a year before Dang filed his patent application.

77.     Dang has repeatedly stated under oath that, as originally conceived and designed, the functionality of Symmetry's ETG software is as described in the '897 patent.  In other words, the ETG software described and offered for sale in the Aetna RFP response is the same ETG software that was taught and claimed in the '897 patent and the other Dang patents.

78.     Rosenbaum and Dang acted as agents of Symmetry in the prosecution of the '897 patent.  Symmetry knew of Rosenbaum and Dang's actions during prosecution of the '897 patent, including their deliberate non-disclosure of the Aetna RFP Response.

*Once the First Dang Patent Issued, Symmetry Filed Suit and Claimed*
*an Invention Date of **September 1993** to Avoid Invalidating Prior Art*

79.     On November 10, 1998, the same day the '897 patent issued, Symmetry filed suit against The MedStat Group, Inc. ("MedStat"), for infringing the newly-issued '897 patent. (*Symmetry Health Data Systems, Inc. v. The MedStat Group Inc.*, Case No. 2:98-CV-02032-EHC (D. Ariz.)).  Rosenbaum, Symmetry's patent prosecution counsel, served as litigation counsel in the MedStat litigation.

80.     During discovery in that litigation, Symmetry, through counsel of record Daniel Maynard, Douglas Erickson, Bradley Hartman, and Jennifer Sparks, twice represented <u>under oath</u>

in interrogatory responses served in August and November 1999 that Dang conceived of the invention claimed in the '897 Patent "at least as early as September 1993."

81.     Symmetry specifically stated that, "at least as early as September 1993," the invention of the '897 patent "was the subject of a mental formulation and was sufficiently complete to enable one of ordinary skill in the art to reduce the claimed invention to practice."

82.     Dang confirmed through sworn testimony in the MedStat litigation and again in later sworn testimony in litigation against CCGroup that Symmetry's interrogatory response was correct, that he conceived of the invention claimed in the '897 patent in September of 1993, and that the invention was sufficiently conceived to enable one skilled in the art to reduce the invention to practice.

83.     Symmetry's patent prosecution counsel, Rosenbaum, was present at Dang's deposition when Dang testified that he conceived of his invention in September of 1993.

84.     Symmetry adopted this September 1993 conception date for Dang's invention in the MedStat litigation in order to predate invalidating prior art cited by MedStat.  Specifically, the earlier conception date helped to avoid invalidation by U.S. Patent No. 5,557,514—a patent issued from a June 23, 1994 application by Jerry Seare.

85.     These sworn statements also confirmed that Dang's invention was fully conceived and ready for patenting by the time Symmetry offered to license the technology to Aetna on June 12, 1994—more than a year before the filing date of the '897 patent.

86.     Dang's admission during the MedStat litigation that he conceived of his invention in September 1993 also confirmed that Symmetry's 1994 RFP Response to Aetna was an invalidating prior offer for sale under 35 U.S.C. § 102(b).

87.     Dang and Symmetry's litigation counsel in the MedStat litigation, including Rosenbaum, acted as Symmetry's agents in that litigation.   Symmetry knew of the sworn

statements from Dang that Dang conceived his invention in September 1993, and that his invention was fully conceived and ready for patenting by the time of the 1994 Aetna RFP Response. Symmetry also made express representations under oath through its interrogatory answers confirming those facts.

*In Subsequent USPTO Proceedings, Symmetry Switched its Invention Date*
*to **August 1994** to Avoid the On-Sale Bar of 35 U.S.C. § 102(b)*

88.     On March 27, 2000, several months before the parties settled the MedStat Litigation, Symmetry initiated a reexamination of its '897 patent.

89.     The initial petition for reexamination, filed by Rosenbaum, did <u>not</u> include any mention of the Aetna RFP Response. In fact, Symmetry and Rosenbaum continued to withhold the Aetna RFP Response until the reexamination had been pending for more than 9 months. Instead of disclosing the Aetna RFP Response, Rosenbaum and Symmetry focused on certain other prior art references.

90.     To ensure that the Aetna RFP Response would not invalidate the '897 patent, Dang and Rosenbaum, together with Portnoy and Gardiner (as discussed, Dang's associates at Symmetry), needed to concoct an explanation for why the Aetna RFP Response was not an invalidating offer for sale under 35 U.S.C. § 102(b).

91.     The scheme that they settled on was to manufacture a different conception date from the one they provided in the MedStat litigation. Although the September 1993 conception date they relied on in litigation helped them to avoid prior art, that conception date, in light of the early offer to license Dang's invention to Aetna, would have invalidated the '897 patent under Section 102(b).

92.     During the period from about October 2000 through December 2000, Rosenbaum, Dang, Portnoy, and Gardiner exchanged a number of drafts and revisions of affidavits and

arguments for submission in the '897 reexamination, all of which related to the Aetna RFP Response.

93.     Eventually, after months of drafts and revisions, Rosenbaum, Dang, Portnoy, and Gardiner settled on the story they would tell, and how they would tell it.

94.     On January 5, 2001, Rosenbaum finally disclosed the Aetna RFP Response to the USPTO, together with affidavits from himself, Dang, Portnoy, and Gardiner that reflected their manufactured story regarding the Aetna RFP Response and Dang's conception of the inventions in the '897 patent.

95.     The calculated purpose of this disclosure was to attempt to "cure," in a non-adversarial setting, the effect of Symmetry's June 12, 1994 offer for sale of the invention, as well as Dang and Rosenbaum's deliberate withholding of the Aetna RFP Response during prosecution of the '897 patent.

96.     Specifically, Rosenbaum, Dang, Portnoy and Gardiner falsely represented in their affidavits that Dang's invention was not fully conceived and ready for patenting until <u>August 1994</u>.  The affidavits contained material falsehoods regarding the date of conception of the inventions disclosed in the '897 patent and embodied in the ETG software.

97.     Rosenbaum submitted these affidavits and an accompanying Information Disclosure Statement to the USPTO on behalf of Symmetry.

98.     The focus of the affidavits and Information Disclosure Statement was the notion that at the time of the Aetna RFP Response, Dang had not yet conceived of "shifting" and "resetting" required by the "dynamic time windows" in the patent.  This was false.

99.     The calculated purpose of this misrepresentation was to attempt to "cure," in a non-adversarial setting, the effect of Symmetry's June 12, 1994 offer for sale of the invention, as

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT
- 17 -

well as Dang and Rosenbaum's deliberate withholding of the Aetna RFP Response during prosecution of the '897 patent.

100.    The August 1994 conception date offered by Dang, Rosenbaum, Portnoy, and Gardiner was false and directly contradicted Dang's earlier sworn testimony that he fully conceived of his invention by September of 1993.

101.    By adopting an August 1994 conception date, Symmetry was able to argue to the Patent Office that the June 12, 1994 offer to Aetna was not an invalidating "offer for sale" under 35 U.S.C. § 102(b) because the invention was not yet "ready for patenting," purportedly saving the '897 patent and all related pending applications from invalidation.

102.    Symmetry did not provide the USPTO with Symmetry's sworn interrogatory responses or Dang's sworn deposition testimony from the MedStat litigation.  This evidence clearly identified Dang's conception date as "at least as early as September 1993"—directly contradicting Dang, Rosenbaum, and Gardiner's affidavits to the USPTO— and conclusively established the Aetna offer as an invalidating § 102(b) offer for sale.

103.    The withheld litigation materials were material to the patentability of the '897 patent and all of the other patents that ultimately issued from the original application for the '897 patent.  Dang, Rosenbaum, Portnoy, and Gardiner knew of those materials, knew they were material, and made the deliberate decision to withhold them.

104.    Rosenbaum also lied about his knowledge of the Aetna RFP Response.  In the reexamination, Rosenbaum represented to the USPTO that he "first learned about the events surrounding the RFP Response and the dates thereof" around "July 2000."  According to Rosenbaum, when he learned of the Aetna RFP Response in July 2000, "he believed there was no potential on-sale bar at issue." (emphasis added).

105.     All of this was false.   Rosenbaum was intimately familiar with the Aetna RFP Response, and its potential impact on the validity of the '897 patent, at least as early as August 1999.

106.     As early as August 1999, Rosenbaum (along with other Symmetry counsel) concocted a scheme to avoid producing the Aetna RFP Response in Symmetry's litigation against MedStat, prior to the reexamination.   In that case, MedStat served Symmetry with requests for production in August 1999 including the following:

REQUEST FOR PRODUCTION NO. 9:

All documents referring, relating to, or evidencing any offers, negotiations, discussions, communications or agreements between Plaintiff and any third party for the proposed, potential or actual license, sale, or use of the inventions of the '897 patent, or a suggestion or demand by Plaintiff that any person refrain from infringing the '897 patent.

REQUEST FOR PRODUCTION NO. 31:

All documents which refer or relate to any perceived need by anyone for the alleged inventions of, or for any product covered by, any claim of the '897 patent.

107.     Both of these requests clearly called for production of the Aetna RFP Response.

108.     Symmetry's counsel, including Rosenbaum, knew that MedStat's requests for production implicated the Aetna RFP Response.   On August 17, 1999, Rosenbaum met with Mitchell Portnoy of Symmetry and discussed the details of the Aetna RFP and the Aetna RFP Response.   Because the Aetna RFP Response was clear evidence of the invalidity of the '897 patent, Rosenbaum and Symmetry's other counsel scrambled for a way to avoid producing it.

109.     First, Symmetry litigation counsel Douglas Erickson and James O'Sullivan sent to co-counsel at Sonnenschein (Rosenbaum's firm) a copy of: (1) the Aetna RFP Response, (2) MedStat's request for production, and (3) the '897 patent for analysis.   Rosenbaum received a copy of this communication. On the same day, Erickson sent to the Sonnenschein attorneys a

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT
- 19 -

copy of Symmetry's responses to MedStat's interrogatories.  Next to the response identifying September 1993 as the conception date of the inventions in the '897 patent was a handwritten notation reading "Right answer."

110.    A few days later, on September 1 and 2, 1999, Erickson sent letters to MedStat's litigation counsel memorializing conversations they had had the day before.  The letters made clear that Erickson had artificially and surreptitiously narrowed the scope of MedStat's requests for production—specifically, requests #9 and #31—in order to avoid having to produce the Aetna RFP Response, which was unquestionably responsive and highly relevant.  Erickson sent copies of his letters to Rosenbaum.

111.    Thus, Rosenbaum misrepresented to the USPTO that he "first learned about the events surrounding the RFP Response and the dates thereof" around "<u>July 2000</u>" and that "he believed there was <u>no potential on-sale bar at issue</u>." (emphasis added).

112.    Relying on Symmetry's material misrepresentations and omissions, and without any of the information evidencing Dang's actual conception in September of 1993, the USPTO issued a reexamination certificate for the claims of the '897 Patent on February 19, 2002.

113.    Dang, Portnoy, Gardiner, and Symmetry's patent counsel in the reexamination, including Rosenbaum, acted as Symmetry's agents in the reexamination.  Symmetry knew of their false claims that Dang conceived his invention in August 1994, and knew of their deliberate non-disclosure of the sworn statements from the MedStat litigation in which Symmetry claimed a September 1993 conception date.

*In Its Next Litigation, Symmetry Reverted **Back to a September 1993** Conception Date to Argue that Seare Derived His Invention from the '897 Patent*

114.    In April of 2001, while the reexamination of the '897 patent was pending, OptumInsight (then known as Ingenix) sued Symmetry for infringement of U.S. Patent No. 6,223,164 ("the '164 patent").  (*Ingenix, Inc. v. Symmetry Health Data Systems, Inc.*, No. 0:01-

cv-00704 (D. Minn.)).  The '164 patent is in the same family as the '079 and '252 Seare patents that OptumInsight later asserted against CCGroup in litigation in the Northern District of California.

115.    As in the MedStat litigation, Symmetry's prosecution counsel, Rosenbaum, assisted as Symmetry's litigation counsel.

116.    Peter Lancaster of the Dorsey & Whitney law firm, who would later represent OptumInsight in its litigation against CCGroup, was counsel of record for Ingenix/OptumInsight in this litigation with Symmetry.

117.    Kevin McMahon and Steven Glazer of the Weil Gotshal law firm, who would later represent OptumInsight in interference proceedings at the USPTO regarding the '897 patent, were also counsel of record for Ingenix/OptumInsight in this litigation with Symmetry.

118.    Symmetry responded to OptumInsight's infringement allegations by counterclaiming that Seare and the other inventors derived—or stole—their invention from Dang.

119.    To substantiate its derivation claim, Symmetry asserted that Dang had conceived of his ETG software (as described and claimed in the Dang patents) <u>before</u> the June 23, 1994 filing date of Seare's patent application.

120.    Because the Seare patent has a filing date of June 23, 1994, Symmetry could not use the August 1994 conception date it had only recently provided to the USPTO in sworn affidavits during the reexamination proceedings.

121.    Symmetry, with Rosenbaum assisting as litigation counsel, therefore changed its position regarding Dang's conception date for the '897 patent once again—this time from August 1994 ***back*** to September 1993—for purposes of this new litigation against OptumInsight.

122.    To support its renewed claim to a 1993 conception date in the litigation, Symmetry disclosed source code dated 1993 that had not previously been disclosed to the USPTO (and that

has not been disclosed to the USPTO to this day).

123. Ignoring the sworn statements Dang, Rosenbaum, Portnoy, and Gardiner made to the USPTO just the previous year, Symmetry represented to the district court in a brief that "Mr. Dang's underlined testimony is that he first conceived of the invention, which is now known as ETGs, in the summer of 1993" and that "Mr. Dang conceived of the invention during the summer of 1993, that the conception was communicated to Mr. Portnoy during the summer of 1993 and to Mr. Gardiner by at least November 1993." (emphasis added).

124. Lancaster and Glazer received this brief—a memorandum in opposition to a motion for partial summary judgment filed by OptumInsight—in October 2002. McMahon knew of it as of at least November 14, 2002, when his petition for admission *pro hac vice* in the case was granted.

125. In the hearing on OptumInsight's motion for partial summary judgment in November 2002, counsel for Symmetry expressly argued that Dang "came up with this idea in the summer of 1993" and further referred the Court to "affidavits from Mr. Dang."

126. Attorneys Lancaster and McMahon were present at that hearing.

127. These representations directly contradicted the sworn affidavits that Dang, Portnoy, Gardiner, and Rosenbaum had submitted to the USPTO during reexamination to support a conception date of August 1994—the date Symmetry used to avoid invalidity under § 102(b) in light of its June 1994 sales offer to Aetna (i.e., the Aetna RFP Response).

128. Additionally, the dated source code and representations in briefing used to reestablish a 1993 conception date were never produced to the USPTO, by OptumInsight or Symmetry, in the then-pending reexamination proceedings or in any subsequent prosecutions based on the original Dang application.

129. Even after OptumInsight was served with CCGroup's Amended Complaint in the

parties' subsequent litigation—which explicitly identified the documents that Symmetry and OptumInsight had failed to disclose—OptumInsight thereafter withheld these materials from the USPTO with respect to all of the pending Dang applications.

130.    In the litigation between Symmetry and OptumInsight, Rosenbaum was acting as an agent of Symmetry, and Lancaster, McMahon, and Glazer were acting as agents of OptumInsight.    Symmetry and OptumInsight knew of the dated source code and the representations in briefing that were offered in that litigation to prove that Dang conceived his invention in September 1993.   In this litigation, Lancaster, McMahon and Glazer were also provided with the interrogatory responses and other materials from the earlier MedStat litigation that identified September 1993 as the actual conception date for Dang's invention.

131.    The foregoing information learned by OptumInsight's counsel was, on information and belief, communicated to OptumInsight, consistent with counsel's obligation to keep their client reasonably informed of the status of the litigation.  Knowledge of that information is also imputed to OptumInsight as a matter of law.

*OptumInsight Acquired Symmetry in 2003 and Adopted Symmetry's Material Misrepresentations and Omissions Regarding Dang's Conception Date*

132.    Around the same time it sued Symmetry for patent infringement, OptumInsight also provoked an interference proceeding at the USPTO between the Dang '897 patent and the application that later issued as the Seare '079 patent—both of which OptumInsight subsequently asserted against CCGroup—to determine whether Dang or Seare first invented the episode grouping methodology claimed in those applications.  The claims at issue were claim 38 in the Seare application and claims 1, 3, 5, 11 and 33 of the Dang patent. This formed the "count" at issue in the interference.

133.    This occurred after Symmetry sued OptumInsight for infringement of the '897 patent, in a separate lawsuit between Symmetry and OptumInsight in the U.S. District Court for

the District of Arizona.  (*Symmetry Health Data Systems, Inc. v. Ingenix, Inc. et al.*, No. CIV 00 1411 (D. Ariz.)).  In that case, OptumInsight counterclaimed that the '897 patent is unenforceable due to inequitable conduct.

134.   OptumInsight provoked the interference by copying, word-for-word, claim 1 of the Dang '897 patent into the Seare application.  Through its attorneys Gorman, McMahon and Glazer, OptumInsight represented to the USPTO that the Dang patent and the Seare application are directed to the same invention.

135.   Gorman and McMahon were participants in the prosecution of the application that issued as the Seare '079 patent.  In a January 3, 2002 interview with the examiner, Gorman and McMahon persuaded the examiner that the disclosure of the Seare application fully supported the claims that had been copied directly from the Dang '897 patent—including the "dynamic time window."

136.   Shortly after the interview, Gorman—counsel for OptumInsight—explained to the examiner that Dang was attempting in the '897 reexamination to change the meaning of "dynamic time windows":

> In spite of the above clear definition of the meaning of "dynamic time window" in the Dang file history, and in spite of the fact that it couldn't be considered during Reexamination proceedings, Dang submitted information concerning an on sale issue during a recently concluded Reexamination, and argued that his invention was not on sale, based on a new definition of "dynamic time window."  Now Dang argued that, to be "dynamic," the episode time window had to include the concept of "shifting," by which, if, during the generation of an episode of care for one ETG, a record is encountered that changes the appropriate diagnosis to a different ETG, the system can shift the originally assigned ETG to the new one. This belated attempt to change the meaning of a claim term in an issued patent is clearly improper and ineffective.

137.   Nevertheless, during the course of the interference, neither Gorman, McMahon, nor any other OptumInsight agent alerted the Board of Patent Appeals and Interferences to the impropriety that Gorman had identified in the Dang reexamination.  Instead, OptumInsight

elected to purchase Symmetry.  By doing so, OptumInsight could falsely name Seare as the prior inventor and continue prosecuting the Dang claims in the Seare family.

138.    Thus, in May 2003, before any ruling on the merits of the interference, OptumInsight purchased all of Symmetry's outstanding stock—and therefore all of its intellectual property, including the '897 patent and related continuation applications (*i.e.*, the entire Dang patent family).

139.    Because of the stock purchase, the issue of whether Dang or Seare invented first was never resolved by an independent factfinder—*i.e.*, the Board.  Instead, OptumInsight resolved the interference by deciding for itself that Seare had invented first.

140.    OptumInsight represented to the Board of Patent and Interferences that it had reached this decision based on "a thorough investigation of the relevant facts."

141.    After having decided to make Seare the first inventor, OptumInsight urged the Board to add claims 7, 8, 12-16, 31, 35 and 38 from the Dang '897 patent to the "count" at issue in the interference.  OptumInsight explained to the Board that the Seare application "<u>fully supports</u>" the subject matter of claims 7, 8, 12-16, and 31, and that claims 35, 36 and 38 "<u>are directed to essentially the same subject matter</u>" as the other claims.

142.    Thus, OptumInsight argued that the Seare application fully disclosed the inventions in the Dang patent claims, and that Seare had invented the inventions in those claims before Dang did.

143.    By asking the Board to add more Dang '897 claims to the count in the interference, OptumInsight sought to whitewash the inequitable conduct that had occurred in the '897 reexamination.  OptumInsight intended to pursue the same claims in the Seare family unsoiled by Dang's misrepresentations.

144.    The Board rejected OptumInsight's bid for procedural reasons.

145.    The Board entered judgment in the interference in favor of Seare "Because [OptumInsight] has elected that [Seare] should prevail."

146.    OptumInsight has since contradicted its representation in the interference that Seare conceived the invention before Dang.   In white papers released in 2006 and 2012, OptumInsight acknowledged that Dang's Symmetry ETG software was introduced to the market in 1993.  OptumInsight also represented in a 2007 response to an RFP from McKesson that Dang and Portnoy conceived the ETG software in 1993.

147.    In deciding priority in favor of the Seare patent, whose application was filed on June 23, 1994, OptumInsight ignored and did not disclose to the USPTO the documents and prior sworn statements from Dang, Rosenbaum, Portnoy and Gardiner evidencing Dang's conception in September 1993.

148.    By failing to disclose these materials to the USPTO, and falsely representing to the USPTO that it conducted "a thorough investigation of the relevant facts" and determined that Seare was entitled to priority, without disclosing any of the documents evidencing Dang's conception in 1993, OptumInsight committed egregious misconduct and is guilty of unclean hands before the USPTO, rendering all Seare patents claiming priority to the application for the '079 patent unenforceable.

149.    During the interference proceedings, and prior to its acquisition by OptumInsight, Symmetry likewise did not disclose to the USPTO the documents and prior sworn statements from Dang, Rosenbaum, Portnoy and Gardiner evidencing Dang's conception in September 1993. Rosenbaum was counsel of record for Symmetry in the interference proceedings.  At the time OptumInsight decided priority in favor of the Seare patent application, OptumInsight knew of the dated source code and testimony evidencing a September 1993 conception date for Dang's invention, at least because those materials had been provided to its counsel, including Lancaster,

McMahon, and Glazer, in late 2002.  Additionally, as of May 2003, Symmetry's corporate knowledge, including that of its agents Rosenbaum, Dang, and Portnoy, was imputed to OptumInsight as the purchaser of all of Symmetry's outstanding stock.  Thereafter, in 2007, OptumInsight merged with Symmetry—further reinforcing OptumInsight's imputed and actual knowledge of Symmetry's misconduct.  Before the 2003 acquisition, Symmetry knew of the source code and affidavits evidencing a September 1993 conception date, as well as all of the other evidence of Dang's September 1993 conception, at least because Dang, Portnoy, Gardiner, and Rosenbaum were acting as agents of Symmetry when they made those representations in litigation.

150.    OptumInsight has acknowledged in litigation that it stands in the shoes of Symmetry with respect to the Dang patents.  In prior litigation between the parties to this case, OptumInsight took the position that it is entitled to assert Symmetry's attorney-client privilege and work product protection with respect to Symmetry's activities before it was acquired by OptumInsight.  Specifically, OptumInsight claimed attorney-client privilege and work product protection over documents relating to the patent application that resulted in the '897 patent, including communications between Rosenbaum and Symmetry regarding the Aetna RFP Response, the effect of the Aetna RFP Response on the enforceability or validity of the Dang patent family, and the subject matter of the false affidavits submitted in the reexamination by Dang, Rosenbaum, Portnoy, and Gardiner.

151.    In spite of the knowledge it acquired in the litigation with Symmetry and by virtue of its acquisition of Symmetry, OptumInsight falsely represented to the USPTO in the interference, through McMahon and Glazer,that Dang conceived of his invention in August of 1994.

152.    When OptumInsight made this representation to the USPTO, Lancaster,

McMahon, Glazer, and OptumInsight had full knowledge that it was false as a result of the dated source code, sworn statements, testimony and other materials Symmetry had produced in the litigation between Symmetry and OptumInsight. Although Lancaster was not counsel of record in the interference, he was at the same time representing OptumInsight alongside McMahon and Glazer in litigation in which the timing of Dang's conception was also at issue.

153. Despite this knowledge, OptumInsight, as noted, falsely represented to the USPTO that it had conducted "a thorough investigation of the relevant facts" and certified that Seare was entitled to priority.

154. OptumInsight's counsel in the interference proceedings, including Gorman, McMahon and Glazer, acted as agents of OptumInsight. OptumInsight knew of its agents' representations that they had conducted a thorough investigation of the relevant facts and determined that Dang conceived his invention in August 1994, consistent with counsel's duty to keep their client reasonably informed of the status of the interference.

155. OptumInsight misrepresented its investigation, misrepresented Dang's conception date, and deliberately withheld from the USPTO the source code, interrogatory responses, briefing, and sworn testimony establishing that Dang actually conceived of his invention in September of 1993, in order to ensure the continued validity of the Dang patent family.

156. This conduct in the prosecution of the '897 patent renders the patent unenforceable.

157. Because the inequitable conduct in the prosecution of the '897 patent is related to the claims of the patents that claim priority from the '897 patent, all of those claims are likewise unenforceable. Despite its continued prosecution of applications in the Dang patent family, neither OptumInsight nor its predecessor Symmetry has <u>ever</u> disclosed any information to the USPTO regarding Dang's 1993 conception date. OptumInsight has known that Dang had

evidence that he conceived of his invention in September 1993 since at least 2002, when Lancaster and Glazer received Symmetry's response to OptumInsight's motion for partial summary judgment and the dated source code in the litigation between Symmetry and OptumInsight. Yet, that evidence—which is material because it directly contradicts affirmative statements made to the USPTO—was never disclosed to the USPTO.

158. Since the issuance of the original '897 Patent in 1998, OptumInsight and its predecessor Symmetry have applied for, and the USPTO has issued, at least eight other patents based on Dang's original application from 1995, some of which were pending applications at the time of OptumInsight's acquisition of Symmetry and some of which were continuations filed later by OptumInsight.

159. This includes several patents that issued after OptumInsight acquired Symmetry, which patents OptumInsight subsequently enforced against CCGroup.

160. These patents were all prosecuted by attorneys, including Devan Padmanabhan, in the Dorsey & Whitney law firm—the same firm that represented OptumInsight in its litigation against Symmetry and against CCGroup. As such, those attorneys were privy to the source code, briefing, sworn testimony, and interrogatory responses proving that Dang actually conceived of his invention in September of 1993. OptumInsight also participated directly in the prosecution of those patents through at least Brigid Spicola, Secretary of Symmetry and later Secretary and General Counsel of Ingenix/OptumInsight. OptumInsight knew of the source code, briefing, sworn testimony, and interrogatory responses proving that Dang conceived of his invention in September of 1993, because that information was acquired in 2002 by OptumInsight's agents in the Symmetry litigation, including Lancaster, McMahon, and Glazer. OptumInsight also knew of Dang's 1993 conception date as a result of its acquisition of Symmetry in 2003 and its subsequent merger with Symmetry in 2007.

161.    Because all of the Dang patents rely on Dang's original patent application for priority, and because the claims are all related, each of them is invalid and unenforceable in light of the repeated material misrepresentations and omissions before the USPTO regarding Dang's conception date and related June 12, 1994 offer to sell the ETG software to Aetna (i.e., the Aetna RFP Response).

162.    Moreover, OptumInsight and its counsel, including Padmanabhan and Spicola, prosecuted the remainder of the Dang patent portfolio without ever disclosing the testimony, documents, or pleadings establishing that Dang conceived of his invention at least as early as September 1993.  In fact, OptumInsight and its counsel continued to withhold from the examiners of the Dang applications the  invalidating effect of the Aetna RFP Response, despite the fact that the Response was but-for material to the patentability of all of the claims at issue, including both final claims and their antecedents.  This constitutes separate acts of inequitable conduct in each of the subsequent prosecutions.

163.    OptumInsight continued to engage in these deceptive practices before the USPTO to ensure that nothing jeopardized the Dang patent portfolio—a portfolio that it has licensed to numerous companies for well over a decade and has improperly relied on to obtain and maintain its substantial share of the Grouper Software Market.

*OptumInsight Also Committed Inequitable Conduct*
*in Its Prosecution of the Seare Patent Family*

164.    After acquiring Symmetry, OptumInsight continued to prosecute applications in the Seare patent family.  In the years following the acquisition, OptumInsight procured at least two additional Seare patents from the USPTO—U.S. Patent Nos. 7,222,079 and 7,774,252.

165.    OptumInsight and its counsel at Dorsey & Whitney conducted their patent prosecution efforts with full knowledge of evidence—gained through its litigation with Symmetry and/or as a result of its subsequent acquisition of and merger with Symmetry—proving that Dang

had actually invented the grouping methodology claimed in the Seare patents before Seare.

166.    This evidence includes the Aetna RFP Response, which represented an offer to sell Dang's already-conceived invention on June 12, 1994 (before Seare's earliest priority date of June 23, 1994), as well as the source code, interrogatory responses and sworn testimony produced during litigation, all of which establishes Dang's conception in late 1993.

167.    Despite full knowledge of Dang's earlier invention, OptumInsight, through its counsel, prosecuted the Seare patent applications without ever disclosing to the USPTO the Aetna RFP Response, source code, interrogatory responses, briefing, sworn testimony, or any other evidence in its possession that established Dang's priority conception in 1993.

168.    OptumInsight, through its agents including Padmanabhan, Spicola, and others, had an obligation to disclose the foregoing materials to the USPTO because those materials represented anticipating prior art under at least 35 U.S.C. § 102(g).  Because OptumInsight represented to the USPTO that Seare's invention is to the same as Dang's, those materials constituted prior art under Section 102(g) because they evidenced first invention by another (namely, Dang) who did not subsequently abandon, suppress, or conceal that invention.

169.    As OptumInsight was well aware, Dang did not keep his invention from the public but instead publicized his invention by, among other things, by licensing the ETG software and obtaining patents on his invention.

170.    The documents and other evidence that OptumInsight withheld from the USPTO during prosecution of the Seare patent portfolio was material because not a single claim of the Seare patents would have issued had the USPTO been aware of Dang's earlier invention.

171.    OptumInsight, through its agents including Padmanabhan, Spicola, and others, made the deliberate decision not to disclose these materials to the USPTO because they would have rendered Seare's invention unpatentable.   This decision was but one component of a larger

pattern of deceptive conduct on the part of OptumInsight and its attorneys in the Dorsey & Whitney law firm, who learned of Dang's 1993 conception at least as early as October 2002 yet continued to prosecute and enforce the Dang and Seare patents in spite of their resulting unenforceability.

172.    In light of the foregoing, the decision of OptumInsight and its prosecution counsel, including Padmanabhan and Spicola, to withhold evidence of Dang's earlier invention during its subsequent prosecution of the Seare patents constitutes fraud on the USPTO that renders the Seare patents unenforceable.

## OptumInsight's Sham Litigations Against CCGroup

173.    On January 11, 2011, OptumInsight initiated a lawsuit in Minnesota against CCGroup in which it asserted infringement of two patents from its Seare portfolio and five patents from its Dang portfolio.  *(Ingenix, Inc. v. Cave Consulting Group, LLC*, Case No. 11-cv-00077-DWF-FLN).

174.    OptumInsight was represented in that litigation by the Dorsey & Whitney law firm, whose attorneys include Padmanabhan and Lancaster.  Padmanabhan was counsel of record for OptumInsight.   Lancaster was with Dorsey & Whitney at that time and has represented OptumInsight in matters involving the Dang and Seare patents since at least 2001.

175.    Dorsey & Whitney, including Padmanabhan and Lancaster, knew prior to filing suit that Dang had evidence that he conceived his invention in September 1993, at least as a result of Symmetry's representations and disclosures in the litigation between OptumInsight and Symmetry and through OptumInsight's acquisition of and merger with Symmetry.

176.    Dorsey & Whitney, including Padmanabhan and Lancaster, knew prior to filing suit that Dang, Rosenbaum, Portnoy, and Gardiner had submitted sworn statements to the USPTO that Dang conceived his invention in August 1994.

177.    Dorsey & Whitney, including Padmanabhan and Lancaster, had an obligation to review, and on information and belief did review, the prosecution histories of the asserted Dang patents prior to filing suit.  Those prosecution histories revealed that Dang, Rosenbaum, Portnoy, and Gardiner claimed an August 1994 conception date before the USPTO and withheld materials directly contradicting that conception date.

178.    As a result, Dorsey & Whitney, including Padmanabhan and Lancaster, knew prior to filing suit that material information had been withheld, and affirmative misstatements had been made, during prosecution of the Dang patent family and that the family is invalid and unenforceable due to inequitable conduct.

179.    Dorsey & Whitney, including Padmanabhan and Lancaster, also knew prior to filing suit that OptumInsight had represented—explicitly in proceedings before the USPTO—that Seare's invention is the same as that of Dang.  At that time, they also knew that a deliberate decision had been made by patent prosecution counsel not to disclose the evidence of Dang's 1993 conception, including contradictory statements under oath, to the USPTO during prosecution of the Seare patents.  Dorsey & Whitney, including Padmanabhan and Lancaster, also had an obligation to review, and on information and belief did review, the file from the Dang-Seare interference prior to filing suit, which included OptumInsight's misrepresentations and omissions regarding the purported determination that the application for the Seare '079 patent was entitled to priority over the Dang '897 patent.

180.    As a result, Dorsey & Whitney, including Padmanabhan and Lancaster, knew prior to filing suit that the two asserted Seare patents were invalid in light of the offer for sale of the ETG software, as reflected in the Aetna RFP Response, and unenforceable due to inequitable conduct and/or unclean hands.

181.    Despite making these public allegations of infringement against CCGroup,

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT                - 33 -

OptumInsight did not pursue its claims against CCGroup.  On June 20, 2011, four months after filing suit, and without ever serving the Complaint, OptumInsight dismissed its lawsuit without prejudice.

182.    After learning that OptumInsight did not intend to move forward with the litigation, CCGroup requested that OptumInsight agree to a dismissal with prejudice to ensure that OptumInsight's public allegations of infringement would not tarnish CCGroup's reputation and ability to compete in the marketplace.

183.    Despite these requests, OptumInsight refused to dismiss its case with prejudice and also refused to give CCGroup any assurances that OptumInsight would not pursue infringement allegations again in the future.

184.    During this period, CCGroup received numerous inquiries from customers and potential customers regarding OptumInsight's allegations of infringement.

185.    To clear the pall that OptumInsight's allegations had cast over CCGroup's business, on July 11, 2011, CCGroup filed a declaratory judgment action in the Northern District of California to resolve OptumInsight's infringement claims.  (*Cave Consulting Group, Inc. v. OptumInsight, Inc*., 5:11-cv-00469-EJD) ("*Cave I*").

186.    On August 31, 2011, OptumInsight filed counterclaims against CCGroup that affirmatively accused CCGroup of infringing the patents it had earlier asserted in its Minnesota complaint and named one new Dang patent that it had since obtained from the USPTO.

187.    OptumInsight was represented in that litigation by the Dorsey & Whitney law firm, including Padmanabhan.  OptumInsight was also represented in that litigation by Lancaster, who had represented OptumInsight in its earlier litigation with Symmetry—the litigation in which Symmetry produced dated source code to support its claim to a September 1993 conception date, and in which Symmetry expressly represented in briefing that Dang conceived his invention in

1   September 1993.

2       188.    As a result, and as described in detail herein, Padmanabhan, Lancaster,

3   OptumInsight, and Dorsey & Whitney knew before those counterclaims were filed that the Dang

4   and Seare patents are invalid and unenforceable.

5

6       189.    Dorsey & Whitney and OptumInsight's prior knowledge that the Dang and Seare

7   patents are invalid and unenforceable is imputed to the other Dorsey & Whitney attorneys who

8   represented OptumInsight in that litigation.

9       190.    For the next three years, CCGroup defended against OptumInsight's accusations of

10  infringement of the Dang and Seare patents.  The litigation required CCGroup to undertake a

11  costly claim construction, extensive fact discovery, and an in-depth review of the asserted patents

12  and prior art.

13

14      191.    During the litigation, OptumInsight continued its pattern of presenting arguments

15  and facts in litigation that directly contradicted its sworn statements to the USPTO.

16      192.    For example, during claim construction, OptumInsight asserted that the "dynamic

17  time window" claimed in the Dang and Seare patents does <u>not</u> require "shifting" or "resetting"

18  functionality, blatantly arguing that "'[s]hifting' is a concept distinct from the "'dynamic time

19  window' and <u>is thus not properly included in the construction of that claim term</u>." (emphasis

20  added).

21

22      193.    OptumInsight went on to argue:

23      Cave attempts to justify its proposed construction through the premise
        "that resetting and shifting were necessary components of a dynamic time
24      window."  Cave Brief at 22.  The evidence does not support this position.
        To the contrary, the intrinsic record, including the evidence cited by Cave,
25      <u>demonstrates that "resetting" and "shifting," while certainly elements of</u>
        <u>an embodiment of Dang's invention, are not "necessary components of a</u>
26      <u>dynamic time window</u>."  (emphasis added)

27      194.    OptumInsight's claim construction arguments applied to "dynamic time windows"

28

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT                    - 35 -

in both the Seare and Dang patents.

195.    During prosecution of the '079 Seare patent, OptumInsight similarly argued that dynamic time windows do <u>not</u> require "shifting":

> In spite of the above clear definition of the meaning of "dynamic time window" in the Dang file history, and in spite of the fact that it couldn't be considered during Reexamination proceedings, Dang submitted information concerning an on sale issue during a recently concluded Reexamination, and argued that his invention was not on sale, based on a new definition of "dynamic time window." <u>Now Dang argued that, to be "dynamic," the episode time window had to include the concept of "shifting," by which, if, during the generation of an episode of care for one ETG, a record is encountered that changes the appropriate diagnosis to a different ETG, the system can shift the originally assigned ETG to the new one. This belated attempt to change the meaning of a claim term in an issued patent is clearly improper and ineffective.</u>

196.    OptumInsight's arguments acknowledge that, under OptumInsight's construction of "dynamic time window," Dang's representations about "dynamic time windows" during the '897 reexamination were incorrect, and the Aetna RFP Response represents an invalidating offer for sale.

197.    OptumInsight made these arguments despite the fact that Dang had earlier submitted a sworn affidavit to the USPTO in which he adopted the <u>exact opposite position</u> while attempting to distinguish his claimed invention from the methodology taught and offered for sale in the Aetna RFP Response:

> Symmetry could not have delivered a product to Aetna because the concept of dynamic windows, and its use to accomplish shifting of episodes based upon complications or comorbidities, was not made until August, 1994 . . . <u>I did not believe that the response to the RFP was an offer-for-sale because the RFP Response described a developmental version of the ETG Program that did not include my August 1994 concepts of episodes with dynamic windows for shifting</u>. (emphasis added)

198.    Moreover, just as OptumInsight's claim construction position regarding "shifting" was objectively baseless, OptumInsight lacked any non-frivolous basis for alleging infringement of the Dang and Seare patents because the accused CCGroup process did not perform "shifting"

and therefore did not include the use of a "dynamic time window" as that term is properly construed.  OptumInsight took these frivolous claim construction and infringement positions because it knew that CCGroup's accused process would otherwise not infringe.

199.    These and other contradictory positions taken by OptumInsight further evidence the vexatious and objectively baseless nature of its patent infringement litigation against CCGroup.

200.    Two years into the litigation, over objection and after extensive meet and confer efforts by CCGroup, OptumInsight responded to a series of CCGroup's discovery requests by producing over 25,000 pages of confidential documents from its prior litigations involving the Dang and Seare patent portfolios.

201.    After conducting an exhaustive review of those materials, the vast majority of which were chaff with no relevance to these issues, CCGroup's counsel first uncovered the documents, sworn testimony and other evidence that OptumInsight and its predecessor, Symmetry, had been hiding from the USPTO for well over a decade of prosecuting the Dang and Seare patents.

202.    The inequitable conduct in the prosecution of the Dang patents was evident from comparing Dang's representations to the USPTO that he conceived his invention in August 1994 with the confidential evidence from the MedStat and Symmetry/Ingenix litigations showing that Dang had actually conceived his invention in September 1993.

203.    The documents that CCGroup uncovered made plain that OptumInsight had obtained its Dang and Seare patents through the pattern of fraudulent misconduct before the USPTO discussed above.

204.    On May 22, 2013, CCGroup obtained consent to file a Second Amended Complaint to add allegations that OptumInsight had obtained the asserted Dang patents through

inequitable conduct and that the patents were invalid and unenforceable.

205.    Rather than withdraw its infringement allegations in light of the evidence CCGroup had uncovered—information that had been produced from OptumInsight's own files—OptumInsight and its litigation counsel continued to press claims that CCGroup infringed the Dang and Seare patents.  For the next eleven months, OptumInsight forced CCGroup to continue to litigate its defense against the Dang and Seare patents.

206.    Almost a year later, on April 24, 2014, having forced CCGroup to incur significant and unnecessary additional litigation costs, OptumInsight finally dismissed the entire Dang patent family from the lawsuit.

207.    Although OptumInsight withdrew the asserted Dang patents from suit, it continued to press its claim that CCGroup infringed the two Seare patents.

208.    On the eve of trial, OptumInsight withdrew yet another of its patents from suit—this time the '252 Patent, one of the two asserted Seare patents.

209.    OptumInsight kept its remaining Seare patent in suit and ultimately forced CCGroup to defend itself against accusations of infringement of that patent at trial at great expense to CCGroup.

210.    Through this one remaining claim, OptumInsight asserted infringement based on theories, claim constructions, and arguments that directly contradicted representations it had earlier made to the USPTO during patent prosecution.

211.    Notwithstanding OptumInsight's litigation tactics, the jury ultimately returned a verdict in CCGroup's favor on infringement of the '079 Seare patent.

212.    By that point, CCGroup had incurred significant legal fees and expenses in defending against OptumInsight's accusations of infringement of the Dang and Seare patents as well as harm to its reputation and loss of business.

1

**OptumInsight's Predatory and Anticompetitive Conduct Has Injured CCGroup and
Eliminated or Weakened Competition in the Market**

2

3          213.    Acquiring the Dang and Seare patent portfolios through fraud on the USPTO

4    provided OptumInsight with an unfair and unlawful competitive advantage in the Grouper

5    Software Market.

6          214.    OptumInsight's fraud on the USPTO, and its resulting possession and baseless

7    assertion of the Dang and Seare patent families, has enabled OptumInsight to acquire and

8    maintain monopoly power or, in the alternative, created a dangerous probability of OptumInsight

9    obtaining monopoly power, in the Grouper Software Market.

10

11         215.    This unlawful conduct has injured CCGroup and competition in this market.

12         216.    CCGroup has made substantial investments to develop its Cave Grouper software,

13   which began competing directly with OptumInsight's ETG Grouper at least as early as 2005.

14         217.    Through its unlawful attempts to enforce its fraudulently-obtained patents,

15   OptumInsight forced CCGroup to incur litigation expenses to defend against baseless claims

16   alleging infringement of the Dang and Seare patents.

17

18         218.    By asserting the fraudulently obtained Dang and Seare patents and pursuing these

19   serial sham litigation tactics, OptumInsight has sought to force CCGroup and other competitors to

20   exit the Grouper Software Market.

21         219.    OptumInsight's assertion of its fraudulently-obtained patent monopoly, and its

22   public and private claims regarding the strength and breadth of its patent portfolio, have also

23   harmed CCGroup and other competitors of OptumInsight by deterring customers from purchasing

24   episode grouper software from competitors, like CCGroup, that do not have a license to

25   OptumInsight's patent portfolio.  This deterrent effect has enabled OptumInsight to further bolster

26   its position in the marketplace by coercing customers into licensing OptumInsight's ETG Grouper

27

28

1   and related products and services, including downstream analytical tools and consulting services,

2   from OptumInsight or its licensed resellers rather than from CCGroup or other competitors.

3       220.    OptumInsight has also asserted infringement of the unenforceable Dang and Seare

4   patent portfolio to force competitors, including Truven—the third competitor in the Grouper

5   Software Market—to license those patents.

6       221.    OptumInsight's campaign of sham legal actions against CCGroup and others has

7   saddled CCGroup and other competitors with debilitating legal fees and fostered customer

8   apprehension, making it more difficult for those competitors to compete against OptumInsight.

9       222.    The foregoing and other anticompetitive effects from OptumInsight's unlawful

10  conduct have harmed and will continue to harm competition at least in the Grouper Software

11  Market.

12  ### OptumInsight's Fraudulent Concealment of Its Anticompetitive Acts

13      223.    The misrepresentations and omissions set forth above evidence a pattern of

14  concealment that was effective in keeping the public from learning of OptumInsight's

15  anticompetitive and fraudulent activities.

16      224.    OptumInsight's fraudulent activities remained secret until OptumInsight was

17  forced to produce its confidential prior litigation materials in response to discovery requests

18  served by CCGroup in the regular course of fact discovery in the patent infringement lawsuit by

19  OptumInsight that CCGroup was forced to defend.

20      225.    In response to document requests served by CCGroup, OptumInsight produced

21  large volumes of confidential materials from its prior litigations involving the Dang and Seare

22  patent portfolios.  The Dorsey & Whitney law firm had access to and, on information and belief,

23  control over, these documents before they were produced to CCGroup.

226.    CCGroup's counsel conducted a detailed analysis of these voluminous materials and, for the first time, discovered that OptumInsight had acquired its patents through fraud on the USPTO.

227.    These discoveries came from interrogatory responses, sworn deposition testimony, sealed briefings, source code and other documents—buried within OptumInsight's voluminous production—that evidenced Dang's conception in September of 1993, not August 1994 as OptumInsight had repeatedly represented publicly to the USPTO.  OptumInsight knew of this information since at least October 2002, when it was disclosed to Lancaster, Glazer, and other attorneys representing OptumInsight in litigation with Symmetry.

228.    CCGroup's lack of awareness of OptumInsight's fraudulent activities was not the result of any lack of diligence by CCGroup.    To the contrary, CCGroup's review of OptumInsight's extensive document production uncovered OptumInsight's fraudulent behavior.

229.    Until OptumInsight produced its confidential litigation materials in 2013, CCGroup had no way of knowing, or learning through the exercise of due diligence, that OptumInsight had engaged in anticompetitive conduct through its enforcement of a fraudulently obtained patent portfolio.  Moreover, none of the public information reasonably available to CCGroup, including the materials OptumInsight filed publicly with the USPTO, reflected the September 1993 conception date later uncovered in the confidential materials OptumInsight produced to CCGroup.

230.    In further efforts to conceal its fraud, when OptumInsight eventually produced its prior litigation materials from the Symmetry and MedStat litigations, OptumInsight continued its efforts to keep these documents secret by designating those materials as confidential, attorneys'-eyes-only materials under the Court's protective order.  These documents and testimony remain confidential to this day.  CCGroup is able to acknowledge their existence in this Complaint

because the same allegations appear publicly in CCGroup's Second Amended Complaint filed in the prior patent infringement litigation.

231.    On information and belief, OptumInsight did not oppose CCGroup's public filing of that Second Amended Complaint because OptumInsight was concerned about incurring additional liability for further concealing its fraudulent and anticompetitive conduct.

232.    Based on the foregoing, OptumInsight fraudulently concealed its anticompetitive conduct from CCGroup until at least July of 2013 and continues to conceal that conduct from the USPTO and the general public today.

### OptumInsight and Symmetry's Inequitable Conduct Renders the Claims of the Asserted Dang and Seare Patents Unenforceable

233.    The inequitable conduct described in this Complaint renders the Dang and Seare patents unenforceable.

234.    The following Dang patents claim priority to the application for the '897 patent:

    i.   US Patent No. 6,370,511 (the "'511 patent")

    ii.   US Patent No. 7,620,560 (the "'560 patent")

    iii.   US Patent No. 7,725,333 (the "'333 patent")

    iv.   US Patent No. 7,774,216 (the "'216 patent")

    v.   US Patent No. 7,979,290 (the "'290 patent")

    vi.   US Patent No. 8,121,869 (the "'869 patent")

    vii.   US Patent No. 8,296,165 (the "'165 patent")

    viii.   US Patent No. 8,700,433 (the "'433 patent")

235.    As noted by OptumInsight in its Opening Claim Construction Brief in *Cave I*, the Dang patents share a common specification.

236.    As explained in the paragraphs that follow, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of at

least one claim from each of the Dang patents and applications, including both issued claims and antecedents to issued claims.  The ETG software also rendered obvious at least one claim from each of the Dang patents and applications.

237.  All of the Dang patents share a nearly identical disclosure and are directed to nearly identical subject matter. The claims of the Dang patents repeat the same concepts over and over, often with identical or nearly identical language from one patent's claims to the next.

238.  As to all of the claim limitations in the Dang patents relating to computer-implemented systems, computer instructions, processors, and the like, the ETG software offered for sale and described in the Aetna RFP Response clearly embodied those limitations.  The Aetna RFP Response makes clear that the ETG software comprised instructions for a computer and was designed for use on a computer.  For example, the Aetna RFP Response offered "software, including mainframe, server and workstation software."  The Aetna RFP Response also provided that employees would be "permitted to use copies of the software on a workstation installed at the employee's home and on a portable lap-top workstation."

239.  Attached hereto as Exhibit B are exemplary claim charts that match at least one claim of each Dang and Seare patent to the disclosure found in the Aetna RFP Response.  A more fulsome discussion of how the Aetna RFP Response discloses the subject matter claimed in the Dang and Seare patents follows.

*The '897 Patent*

240.  The '897 patent generally covers a process for grouping medical claim records based on diagnostic codes and/or treatment codes in the claim records.

241.  Claims 2-32 of the '897 patent depend from independent claim 1.

242.  Claims 34-52 of the '897 patent depend from independent claim 33.

243.    The '897 patent claims a process that includes reading medical claims data from data records into computer memory.  The ETG software offered for sale and described in the Aetna RFP Response practiced this limitation.  Page 3 explained that the "software accepts health care claims."  Page 4 explains that the software used health care claim data as input, focusing on the ICD-9 and CPT-4 codes.

244.    This disclosure in the Aetna RFP Response also renders this limitation obvious to one having ordinary skill in the art.

245.    The '897 patent claims include a limitation of "validating each of the at least one of a plurality of data records for at least one of a diagnosis code and a treatment code."

246.    The '897 patent specification describes one example of validation:

From the patient records read to memory in step 102, a record validation step 104 is carried out to check provider type, treatment code and diagnosis code against pre-determined CPT code and diagnosis code look up tables. The diagnosis code is preferably the industry standard ICD-9 code and the treatment code is preferably the industry standard CPT-4 code.

247.    Page 17 of the Aetna RFP Response explained that the ETG software required "at least one of a diagnosis code and a treatment code."

248.    The Aetna RFP Response describes the ETG software's validation process on page 3, where it explains that "the ETG software does have built-in edit checks to make sure that services with inappropriate ICD9-CPT4 relationships are separated for special consideration." An ICD-9 code is a diagnosis code, and a CPT-4 code is a treatment code.

249.    Pages 18-19 of the Aetna RFP Response also describe validation by the ETG software, explaining that the software is configured to "determine the appropriateness of each ICD-9 to each CPT-4 code," and that "[i]nappropriate pairings are flagged and excluded from further analysis."  Page 19 explains that "certain claims with valid diagnosis codes and invalid CPT-4 codes (or the opposite scenario) will be accommodated and grouped correctly."

250.     The Aetna RFP Response also explains at page 5 that "[t]he ETG software contains a series of reference tables identifying each ICD-9 diagnosis and CPT-4 procedure with respect to ETG assignment algorithms."

251.     Thus, the Aetna RFP Response shows that the ETG software offered for sale was capable of validation as claimed in the '897 patent (and subsequent Dang patents).

252.     The above disclosure in the Aetna RFP Response was also sufficient to render validation obvious to one having ordinary skill in the art.

253.     The '897 patent claims require reading a pre-defined relationship between diagnosis or procedure codes, on the one hand, and pre-defined episode treatment categories, on the other.   On page 5, the Aetna RFP Response described the ETG software practicing this limitation, explaining that "[t]he ETG software contains a series of reference tables identifying each ICD-9 diagnosis and CPT-4 procedure with respect to ETG assignment algorithms," and that "this mapping forms the basis for initial ETG assignment."   Page 17 describes "the ICD-9 diagnoses [sic] and CPT-4 procedure codes which define each ETG."

254.     Pages 18-19 likewise describe "specialized algorithms within the ETG software" that "determine the pairings of ICD-9 and CPT-4 codes which are most consistent with an ETG's definition."

255.     Thus, the ETG software described and offered for sale in the Aetna RFP Response practiced this limitation.

256.     This disclosure in the Aetna RFP Response also renders this limitation obvious to one having ordinary skill in the art.

257.     Claims 1-32 of the '897 patent require grouping claim records into episode treatment categories based on the relationship between the diagnosis and/or procedure codes and the episode treatment categories.

258.     The Aetna RFP Response describes the ETG software grouping claims data to episode treatment groups or categories based on the relationship between the diagnosis and/or treatment codes in the claim records and the pre-defined episode treatment groups.  The grouping process is described, for example, at pages 3-6 of the Aetna RFP Response.  Pages 30-42 list episode treatment groups into which claims data can be grouped.  Thus, the ETG software described and offered for sale in the Aetna RFP Response practiced this grouping limitation.

259.     This disclosure in the Aetna RFP Response also renders this limitation obvious to one having ordinary skill in the art.

260.     Claims 1-32 and 43-44 of the '897 patent (and several claims in the other Dang patents) include limitations directed to "dynamic time windows."

261.     Although the specifications of the Dang patents do not use the phrase "dynamic time window," the concept is described.  The written description states that the "ETG grouper method continues to collect information <u>until an absence of treatment is detected for a predetermined period of time commensurate with the episode</u>. . . .  Subsequent records of the same nature within the window reset the window for an additional period of time until the patient is asymptomatic for the predetermined time period."  (emphasis added).

262.     In its opening claim construction brief in *Cave I*, OptumInsight identified this language as describing dynamic time windows.

263.     During prosecution of the '897 patent, Dennis Dang (through David Rosenbaum) used the same language to describe "dynamic time windows," explaining that "the inventive methodology employs a <u>dynamic time window</u> which changes based upon correlation of other related claim records, <u>until there is an absence of related claim records for a period of time corresponding to the pre-defined time period</u>." (emphasis added).

264.    The Aetna RFP Response used the same language to explain that ETGs used exactly the same methodology at the time the Response was submitted.  Page 16 explains that, "[u]nlike some other methodologies which set a pre-determined episode length based upon illness, ETG's take an altogether different approach.  An episode begins when a management record for a particular illness is first detected.  An episode ends when the ***absence of recurring claims for a specified period of time is detected***."  (emphasis in original).

265.    In a deposition on September 9, 1999, Dang testified about the meaning of "dynamic time window" by describing it as "flexible":

Q: What does the term "dynamic" mean in the term "dynamic time window"?

A: **That the length of time by which a claim record can be assigned to the episode is flexible**.

Q: And what does that mean, that it is flexible?

A: **Well, that it's not set at the beginning of the episode and predetermined to be a certain length of time. It can be adjustable as time goes on in an episode**.

266.    The Aetna RFP Response explains that ETGs used exactly the same methodology at the time the Response was submitted.  Page 3 explains that "an ETG episode is *flexible* to detect when a patient's treatment for a particular illness has ended."  (emphasis in original).

267.    Thus, according to the Dang patents and the Aetna RFP Response, an episode of care is termed complete based on the absence of treatment for a condition for a specified period of time.  The approach taken for the identification of a complete episode relies on a flexible, rather than a fixed length of time. In other words, there are no presumed definitions of an episode's chronological length.

268.    Each ETG has its own pre-defined time period. If a claim record is received that corresponds to an episode within the predefined period of time, then the time period resets.  The

process continues until there is an absence of relevant claims within the time period.  This is the "dynamic time window" concept disclosed and claimed in the '897 patent.

269.    This is a restatement of the principle described in the Aetna RFP Response, which explains that "an episode ends when the absence of recurring claims for a specified period of time is detected."

270.    Thus, the ETG software described and offered for sale in the Aetna RFP Response embodied the "dynamic time window" limitation in the '897 patent claims 1-32.

271.    This disclosure in the Aetna RFP Response also renders this limitation obvious to one having ordinary skill in the art.

272.    Claim 3 of the '897 patent adds the limitation of classifying medical claims data into episode treatment groups.  Pages 3-6 of the Aetna RFP Response described the ETG software grouping into episode treatment groups.

273.    Thus, the ETG software described and offered for sale in the Aetna RFP Response practiced this grouping limitation.

274.    This disclosure in the Aetna RFP Response also renders this limitation obvious to one having ordinary skill in the art.

275.    Claim 10 of the '897 patent adds to claim 3 the limitation of differentiating illness severity based upon data relating to at least one of patient age, diagnosis and major surgery.

276.    Page 2 of the Aetna RFP Response explains that the ETG software was "[a]ble to sufficiently account for differences in patient severity."

277.    Page 3 of the Aetna RFP Response further shows that the ETG software embodied this limitation:

**Case Mix Adjustment** ETGs have been developed to account for differences in patient severity. Differences in patients' diagnoses, age, complicating conditions, comorbidities and major surgeries have been factored into the definition of the ETGs. As a result, subsequent analysis of provider performance or health care utilization is based on a sound methodological base, controlling for differences in patient severity. Individual groups are **clinically homogeneous**.

278.    The lists of ETGs in Appendix A of the Aetna RFP Response likewise show ETGs reflecting differences in patient age, diagnosis, and major surgery.

279.    Thus, the ETG software described and offered for sale in the Aetna RFP Response practiced this differentiating limitation.

280.    This disclosure in the Aetna RFP Response also renders this limitation obvious to one having ordinary skill in the art.

281.    Claim 11 of the '897 patent adds the further limitation of identifying claim records as one of management, surgery, facility, ancillary, and prescription drug records.

282.    Page 4 of the Aetna RFP Response shows that the ETG software identified claim records as either a management or ancillary record, including surgery records. Page 18 of the Aetna RFP Response likewise shows that the ETG software could identify prescription drug data.

283.    Thus, the ETG software described and offered for sale in the Aetna RFP Response embodied this limitation.

284.    The ETG software in the Aetna RFP Response also rendered this limitation obvious to one having ordinary skill in the art.

285.    Claim 13 adds to claim 11 the further limitation of ancillary records comprising claim records representing services incidental to direct evaluation, management and treatment of the patient.

286.    The ETG software described and offered for sale in the Aetna RFP Response practiced this limitation, as shown on page 4:

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT

- 49 -

*Ancillary records* represent services that are incidental to the direct evaluation, management and treatment of a patient; such as x-rays and laboratory.

287.    This disclosure also rendered this claim limitation obvious.

288.    Claim 21 of the '897 patent recites "*resetting the predefined time window of the medical episode when a second at least one of a plurality of data records matches an open medical episode the predefined time window being reset for an additional period of time until no other data records are grouped to the open medical episode within the reset predetermined time windows.*"

289.    In its responsive claim construction brief in *Cave I*, OptumInsight argued that "'[r]esetting' is one method (indeed the most common method) of changing the overall duration of a time period for an episode of care, by restarting the time period when a related event within the period is detected."

290.    This is a restatement of the principle described in the Aetna RFP Response, which explains that "an episode ends when the absence of recurring claims for a specified period of time is detected."

291.    In a deposition on October 15, 2013, Dang testified that the Aetna RFP Response taught the "dynamic time window" concept and that the ETG software included that functionality at the time the Aetna RFP Response was submitted.

292.    Thus, the ETG software described and offered for sale in the Aetna RFP Response practiced the "resetting" limitation of the '897 patent claims.

293.    The ETG software also rendered this limitation obvious.

294.    The Dang patent claims also include limitations directed to a concept known as "shifting." The '897 patent specification describes shifting by explaining that "ETGs can identify a change in the patient's condition and shift the patient's episode from the initially defined ETG to the ETG which includes the change in condition."

295.   The '897 patent identifies comorbidities, complications, and defining surgeries as three factors that can cause the program to "shift" from one ETG to another:

> Comorbidities, complications or a defining surgery could require an update of the patient's condition to an ETG requiring a more aggressive treatment profile. ETG's changes in the patient's clinical condition and shift the patient's episode from the initially defined ETG to an ETG which includes the change in clinical condition.

296.   Claim 23 of the '897 patent recites "*shifting a medical episode to a different medical episode treatment category based upon changes in patient condition comprising at least one of comorbidity, complication and defining surgery.*"

297.   Claim 45 of the '897 patent recites "*shifting a medical claim to a different one of the plurality of episode treatment groups based upon a inputting of a medical claim record including changes in patient condition comprising at least one of comorbidity, complication and defining surgery.*"

298.   In its Opening Claim Construction Brief in *Cave I*, OptumInsight argued that, "[a]s used in the claims [of the Dang patents], 'shifting' is a simple, readily understandable action.  The conditions that trigger the 'shifting' are defined by other language in the claims (*e.g.*, 'changes in patient condition comprising at least one of comorbidity, complication and defining surgery')."

299.   OptumInsight also explained:

> The specifications of the Dang patents illustrate that "shifting" refers to the ordinary meaning of the term.  For example, the '897 patent specification states that "[t]he present computer-implemented health care system contains important improvements and advances upon conventional health care systems by…shifting groupings for changed clinical conditions."  The '897 patent specification also states that "ETGs can identify a change in the patient's condition and shift the patient's episode from the initially defined ETG to the ETG which includes the changed in condition."  The '897 patent discloses that "ETG's may be shifted to account for changes in clinical severity, for a more aggressive ETG treatment profile if a complication or comorbidity is encountered during the course of treatment for a given ETG or where a defining surgery is encountered during the course of treatment for a given ETG."

300.     The ETG software offered for sale and described in the Aetna RFP Response used exactly the same "shifting" methodology as that claimed in the Dang patents, including the '897 patent.  Page 3 of the Aetna RFP Response explains that "ETGs have been developed to account for differences in patient severity.   Differences in patients' diagnoses, age, complicating conditions, comorbidities and major surgeries have been factored into the definition of the ETGs."

301.     At pages 4-6, the Aetna RFP Response describes "shifting" claims data from an initial ETG to a second ETG based upon later claims data reflecting comorbidities, complications, defining surgeries, and/or patient age.  As explained there, "each ICD-9 code has been previously assigned principally to one and only one ETG.  This mapping forms the basis for <u>initial</u> ETG assignment" (emphasis in original).   The Response then explains that, after an initial ETG assignment, the software can "shift" claim records to a different ETG based on subsequent ICD-9 codes indicating changed conditions, including comorbidities and complications.

302.     In a 1996 article describing his ETG software, under the heading "Clinical Logic and ETG Shifting," Dang used nearly identical language to describe shifting.  Dang wrote that "each ICD-9 code is principally assigned to one and only one ETG.  This mapping forms the basis for 'initial' ETG assignment—initial, since subsequent diagnosis codes may affect final ETG assignment in a process called 'shifting.'"

303.     Dang continued his explanation of shifting by explaining that "comorbid diagnoses" will "shift an ETG assignment."  Dang provided an illustration of "shifting" based on a comorbidity:

> For example, a patient receiving care for arthritis would be considered to be more difficult and expensive to treat if the patient also had osteoporosis, a comorbid condition. Although the patient may not be receiving treatment for osteoporosis per se, the patient would generally require a more intensive treatment regimen for the arthritis than if this comorbid condition did not exist.  Hence, <u>the patient shifts into a more complicated episode of arthritis with comorbidity</u>.   (emphasis added)

1

2      304.    The Aetna RFP Response used nearly identical language on page 5 to describe

3  how the ETG software "shifted" based on comorbidities:

4          A patient receiving care for arthritis would be considered to be more difficult and
        expensive to treat if the patient also had osteoporosis, a comorbid condition.
5          Although the patient may not currently receive treatment for osteoporosis per se,
        the patient would require a more intensive treatment regimen than if his comorbid
6          condition did not exist.  Hence, the patient "shifts" into a more complicated ETG:
        Arthritis **with** comorbidity.  (underlining added; bold/italics in original).
7

8      305.    Page 41 of the Aetna RFP Response shows separate ETGs for arthritis with and

9  without comorbidity.  As explained in the example on page 5, the ETG software would "shift"

10 from the ETG for arthritis without comorbidity to the ETG for arthritis with comorbidity when it

11 received a subsequent claim data record indicating the presence of comorbidity.

12
       306.    Appendix A of the Aetna RFP Response also included a list of episode treatment
13
   groups.  The episode treatment groups listed on pages 30-42 of the Aetna RFP Response included
14
   conditions with and without complications and comorbidities, consistent with the description of
15
   "shifting" on pages 4-6, as well as with Dang's description of the ETG software in 1996.
16

17     307.    The list of ETGs in the Aetna RFP Response also included separate ETGs for the

18 same base condition, split up by patient age. This is consistent with the description of "shifting"

19 on pages 4-6, as well as with Dang's description of the ETG software in 1996.

20
       308.    The list of ETGs in the Aetna RFP Response also includes conditions with and
21
   without defining surgeries, such as epilepsy with surgery and epilepsy without surgery.  This is
22
   consistent with the description of "shifting" on pages 4-6, as well as with Dang's description of
23
   the ETG software in 1996.
24

25     309.    In a deposition on October 15, 2013, Dang confirmed that the Aetna RFP

26 Response taught the "shifting" concept, including shifting based on comorbidity, surgery, and

27

28

CAVE CONSULTING GROUP, INC.'S            - 53 -
SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

complication, and that the ETG software included that functionality at the time the Aetna RFP Response was submitted.

310.    Claim 2 of the '897 patent adds the further limitation of "assigning treatment and cost information to the episode treatment category."  Page 3 of the Aetna RFP Response explained that the ETG software "insures that *all* appropriate treatment and cost information has been collected and correctly assigned to one complete illness episode."  (emphasis in original)

311.    Claim 4 of the '897 patent adds to claim 3 the limitation of episode treatment groups being "clinically homogeneous groupings with respect to the underlying cause of illness and treatment requirement.  Page 3 of the Aetna RFP Response explained that "[i]ndividual groups are **clinically homogeneous**."  (emphasis in original).  Page 16 explained that ETGs were iteratively analyzed "until acceptable clinical and statistical homogeneity was displayed for each ETG."

312.    Claim 7 of the '897 patent adds to claim 3 the limitation of episode treatment groups containing "at least one cluster of medical claim records."  The Aetna RFP Response explained that, in the ETG software, "[t]aken together, management records with their linked ancillary records form a *cluster* of services.  **One or more clusters represent a treatment episode**."  (emphasis in original).  Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

313.    Claim 8 of the '897 patent adds to claim 7 the further limitation of clusters comprising "only one anchor record and n additional medical records, where n is an integer greater than or equal to zero."  Page 4 of the Aetna RFP Response describes formation of ETGs using management records, "also known as *anchor* records." (emphasis in original).  Page 4 of the Aetna RFP Response also describes formation of ETGs using "ancillary records" linked to the

anchor records to form "clusters":  "Taken together, management [anchor] records with their linked ancillary records form a *cluster* of services. **One or more clusters represent a treatment episode**."  (emphasis in original).  Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

314.    Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of the claims of the '897 patent.  Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '897 patent.

*The '511 Patent*

315.    The '511 patent is a continuation of the '897 patent.  The '511 patent's written description is essentially identical to the written description of the '897 patent.

316.    The '511 patent is generally directed to the grouping of pharmaceutical claims data into episodes of treatment.

317.    As in the '897 patent, the '511 patent claims teach that claim records may be differentiated by patient severity based upon factors such as patient age, complicating conditions, and comorbidities.

318.    As in the '897 patent, the '511 patent claims teach shifting records between groups based upon claim data.

319.    As described in detail above with reference to the '897 patent, the ETG software described and offered for sale in the Aetna RFP Response practiced the limitations of reading claim data into computer memory, validating claim data, reading a predefined relationship between claim data and an episode treatment category, and grouping to an episode treatment

group based on a predefined relationship. The only relevant difference is that the '511 patent is directed to grouping using pharmaceutical claim data, rather than diagnosis or treatment codes.

320. The Aetna RFP Response shows that the ETG software offered for sale was capable of performing grouping using pharmaceutical claims data. On page 18 of the response, under the heading "Accommodates diverse data sources," the Aetna RFP Response explains that "[a]ny health care data stream can be accommodated by the ETG grouping methodology. For example, ETGs can accommodate prescription drug data provided that unique patient identifier, from and to service dates and ICD-9 diagnosis code are available on each drug claim." (emphasis added). Such prescription drug data would be represented by a drug code. Thus, the Aetna RFP Response demonstrates that the ETG software offered for sale was capable of grouping based on pharmaceutical claims data.

321. This disclosure shows that the ETG software described and offered for sale in the Aetna RFP Response also rendered grouping by pharmaceutical claim data.

322. Claim 2 of the '511 patent adds to claim 1 the limitation of reading either a national drug code or a generic drug code. These are well-known, standard formats for drug claim data that would be obvious to those having ordinary skill in the art.

323. Claim 4 of the '511 patent is directed to grouping "clusters" of medical claim data.

324. The written description of the '511 patent—which is the same as the other Dang patents' written descriptions—explains that "[a] 'cluster' is a grouping of one, and only one, anchor record, management or surgery, and possibly ancillary, facility and/or drug records. A cluster represents a group of services in which the focal point, and therefore the responsible medical personnel, is the anchor record. An episode is made up of one or more clusters."

325.    Pages 4-5 of the Aetna RFP Response disclosed the very same concept: "Taken together, management records with their linked ancillary records form a *cluster* of services. **One or more clusters represent a treatment episode**."  (emphasis in original).

326.    Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

327.    The '511 patent defines "management records" as "claims which represent a service by a provider engaging in the direct evaluation, management or treatment or [*sic*] a patient."  The Aetna RFP Response likewise explained, at page 4, that "*Management records represent a service by a provider engaging in the direct evaluation, management, or treatment of a patient. . . .  Management records are also known as anchor records since they indicate that an illness has begun, and in addition, provide a reference point from which to link ancillary records.*" (emphasis in original).

328.    The '511 patent defines "ancillary records" as "claims which represent services which are incidental to the direct evaluation, management and treatment of the patient. Examples of ancillary records include X-ray and laboratory tests."  The Aetna RFP Response likewise explained, at page 4, that "*Ancillary records represent services that are incidental to the direct evaluation, management and treatment of a patient; such as x-rays and laboratory.*"

329.    Thus, the Aetna RFP Response demonstrates that the ETG software offered for sale and described in the Aetna RFP Response was capable of grouping "clusters" comprising at least one anchor record, as claimed in claim 4 of the '511 patent.

330.    Limitation (c) of claim 4 is directed to "shifting" clusters.  As described above, the ETG software offered for sale and described in the Aetna RFP Response practiced such "shifting."

331.   Claim 5 of the '511 patent is directed to a method in which the ETGs include "one anchor record and n data records linked [to the anchor record]," in which the "n data records" can be "ancillary records."

332.   Claim 6 is directed to the method of claim 5, with the further requirement that at least one of the ETGs contain at least one "cluster."

333.   Claim 7 is directed to the method of claim 6, with the further requirement that one of the clusters include at least one ancillary record and one anchor record.

334.   The Aetna RFP Response demonstrates that the ETG software practiced the limitations of claims 5, 6, and 7 of the '511 patent.

335.   Page 4 of the Aetna RFP Response describes formation of ETGs using management records, "also known as *anchor* records." (emphasis in original).

336.   Page 4 of the Aetna RFP Response also describes formation of ETGs using "ancillary records" linked to the anchor records to form "clusters": "Taken together, management [anchor] records with their linked ancillary records form a *cluster* of services. **One or more clusters represent a treatment episode**."  (emphasis in original).

337.   Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

338.   Thus, the Aetna RFP Response demonstrates that the ETG software offered for sale was capable of practicing the limitations of claims 5, 6, and 7 of the '511 patent.

339.   Claim 8 of the '511 patent is directed to the method of claim 1, with the further limitation of "differentiating patient severity based upon data relating to at least one of patient age, complicating conditions, comorbidities, and major surgeries."   As explained above by reference to the '897 patent, the Aetna RFP Response includes a detailed description of all these limitations.

340.     When Dennis Dang (through David Rosenbaum) first filed the application that led to the '511 patent, he asked the USPTO to grant him claims including the following:

*1. A cluster of correlated medical claim records for a single medical patient, consisting of at least one of a plurality of medical claim records grouped to a common anchor record.*

*2. An episode treatment group comprising at least one of a plurality of clusters according to Claim 1.*

*3. A computer-implemented episode treatment grouping of related medical claim data encoded as a plurality of machine readable bits on a machine readable carrier, comprising one anchor record and n data records linked thereto, the n data records being selected from the group consisting of ancillary records, facility records and prescription drug records, where n is an integer greater than or equal to 0.*

341.     Each of these claims would cover, for example, an ETG made up of "clusters" of anchor records with ancillary records linked to them—*i.e.*, exactly what was described and offered for sale in the Aetna RFP Response (as explained above with respect to claims 5, 6, and 7).

342.     The detailed disclosure of the ETG software offered for sale and described in the Aetna RFP Response is also sufficient to render obvious to one having ordinary skill in the art the limitations of the '511 patent claims relating to pharmaceutical claims data.

343.     Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of the claims of the '511 patent.  Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '511 patent.

344.     During prosecution of the '511 patent, on March 10, 2000, the examiner entered a restriction requirement requiring Dang to prosecute certain groups of claims in separate applications.

345.   In response to the restriction requirement, on June 29, 2000, Dang elected to continue prosecuting the claims directed to grouping using pharmaceutical claims data.

346.   Nearly two years later, on March 25, 2002, Dang filed five divisional patent applications claiming priority through the '511 patent application to the original '897 patent application.

347.   The five divisional applications filed by Dang in March 2002 were filed about a month after the conclusion of the reexamination of the '897 patent, in which reexamination the Aetna RFP Response was first disclosed to the USPTO and Dang, Portnoy, Rosenbaum, and Gardiner filed false affidavits claiming that Dang had not conceived of his invention until August 1994.

*The '560 Patent*

348.   The first divisional application filed by Dang in March 2002 was application number 10/106,281 (the "'281 application").  The '281 application eventually issued as the '560 patent.  The '281 application was filed by Rosenbaum.

349.   On July 19, 2004, Bridgid Spicola of OptumInsight filed a document giving power of attorney to "the Dorsey & Whitney LLP attorneys and agents associated with Customer Number 25763" to prosecute the '281 application.  The document directed all communications and correspondence to Devan Padmanabhan.

350.   At no time during the prosecution of the '281 application did Dang, Rosenbaum, Padmanabhan, Spicola, or anyone else associated with the prosecution of the application disclose to the examiner the invalidating effect of the Aetna RFP Response or any of the contradictory information from related litigation regarding the conception date of Dang's invention.

351.   When he filed the '281 application, Dang asked the USPTO to grant him the following claim:

1

2

> *A computer-implemented method for grouping medical claims data, comprising the steps of:*

3

4

> *a. grouping a plurality of medical claim data records to an episode of care;*

5

> *b. assigning a first clean period to the episode of care, the first clean period defined by a predefined time duration; and*

6

7

8

> *c. resetting the first clean period to define a second clean period, the second clean period defining a second predefined time duration, the resetting occurring based upon grouping of a later presented medical claim data to the episode of care within the first clean period's predefined time duration.*

9       352.    The ETG methodology described and offered for sale in the Aetna RFP Response

10   embodied and was but-for material to the patentability of this proposed claim.

11       353.    As explained in detail above, the ETG methodology described and offered for sale

12   in the Aetna RFP Response used a computer to group medical claim data records into episodes of

13   care (see, e.g., page 5 of Response).

14

15       354.    The ETG software in the Aetna RFP Response also rendered this limitation

16   obvious to one having ordinary skill in the art.

17       355.    The ETG software described and offered for sale in the Aetna RFP Response used

18   clean periods as prescribed in the claims of the '560 patent.

19       356.    The ETG software in the Aetna RFP Response also rendered this limitation

20   obvious to one having ordinary skill in the art.

21

22       357.    The term "clean period" does not appear anywhere in the '560 patent specification

23   except in the claim.

24       358.    In a 1996 article describing ETG software, Dennis Dang explained that "there are

25   no a priori definitions of an episode's chronological length. . . .   Episode treatment groups

26   accomplish this by the identification of discrete 'clean periods.'   <u>A clean period is defined as the</u>

27

28

absence of treatment for a specified period of time.   Each ETG has its own clean period."

(emphasis added)

359.   Dang also explained that "[o]nce treatment for an episode has begun, the ETG software continues to collect all clinically relevant information until an absence of treatment or 'clean period' is detected.   An ETG is flexible to detect when treatment for a particular illness has ended." (emphasis added)

360.   In an appeal brief filed during prosecution of the '560 patent, Adriana Luedke of Dorsey & Whitney explained that a "clean period is defined by a predefined time period during which there is an absence of medical claim data having the defining characteristic(s) of the episode treatment group." (emphasis added).

361.   The Aetna RFP Response explains that ETGs used exactly the same methodology at the time the Response was submitted: "Unlike some other methodologies which set a pre-determined episode length based upon illness, ETG's take an altogether different approach.   An episode begins when a management record for a particular illness is first detected.   An episode ends when the *absence of recurring claims for a specified period of time is detected*." (emphasis in original).

362.   The Aetna RFP Response also explains that "an ETG episode is *flexible* to detect when a patient's treatment for a particular illness has ended"—the same language used by Dang in 1996 to describe the function of clean periods.  (underline added; italics in original).

363.   Thus, the "clean period" concept for which Dang sought patent protection is exactly the same methodology used by the ETG software offered for sale in the Aetna RFP Response.

364.   The ETG software described and offered for sale in the Aetna RFP Response therefore used clean periods as prescribed in the claims of the '560 patent.

365.   The ETG software in the Aetna RFP Response also rendered this limitation obvious to one having ordinary skill in the art.

366.   The '560 patent eventually issued with a single claim, reproduced here:

> 1. A computer-implemented method for grouping medical claims data, comprising the steps of:
>   a. grouping a plurality of medical claim data records to an episode of care having at least one defining characteristic, wherein the grouping is preformed by a computer processing unit;
>   b. assigning a first clean period to the episode of care, the first clean period defined by a predefined time duration during which there is an absence of medical claim data having the at least one defining characteristic of the episode treatment group, wherein the grouping is performed by the computer processing unit; and
>   c. resetting the first clean period to define a second clean period, the second clean period defining a second predefined time duration, wherein the first clean period is reset to the second clean period when later presented medical claim data having the at least one characteristic of the episode of care and falling within the first clean period is added to the episode of care, wherein the grouping is performed by the computer processing unit.

367.   As explained in detail above, the ETG methodology described and offered for sale in the Aetna RFP Response used a computer to group medical claim data records into episodes of care (see, e.g., page 5 of Response).

368.   Each of the episodes in the ETG software had a defining characteristic—*e.g.*, a particular medical condition, or a condition of a particular severity (see, e.g., Appendix A of the Response).

369.   In an appeal brief filed during prosecution of the '560 patent, Adriana Luedke of Dorsey & Whitney provided the following illustration of how the claimed methodology uses "clean periods" to group medical claim data:



370.    Luedke explained the illustration as follows:

In the example provided above, in accordance with the methodology of claim 1, a first clean period is assigned upon receipt of claim data for S1.  Upon receipt of claim data for S2, which falls within the first clean period, S2 is grouped with S1 and the first clean period is reset to the second clean period.  Following this methodology one step further, upon receipt of claim data for S3, which falls within the second clean period, S3 is grouped with S1 and S2 and the second clean period is again reset, this time to a third clean period. Upon receipt of claim data for S4, S4 does not fall within the clean period and is therefore not grouped with S1, S2, and S3.

371.    So, according to the illustration and argument in the appeal brief, the specified period of time is the clean period, and as long as a subsequent claim record (relevant to the episode) is received within the clean period, then the clean period will reset beginning at that claim record.  This continues until there is a clean period with no relevant records—*i.e.*, until "the absence of recurring claims for a specified period of time is detected," as explained in the Aetna RFP Response.

372.    This is the same functionality that, in CCGroup's product, OptumInsight accused of satisfying the "dynamic time window" limitation in *Cave I*.

373.    The Aetna RFP Response explains that ETGs used exactly the same methodology at the time the Response was submitted: "Unlike some other methodologies which set a pre-determined episode length based upon illness, ETG's take an altogether different approach.  An episode begins when a management record for a particular illness is first detected.  An episode

ends when the ***absence of recurring claims for a specified period of time is detected***." (emphasis in original).

374.   The Aetna RFP Response also explains that "an ETG episode is *flexible* to detect when a patient's treatment for a particular illness has ended"—the same language used by Dang in 1996 to describe the function of clean periods.  (underline added; italics in original).

375.   Thus, as explained in detail above, the "clean period" and "resetting" concepts for are exactly the same methodology used by the ETG software offered for sale in the Aetna RFP Response.

376.   The ETG software in the Aetna RFP Response also rendered these limitations obvious to one having ordinary skill in the art.

377.   On August 2, 2013, OptumInsight's counsel (including Peter Lancaster) served CCGroup with interrogatory responses in the *Cave I* litigation. In those interrogatory responses, OptumInsight identified the date of conception of claim 1 of the '560 patent as "no later than" June 12, 1994—the date of the Aetna RFP Response.  This response was certified by Elizabeth Schmiesing, Senior Associate General Counsel for OptumInsight, who stated that the response was "prepared based upon [her] personal knowledge and/or based upon information available to [her] upon a reasonable investigation."   OptumInsight never supplemented or amended this response.

378.   Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of the claims of the '560 patent.  Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '560 patent.

*The '333 Patent*

379.    The '333 patent issued from application number 11/761,855 (the "'855 application"). The '855 application was filed on June 12, 2007 by Dorsey & Whitney attorney Adriana Luedke on behalf of OptumInsight. The '855 application was a continuation of the '282 application.

380.    At no time during the prosecution of the '855 application did Ms. Luedke or anyone else associated with the prosecution of the application disclose to the examiner the invalidating effect of the Aetna RFP Response or any of the contradictory information from related litigation regarding the conception date of Dang's invention.

381.    The '333 patent issued with seven claims: independent claim 1, and dependent claims 2-7, which depend from claim 1.

382.    Claim 1 of the '333 patent recites limitations relating to "clusters" of medical claims data comprising "anchor records" and associated "ancillary records." According to the claims, "anchor records" can be "management records."

383.    The '333 patent defines "management records" as "claims which represent a service by a provider engaging in the direct evaluation, management or treatment or [*sic*] a patient." The Aetna RFP Response likewise explained, at page 4, that "*Management records represent a service by a provider engaging in the direct evaluation, management, or treatment of a patient. . . .  Management records are also known as anchor records since they indicate that an illness has begun, and in addition, provide a reference point from which to link ancillary records.*" (emphasis in original).

384.    The '333 patent defines "ancillary records" as "claims which represent services which are incidental to the direct evaluation, management and treatment of the patient. Examples of ancillary records include X-ray and laboratory tests." The Aetna RFP Response likewise

1
2

explained, at page 4, that "*Ancillary records* represent services that are incidental to the direct evaluation, management and treatment of a patient; such as x-rays and laboratory."

3
4
5
6
7
8
9
10

385.    The '333 patent claims are directed to a method for storing a "cluster" of medical claim data representing medical services rendered to a patient.  The written description of the '333 patent—which is the same as the other Dang patents' written descriptions—explains that "[a] 'cluster' is a grouping of one, and only one, anchor record, management or surgery, and possibly ancillary, facility and/or drug records. A cluster represents a group of services in which the focal point, and therefore the responsible medical personnel, is the anchor record.  An episode is made up of one or more clusters."

11
12
13
14

386.    Pages 4-5 of the Aetna RFP Response disclosed the very same concept: "Taken together, management records with their linked ancillary records form a *cluster* of services. **One or more clusters represent a treatment episode**."  (emphasis in original).

15
16

387.    Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

17
18
19
20
21

388.    The '333 patent claims also recite an electronic database storing episode treatment groups comprising medical claim data records "representing correlated medical services rendered to a patient by one or more healthcare providers for treatment of a selected disease or healthcare condition, wherein each medical claim data record has an associated date of service."

22
23

389.    This is exactly the concept practiced by the ETG software offered for sale and thoroughly explained in the Aetna RFP Response.

24
25
26
27
28

390.    The Aetna RFP Response explained at page 2 that the objective of the ETG software was to "identify a meaningful unit of analysis, encompassing all care including physician and ancillary services provided to an individual over the course of treatment for a single illness."

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT

391.    The Aetna RFP Response explained at page 4 that ETG software was "based on chronological evaluation of a patient's known encounters with the health care system."  Page 17 explained that this "chronological evaluation" required claim information to include "service from and to dates."

392.    Further, on page 5, the Aetna RFP Response explains that "[t]he ETG software contains a series of reference tables identifying each ICD-9 diagnosis and CPT-4 procedure with respect to ETG assignment algorithms," and that "this mapping forms the basis for initial ETG assignment."  Page 17 describes "the ICD-9 diagnoses [sic] and CPT-4 procedure codes which define each ETG."

393.    The '333 patent claims also recite an electronic database storing "an episode treatment group classification and a unique episode treatment group identifier for the episode treatment group."

394.    This was also practiced by the ETG software offered for sale and thoroughly explained in the Aetna RFP Response.  Pages 30-42 of the Aetna RFP Response provide a list of episode treatment groups used by the ETG software. Each episode treatment group relates to a particular medical condition and has a unique identifier.  The episode treatment groups are also classified into "Major Practice Categories," as explained at page 6.

395.    Further, on page 5, the Aetna RFP Response explains that "[t]he ETG software contains a series of reference tables identifying each ICD-9 diagnosis and CPT-4 procedure with respect to ETG assignment algorithms," and that "this mapping forms the basis for initial ETG assignment."  Page 17 describes "the ICD-9 diagnoses [sic] and CPT-4 procedure codes which define each ETG."

396.    The '333 patent claims also recite that each episode treatment group has an associated "dynamic time window" relating to a pre-defined period of time that is adjusted "until

no correlated medical services are detected within the defined time period after the latest associated date of service of the medical claim data records in the episode treatment group." As explained thoroughly above with reference to the '897 patent, this "dynamic time window" is the very same methodology performed by the ETG software offered for sale in the Aetna RFP Response.

397.    Dependent claim 2 of the '333 patent incorporates the limitations of claim 1 and adds the further limitation of "shifting" claim records from one episode treatment group to another based on a change in the patient's medical condition.

398.    As explained thoroughly above with reference to the '897 patent, this "shifting" was practiced by the ETG software offered for sale in the Aetna RFP Response.

399.    Dependent claim 3 of the '333 patent incorporates the limitations of claim 1 and adds the further limitation of an episode treatment group comprising "at least one ancillary record and at least one anchor record."

400.    As explained thoroughly above with reference to claim 8 of the '897 patent, this is the methodology practiced by the ETG software offered for sale in the Aetna RFP Response.

401.    Dependent claim 4 of the '333 patent incorporates the limitations of claim 1 and adds the further limitation of assigning an episode treatment group classification "based upon the patient's age, complicating conditions, comorbidities or major surgeries."

402.    As explained thoroughly above with reference to the '897 patent, this is the methodology practiced by the ETG software offered for sale in the Aetna RFP Response.

403.    Dependent claim 5 of the '333 patent incorporates the limitations of claim 1 and adds the further limitation of "shifting" episode treatment groups "based upon a comorbidity, complication or defining surgery."

404.    As explained thoroughly above with reference to claims 23 and 45 of the '897 patent, this is the methodology practiced by the ETG software offered for sale in the Aetna RFP Response.

405.    Dependent claim 6 of the '333 patent incorporates the limitations of claim 1 and adds the further limitation of episode treatment groups including pharmaceutical claim data for the patient.

406.    As explained thoroughly above with reference to the '511 patent, the ETG software offered for sale in the Aetna RFP Response was capable of grouping based on pharmaceutical claim data for the patient.

407.    Dependent claim 7 of the '333 patent incorporates the limitations of claim 1 and adds the further limitation of "storing an assigned primary care physician for the episode treatment group."

408.    The ETG software offered for sale in the Aetna RFP Response practiced this limitation.  Page 15 of the Aetna RFP Response explains that the ETG software offered for sale was "applicable to primary care physicians."   According to the description, "ETGs were developed to profile both primary care physicians as well as specialists," and "ETGs can be assigned to the appropriate PCP."

409.    Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of all claims of the '333 patent.  Further, the ETG software offered for sale and described in the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '333 patent.

*The '626 Application*

410.    The fourth divisional application filed by Dang in March 2002 was application number 10/106,626 (the "'626 application").  The '626 application was filed by Rosenbaum.

411.   On July 19, 2004, Brigid Spicola of OptumInsight filed a document giving power of attorney to "the Dorsey & Whitney LLP attorneys and agents associated with Customer Number 25763" to prosecute the '626 application.  The document directed all communications and correspondence to Devan Padmanabhan.

412.   At no time during the prosecution of the '626 application did Mr. Padmanabhan, Ms. Luedke or anyone else associated with the prosecution of the application disclose to the examiner the invalidating effect of the Aetna RFP Response or any of the contradictory information from related litigation regarding the conception date of Dang's invention.

413.   In a February 1, 2007 filing, Ms. Luedke told the examiner that "the entire disclosure" of the application that had issued as the '511 patent was "considered to be germane to the claimed invention of the ['626] application."

414.   When he filed the '626 application, Dang asked the USPTO to grant him the following two claims:

> 1.   A computer-implemented method for reassigning a relationship of medical claim data assigned to a first episode treatment group, comprising the step of shifting a grouping of medical claim data from a first episode treatment group to a second episode treatment group based upon occurrence of a different degree of relationship to the second episode treatment group than to the first episode treatment group.

> 2.   The method according to Claim 1, wherein the second episode treatment group is representative of medical claim data based upon at least one of a complication, co-morbidity, surgery and changed severity of the first episode treatment group.

415.   Thus, in the '626 application, Dang sought a patent for the idea of shifting medical claim data records from one episode treatment group to another based on, *e.g.*, complications, co-morbidities, and surgeries.

416.     The ETG software offered for sale and described in the Aetna RFP Response clearly practiced the methodology in these claims.  For example, page 5 of the Aetna RFP Response describes shifting to a second episode treatment group based on a co-morbidity:

A patient receiving care for arthritis would be considered to be more difficult and expensive to treat if the patient also had osteoporosis, a comorbid condition.  Although the patient may not currently receive treatment for osteoporosis per se, the patient would require a more intensive treatment regimen than if his comorbid condition did not exist.  Hence, the patient "shifts" into a more complicated ETG: Arthritis *with* comorbidity.

(underlining added; bold/italics in original).

417.     Page 41 of the Aetna RFP Response shows separate ETGs for arthritis with and without comorbidity.  As explained in the example on page 5, the ETG software would "shift" from the ETG for arthritis without comorbidity to the ETG for arthritis with comorbidity based on occurrence of a claim record indicating comorbidity in the patient—*i.e.*, "occurrence of a different degree of relationship to the second episode treatment group than to the first episode treatment group."

418.     Pages 5 and 6 of the Aetna RFP Response likewise describe the ETG software's method of shifting episode treatment groups based on complications, surgeries, and severity.  Further, the episode treatment groups listed on pages 30-42 of the Aetna RFP Response included separate ETGs for the same base condition, split up by presence or absence of complications and comorbidities and by high and low severity.  This is consistent with the description of shifting on pages 4-6.

419.     Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability all claims of the '626 application.  Further, the ETG software offered for sale and described in the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '626 application.

420.     OptumInsight eventually abandoned the '626 application.

*The '216 Patent*

421.   The '216 patent issued from application number 11/841,439 (the "'439 application), which was a continuation of the '626 application.  The '439 application was filed on May 24, 2010 by Dorsey & Whitney attorney Adriana Luedke on behalf of OptumInsight.  Devan Padmanabhan also participated in the prosecution of the '439 application.

422.   At no time during the prosecution of the '439 application did Ms. Luedke, Mr. Padmanabhan, or anyone else associated with the prosecution of the application disclose to the examiner the invalidating effect of the Aetna RFP Response or any of the contradictory information from related litigation regarding the conception date of Dang's invention.

423.   On August 2, 2013, OptumInsight's counsel (including Peter Lancaster) served CCGroup with interrogatory responses in the *Cave I* litigation. In those interrogatory responses, OptumInsight identified the date of conception of claims 1-5 of the '216 patent as "no later than" June 12, 1994—the date of the Aetna RFP Response.  This response was certified by Elizabeth Schmiesing, Senior Associate General Counsel for OptumInsight, who stated that the response was "prepared based upon [her] personal knowledge and/or based upon information available to [her] upon a reasonable investigation."   OptumInsight never supplemented or amended this response.

424.   Upon filing the '439 application, OptumInsight, through Ms. Luedke, filed a preliminary amendment asking the USPTO to grant it a patent on the following claim 1:

*A computer-implemented method for processing medical claim data records, the medical claim data records each including at least one of a diagnosis code and a treatment code, comprising:*

*storing a plurality of episode treatment groups, wherein each episode treatment group is associated with one or more diagnosis codes or treatment codes;*

*upon receiving a first medical claim data record associated with a patient, assigning the first medical claim data record to a first episode treatment group based upon a diagnosis code or treatment code in the first medical claim data record; and*

*upon receiving a second medical claim data record associated with the patient, shifting the first medical claim data record from the first episode treatment group to a second*

*episode treatment group based upon a diagnosis code or treatment code in the second medical claim data record.*

425.   The ETG software offered for sale and described in the Aetna RFP Response clearly practiced the methodology in this claim, for which OptumInsight sought patent protection.

426.   The proposed claim was directed to grouping claim data records based on the diagnosis or procedure codes on the records and "shifting" the records from one episode treatment group to another.

427.   As explained thoroughly above, the ETG software offered for sale and described in the Aetna RFP Response performed exactly this grouping and shifting, as illustrated, for example, in the following excerpt from page 5:  "For example, if during the course of treatment for a cervical infection (less serious ETG), a patient begins treatment for a tubal infection (more serious ETG), the cervical infection ETG episode 'shifts' to a tubal infection ETG.  All claim records for the treatment of both conditions would therefore be placed in a single tubal infection illness episode."

428.   The ETG software offered for sale and described in the Aetna RFP Response was therefore an embodiment of and was but-for material to the patentability of proposed claim 1.

429.   Upon filing the '439 application, OptumInsight, through Ms. Luedke, filed a preliminary amendment asking the USPTO to grant it a patent on the following claim 2:

*The method according to claim 1, wherein the second episode treatment group is representative of medical claim data based upon at least one of a complication, co-morbidity, surgery and changed severity of the first episode treatment group.*

430.   The ETG software offered for sale and described in the Aetna RFP Response clearly practiced the methodology in this claim, for which OptumInsight sought patent protection. For example, page 5 of the Aetna RFP Response describes shifting to a second episode treatment group based on a co-morbidity:

A patient receiving care for arthritis would be considered to be more difficult and expensive to treat if the patient also had osteoporosis, a comorbid condition.  Although the patient may not currently receive treatment for osteoporosis per se, the patient would require a more intensive treatment regimen than if his comorbid condition did not exist.  Hence, the patient "shifts" into a more complicated ETG: Arthritis **with** comorbidity.

(underlining added; bold/italics in original).

431.     Page 41 of the Aetna RFP Response shows separate ETGs for arthritis with and without comorbidity.  As explained in the example on page 5, the ETG software would "shift" from the ETG for arthritis without comorbidity to the ETG for arthritis with comorbidity when it received a subsequent claim data record indicating the presence of comorbidity.

432.     The ETG software offered for sale and described in the Aetna RFP Response was therefore an embodiment of and was but-for material to the patentability of proposed claim 2.

433.     Upon filing the '439 application, OptumInsight, through Ms. Luedke, also asked the USPTO to grant it a patent on dependent claims 3 and 4, which incorporated the limitations of proposed claim 1 and added the further limitations of shifting to a third episode treatment group based on co-morbidity (claim 3) or patient age (claim 4).

434.     Pages 5 and 6 of the Aetna RFP Response describe the ETG software's method of shifting episode treatment groups based on co-morbidity and patient age.

435.     The episode treatment groups listed on pages 30-42 of the Aetna RFP Response included separate ETGs for the same base condition, split up by presence or absence of complications and comorbidities.  This is consistent with the description of "shifting" on pages 4-6.

436.     The list of ETGs in the Aetna RFP Response also included separate ETGs for the same base condition, split up by patient age. This is consistent with the description of "shifting" on pages 4-6.

437.     Thus, in 2007, OptumInsight sought patent claims for methods that had been offered for sale in the Aetna RFP Response.

438.    In response to the examiner's rejection over a prior art reference, OptumInsight amended the claims in the '439 application.  The amendments are reproduced here:

> 1. (Currently Amended) A computer-implemented method for processing medical claim data records, the medical claim data records each including at least one of a diagnosis, procedure or drug code ~~and a treatment code~~, comprising one or more computers performing the following:
>
>      storing a plurality of diagnostic ~~episode treatment~~ groups in at least one data storage device, wherein each diagnostic ~~episode treatment~~ group is associated with one or more diagnosis, procedure or drug  codes ~~or treatment codes~~;
>
>      upon receiving a first medical claim data record associated with a patient, processing the first medical claim data record using at least one data processor to: identify one or more diagnosis, procedure or drug codes in the first medical claim data record; compare the identified codes in the first medical claim data record with the codes associated with one or more of the plurality of the stored diagnostic groups; and assigning the first medical claim data record to a first diagnostic ~~episode treatment~~ group based upon the one or more [[a]] diagnosis, procedure or drug codes ~~or treatment code~~ identified in the first medical claim data record; and
>
>      upon receiving a second medical claim data record associated with the patient, processing the second medical claim data record using the data processor to: identify one or more diagnosis, procedure or drug codes in the second medical claim data record; determine whether the identified codes in the second medical claim data record indicate a change in the patient's clinical condition; and, if so, shif~~ting~~ the first medical claim data record from the first diagnostic ~~episode treatment~~ group to a second diagnostic ~~episode treatment~~ group that includes the change in the patient's clinical condition ~~based upon a diagnosis code or treatment code in the second medical claim data record.~~
>
> 2. (Currently Amended)  The method according to claim 1, wherein the change in the patient's clinical condition indicated by the codes in the second medical claim data record represents ~~second episode treatment group is representative of medical claim data based upon at least one of~~ a complication, co-morbidity, surgery or ~~and~~ changed severity of the clinical condition of the patient ~~first episode treatment group~~.

3. (Currently Amended)  The method of claim 1, wherein upon receiving a third medical claim data record associated with the patient, the third medical claim data record is processed by the data processor to: identify one or more diagnosis, procedure or drug codes in the third medical claim data record; determine whether the identified codes in the third medical claim data record indicate an additional change in the patient's clinical condition; and, if so, shift the first medical claim data record from the second diagnostic group to a third diagnostic group that includes the additional change in the patient's clinical condition further comprising shifting the first medical data record from the second episode treatment group to a third episode treatment group based upon a co-morbidity of the patient.

4. (Currently Amended)  The method of claim 3, wherein the change in the patient's clinical condition indicated by the codes in the third medical claim data record represents a complication, co-morbidity, surgery or changed severity of the clinical condition of the patient 1, further comprising shifting the first medical data record from the second episode treatment group to a third episode treatment group based on the patient's age.

5. (New)  The method of claim 1, wherein the diagnostic groups are episode treatment groups.

439.    Among other things, OptumInsight changed "episode treatment groups" to "diagnostic groups."  Luedke stated that the claimed invention relates to a method in which medical claim data records with CPT, diagnostic or drug codes "are processed and grouped into diagnostic groups based upon the assigned codes."

440.    The term "diagnostic group" does not appear in the specification of the '216 patent, except in the claims.  The claims indicate that a "diagnostic group" is a group of medical claims data "associated with one or more diagnosis, procedure or drug codes."

441.    In an appeal brief filed January 5, 2010, Luedke explained that support for the claim language "storing a plurality of diagnostic groups in at least one data storage device, wherein each diagnostic group is associated with one or more diagnosis, procedure or drug codes" was supported by language in the specification describing episode treatment groups related to diagnosis codes.

442. Dependent claim 5 also demonstrates that episode treatment groups are "diagnostic groups." To support this limitation, Luedke directed the examiner's attention to the definition of "episode treatment group" in the specification.

443. In the appeal brief, Luedke provided the following diagram to illustrate the claimed method:

**Present Invention**

```
┌─────────────────┐
│ Receive first   │
│ patient medical │
│ claim record    │
└─────────────────┘
         │
         ▼
┌─────────────────┐
│ Analyze record  │
│ and assign first│
│ diagnostic group│
└─────────────────┘
         │
         ▼
┌─────────────────┐
│ Receive second  │
│ patient medical │
│ claim record    │
└─────────────────┘
         │
         ▼
┌─────────────────┐
│ Analyze second  │
│ patient medical │
│ claim record to │
│ determine       │
│ whether patient's│
│ clinical condition│
│ has changed     │
└─────────────────┘
         │
         ▼
┌─────────────────┐
│ Shift first medical│
│ claim record from │
│ first diagnostic  │
│ group to second   │
│ diagnostic group  │
│ including change  │
│ in patient's      │
│ clinical condition│
└─────────────────┘
```

444. Luedke explained that, in the claimed invention, assignment of a claim record to a particular diagnostic group "changes when a new medical claim record is received indicating a change in the patient's clinical condition."

445. Luedke explained that "changes indicated in a second medical record result in a shift from the first to the second diagnostic group."

446.    Claim 4 was directed to the method of claims 1 and 3 wherein the change in patient condition was reflected in claim data representing a complication, co-morbidity, surgery or changed severity of the clinical condition of the patient.

447.    Thus, as in the other OptumInsight patents discussed above, the amended claims were directed to grouping based on medical claims data and shifting from one group to another based on changes in the patient's condition as reflected in the medical claims data.  Specific examples of changes in a patient's condition include complication, co-morbidity, surgery, and changed severity.

448.    OptumInsight's appeal was successful, and the claims as amended issued in the '216 patent.

449.    The ETG software offered for sale and described in the Aetna RFP Response clearly embodied and was but-for material to the patentability of the claims of the '216 patent.

450.    The ETG software offered for sale and described in the Aetna RFP Response was a computer-implemented method for processing medical claim records having diagnosis, procedure or drug codes.  The Aetna RFP Response explained at page 4 that ETG software was "based on chronological evaluation of a patient's known encounters with the health care system," and that the software uses medical claims data, including ICD-9 diagnosis and CPT-4 procedure codes as input.

451.    The ETG software offered for sale and described in the Aetna RFP Response stored a plurality of diagnostic groups associated with diagnosis, procedure or drug codes.  As explained above, "diagnostic groups" include episode treatment groups.  Pages 30-42 of the Aetna RFP Response list diagnostic groups stored in the ETG software.  Page 5 explains that each episode treatment group is associated with specific diagnosis codes.  Page 17 refers to "the ICD-9 diagnoses [sic] and CPT-4 procedure codes which define each ETG."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

452.    The ETG software offered for sale and described in the Aetna RFP Response processes medical claims data to identify diagnosis, treatment or drug codes on a claim data record, to compare the codes with the codes associated with episode treatment groups, and to assign the data record to an episode treatment group based on the codes contained on the claim data record.  This is explained in detail in the preceding paragraphs by reference to pages 3-6 and 30-42 of the Aetna RFP Response.  The Aetna RFP Response also explains at page 5 that "[t]he ETG software contains a series of reference tables identifying each ICD-9 diagnosis and CPT-4 procedure with respect to ETG assignment algorithms," and that "this mapping forms the basis for <u>initial</u> ETG assignment."  (emphasis in original)

453.    The ETG software offered for sale and described in the Aetna RFP Response, upon receiving a second medical claim data record, determined whether the codes in the second record indicated a change in the patient's condition and, if so, shifted the first medical claim data record to a second episode treatment group that included the change in the patient's condition.  This is explained in detail in the preceding paragraphs by reference to pages 3-6 and 30-42 of the Aetna RFP Response.

454.    The ETG software offered for sale and described in the Aetna RFP Response performed the "shifting" function based on codes indicating changes including complication, co-morbidity, surgery, and changed severity.  This is explained in detail in the preceding paragraphs by reference to pages 2-6, 16, and 30-42 of the Aetna RFP Response.

455.    The ETG software offered for sale and described in the Aetna RFP Response, upon receiving a third medical claim data record, determined whether the codes in the third record indicated a change in the patient's condition and, if so, shifted the first medical claim data record to a third episode treatment group that included the change in the patient's condition.  This is simply a repetition of the process described above and reflected in the Aetna RFP Response.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT                      - 80 -

456.     For example, with reference to page 30 of the Aetna RFP Response, a patient's initial record could reflect adult diabetes without complication or comorbidity, resulting in assignment to ETG 34.  A subsequent record could indicate a comorbid condition for the same patient, causing a shift to ETG 33.   A third record indicating a complication would cause a shift to ETG 31.  This would also satisfy claim 4 of the '216 patent.

457.     Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to all claims of the '216 patent.  Further, the ETG software offered for sale and described in the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '216 patent.

### The '290 Patent

458.     The '290 patent issued from application number 12/785,927 (the "'927 application").  The '927 application was filed on May 24, 2010 by Dorsey & Whitney attorney Devan Padmanabhan on behalf of OptumInsight.  The '927 application was a continuation of the '855 application that issued as the '333 patent.

459.     On March 4, 2011, Brigid Spicola of OptumInsight filed a document giving power of attorney to "the Dorsey & Whitney LLP attorneys and agents associated with Customer Number 25763" to prosecute the '927 application.  The document directed all communications and correspondence to Devan Padmanabhan.

460.     At no time during the prosecution of the '927 application did Mr. Padmanabhan, Ms. Luedke or anyone else associated with the prosecution of the application disclose to the examiner the invalidating effect of the Aetna RFP Response or any of the contradictory information from related litigation regarding the conception date of Dang's invention.

461.     On August 2, 2013, OptumInsight's counsel (including Peter Lancaster) served CCGroup with interrogatory responses in the *Cave I* litigation. In those interrogatory responses,

1
2
3
4
5
6
7

OptumInsight identified the date of conception of claims 1-12 of the '290 patent as "no later than" June 12, 1994—the date of the Aetna RFP Response.  This response was certified by Elizabeth Schmiesing, Senior Associate General Counsel for OptumInsight, who stated that the response was "prepared based upon [her] personal knowledge and/or based upon information available to [her] upon a reasonable investigation."   OptumInsight never supplemented or amended this response.

8
9

462.    Upon filing the '927 application, OptumInsight sought protection for the following claims:

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.    A computer-implemented process for profiling medical claims including the steps of:

  (a)  constructing a first cluster of episode-related medical claim data, the cluster having one anchor record;

  (b)  grouping a second cluster of episode-related medical claim data to the first cluster of episode-related medical claim data based upon relationship of the second cluster to the medical episode represented by the first cluster; and

  (c)  shifting the second cluster of episode-related medical claim data to a different and distinct episode group conditioned upon a higher degree of relationship of the second cluster to the different and distinct episode group.

2.    A computer-implemented process for profiling medical claims including the steps of:

  (a)  reading a first patient's medical claim data, input as at least one of a plurality of data records, into a computer memory;

  (b)  validating each of the at least one of a plurality of data records for at least one of a diagnosis code and a treatment code;

  (c)  reading at least one pre-defined relation between the at least one of a diagnosis code and a treatment code in the validated at least one of a plurality of data records and pre-defined medical episodes; and

  (d)  grouping the validated at least one of a plurality of data records to at least one of a plurality of episode treatment groups, each of the at least one of a plurality of episode treatment groups further comprising one anchor record and n data records linked thereto, the n data records being selected from the group consisting of ancillary records, facility records and prescription drug records, where n is an integer greater than or equal to 0, and having a predefined time window during which the n data records may group to the one anchor record.

3.    The process as claimed in Claim 2, wherein each of the at least one of a plurality of episode treatment groups contain at least one cluster.

4.     The process as claimed in Claim 3, wherein the at least one cluster further comprises at least one ancillary record and at least one anchor record.

5.     The process as claimed in Claim 2, wherein the step (d) further comprises the step of differentiating patient severity based upon data relating to at least one of patient age, complicating conditions, comorbidities and major surgeries.

6.     The process as claimed in Claim 2, further comprising the step of outputting and discontinuing processing of invalid data records and comparing diagnosis and treatment code data.

7.     The process as claimed in Claim 6 wherein the step of outputting and discontinuing processing of invalid data records further includes the step of assigning a different episode treatment group for at least one of an invalid diagnosis code, an invalid treatment code and an invalid provider type.

8.     The process as claimed in Claim 2, further comprising the step of identifying valid episode treatment groups by comparing current treatment codes to prior related episodes in look-up tables.

9.     The process as claimed in Claim 2, further comprising the step of flagging valid claim records with a diagnosis code identifier.

10.     The process as claimed in Claim 9, wherein the step of flagging valid claim records further comprises the step of incrementing a sequential anchor count and a sequential episode count for each episode treatment group assignment.

11.     The process as claimed in Claim 2, further comprising the step of resetting the dynamic time window of the medical episode when a second at least one of a plurality of data records matches an open medical episode, the dynamic time window being reset for an additional period of time until no other data records are grouped to the open medical episode within the reset dynamic time window.

12.     The process as claimed in Claim 11, wherein the step of resetting the dynamic time window of the medical episode, further comprises the step of selecting a most recent claim record if more than one matched claim record exists.

13.     The process as claimed in Claim 2, further comprising the step of shifting a medical claim to a different one of the plurality of episode treatment groups based upon a inputting of a medical claim record including changes in patient condition comprising at least one of comorbidity, complication and defining surgery.

14.     The process as claimed in Claim 13, wherein the step of shifting further comprises shifting an episode treatment group originally assigned by a first diagnosis on a medical claim record based on at least one of a second, third and fourth diagnosis.

15.     The process as claimed in Claim 8, wherein the step of identifying valid episode treatment groups further comprises the step of comparing pharmaceutical claim data in a patient's medical claim data to open episode treatment groups for the patient by analyzing Generic Drug Codes by episode treatment group and National Drug Code by Generic Drug Codes look-up tables.

16.     The process as claimed in Claim 2, further comprising the step of identifying medical providers treating episodes treatment groups by identifying each episode treatment group by Primary Care Physician.

463.    The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 1 in the '927

application.  Claim 1 was directed to forming "clusters" of medical claim data, the clusters having one anchor record.  Pages 4-5 of the Aetna RFP Response disclosed the very same concept: "Taken together, management records with their linked ancillary records form a *cluster* of services.  **One or more clusters represent a treatment episode**."  (emphasis in original).

464.   Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

465.   As explained above, the Aetna RFP Response identifies management records as "anchor records."

466.   Proposed claim 1 of the '927 application also claimed grouping multiple clusters. As explained above, the Aetna RFP Response explained that the ETG software grouped clusters into episodes.

467.   Proposed claim 1 of the '927 application also claimed shifting of clusters from one episode group to another episode group based on "a higher degree of relationship of the second cluster" to a different episode group.  As explained above, including with reference to the example of arthritis with and without comorbidity, the ETG software described in the Aetna RFP Response performed this shifting.

468.   The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 2 in the '927 application.  As explained above with reference to the claims of the '897 patent, the ETG software performed the steps of reading medical claims data, validating the data, comparing the data to pre-defined relationships between diagnosis or treatment codes and medical episodes, and grouping the data to episode treatment groups with pre-defined time windows.  As explained above with reference to claim 8 of the '897 patent, page 4 of the Aetna RFP Response describes formation of ETGs using management records, "also known as *anchor* records." (emphasis in

original).  Page 4 of the Aetna RFP Response also describes formation of ETGs using "ancillary records" linked to the anchor records to form "clusters": "Taken together, management [anchor] records with their linked ancillary records form a *cluster* of services. **One or more clusters represent a treatment episode**."  (emphasis in original). Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

469.   The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claims 3 and 4 in the '927 application.  The Aetna RFP Response explained that, in the ETG software, "[t]aken together, management records with their linked ancillary records form a *cluster* of services. **One or more clusters represent a treatment episode**."  (emphasis in original).  Page 15 of the Aetna RFP Response likewise explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."

470.   The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 5 in the '927 application.  For example, page 5 of the Aetna RFP Response describes shifting to a second episode treatment group based on a co-morbidity:

> A patient receiving care for arthritis would be considered to be more difficult and expensive to treat if the patient also had osteoporosis, a comorbid condition. Although the patient may not currently receive treatment for osteoporosis per se, the patient would require a more intensive treatment regimen than if his comorbid condition did not exist.  Hence, the patient "shifts" into a more complicated ETG: Arthritis *with* comorbidity.
> (underlining added; bold/italics in original).

471.   Page 41 of the Aetna RFP Response showed separate ETGs for arthritis with and without comorbidity.  As explained in the example on page 5, the ETG software would "shift" from the ETG for arthritis without comorbidity to the ETG for arthritis with comorbidity based on

occurrence of a claim record indicating comorbidity in the patient—*i.e.*, "occurrence of a different degree of relationship to the second episode treatment group than to the first episode treatment group."

472.    Pages 5 and 6 of the Aetna RFP Response likewise described the ETG software's method of shifting episode treatment groups based on complications, surgeries, and severity. Further, the episode treatment groups listed on pages 30-42 of the Aetna RFP Response included separate ETGs for the same base condition, split up by presence or absence of complications and comorbidities and by high and low severity.  This is consistent with the description of shifting on pages 4-6.

473.    The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 6 in the '927 application.  Page 3 explained that "the ETG software does have built-in edit checks to make sure that services with inappropriate ICD9-CPT4 relationships are separated for special consideration."   Pages 18-19 explained that the software is configured to "determine the appropriateness of each ICD-9 to each CPT-4 code," and that "[i]nappropriate pairings are flagged and excluded from further analysis."   Page 19 explained that "certain claims with valid diagnosis codes and invalid CPT-4 codes (or the opposite scenario) will be accommodated and grouped correctly."

474.    The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 11 in the '927 application.  As explained above with reference to "dynamic time windows" in the '897 patent and "clean periods" in the '281 application, the Aetna RFP Response described how the ETG software reset the time window associated with an episode treatment group until there were no other data records grouped to the episode.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT

- 88 -

475.   The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 13 in the '927 application.  As explained above with reference to the '897 patent, the ETG software "shifted" medical claim data from one episode to another based on comorbidity, complication, and defining surgery.

476.   The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 14 in the '927 application.  The ETG software offered for sale and described in the Aetna RFP Response, upon receiving a second medical claim data record, determined whether the codes in the second record indicated a change in the patient's condition and, if so, shifted the first medical claim data record to a second episode treatment group that included the change in the patient's condition.  This is explained in pages 3-6 and 30-42 of the Aetna RFP Response.

477.   The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of proposed claim 16 in the '927 application.  Page 15 of the Aetna RFP Response explains that the ETG software offered for sale was "applicable to primary care physicians."  According to the description, "ETGs were developed to profile both primary care physicians as well as specialists," and "ETGs can be assigned to the appropriate PCP."

478.   On August 30, 2010, the examiner issued an office action in which she stated that the proposed claims in the '927 application were "not patentably distinct" from the claims in the '897, '511, and '333 patents.  The examiner therefore rejected the claims under a "double patenting" rejection.

479.   In response to the examiner's rejection, OptumInsight, through Nadeem Schwen of Dorsey & Whitney, cancelled all pending claims and added 12 new claims.

480.    In an interview with Schwen on February 23, 2011, the examiner indicated that even the amended claims were not patentably distinct from the '897, '511, and '333 patents.

481.    To get the examiner to allow the claims, Schwen agreed to file a terminal disclaimer, in which OptumInsight disclaimed any enforceability of the patent claims that extended beyond the expiration date of the '897, '511, and '333 patents.

482.    This demonstrates that the claims of the '290, '333, '511, and '897 patent are closely related.

483.    The ETG software offered for sale and described in the Aetna RFP Response embodied the claims of the '290 patent.

484.    The Aetna RFP Response makes clear that the ETG software comprised instructions for a computer and was designed for use on a computer.  The Aetna RFP Response offered "software, including mainframe, server and workstation software."  The Aetna RFP Response also provided that employees would be "permitted to use copies of the software on a workstation installed at the employee's home and on a portable lap-top workstation."

485.    Claim 1 of the '290 patent is directed to a computer system for processing medical claims data.  The claimed system performs functions relating to grouping medical claims data.  Claim 1 is reproduced here:

> *1. A system for processing medical claims data, comprising:*
> *a processor; and*
> *a storage medium operably coupled to the processor, wherein the storage medium stores program instructions that, when executed by the processor, cause the processor to:*
> *group a plurality of medical claim data records to an episode of care having at least one defining characteristic;*
>
> *assign a first clean period to the episode of care, the first clean period defined by a predefined time duration during which there is an absence of medical claim data having the at least one defining characteristic of the episode treatment group; and*
>
> *reset the first clean period to define a second clean period, the second clean period defining a second predefined time duration, wherein the first clean period is reset to the second*

*clean period when later presented medical claim data having the at least one characteristic of the episode of care and falling within the first clean period is added to the episode of care.*

486.    Claim 1 of the '290 patent is essentially identical to claim 1 of the '560 patent, except that claim 1 of the '560 patent is directed to a computer-implemented <u>process</u>, and claim 1 of the '290 patent is directed to a computer <u>system</u> that performs the process.

487.    As described above with reference to claim 1 of the '560 patent, the ETG software offered for sale and described in the Aetna RFP Response embodied claim 1 of the '290 patent. The ETG methodology used a computer to group medical claim data records into episodes of care (see, e.g., page 5 of Response).

488.    Claim 2 of the '290 patent is essentially identical to claim 1, except that it is directed to "a computer readable storage medium storing instructions" for a computer to perform the steps of the process. This is simply a computer hard drive or similar computer storage device, like that disclosed in the Aetna RFP Response (e.g. page 5, page 12 "any hardware operating platform").

489.    Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied claim 2 of the '290 patent.  The ETG software also rendered the claim obvious.

490.    Claim 3 of the '290 patent is directed to a system for grouping medical claim data records into "diagnostic groups."

491.    The term "diagnostic group" does not appear in the specification of the '290 patent, except in the claims.  The term was added when the claims were amended on December 30, 2010.  Dependent claim 7 demonstrates that episode treatment groups are "diagnostic groups."  Thus, grouping claims data to episode treatment groups is one example of grouping claims data to diagnostic groups.

492.     As described in detail above, the ETG software described and offered for sale in the Aetna RFP Response practiced this grouping limitation by grouping to episode treatment groups.

493.     Claim 3 of the '290 patent is essentially identical to claim 1 of the '216 patent, except that claim 3 of the '290 patent is directed to a system, and claim 1 of the '216 patent is directed to a method.

494.     As explained above with reference to claim 1 of the '216 patent, the ETG software described and offered for sale in the Aetna RFP Response embodied the limitations of claim 3 of the '290 patent.

495.     Claim 4 of the '290 patent adds to claim 3 the limitation of change in patient condition representing a complication, co-morbidity, surgery or changed severity of clinical condition of the patient. This is essentially identical to claim 2 of the '216 patent.

496.     As explained above with reference to claim 2 of the '216 patent, the ETG software described and offered for sale in the Aetna RFP Response embodied the limitations of claim 4 of the '290 patent.

497.     Claims 5 and 6 of the '290 patent add to claim 4 the limitations of processing a third medical claim data record and shifting based on the third record (claim 5) and changed conditions reflecting complication, co-morbidity, surgery or changed severity of clinical condition of the patient (claim 6).  These are essentially identical to the limitations of claims 3 and 4 of the '216 patent.

498.     As explained above with reference to claims 3 and 4 of the '216 patent, the ETG software described and offered for sale in the Aetna RFP Response embodied the limitations of claim 5 and 6 of the '290 patent.

499.    Claim 7 of the '290 patent adds to claim 3 the limitation of a "diagnostic group" being an episode treatment group.  This is essentially identical to claim 5 of the '216 patent.

500.    As explained above with reference to claim 5 of the '216 patent, the ETG software described and offered for sale in the Aetna RFP Response embodied the limitations of claim 7 of the '290 patent.

501.    Claims 8-12 of the '290 patent are essentially identical to claims 3-7, except that claims 8-12 are directed to "a computer readable storage medium storing instructions" for a computer to perform the steps of the process. This is simply a computer hard drive or similar computer storage device, like that disclosed in the Aetna RFP Response (e.g. page 5, page 12 "any hardware operating platform").

502.    The ETG software offered for sale and described in the Aetna RFP Response embodied the limitations of claims 8-12 of the '290 patent.  The explanation provided above with respect to claims 3-7 of the '290 patent applies equally to claims 8-12 of the '290 patent, because the claims

503.    Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of the claims of the '290 patent.  Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '290 patent.

*The '869 Patent*

504.    The '869 patent issued from application number 12/852,978 (the "'978 application").  The '978 application was filed on August 9, 2010 by Dorsey & Whitney attorney Devan Padmanabhan on behalf of OptumInsight.  The '978 application was a continuation of the '439 application, which issued as the '216 patent.

505.    Upon filing the '978 application, OptumInsight, through Padmanabhan, sought a patent containing the following claims:

> 1.    A computer-implemented method for reassigning a relationship of medical claim data assigned to a first episode treatment group, comprising the step of shifting a grouping of medical claim data from a first episode treatment group to a second episode treatment group based upon occurrence of a different degree of relationship to the second episode treatment group than to the first episode treatment group.

> 2.    The method according to Claim 1, wherein the second episode treatment group is representative of medical claim data based upon at least one of a complication, co-morbidity, surgery and changed severity of the first episode treatment group.

506.    These claims were identical to the claims filed in the '626 application, which claims had been rejected by the examiner.  Padmanabhan did not disclose to the examiner that the claims were identical to previously-rejected claims from a different application.

507.    As explained above with reference to the '626 application, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the patentability of these claims in the '978 application.

508.    The examiner rejected proposed claims 1 and 2, finding, among other things, that the claims were "not patentably distinct" from the claims of the '216 patent.

509.    In response to the rejection, proposed claims 1 and 2 were cancelled and new claims 3-22 were added.  Claim 3 read as follows:

3.    (New)   A computer-implemented method for processing medical claims, including the steps of:

receiving medical claims data stored into a computer memory, including at least one medical claim;

determining a diagnosis code associated with the at least one medical claim;

mapping a relationship between the diagnosis code of the at least one medical claim and one of a plurality of diagnostic episode groups, each diagnostic episode group associated with a medical condition and having a predetermined window period; and

grouping the at least one medical claim into a related diagnostic episode group having an extendable time window.

510.    This claim was directed to a process in which a diagnosis code in a medical claim was compared with "diagnostic episode groups" associated with a medical condition and having a "predetermined window period."

511.    The ETG software offered for sale and described in the Aetna RFP Response embodied this claim.  As described throughout the Aetna RFP Response and in the preceding paragraphs, the ETG software read diagnosis (ICD-9) codes to group claims data.

512.    The term "diagnostic episode group" does not appear in the specification of the '869 patent outside of the claims. The disclosure of the patent indicates that an episode treatment group is a diagnostic episode group.

513.    The ETG software also mapped a relationship between the diagnosis codes and diagnostic episode groups.  Page 5 of the Aetna RFP Response explains that "[w]ith respect to diagnosis codes, each ICD-9 code has been previously assigned principally to one and only one ETG. This mapping forms the basis for initial ETG assignment, based on the first diagnosis code found on a management record."  (emphasis in original)

514.    The diagnostic episode groups in the ETG software were associated with particular medical conditions and had predetermined window periods. Pages 30-42 of the Aetna RFP Response show the ETGs associated with medical conditions. The "predetermined window periods" are the "clean periods" discussed above with reference to the '281 application and used by the ETG software.

515.    Page 16 of the Aetna RFP Response explains that records were added to groups until an "absence of recurring claims for a specified period of time is detected."

516.    The ETG software grouped claims into diagnostic episode groups having "extendable time windows." This is the "resetting" of clean periods discussed above with reference to the '560 patent.

517.    Dependent claims 4-9 were also added:

    4.    (New) The method of claim 3, wherein the time window of the diagnostic episode group is extendible until an absence of related medical claims is detected during the predetermined window period.

    5.    (New)  The method of claim 4, wherein the time window is extendible by resetting the predetermined window period.

    6.    (New) The method of claim 5, wherein medical claims representing chronic conditions are grouped differently than medical claims representing acute conditions.

    7.    (New) The method of claim 6, wherein the medical claims data includes pharmaceutical data records.

    8.    (New) The method of claim 7, wherein the diagnosis code is an ICD-9 code.

    9.    (New) The method of claim 8, further comprising shifting the grouping of a diagnostic episode group from a first diagnostic episode group to a second diagnostic episode group upon receiving a second medical claim having at least one diagnosis code, procedure code, or drug code associated with the second diagnostic episode group.

518.    The added limitations of claims 4, 5, and 8 are discussed in the Aetna RFP Response at pages 3-6.

519.    The added limitation of claim 7 is discussed in the Aetna RFP Response at page 18, as discussed above with reference to the '511 patent.

520.    The added limitation of claim 9 (shifting) is discussed in the Aetna RFP Response at pages 3-6, as discussed above with reference to disclosure of "shifting."

521.    The examiner found that the "shifting" described in claim 9 was not patentably distinct from the "shifting" in the '216 patent.

522.    The other proposed claims were essentially the same as claims 1-9, except that they were framed as system claims.  Thus, the ETG software offered for sale and described in the Aetna RFP Response embodied those claims as well.

523.    At the examiner's suggestion, the dependent claims containing "shifting" limitations were incorporated into their respective independent claims.  To get the examiner to allow the claims, Padmanabhan agreed to file a terminal disclaimer, in which OptumInsight disclaimed any enforceability of the patent claims that extended beyond the expiration date of the '216 patent.

524.    The ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the issued claims of the '869 patent.  Further, the ETG software offered for sale and described in the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of the claims of the '869 patent.

*The '165 Patent*

525.    The '165 patent issued from application number 13/181,207 (the "'207 application").  The '207 application was filed on July 12, 2011 by Dorsey & Whitney attorney

Devan Padmanabhan on behalf of OptumInsight.  The '207 application was a continuation of the '927 application, which issued as the '290 patent.

526.    Upon filing the '207 application, OptumInsight, through Padmanabhan, sought a patent containing the following claims:

1.    A computer-implemented process for profiling medical claims including the steps of:

(a)    constructing a first cluster of episode-related medical claim data, the cluster having one anchor record;

(b)    grouping a second cluster of episode-related medical claim data to the first cluster of episode-related medical claim data based upon relationship of the second cluster to the medical episode represented by the first cluster; and

(c)    shifting the second cluster of episode-related medical claim data to a different and distinct episode group conditioned upon a higher degree of relationship of the second cluster to the different and distinct episode group.

2.    A computer-implemented process for profiling medical claims including the steps of:

(a)    reading a first patient's medical claim data, input as at least one of a plurality of data records, into a computer memory;

(b)    validating each of the at least one of a plurality of data records for at least one of a diagnosis code and a treatment code;

(c)    reading at least one pre-defined relation between the at least one of a diagnosis code and a treatment code in the validated at least one of a plurality of data records and pre-defined medical episodes; and

(d)    grouping the validated at least one of a plurality of data records to at least one of a plurality of episode treatment groups, each of the at least one of a plurality of episode treatment groups further comprising one anchor record and n data records linked thereto, the n data records being selected from the group consisting of ancillary records, facility records and prescription drug records, where n is an integer greater than or equal to 0, and having a predefined time window during which the n data records may group to the one anchor record.

3.    The process as claimed in Claim 2, wherein each of the at least one of a plurality of episode treatment groups contain at least one cluster.

4.    The process as claimed in Claim 3, wherein the at least one cluster further comprises at least one ancillary record and at least one anchor record.

5.    The process as claimed in Claim 2, wherein the step (d) further comprises the step of differentiating patient severity based upon data relating to at least one of patient age, complicating conditions, comorbidities and major surgeries.

6.    The process as claimed in Claim 2, further comprising the step of outputting and discontinuing processing of invalid data records and comparing diagnosis and treatment code data.

7.    The process as claimed in Claim 6 wherein the step of outputting and discontinuing processing of invalid data records further includes the step of assigning a different episode treatment group for at least one of an invalid diagnosis code, an invalid treatment code and an invalid provider type.

8.    The process as claimed in Claim 2, further comprising the step of identifying valid episode treatment groups by comparing current treatment codes to prior related episodes in look-up tables.

9.    The process as claimed in Claim 2, further comprising the step of flagging valid claim records with a diagnosis code identifier.

10.    The process as claimed in Claim 9, wherein the step of flagging valid claim records further comprises the step of incrementing a sequential anchor count and a sequential episode count for each episode treatment group assignment.

11.     The process as claimed in Claim 2, further comprising the step of resetting the dynamic time window of the medical episode when a second at least one of a plurality of data records matches an open medical episode, the dynamic time window being reset for an additional period of time until no other data records are grouped to the open medical episode within the reset dynamic time window.

12.     The process as claimed in Claim 11, wherein the step of resetting the dynamic time window of the medical episode, further comprises the step of selecting a most recent claim record if more than one matched claim record exists.

13.     The process as claimed in Claim 2, further comprising the step of shifting a medical claim to a different one of the plurality of episode treatment groups based upon a inputting of a medical claim record including changes in patient condition comprising at least one of comorbidity, complication and defining surgery.

14.     The process as claimed in Claim 13, wherein the step of shifting further comprises shifting an episode treatment group originally assigned by a first diagnosis on a medical claim record based on at least one of a second, third and fourth diagnosis.

15.     The process as claimed in Claim 8, wherein the step of identifying valid episode treatment groups further comprises the step of comparing pharmaceutical claim data in a patient's medical claim data to open episode treatment groups for the patient by analyzing Generic Drug Codes by episode treatment group and National Drug Code by Generic Drug Codes look-up tables.

16.     The process as claimed in Claim 2, further comprising the step of identifying medical providers treating episodes treatment groups by identifying each episode treatment group by Primary Care Physician.

527.    These claims were identical to the claims filed in the '927 application.    As discussed in detail above with reference to the '927 application, the ETG software offered for sale and described in the Aetna RFP Response embodied the limitations of at least claims 1-6, 11, 13,

14, and 16.  Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of these claims.

528.    The examiner rejected the claims, finding that they were "not patentably distinct" from the claims of the '897, '290, '333, and '511 patents.

529.    In response to the rejection, claim 1 was cancelled and claim 2 was amended to add references to a computer processor, as reflected here:

> 2.    (Currently Amended)  A computer-implemented process for profiling medical claims including the steps of:
>
> (a)    reading a first patient's medical claim data, input as at least one of a plurality of data records, into a computer memory;
>
> (b)    validating each of the at least one of a plurality of data records for at least one of a diagnosis code and a treatment code using a computer processor;
>
> (c)    ~~reading~~ determining at least one pre-defined relation between the at least one of a diagnosis code and a treatment code in the validated at least one of a plurality of data records and pre-defined medical episodes using the computer processor; and
>
> (d)    grouping the validated at least one of a plurality of data records to at least one of a plurality of episode treatment groups using the computer processor, each of the at least one of a plurality of episode treatment groups further comprising one anchor record and n data records linked thereto, the n data records being selected from the group consisting of ancillary records, facility records and prescription drug records, where n is an integer greater than or equal to 0, and having a predefined time window during which the n data records may group to the one anchor record.

530.    Claims 3-16 remained unchanged.

531.    Concurrently with amending the claims, OptumInsight (through Dorsey & Whitney attorney Bridget Hayden) filed a terminal disclaimer, in which OptumInsight disclaimed any enforceability of the patent claims that extended beyond the expiration date of the '897, '290, '511, and '333 patents.

532.    Claims 2-16 issued as claims 1-15 of the '165 patent.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT
- 101 -

533.   As explained above with reference to the '927 application and the as-filed claims of the '207 application, the ETG software offered for sale and described in the Aetna RFP Response embodied and was but-for material to the limitations of at least claims 1-5, 10, 12, 13, and 15.   Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of these claims.

534.   On July 19, 2012, Hayden filed an information disclosure statement disclosing the Aetna RFP Response and CCGroup's Invalidity Contentions from *Cave I*.  CCGroup had served the Invalidity Contentions on OptumInsight on December 19, 2011.

535.   Despite having had the invalidity contentions in their possession for more than six months, OptumInsight (through Hayden and Padmanabhan) waited until they had received a notice of allowance on the '165 patent claims before disclosing the information to the examiner.

536.   On information and belief, OptumInsight (through Hayden and Padmanabhan) waited to disclose the information so that they could avoid having to make the statement, required by 37 CFR § 1.97(e), that no person required to make the disclosure knew of the information more than three months prior to filing the information disclosure statement.   Further, on information and belief, they waited to make the disclosure because they believed that, in practice, an examiner is less likely to closely review references disclosed after a notice of allowance has been entered.

537.   At no time during the prosecution of the '207 application did Padmanabhan, Hayden, or anyone else associated with the prosecution of the application disclose to the USPTO any of the contradictory information from related litigation regarding the conception date of Dang's invention.

*The '433 Patent*

538.    The '433 patent issued from application number 13/611,350 (the "'350 application"). The '350 application was filed on September 12, 2012 by Dorsey & Whitney attorney Bridget Hayden on behalf of OptumInsight. The '207 application was a continuation of the '927 application, which issued as the '290 patent.

539.    Upon filing the '350 application, the applicant sought a patent on the same 16 claims as had been originally filed in the '207 application.

540.    As explained above with reference to the '207 application and the '927 application, the ETG software offered for sale and described in the Aetna RFP Response embodied the limitations of at least claims 1-6, 11, 13, 14, and 16. Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of these claims.

541.    The examiner rejected the claims, finding that they were "not patentably distinct" from the claims of the '897, '290, '333, '165, and '511 patents.

542.    In response to the rejection, claim 1 was cancelled and claim 2 was amended in the same way as the initial claims of the '165 patent had been amended, except that the phrase "reading at least one pre-defined relation" in step (b) was left unchanged.

543.    Claims 3-16 remained unchanged.

544.    Concurrently with amending the claims, OptumInsight (through Dorsey & Whitney attorney Bridget Hayden) filed a terminal disclaimer, in which OptumInsight disclaimed any enforceability of the patent claims that extended beyond the expiration date of the '897, '290, '511, '165 and '333 patents.

545.    Claims 2-16 issued as claims 1-15 of the '433 patent.

546.    As explained above with reference to the '927 application and the as-filed claims of the '207 application, the ETG software offered for sale and described in the Aetna RFP

Response embodied and was but-for material to the limitations of at least claims 1-5, 10, 12, 13, and 15.  Further, the disclosure of the ETG software and the Aetna RFP Response rendered obvious to one having ordinary skill in the art the limitations of these claims.

547.    Upon filing the application that issued as the '433 patent, OptumInsight disclosed to the examiner the Aetna RFP Response.  OptumInsight did not, however, disclose any of the contradictory representations from litigation regarding conception date.

548.    OptumInsight waited until more than a year later, and only after having received a notice of allowance, to disclose other material documents, including the file histories for the '897 reexamination, the Seare/Dang interference, and the Dang applications that had been abandoned.

549.    OptumInsight also disclosed to the examiner the Court's claim construction order in *Cave I*, but OptumInsight did not disclose the arguments it had made in claim construction briefing regarding "dynamic time windows," which arguments contradicted the representations made by Dang and Rosenbaum in the '897 reexamination.

550.    In *Cave I*, OptumInsight accused CCGroup of infringing US Patent Nos. 7,222,079 (the '079 patent) and 7,774,252 (the '252 patent) (together, the "Seare patents").

*The '079 Patent*

551.    The '079 patent issued on May 22, 2007 from application number 09/437,567 (the "'567 application").  The '567 application was filed on November 10, 1999 by OptumInsight attorney Alan Gorman.  On June 22, 2004, power of attorney for the '567 application was transferred to Dorsey and Whitney, with communication directed to Devan Padmanabhan.

552.    The '567 application claimed priority to an application filed on June 23, 1994.

553.    To provoke an interference with the Dang '897 patent, Gorman cancelled the pending claims and added 18 claims copied from the '897 patent.  Eventually, Gorman cancelled all but one claim, which had been copied from claim 1 of the '897 patent.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT                      - 104 -

554.    At no time did Gorman, Padmanabhan or anyone else associated with the prosecution of the '079 patent disclose the invalidating effect of the Aetna RFP Response to the examiner.

555.    The '079 patent eventually issued with one claim, which was identical to claim 1 of the '897 patent.

556.    As explained above with reference to claim 1 of the '897 patent, the ETG software described and offered for sale in the Aetna RFP Response was an embodiment of claim 1 of the '079 patent.  The date of the Aetna RFP Response predates the priority date of the '079 patent. Thus, the invention of claim 1 of the '079 patent was invented by Dang before its invention by Seare.

*The '252 Patent*

557.    The '252 patent issued on August 10, 2010 from application number 11/512,003 (the '003 application).  The '003 application was filed on August 29, 2006 by OptumInsight attorney Adriana Luedke, who also participated in the prosecution of several of the Dang patents. The '003 application was a continuation of the '567 application and claimed a priority date of June 23, 1994.

558.    On filing the '003 application, Luedke told the examiner that the proposed claims corresponded to the '897 patent claims that had formed the "count" in the Seare/Dang interference.   Luedke stated that, because these claims had been "issued and subsequently successfully reexamined" in the '897 patent, they were immediately patentable.

559.    Thus, Luedke equated the claims of the '252 patent to the claims of the '897 patent.

560.    At no time did Luedke or anyone else associated with the prosecution of the '252 patent disclose the invalidating effect of the Aetna RFP Response to the examiner.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT

- 105 -

561.     The '252 patent eventually issued with four claims.

562.     Claim 1 of the '252 patent is essentially identical to claim 3 of the '897 patent. Claim 3 of the '897 patent was one of the claims in the "count" at issue in the interference.

563.     As explained above with reference to claim 3 of the '897 patent, the ETG software described and offered for sale in the Aetna RFP Response was an embodiment of claim 1 of the '252 patent.  The date of the Aetna RFP Response predates the priority date of the '252 patent. Thus, the invention of claim 1 of the '252 patent was invented by Dang before its invention by Seare.

564.     Claim 2 of the '252 patent is essentially identical to claim 5 of the '897 patent. Claim 2 of the '252 patent adds to claim 1 the further limitation: "wherein an active and open episode treatment group comprises an episode treatment group number, sequential episode number, and most recent anchor date of treatment."

565.     The ETG software described and offered for sale in the Aetna RFP Response practiced this limitation.  Because episodes are in date order, for a specific patient, it is inherent that sequential episode number could be tracked.  Anchor records represent service by a clinician engaging in the direct evaluation, management or treatment of a patient.

566.     Page 4 of the Aetna RFP Response explains that, in the ETG software, "aggregations of segments which form entire episodes are identified through a chronological and clinical algorithm.  ETG value and an episode number is written to each claim segment."

567.     Thus, the invention of claim 2 of the '252 patent was invented by Dang before its invention by Seare.

568.     Claim 3 of the '252 patent is essentially identical to claim 11 of the '897 patent. Claim 3 of the '252 patent adds to claim 1 the limitation of "wherein step (d) further comprises

the step of identifying claim records as one of management, surgery, facility, ancillary, and prescription drug records."

569.    The ETG software described and offered for sale in the Aetna RFP Response practiced this limitation, as reflected on page 4 of the Aetna RFP Response.

570.    Thus, the invention of claim 3 of the '252 patent was invented by Dang before its invention by Seare.

571.    Claim 4 of the '252 patent, which is essentially identical to claim 33 of the '897 patent, is reproduced here:

> **4.** A computer-implemented process for processing medical claims comprising a computer performing the following:
> (a) reading a first patient's medical claim data, input as at least one of a plurality of data records, into a computer memory;
> (b) validating each of the at least one of a plurality of data records for at least one of a diagnosis code and a treatment code;
> (c) reading at least one pre-defined relation between the at least one of a diagnosis code and a treatment code in the validated at least one of a plurality of data records and pre-defined medical episodes; and
> (d) grouping the validated at least one of a plurality of data records to at least one of a plurality of episode treatment groups, each of the at least one of a plurality of episode treatment groups further comprising an episode treatment group identifier, a most recent anchor from date of treatment and a most recent sequential anchor record count.

572.    As explained in detail above, the ETG software described and offered for sale in the Aetna RFP Response practiced the preamble and limitations (a), (b), and (c) of claim 4, which are essentially identical to claims in other Dang and Seare patents.

573.    As explained in detail above, the ETG software described and offered for sale in the Aetna RFP Response grouped data records to episode treatment groups as prescribed in limitation (d) of claim 4.

574.    The episode treatment groups in the ETG software described and offered for sale in the Aetna RFP Response comprised an episode treatment group identifier, a most recent anchor from date of treatment and a most recent sequential anchor record count.

575.    Page 4 of the Aetna RFP Response explains that, in the ETG software, "aggregations of segments which form entire episodes are identified through a chronological and clinical algorithm.  ETG value and an episode number is written to each claim segment." Appendix A of the Aetna RFP Response lists ETGs with their identifying numbers.

576.    Page 15 of the Aetna RFP Response explains that "each ETG is comprised of one or more clusters of management records and their associated ancillary records."  Page 4 explains that "Management records are also known as *anchor* records since they indicate that an episode has begun, and in addition, provide a reference point from which to link ancillary records." (emphasis in original).

577.    Thus, the invention of claim 4 of the '252 patent was invented by Dang before its invention by Seare, as reflected in the Aetna RFP Response.

## COUNT ONE

### *Walker Process*:
### Monopolization and Attempted Monopolization in Violation of
### § 2 of the Sherman Act, 35 U.S.C. § 2

578.    CCGroup incorporates by reference the other paragraphs of this Complaint.

579.    OptumInsight has monopolized the Grouper Software Market, a nationwide market in which OptumInsight is actively engaged in interstate commerce.

580.    By fraudulent misrepresentations and omissions to the USPTO in connection with the prosecution of the Dang and Seare patents, and its efforts to enforce those fraudulently-obtained patents, OptumInsight obtained and/or maintained its monopoly of the Grouper Software Market in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

581.   In the alternative, OptumInsight has attempted to monopolize the Grouper Software Market with the specific intent to do so through its fraudulent misrepresentations and omissions to the USPTO in connection with the prosecution of the Dang and Seare patents, and its efforts to enforce those fraudulently-obtained patents, creating a dangerous probability that OptumInsight will obtain a monopoly in the market, in violation of Section 2 of the Sherman Act.

582.   The Dang patents that OptumInsight asserted against CCGroup in *Cave I* were invalid and unenforceable due to inequitable conduct, as a result of affirmative egregious misconduct before the USPTO and/or the intentional withholding of information that was but-for material to patentability, and/or unclean hands based on egregious misconduct before the USPTO in the Dang-Seare interference regarding the misrepresentation that the application for the Seare '079 patent was entitled to priority over the Dang '897 patent.

583.   The Seare patents that OptumInsight asserted against CCGroup in *Cave I* were invalid and unenforceable due to inequitable conduct, as a result of the intentional withholding of information that was but-for material to patentability.

584.   OptumInsight knew that the Dang and Seare patents asserted against CCGroup in *Cave I* were invalid and unenforceable at that time, based on at least the following and further as described in the foregoing paragraphs:

b.   OptumInsight acquired Symmetry in 2003 and merged with Symmetry in 2007, and as a result OptumInsight had knowledge of the inequitable conduct committed by Symmetry—specifically Dang, Rosenbaum, Portnoy, and Gardiner—with respect to the Dang '897 and '511 patents.

c.   OptumInsight represented in white papers released in 2006 and 2012 that Dang's Symmetry ETG software was introduced to the market in 1993, and represented in a 2007 response to a request for proposal that Dang and Portnoy conceived the ETG software in 1993.

These representations directly contradicted the prior public claims of Rosenbaum, Dang, Portnoy, and Gardiner in the '897 reexamination that Dang conceived his invention in August 1994, and they also directly contradicted OptumInsight's prior representation in the Dang-Seare interference that Dang conceived his invention after the June 23, 1994 filing date of the application for the Seare '079 patent.

d.       In 2002, OptumInsight's counsel, including Peter Lancaster, received ETG software source code dated 1993 and briefing in which Symmetry represented that Dang conceived his invention in September 1993, directly contradicting Dang, Rosenbaum, Portnoy, and Gardiner's representations to the USPTO in the '897 reexamination that Dang conceived his invention in August 1994.  Lancaster represented OptumInsight in *Cave I* and has represented OptumInsight in matters involving the Dang and Seare patents since at least 2001.

e.       Devan Padmanabhan, who represented OptumInsight in *Cave I*, managed the preparation and prosecution of the patents and applications in the Dang and Seare patent families after those files were transferred to Dorsey & Whitney upon OptumInsight's acquisition of Symmetry, and consequently Padmanabhan was aware of the Aetna RFP Response and the statutory bars to patentability that it raised.  Padmanabhan and the other Dorsey & Whitney attorneys who participated in the prosecution of the Dang patents hid the invalidating effect of the Aetna RFP Response from the USPTO.  Then, in *Cave I*, Padmanabhan affirmatively relied on the Aetna RFP Response and the affidavits from the reexamination of the '897 patent to claim that Dang conceived of his invention in 1994, as evidence both of Dang's conception and of a pre-filing offer for sale of the claimed invention. Additionally, because Padmanabhan, like Lancaster, was associated with the Dorsey & Whitney law firm, he was privy to the dated source code, briefing, sworn testimony, and interrogatory answers proving that Dang conceived his invention in September 1993, which Lancaster received in prior litigation, and which conflicted

with the affidavits submitted by Rosenbaum, Dang, Portnoy, and Gardiner in the reexamination of the '897 patent.  Documents and other information reflecting the existence of Symmetry's prior litigations involving the subject matter of the Dang and Seare patents that Padmanabhan prosecuted were also readily available to Padmanabhan at Dorsey & Whitney, if he was not already aware of those litigations through his work for OptumInsight or through his contact with other Dorsey & Whitney attorneys doing work for OptumInsight.

f.      Padmanabhan was responsible for conducting the pre-filing investigation that preceded OptumInsight's assertion of the aforementioned Dang and Seare patents against CCGroup.

g.      During prosecution of the Seare '079 patent, OptumInsight's counsel, Alan Gorman, recognized and described to the USPTO examiner the impropriety of Dang's changing the meaning of "dynamic time windows" during the '897 reexamination.

h.      In the Dang-Seare interference, OptumInsight's counsel, including Kevin McMahon and Steven Glazer, represented to the USPTO that OptumInsight conducted a "thorough investigation of the relevant facts" regarding Dang's conception.  In connection with resolving the interference upon OptumInsight's acquisition of Symmetry, McMahon also noted internally the importance of interviewing Dang and Gardiner and discussing with them any documents they might have pertaining to the timing of Dang's conception, which necessarily would have included at least the 1993 dated source code and Symmetry's claim to a 1993 conception date in its litigation with MedStat.   In resolving the interference by falsely representing that the application for the Seare '079 patent was entitled to priority over the Dang '897 patent, McMahon and Glazer misrepresented that this conclusion was supported by a "thorough investigation" and failed to disclose any documents evidencing Dang's conception in 1993.

i.      Brigid Spicola, Secretary of Symmetry and later Secretary and General Counsel of OptumInsight, participated in the prosecution of the asserted Dang '560, '333, and '290 patents, and the asserted Seare '079 and '252 patents, during which the acts of inequitable conduct described herein occurred.

j.      On information and belief, prior to *Cave I*, OptumInsight's counsel delivered to employees of OptumInsight documents asserting and evidencing Dang's 1993 conception of the ETG software—documents establishing the invalidity and enforceability of the Dang and Seare patents later asserted against CCGroup.

k.      Symmetry and Dang were obligated to turn over, and did turn over, all of their files regarding the ETG software to OptumInsight in connection with OptumInsight's acquisition of Symmetry in 2003.

l.      OptumInsight's counsel's knowledge of facts establishing the invalidity and unenforceability of the asserted Dang and Seare patents, as described herein, is imputed to OptumInsight by virtue of the relationship between counsel and client, and on information and belief, OptumInsight's counsel communicated these matters to OptumInsight consistent with their obligation to keep their client reasonably informed about the status of matters.

585.    As a direct and proximate result of OptumInsight's unlawful conduct, competition in the Grouper Software Market has been severely harmed through price control, less innovation, lower quality, and fewer options for customers.

586.    As a direct and proximate result of OptumInsight's unlawful conduct, CCGroup has been harmed in an amount to be established at trial.  CCGroup's damages include the attorneys' fees and costs it incurred in defending against OptumInsight's baseless claims for infringement of the Dang and Seare patents, as well as the anticompetitive harm it has suffered as a result of OptumInsight's unlawful acquisition and maintenance (or attempted acquisition and

maintenance) of a monopoly in the Grouper Software Market, including loss of past and future profits and loss of past and future customers and customer goodwill.

587.   OptumInsight's unlawful conduct will continue unless enjoined, resulting in irreparable injury to CCGroup for which it has no adequate remedy at law.

## COUNT TWO

### *Handgards*:
### Monopolization and Attempted Monopolization in Violation of
### § 2 of the Sherman Act, 35 U.S.C. § 2

588.   CCGroup incorporates by reference the other paragraphs of this Complaint.

589.   OptumInsight has monopolized the Grouper Software Market, a nationwide market in which OptumInsight is actively engaged in interstate commerce.

590.   OptumInsight obtained and maintained this monopoly by serial sham legal actions asserting infringement of Dang and Seare patents, knowing those patents to be invalid (in light of Dang's 1993 offer for sale of the ETG software, evidenced by the Aetna RFP Response) and unenforceable (in light of the inequitable conduct described in detail herein), against CCGroup and others, and by taking frivolous positions against CCGroup with respect to claim construction and infringement of the Seare patents, in violation of Section 2 of the Sherman Act.

591.   In the alternative, OptumInsight has attempted to monopolize the Grouper Software Market with the specific intent to do so through serial sham legal actions asserting infringement of the Dang and Seare patent portfolios against CCGroup and others, creating a dangerous probability that OptumInsight will obtain a monopoly in the market, in violation of Section 2 of the Sherman Act.

592.   As a direct and proximate result of OptumInsight's unlawful conduct, competition in the Grouper Software Market has been severely harmed through price control, less innovation, lower quality, and fewer options for customers.

593.   As a direct and proximate result of OptumInsight's unlawful conduct, CCGroup has been harmed in an amount to be established at trial.  CCGroup's damages include the attorneys' fees and costs it incurred in defending against OptumInsight's baseless claims for infringement of Dang and Seare patents, as well as the anticompetitive harm it has suffered as a result of OptumInsight's unlawful acquisition and maintenance (or attempted acquisition and maintenance) of a monopoly in the Grouper Software Market, including loss of past and future profits and loss of past and future customers and customer goodwill.

594.   OptumInsight's unlawful conduct will continue unless enjoined, resulting in irreparable injury to CCGroup for which it has no adequate remedy at law.

### COUNT THREE

**False Advertising:**
**Violations of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)**

595.   CCGroup incorporates by reference the other paragraphs of this Complaint.

596.   OptumInsight made false or misleading statements of fact in the marketplace, to customers and potential customers of OptumInsight and CCGroup, regarding the patent protection OptumInsight enjoys for its episode grouper software.

597.   For example, in a February 1, 2012 proposal to Blue Cross and Blue Shield Association, OptumInsight offered to license "Symmetry's patented ETG illness classification and episode building system." As another example, in a July 30, 2008 letter to the American Board of Medical Specialties, OptumInsight claimed that the '897 and '511 patents cover the ETG software.  As another example, in a 2006 public release regarding a transparency initiative, OptumInsight referred to its "patented ETG software."

598.   These statements were false, or at best misleading, because, as described in detail herein, OptumInsight knew at the time those statements were made that it had no valid or enforceable patent that covered the ETG software.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT                      - 114 -

599.     OptumInsight acted in bad faith when it made these statements.

600.     These false or misleading statements actually deceived, and/or were likely to deceive, a substantial segment of those customers and potential customers into believing that the Dang and Seare patents were enforceable and that they preclude competitors from legally offering competing episode grouper software.

601.     OptumInsight's false or misleading statements were material in that they were likely to influence these customers and potential customers to do business with OptumInsight, rather than CCGroup or another competitor of OptumInsight.

602.     OptumInsight caused these false or misleading statements to enter interstate commerce.

603.     OptumInsight's false or misleading statements were likely to cause and did cause injury to CCGroup, at least through the diversion of sales of episode grouper software from CCGroup to OptumInsight and/or through the negative impact on the goodwill associated with the Cave Grouper and CCGroup generally.

## COUNT FOUR

### Malicious Prosecution

604.     CCGroup incorporates by reference the other paragraphs of this Complaint.

605.     OptumInsight initiated and continued to prosecute a civil lawsuit against CCGroup.   That lawsuit was based on allegations that CCGroup infringed six patents from OptumInsight's Dang patent family and that CCGroup infringed the '252 Seare patent.

606.     During the course of that litigation, OptumInsight voluntarily dismissed all six of the asserted Dang patents and the '252 Seare patent from suit.   The remaining claim of the Seare patent was tried to a jury, which found in CCGroup's favor on non-infringement.

607.   Each of the claims for patent infringement originally brought by OptumInsight against CCGroup was resolved in CCGroup's favor.

608.   The Dang patents and '252 patent underlying OptumInsight's claims of infringement were invalid and unenforceable.

609.   OptumInsight knew or had reason to know that the patents at issue in the patent infringement litigation were invalid and unenforceable.

610.   OptumInsight acted without probable cause in initiating and/or continuing its claims for patent infringement against CCGroup.

611.   On information and belief, OptumInsight commenced and continued to prosecute the patent infringement litigation for the purpose of forcing a settlement, obtaining a verdict, or for another purpose which had no relation to the merits of their claims.  In commencing and prosecuting the patent infringement litigation, OptumInsight acted with malice.

612.   The malicious actions of OptumInsight forced CCGroup to defend meritless claims regarding the Dang patents and the '252 Seare patent, and caused CCGroup to suffer injury, damage, loss, and harm in an amount to be proven at trial or otherwise.

## Prayer for Relief

On motion or after a trial by jury, CCGroup requests that the Court grant the following relief:

A.   Enter judgment in favor of CCGroup declaring that OptumInsight has attempted to monopolize and has monopolized the grouper software market in violation of Section 2 of the Sherman act, 15 U.S.C. § 2.

B.   Permanently enjoin OptumInsight, its respective officers, agents, servants, directors, and employees, and all persons in active concert or participation with each, from monopolizing and attempting to monopolize the relevant markets under Section 16 of the Clayton

Act, 15 U.S.C. § 26;

C.      Permanently enjoin OptumInsight from enforcing or attempting to enforce the Dang and Seare patent portfolios;

D.      Award CCGroup actual and compensatory damages, including but not limited to, lost profits and attorneys' fees and costs, trebled as provided by law, plus interest;

E.      Award CCGroup punitive and exemplary damages as the law shall permit or the jury shall find, plus interest;

F.      Award CCGroup its attorneys' fees and costs incurred in this action, with interest; and

G.      Award CCGroup such other and further relief as the Court finds just and proper.

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT

1

**JURY DEMAND**

2

      CCGroup asserts its right to, and demands, a trial by jury pursuant to Fed. R. Civ. P. 38.

3

4

5

6

Dated:  May 13, 2016

7

8

                       By:  /s/  Richard L. Brophy
                           Richard L. Brophy

9

                       Richard L. Brophy (*pro hac vice*)

10

                       David W. Harlan (*pro hac vice*)
                       Charles W. Steese (*pro hac vice*)

11

                       Mark A. Thomas (*pro hac vice*)
                       Zachary C. Howenstine  (*pro hac vice*)

12

                       ARMSTRONG TEASDALE LLP

13

                       Holly A. House (SB# 136045)

14

                       Sophie J. Sung (SB# 279056)
                       PAUL HASTINGS LLP

15

                       Attorneys for Plaintiff

16

                       CAVE CONSULTING GROUP, INC.

17

18

19

20

21

22

23

24

25

26

27

28

CAVE CONSULTING GROUP, INC.'S
SECOND AMENDED COMPLAINT