1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6

| | |
|---|---|
| CAVE CONSULTING GROUP, INC., | Case No. 15-cv-03424-JCS |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| OPTUMINSIGHT, INC., | |
| Defendant. | Re: Dkt. No. 103 |

## I.     INTRODUCTION

Plaintiff Cave Consulting Group, Inc. ("CCGroup") brings antitrust, malicious prosecution, and false advertising claims against Defendant OptumInsight, Inc. based on OptumInsight's assertion, in litigation and otherwise, of patents that CCGroup contends are invalid or unenforceable.  The Court previously dismissed CCGroup's First Amended Complaint with leave to amend, and OptumInsight now moves to dismiss the Second Amended Complaint.  The Court held a hearing on September 2, 2016.  For the reasons discussed below, OptumInsight's present motion is DENIED.[1]

## II.    BACKGROUND

### A.     Allegations of the Second Amended Complaint

CCGroup's allegations are generally taken as true at the pleading stage.  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  This section summarizes the allegations but should not be construed as resolving any factual issues that might be disputed.

Both parties in this case are in the business of providing software, known as "episode of care groupers" or simply "groupers," used to group medical claims data based on discrete periods

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

of treatment in order to better evaluate the quality and efficiency of medical care.  2d Am. Compl. ("SAC," dkt. 86) ¶¶ 22−28.  From 2005 through 2014, only three groupers existed in the national market, including OptumInsight's "ETG" product, CCGroup's "Cave Grouper," and a product sold by non-party Truven Health Analytics, Inc., formerly known as MedStat Group, Inc. ("MedStat").  *Id.* ¶ 28.  OptumInsight controlled eighty-five to ninety percent of the market during that period.  *Id.* ¶ 30.  OptumInsight (including its predecessors Ingenix, Inc. and Symmetry Health Data Systems Inc.) obtained its dominant market share through actual and threatened enforcement of a portfolio of patents, including two families: the "Dang Patents" and the "Seare Patents."  *Id.* ¶¶ 31−33.[2]

### 1.  Symmetry and the '897 Patent

Dennis Dang, among others, formed Symmetry Health Data Systems Inc. ("Symmetry") in 1993, and "[b]y early 1994 . . . had developed a software grouping methodology, which Symmetry began advertising for sale under the trade name 'Episode Treatment Groups' or 'ETGs.'"  *Id.* ¶¶ 43−44.  On June 12, 1994, Symmetry responded to a request for proposal from Aetna, a large insurance company, by offering to license the ETG software to Aetna and providing a description of the software, sample reports generated by the software, and pricing information.  *Id.* ¶¶ 45−46 & Ex. A.  The response stated that the ETG software was "recently developed and available" and described features of the product, including a "dynamic time window" function that allowed the software to determine the end of a period of treatment by recognizing the absence of recurring claims, and a "shifting" function that helped account for patient severity to ensure "clinical homogeneity."  *Id.* ¶¶ 54−66.  The software was fully functional at the time of Symmetry's response to the request for proposal.  *Id.* ¶ 67.  Symmetry's response constituted an offer of sale describing the invention, and therefore triggered a one-year period to file a patent application under the then-existing version of 35 U.S.C. § 102(b).  *Id.* ¶ 71.[3]

---

[2] The Dang Patents include U.S. Patent Nos. 5,835,897; 6,370,511; 7,620,560; 7,725,333; 7,774,216; 7,979,290; 8,121,869; 8,296,165; and 8,700,433.  The Seare Patents include U.S. Patent Nos. 7,222,079 and 7,774,252.  This Order refers to these patents using the last three digits of each number (e.g., the '897 patent).

[3] At the time, that statute read as follows: "A person shall be entitled to a patent unless-- . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in

United States District Court
Northern District of California

United States District Court
Northern District of California

1    More than one year after responding to Aetna's RFP, Symmetry filed a patent application

2    for its grouping methodology. *Id.* ¶ 73. "When [Symmetry's patent counsel David] Rosenbaum

3    and Dang filed the patent application, they deliberately withheld from the USPTO all of the

4    information in their possession regarding Symmetry's early efforts to commercialize Dang's

5    invention, including Dang's offer to sell his inventive methodology to Aetna," which "would have

6    rendered the claims . . . unpatentable" if properly disclosed. *Id.* ¶¶ 74−75. In response to that

7    application, the USPTO issued the '897 patent in 1998. *Id.* ¶ 76. CCGroup's Second Amended

8    Complaint discusses the claims of the '897 patent and their overlap with the RFP response in

9    detail at paragraphs 240 through 314.

10    ### 2.  Symmetry-MedStat Litigation

11    Immediately after the '897 patent was issued, Symmetry sued MedStat for infringing that

12    patent. *Id.* ¶ 79 (citing *Symmetry Health Data Sys., Inc. v. The MedStat Grp. Inc.*, No. 2:98-CV-

13    02032-EHC (D. Ariz.)). "Rosenbaum, Symmetry's patent prosecution counsel, served as

14    litigation counsel in the MedStat litigation." *Id.* Symmetry stated in sworn interrogatory

15    responses that Dang conceived of the invention "at least as early September 1993" and that, at that

16    time, it was "sufficiently complete to enable one of ordinary skill in the art to reduce the claimed

17    invention to practice." *Id.* ¶¶ 80−81. Dang confirmed that position in sworn testimony in both the

18    MedStat litigation and later litigation against CCGroup. *Id.* ¶¶ 82, 85. According to CCGroup,

19    Symmetry took the position that the invention occurred in 1993 "in order to predate prior art cited

20    by MedStat," specifically a patent issued from a 1994 application by Jerry Seare. *Id.* ¶ 84. The

21    MedStat litigation ultimately settled in 2000. *See id.* ¶ 88.

22    ### 3.  Reexamination of the '897 Patent

23    Earlier in 2000, before the MedStat case settled, Symmetry initiated a non-adversarial

24    USPTO reexamination of the '897 patent. *Id.* The initial petition for reexamination focused on

25    certain prior art references not at issue in the present case, but after the reexamination had been

26    pending for nine months, Symmetry and Rosenbaum also disclosed the Aetna RFP response to the

27

28    public use or on sale in this country, more than one year prior to the date of the application for
patent in the United States . . . ." 35 U.S.C. § 102 (prior to amendment in 2015).

USPTO for the first time. *Id.* ¶ 89. CCGroup contends that if Dang had fully conceived the invention in 1993 (which was the position Symmetry took in the Medstat litigation) and offered it for sale to Aetna in 1994 (as evidenced by the RFP response), the '897 patent would be invalid under § 102(b). *Id.* ¶ 91. Over several months in 2000, Rosenbaum, Dang, and other Symmetry personnel "concoct[ed] an explanation" for why the RFP response should not invalidate the patent, ultimately submitting affidavits to the USPTO falsely stating that Dang did not fully conceive the invention until August of 1994, shortly after Symmetry responded to Aetna's RFP. *Id.* ¶¶ 90–97. "The affidavits contained material falsehoods regarding the date of conception," focusing on the "false" premise "that at the time of the Aetna RFP Reponse, Dang had not yet conceived of 'shifting' and 'resetting' required by the 'dynamic time windows' in the patent." *Id.* ¶¶ 96, 98. Such statements "directly contradicted Dang's earlier sworn testimony that he fully conceived of his invention by September of 1993." *Id.* ¶ 100. Symmetry withheld from the USPTO the litigation materials in which Symmetry had asserted a 1993 conception date, which CCGroup alleges "were material to the patentability of the '897 patent and all of the other patents that ultimately issued from the original application for the '897 patent." *Id.* ¶¶ 102–03. CCGroup also contends that Rosenbaum "lied about his knowledge of the Aetna RFP Response" by representing that he did not learn of it until July of 2000, when in fact he "was intimately familiar with [it] at least as early as August 1999" based on communications he received from Symmetry's litigation counsel in the MedStat case seeking to avoid producing that document in response to a discovery request. *Id.* ¶¶ 104–11. "Relying on Symmetry's material misrepresentations and omissions, and without any of the information evidencing Dang's actual conception in September of 1993, the USPTO issued a reexamination certification for the claims of the '897 Patent on February 19, 2002." *Id.* ¶ 112.

### 4. Ingenix-Symmetry Litigation

"In April of 2001, while the reexamination of the '897 patent was pending, OptumInsight (then known as Ingenix) sued Symmetry for infringement of [Seare's '164 patent]." *Id.* ¶ 114 (citing *Ingenix, Inc. v. Symmetry Health Data Systems, Inc.*, No. 0:01-cv-00704 (D. Minn.)). Rosenbaum again assisted as Symmetry's litigation counsel. *Id.* ¶ 115. OptumInsight's counsel

4

1    included Peter Lancaster[4] of the Dorsey & Whitney firm, and Kevin McMahon and Steven Glazer

2    of the Weil Gotshal firm.  *Id.* ¶¶ 116–17.

3        Symmetry counterclaimed that Seare derived his invention from Dang's work.  *Id.* ¶ 118.

4    The Seare '164 patent's filing date was June 23, 1994, and Symmetry argued that Dang conceived

5    his ETG invention in September of 1993—contradicting the position Symmetry took in the

6    reexamination and reverting to the date it asserted in its litigation against MedStat.  *Id.* ¶¶ 119–21.

7    Symmetry disclosed dated source code to support the 1993 date, and asserted in a brief opposing

8    summary judgment that "'Mr. Dang's undisputed testimony is that he first conceived of the

9    invention, which is now known as ETGs, in the summer of 1993.'"  *Id.* ¶ 122–23 (quoting the

10   brief) (emphasis omitted).  Lancaster, McMahon, and Glazer received or knew of the source code

11   and the brief, and "were also provided with the interrogatory responses and other materials from

12   the earlier MedStat litigation that identified September 1993 as the actual conception date for

13   Dang's invention."  *Id.* ¶¶ 124, 130.  Symmetry's counsel argued at a hearing where Lancaster and

14   McMahon were present that Dang conceived the invention in 1993.  *Id.* ¶ 125.

15       Separate litigation between OptumInsight and Symmetry also occurred in the District of

16   Arizona.  *See id.* ¶ 113 (citing *Symmetry Health Data Systems, Inc. v. Ingenix, Inc.*, No. CIV 00-

17   1411 (D. Ariz.)).  Symmetry sued OptumInsight for infringing the '897 patent, and OptumInsight

18   counterclaimed that the '897 patent was unenforceable on account of inequitable conduct.  *Id.*

19          **5.  Interference Proceeding, Acquisition of Symmetry, and Subsequent
              Representations and Prosecutions**

20

21       In addition to its infringement lawsuit, OptumInsight also provoked a USPTO interference

22   proceeding between the '897 Dang patent and the then-pending application for what became the

23   '079 Seare patent to determine who first invented the methodology claimed in those applications.

24   *Id.* ¶ 132.  OptumInsight's application for the '079 patent included, verbatim, the first claim of the

25   '897 patent, and OptumInsight's attorneys represented to the USPTO that the applications were

26   directed to the same invention.  *Id.* ¶ 134.

27
_____

28   [4] Lancaster also represents OptumInsight in the present action, in which he is OptumInsight's lead
     counsel.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In May of 2003, OptumInsight purchased all the outstanding stock of Symmetry, and thus

2    acquired Symmetry's intellectual property. *Id.* ¶ 138. To resolve the interference, OptumInsight

3    decided unilaterally that the Seare application for the '079 patent had priority over the '897

4    patent—now also owned by OptumInsight—without the issue being decided by a finder of fact.

5    *Id.* ¶ 139. After OptumInsight represented that it had conducted "a thorough investigation of the

6    relevant facts" and determined that Seare invented first, and that Dang conceived his invention in

7    1994, the Board of Patent Appeals and Interferences entered judgment to that effect "'[b]ecause

8    [OptumInsight] has elected that [Seare] should prevail.'" *Id.* ¶¶ 140, 145, 151, 153 (quoting the

9    Board; second and third alterations in original). Neither Symmetry nor OptumInsight disclosed to

10   the USPTO documents that, CCGroup contends, demonstrate a 1993 conception date for the '897

11   patent. *Id.* ¶¶ 147−49. Later, in 2007, Symmetry merged into OptumInsight. *Id.* ¶ 149.

12   Since the interference proceeding, OptumInsight has contradicted the representations it

13   made therein by representing that Dang's software was introduced in 1993 in white papers

14   released in 2006 and 2012 and in response to a request for proposal in 2007. *Id.* ¶ 146.

15   OptumInsight, through its general counsel (and former secretary of Symmetry) Brigid Spicola and

16   attorneys at Dorsey & Whitney including Devan Padmanabhan, has prosecuted additional patents

17   in the Dang family, all of which are related to the '897 patent and rely on it for priority, without

18   disclosing the 1993 conception date.[5] *Id.* ¶¶ 160−62. OptumInsight, through Spicola and

---

19

20   [5] The Second Amended Complaint separately discusses in detail a number of Dang family patents
     and applications, including their relationship to the '897 patent and the Aetna RFP response.

21   Paragraphs 315 through 347 discuss the '511 patent, which differs from the '897 patent in that it
     focuses on pharmaceutical claims data. Paragraphs 348 through 378 discuss the '560 patent,

22   which focuses on the "clean periods" used to detect the end of a treatment group. Paragraphs 379
     through 409 discuss the '333 patent. Paragraphs 410 through 420 discuss application number

23   10/106,626, which focused on the "shifting" concept but which OptumInsight ultimately
     abandoned. Paragraphs 421 through 457 discuss the '216 patent, which was initially rejected but

24   ultimately issued after OptumInsight amended its claims. Paragraphs 458 through 503 discuss the
     '290 patent, which CCGroup contends is essentially identical to claims of previous patents, except

25   that the '290 patent is directed to systems rather than methods. Paragraphs 504 through 524
     discuss the '869 patent. Paragraphs 525 through 537 discuss the '165 patent, which the examiner

26   determined was not distinct from previous patents until OptumInsight amended its application to
     add references to a computer processor. Paragraphs 538 through 549 discuss the '433 patent,

27   which was also initially rejected but issued after references to computer processors were added.
     Several of these patents were only issued after OptumInsight filed terminal disclaimers against

28   enforceability beyond the expiration dates of earlier-issued patents. *See, e.g.*, SAC ¶ 531.
     CCGroup contends that the invention described and offered for sale in the Aetna RFP response

United States District Court
Northern District of California

Padmanabhan, among others, also prosecuted two patents in the Seare family—the '079 and '252 patents,[6] without disclosing Dang's 1993 conception date and evidence of that date constituting prior art, which were material to the applications and would have resulted in denial if disclosed. *Id.* ¶¶ 164−72.  Neither OptumInsight nor Symmetry ever disclosed that conception date to the USPTO.  *Id.* ¶ 157.

### 6.   Minnesota OptumInsight-CCGroup Litigation

On January 11, 2011, OptumInsight filed a complaint against CCGroup in the District of Minnesota for infringement of two Seare patents and five Dang patents.  *Id.* ¶ 173 (citing *Ingenix, Inc. v. Cave Consulting Grp., LLC*, No. 11-cv-00077-DWF-FLN (D. Minn.)).  CCGroup alleges that OptumInsight and its attorneys, including Lancaster and Padmanabhan of Dorsey & Whitney, knew when they filed suit that both patent families were invalid and unenforceable due to inequitable conduct.  *Id.* ¶¶ 174−80.

OptumInsight did not serve the complaint on CCGroup, and ultimately dismissed the Minnesota lawsuit without prejudice on June 20, 2011.  *Id.* ¶ 181.  CCGroup nevertheless "received numerous inquiries from customers and potential customers regarding OptumInsight's allegations of infringement."  *Id.* ¶ 184.  CCGroup asked OptumInsight to dismiss its claims with prejudice "to ensure that OptumInsight's public allegations of infringement would not tarnish CCGroup's reputation and ability to compete in the marketplace," but OptumInsight refused.  *Id.* ¶¶ 132–33.

### 7.   Declaratory Judgment Action and Infringement Counterclaims (*Cave I*)

"To clear the pall that OptumInsight's allegations had cast over CCGroup's business, on July 11, 2011, CCGroup filed a declaratory judgment action in the Northern District of California to resolve OptumInsight's infringement claims."  *Id.* ¶ 185 (citing *Cave Consulting Grp., Inc. v.*

---

embodied or rendered obvious most if not all of the claims in the patents discussed above.  *See, e.g.*, *id.* ¶ 546.  A chart comparing specific claims of the patents at issue to language in the RFP response is attached to the Second Amended Complaint as Exhibit B.
[6] The '079 patent, discussed above, has only a single claim, which is identical to the first claim of the '897 Dang patent.  *See* SAC ¶¶ 551−56.  CCGroup contends that the four claims of the '252 patent are "essentially identical" to various other claims of the '897 patent, all of which were reflected in the response to Aetna's RFP.  *Id.* ¶¶ 557−77.

7

1   *OptumInsight, Inc.*, No. 5:11-cv-00469-EJD (N.D. Cal.) (hereinafter, "*Cave I*")).[7]  OptumInsight,

2   again represented by Dorsey & Whitney attorneys including Lancaster and Padmanabhan, filed

3   counterclaims asserting that CCGroup infringed the patents at issue in the Minnesota complaint, as

4   well as an additional Dang patent issued in the intervening period.  *Id.* ¶¶ 186–87.  Based on

5   information obtained from earlier litigation, "Padmanabhan, Lancaster, OptumInsight, and Dorsey

6   & Whitney knew before those counterclaims were filed that the Dang and Seare patents are invalid

7   and unenforceable."  *Id.* ¶ 188.

8        The *Cave I* litigation continued for three years, and "required CCGroup to undertake a

9   costly claim construction, extensive fact discovery, and an in-depth review of the asserted patents

10  and prior art."  *Id.* ¶ 190.  CCGroup contends that OptumInsight took positions during *Cave I*

11  regarding the relationship between the concepts of "shifting" and "dynamic time windows" that

12  contradicted Symmetry's position during the '897 patent reexamination, and would have led the

13  USPTO to conclude in that proceeding that Symmetry's response to Aetna's RFP was an

14  invalidating offer for sale.  *Id.* ¶¶ 191−97.  "Two years into the litigation . . . OptumInsight . . .

15  produc[ed] over 25,000 pages of confidential documents from its prior litigations involving the

16  Dang and Seare patent portfolios."  *Id.* ¶ 200.  Those documents form the basis for CCGroup's

17  allegations summarized above regarding OptumInsight's alleged inequitable conduct, and

18  CCGroup filed a second amended complaint in *Cave I* asserting that the Dang patents were invalid

19  and unenforceable due to that conduct.  *See id.* ¶¶ 201−04.  Nearly one year later, OptumInsight

20  dismissed its counterclaims based on the Dang patent family, although it continued to assert

21  infringement of the Seare patents.  *Id.* ¶¶ 206−07.

22       Judge Davila granted partial summary judgment for OptumInsight, holding that

23  Symmetry's response to Aetna's RFP in 1994 was not prior invalidating art as to the Seare patents

24  because it was not made public.  *Cave I*, 2015 WL 740379, at *13 (N.D. Cal. Feb. 20, 2015).  He

25  declined to grant summary judgment for either party on other issues relating to the validity of the

26

27  [7] The Court takes judicial notice that Cave Consulting initially filed a claim in January of 2011
    alleging that OptumInsight infringed a patent owned Cave Consulting, and filed an amended
28  complaint in July adding claims for declaratory judgment of non-infringement and invalidity of
    OptumInsight's patents.  *See Cave I* dkts. 1 (Complaint), 23 (First Amended Complaint).

Seare patents because material facts remained disputed. *Id.* at *12–14. There is no indication that CCGroup made any argument in *Cave I* regarding inequitable conduct related to the Seare patents.

OptumInsight withdrew the '252 Seare patent "[o]n the eve of trial." SAC ¶ 208. At trial, a jury determined that CCGroup did not infringe the remaining '079 Seare patent. *Id.* ¶ 211. On September 7, 2016, Judge Davila declined to alter the outcome of *Cave I* in any way relevant to the present action. *See Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 5:11-cv-00469-EJD, 2016 WL 4658979 (N.D. Cal. Sept. 7, 2016) (denying in relevant part motions for judgment as a matter of law and for a new trial). "[T]he parties have indicated that appeals are anticipated at the Federal Circuit." *Id.* at *24.

### 8. Alleged Damages and Claims

CCGroup alleges that "OptumInsight's fraud on the USPTO, and its resulting possession and baseless assertion of the Dang and Seare patent families, has enabled OptumInsight to acquire and maintain monopoly power or, in the alternative, created a dangerous probability of OptumInsight obtaining monopoly power, in the Grouper Software Market." SAC ¶ 214. Since CCGroup introduced its competing software in 2005, it has lost customers due to the perceived strength of OptumInsight's patents, and has incurred litigation expenses as a result of OptumInsight's efforts to enforce the patents through alleged sham litigation. *See id.* ¶¶ 217, 219, 221.

The Second Amended Complaint includes four claims. First, under the doctrine of *Walker Process Equipment Inc. v. Food Machinery and Chemical Corporation*, 382 U.S. 172 (1965), CCGroup alleges that OptumInsight violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the market for grouper software through fraud on the USPTO in connection with prosecution of the Dang and Seare patents. SAC ¶¶ 578−87. Second, under the doctrine of *Handgards v. Ethicon*, 601 F.2d 986 (9th Cir. 1979), CCGroup alleges that OptumInsight monopolized or attempted to monopolize the market through bad faith use of sham litigation to enforce Dang and Seare patents that OptumInsight knew were invalid or unenforceable. SAC ¶¶ 588−94. Third, CCGroup asserts that OptumInsight violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), through false or misleading statements that its ETG software was

United States District Court
Northern District of California

1    "patented" or covered by specific Dang patents, despite OptumInsight's alleged knowledge that "it

2    had no valid or enforceable patent that covered the ETG software."  SAC ¶¶ 595−603.  Finally,

3    CCGroup brings a malicious prosecution claim under California law, asserting that OptumInsight

4    acted without probable cause in bringing infringement counterclaims in the *Cave I* action when it

5    allegedly knew that the patents at issue were invalid and unenforceable.  *Id.* ¶¶ 604−12.

6        **B.    Procedural History**

7            After the *Cave I* trial concluded and judgment was entered in CCGroup's favor on April 6,

8    2015, CCGroup filed the present action in July of that year.  *See generally* Compl. (dkt. 1).

9    OptumInsight moved to dismiss, *see* dkt. 34, and CCGroup filed its First Amended Complaint

10   (dkt. 39) rather than oppose that motion.  OptumInsight moved to dismiss the First Amended

11   Complaint.  *See* dkt. 56.  The Court held a hearing, took supplemental briefing on issues of

12   preclusion that were first clearly raised in OptumInsight's reply brief, and ultimately granted the

13   motion with leave to amend, primarily on the basis that CCGroup had not met the pleading

14   standard of *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009), for failure to

15   include sufficient allegations as to which claims of the patents at issue were implicated by

16   OptumInsight and its predecessors' alleged inequitable conduct, and how those claims related to

17   that alleged conduct.  *See* Order Granting Mot. to Dismiss ("Order," dkt. 84) at 21−22.[8]

18           The Court also held, among other things: (1) that Judge Davila's determination in *Cave I*

19   regarding the Aetna RFP response lacks preclusive effect, *id.* at 10−18; (2) that the Federal

20   Circuit's decision in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)

21   (en banc), concerns a plaintiff's burden of proof on the merits and does not alter the applicable

22   pleading standard, Order at 21; (3) that "Dang's and Rosenbaum's specific intent to defraud the

23   USPTO 'is plausible and . . . flows logically from the facts alleged,'" *id.* at 22 (quoting *Exergen*,

24   575 F.3d at 1329 n.5); (4) that CCGroup could not pursue a claim for malicious prosecution of

25   infringement of the '079 patent so long as post-judgment motions or appeals were pending in *Cave*

26

27   ───────────────

     [8] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 1611042

28   (N.D. Cal. Apr. 22, 2016).  Citations herein to page numbers in the Court's previous Order refer to
     the version filed in the Court's ECF docket.

United States District Court
Northern District of California

*I*, Order at 26−27; and (5) that an antitrust plaintiff such as CCGroup can seek attorneys' fees from a previous action as damages under the "substantive law exception" to Rule 54 of the Federal Rules of Civil Procedure, Order at 27.  The Court declined to reach other issues, including "whether CCGroup must plausibly allege that OptumInsight 'maintained and enforced the patent with knowledge of the fraudulent manner in which it was [allegedly] obtained.'"  *Id.* at 22−23 (quoting *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012)).

CCGroup filed its Second Amended Complaint on May 13, 2016, and OptumInsight again moves to dismiss.

### C.     Parties' Arguments

Much of OptumInsight's present motion is devoted to attacking the premise that OptumInsight can be held liable for the alleged sins of Symmetry.  OptumInsight begins its argument by contending that even if Symmetry obtained patents through inequitable conduct, there is no allegation that Symmetry sought to enforce its patents against CCGroup or otherwise exploit them for monopolistic gain to CCGroup's detriment.  Mot. (dkt. 103) at 13.  OptumInsight therefore argues that Symmetry had no liability to CCGroup that OptumInsight could have inherited after Symmetry merged into OptumInsight.  *Id.* at 13−14.  Next, OptumInsight contends that the merger does not suffice to impute Symmetry's knowledge of fraud on the USPTO to OptumInsight at the time of OptumInsight's allegedly wrongful conduct, either (1) as a matter of law, because CCGroup must instead plausibly allege that the specific individuals responsible for OptumInsight's conduct had such knowledge, *id.* at 16−19, or (2) as a plausible basis for inferring such knowledge by the individuals involved, *id.* at 15−16.  OptumInsight also argues that *Ingenix v. Symmetry* litigation and documents disclosed therein did not actually provide notice of misconduct before the USPTO, and offers a number of court documents and transcripts for judicial notice.  *Id.* at 19−28; Lancaster Decl. (dkt. 104).  According to OptumInsight, the infirmities discussed above are sufficient to dismiss all four of CCGroup's claims.  Mot. at 28−30.

CCGroup responds that it has sufficiently alleged that all of the patents at issue were obtained through fraud on the USPTO, and that it need not demonstrate knowledge of such fraud to state a *Walker Process* claim because OptumInsight, either through its own actions or as a result

11

1   of the merger with Symmetry, can be treated as having prosecuted all of the patents.  Opp'n (dkt.

2   119) at 8−9.  CCGroup argues in the alternative that Symmetry's knowledge of fraud on the

3   USPTO can be imputed to OptumInsight as a result of the merger.  *Id.* at 9−13.  According to

4   CCGroup, it need not "identify a single 'mastermind'" with guilty knowledge at the pleading

5   stage, *id.* at 13−15, and the Second Amended Complaint adequately alleges that OptumInsight

6   learned independently of the merger that the Symmetry patents were obtained through fraud, *id.* at

7   17−20.  CCGroup disputes OptumInsight's reliance on securities cases subject to the statutory

8   pleading standard of the Private Securities Litigation Reform Act ("PSLRA").  *Id.* at 15−16.

9   CCGroup also disputes OptumInsight's characterization of the documents that OptumInsight

10   submits, and moves to strike certain documents that it contends are not properly subject to judicial

11   notice or otherwise appropriate for consideration at the pleading stage.  *Id.* at 20−27, 30.

12   CCGroup argues that it has plausibly alleged actionable misconduct by OptumInsight and that all

13   of its claims should survive.  *Id.* at 27−30.

14       OptumInsight reasserts in its reply that in order to proceed on any of its claims, CCGroup

15   must plausibly allege that *individuals* responsible for enforcing the patents at issue had knowledge

16   that they were obtained through misconduct or fraud, and argues that the PSLRA pleading

17   standard is equivalent to the standard appropriate for CCGroup's claims.  Reply (dkt. 122) at 1−6.

18   According to OptumInsight, CCGroup's pleading does not meet that standard.  *Id.* at 6−8.

19   OptumInsight also contends that CCGroup has not plausibly alleged that the patents OptumInsight

20   itself prosecuted were obtained through fraud.  *Id.* at 8−14.  OptumInsight concludes by arguing

21   that the documents submitted with its motion are appropriate for consideration at this stage

22   because they are referenced in the Second Amended Complaint.  *Id.* at 15.

## III.   ANALYSIS

### A.   Legal Standard

#### 1.   General Pleading Standard: Rule 8, *Iqbal*, and *Twombly*

26   A complaint may be dismissed for failure to state a claim on which relief can be granted

27   under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss

28   under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp.*

United States District Court
Northern District of California

1   *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage

2   is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading

3   which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim

4   showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

5          In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

6   takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

7   non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

8   Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

9   would support a valid theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

10  1990).  A complaint must "contain either direct or inferential allegations respecting all the material

11  elements necessary to sustain recovery under some viable legal theory."  *Bell Atl. Corp. v.*

12  *Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

13  1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

14  of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

15  (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked

16  assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

17  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient

18  factual allegations to "allow[] the court to draw the reasonable inference that the defendant is

19  liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 570).

20                    **2.   Heightened Pleading Standard for Fraud Claims**

21          Rule 9(b) of the Federal Rules of Civil Procedure sets a heightened pleading standard for

22  claims based on fraud.  "In alleging fraud or mistake, a party must state with particularity the

23  circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Ninth Circuit has held

24  that in order to meet this standard, a "complaint must specify such facts as the times, dates, places,

25  benefits received, and other details of the alleged fraudulent activity."  *Neubronner v. Milken*, 6

26  F.3d 666, 672 (9th Cir. 1993); *see also McMaster v. United States*, 731 F.3d 881, 897 (9th Cir.

27  2013).  The Federal Circuit has similarly held that "in pleading inequitable conduct in patent

28  cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the

United States District Court
Northern District of California

1  material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart*
2  *Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009).

3          ### 3.  Pleading Standard for Knowledge and Intent

4          The heightened pleading standard of Rule 9(b) does not apply to "[m]alice, intent,
5  knowledge, and other conditions of a person's mind." Fed. R. Civ. P. 9(b).  OptumInsight
6  nevertheless cites a number of cases for the proposition that the facts alleged must "'create a
7  *strong* inference of scienter'" that is "'cogent and at least as compelling as any opposing inference
8  one could draw from the facts alleged.'"  Mot. at 17−18 (quoting *Glazer Capital Mgmt. v.*
9  *Magistri*, 549 F.3d 736, 743−44 (9th Cir. 2008); *Tellabs Inc. v. Makor Issue & Right Ltd.*, 551
10  U.S. 308, 324 (2007)) (emphasis added).

11          OptumInsight's motion neglects to mention that the cases discussing that standard are
12  securities actions governed by the PSLRA, and base their analysis on that statute's explicit
13  mandate that "in any private action arising under [Chapter 2B of Title 15]," a complaint must
14  "state with particularity facts giving rise to a strong inference that the defendant acted with the
15  required state of mind." 15 U.S.C. § 78u-4(b)(2)(A), *see also id.* § 78u-4(b)(2)(B).  The Supreme
16  Court has held that the PSLRA imposes "*special heightened pleading requirements* for the
17  scienter element *of § 10(b) fraud cases*," *Merck & Co. v. Reynolds*, 559 U.S. 633, 649 (2010)
18  (emphasis added), and "unequivocally raised the bar" for pleading such cases, *Tellabs*, 551 U.S. at
19  321 (internal quotation marks, citation, and brackets omitted).  To hold the PSLRA pleading
20  standard applicable in all other cases involving a scienter element, as OptumInsight suggests is
21  appropriate, would disregard the statute's limitation of the standard to "private actions arising
22  under this chapter," 15 U.S.C. § 78u-4(b)(2)(A), as well as the Supreme Court's repeated
23  recognition that the PSLRA imposes a special, heightened standard as compared to background
24  law, *see Merck*, 559 U.S. at 649; *Tellabs*, 551 U.S. at 321.  OptumInsight's assertion that "Rule
25  9(b) . . . is the strictest pleading standard imposed by the federal rules," Reply at 5, is perhaps
26  literally accurate in that the PSLRA's standard for scienter is imposed by statute rather than by
27  rule, but as discussed above, the PSLRA standard is stricter than Rule 9.  Under the rule,
28  "conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), and the usual Rule

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    8 standard of plausibility applies to such allegations.  *Iqbal*, 556 U.S. at 686−87 (noting that the

2    "strictures of Rule 8" are "operative" as to allegations of intent).

3          *Exergen* does not hold to the contrary in the context of pleading inequitable conduct.

4    While OptumInsight is correct that the Federal Circuit's opinion cites cases discussing scienter,

5    OptumInsight fails to identify any such case governed by the PSLRA's stringent pleading

6    standard, *see* Reply at 5, and moreover, nothing in *Exergen* suggests that the court intended to

7    import into patent law the "at least as compelling" standard that courts have derived from the

8    PSLRA.  *Cf. Tellabs*, 551 U.S. at 324.  Instead, the Federal Circuit held that a complaint "must

9    include sufficient allegations of underlying facts from which a court may reasonably infer"

10   knowledge and fraudulent intent, explained that a "reasonable inference is one that is plausible and

11   that flows logically from the facts alleged," and contrasted that standard with the "clear and

12   convincing evidence" burden of proof on the merits, at which point—but not before—intent to

13   deceive must be "the *single most reasonable* inference" from the evidence.  *See Exergen*, 575 F.3d

14   at 1328−29 & n.5.

15         The Court finds no basis in case law, rule, or statute to impose anything more than *Iqbal*'s

16   plausibility standard on CCGroup's pleading of knowledge and intent, and rejects OptumInsight's

17   position that cases governed by the PSLRA pleading standard are relevant to that inquiry.  *See*

18   Mot. at 17−18 (citing *Tellabs*, 551 U.S. 308, 324; *Glazer*, 549 F.3d 736, 743−44; *In re Daou Sys.,*

19   *Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365

20   F.3d 353, 366 (5th Cir. 2004); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083,

21   1100 (C.D. Cal. 2008); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 944, 956 (C.D.

22   Cal. 2003)); Reply at 4−6 (citing, *e.g.*, *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701

23   (9th Cir. 2012)).

24         **B.    *Walker Process* and *Handgards* Claims**

25         In 1965, the Supreme Court held in *Walker Process* that a patent obtained through fraud on

26   the Patent Office can provide a basis for claims under the Sherman Act.  *See generally Walker*

27   *Process*, 382 U.S. 172.  The Federal Circuit more recently and succinctly summarized the standard

28   for such a claim:

15

1
2
3
4
5
6
7
8
9
10

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> *Walker Process* set forth two conditions for antitrust liability based on the fraudulent procurement of a patent. First, the plaintiff must show that the defendant procured the relevant patent by knowing and willful fraud on the PTO or (in the case of an assignee) that the defendant maintained and enforced the patent with knowledge of the fraudulent manner in which it was obtained. Second, the plaintiff must prove all the elements otherwise necessary to establish a Sherman Act monopolization charge. *Walker Process*, 382 U.S. at 174, 176–77, 86 S. Ct. 347; see also *id.* at 179, 86 S. Ct. 347 (Harlan, J., concurring). With the first condition, the Court made clear that the invalidity of the patent was not sufficient; a showing of intentional fraud in its procurement was required. *Id.* at 176–77, 86 S. Ct. 347; *id.* at 179, 86 S. Ct. 347 (Harlan, J., concurring). With the second condition, the Court incorporated the rules of antitrust law generally. As Justice Harlan stated in his concurring opinion, "as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play." *Id.* at 180, 86 S. Ct. 347 (Harlan, J., concurring).

*Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012).

The Ninth Circuit recognized a related basis for liability in *Handgards*, 601 F.2d 986. *Handgards* itself was "not a *Walker Process* case" because the plaintiff did "not contend that [the defendant] sought to enforce a fraudulently-procured patent," and instead argued that the defendant "prosecuted infringement actions in bad faith, that is, with knowledge that the patents, though lawfully-obtained, were invalid." *Id.* at 994. Inspired by *Walker Process*, the Ninth Circuit held that a plaintiff could pursue antitrust remedies for bad faith infringement actions— even if not based on fraud on the patent office—so long as the jury is "instructed that a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence." *Id.* at 996.

As illustrated in *Handgards* itself, not all *Handgards* claims are also *Walker Process* claims: a *Handgards* claim can be based on bad faith litigation to enforce a patent known to be invalid for reasons other than fraud on the USPTO. Conversely, not all *Walker Process* claims arise from bad faith litigation: "enforcement actions are not a sine qua non of monopolizing by patent fraud." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984). Here, CCGroup's *Walker Process* claim is based on a theory of monopolization through infringement actions brought in bad faith to enforce patents obtained through fraud—thus basing both claims largely on the same operative facts. The primary potential difference between the two claims is

16

the extent to which CCGroup must demonstrate OptumInsight's knowledge of fraud or invalidity,

because if OptumInsight is considered to be the original owner of the patents rather than an

assignee—a premise that OptumInsight vigorously disputes—the test for *Walker Process* claims

set forth in *Ritz Camera* would not require CCGroup to show that OptumInsight's attorneys knew

of fraud when they file counterclaims against CCGroup.  Despite that potential difference, the

claims are sufficiently aligned to warrant consideration together, beginning with the question of

whether the patents at issue were obtained through fraud on the USPTO.

### 1.  Fraud on the USPTO

OptumInsight's motion appears acknowledges "the Rule 12(b)(6) assumption that

[CCGroup's] SAC validly alleges wrongdoing by Symmetry," referring to the allegedly fraudulent

prosecution of the '897 Dang patent.  Mot. at 4−5 (emphasis omitted).  The Court nevertheless

briefly discusses the standard for pleading such fraud, as set forth in *Exergen*.[9]

The heightened pleading standard of Rule 9(b) applies to allegations of inequitable

conduct, and Federal Circuit law governs "the question of whether inequitable conduct has been

pleaded with particularity under Rule 9(b)."  *Exergen*, 575 F.3d at 1326.  "[I]n pleading

inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what,

when, where, and how of the material misrepresentation or omission committed before the PTO";

it is not sufficient to "simply aver[] the substantive elements of inequitable conduct."  *Id.* at 1326–

27.  Those elements are that an individual associated with prosecuting a patent application

(1) "made an affirmative misrepresentation of a material fact, failed to disclose material

information, or submitted false material information; and (2) . . . did so with a specific intent to

deceive the PTO."  *Id.* at 1327 n.3.

"Moreover, although 'knowledge' and 'intent' may be averred generally, a pleading of

---

[9] The Court's previous Order acknowledged earlier precedent holding that not all inequitable conduct constituted the degree of fraud necessary to support a *Walker Process* claim, but "assume[d] without deciding that *Exergen* and *Therasense* have effectively harmonized the standards for *Walker Process* fraud and other assertions of inequitable conduct."  Order at 20 n.14 (citing *Cornucopia Prods., LLC v. Dyson, Inc.*, 881 F. Supp. 2d 1086, 1099 n.4 (D. Ariz. 2012)).  No party has asserted that the Court should depart from that presumption for the purpose of resolving the present motion.

United States District Court
Northern District of California

1    inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from

2    which a court may reasonably infer that a specific individual (1) knew of the withheld material

3    information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented

4    this information with a specific intent to deceive the PTO." *Id.* at 1328−29.  "A reasonable

5    inference is one that is plausible and that flows logically from the facts alleged, including any

6    objective indications of candor and good faith." *Id.* at 1329 n.5.  At the pleading stage, it need *not*

7    be "the *single most reasonable* inference able to be drawn"—unlike on the merits, where a "clear

8    and convincing evidence" standard applies to inequitable conduct claims.  *Id.* (citation and internal

9    quotation marks omitted).  As discussed above, the Court further holds that pleadings need not

10   give rise to a "strong inference" within the meaning of the PSLRA—i.e., an inference that is

11   "cogent and at least as compelling as any opposing inference one could draw from the facts

12   alleged," *Tellabs Inc. v. Makor Issue & Right Ltd.*, 551 U.S. 308, 324 (2007)—because the

13   PSLRA applies to securities class actions, not patent litigation, and courts have acknowledged that

14   it imposes a more stringent pleading standard than is applicable in other cases.

15                    a.    Allegations of Fraud in Symmetry's Prosecution of the '897 and '511 Patents

16            CCGroup alleges that in prosecuting the '897 patent Dang and Rosenbaum failed to

17   disclose to the USPTO an offer to sell the same invention that they sought to patent, which would

18   have rendered their claims unpatentable.  SAC ¶¶ 74−75.  During the reexamination, they

19   exchanged drafts of declarations until they "settled on the story they would tell," and ultimately

20   they and others submitted false declarations asserting a later conception date, despite Dang's

21   sworn litigation testimony that he conceived the invention in 1993, to convince the USPTO that

22   the Aetna RFP response was not an offer to sell the invention described in the patent.  *Id.*

23   ¶¶ 90−100.  Taking those and other factual allegations as true and drawing reasonable inferences

24   in CCGroup's favor for the limited purpose of resolving a challenge to the pleadings, the Court

25   finds that Dang's and Rosenbaum's specific intent to defraud the USPTO in their prosecution of

26   the '897 patent "is plausible and . . . flows logically from the facts alleged."  *See Exergen*, 575

27   F.3d at 1329 n.5.  The same is true of the '511 patent, which CCGroup plausibly alleges would

28   have been rejected if Dang, Rosenbaum, and others had not fraudulently failed to disclose

18

United States District Court
Northern District of California

1    evidence supporting the 1993 conception date and concealed that the RFP response was an

2    invalidating offer for sale.  *See* SAC ¶¶ 315−347.

3         In addition to those allegations, which are sufficient, a comparison among the RFP

4    response itself, SAC Ex. A, the claims of the patents at issue, *see* SAC ¶¶ 240−347, and the

5    allegedly fraudulent declarations submitted in the reexamination, Lancaster Decl. Exs. C−F,[10] also

6    supports the plausibility of CCGroup's allegations.  The declarations state that the ETF software

7    product was unfinished at the time of the RFP response in June of 1994.  *Id.*  Dang's declaration

8    specifically states that the dynamic time window and shifting functions were not working properly

9    at that time, and that until he prepared flowcharts of how those features should function in August

10   of 1994, he "was unable to appreciate such integration of [his] invention."  Lancaster Decl. Ex. C

11   ¶¶ 4−5.  The RFP response, however: (1) asserts that the ETG software was capable of classifying

12   and organizing claims data, with no indication that it was less than fully functional except for a

13   reference to ongoing "peer review," *see* SAC Ex. A at 598; (2) describes a "flexible" capacity to

14   detect when a treatment period has ended, which CCGroup plausibly alleges corresponds to the

15   dynamic time window function claimed in the patent, *see id.* at 3; and (3) describes a capability to

16   "shift" episodes between groups, which CCGroup plausibly alleges corresponds to the shifting

17   function claimed in the patent, *see id.* at 5.  OptumInsight does not meaningfully address the

18   content of the RFP response or explain how it differs from the patent claims.  There may well be

19   other explanations for these apparent discrepancies between the RFP response and the

20   declarations, but viewing the pleadings (and documents subject to judicial notice) in the light most

21   favorable to CCGroup, one plausible conclusion is that the declarations were fraudulent.

22        b.  Allegations of Fraud in OptumInsight's Prosecution of the Remaining Patents

23        Having determined that CCGroup plausibly alleges fraud on the patent office in

24   Symmetry's prosecution of the '897 and '511 patents—a conclusion it is not clear that

25   OptumInsight contests—the Court turns to OptumInsight's prosecution of the Seare patents and

26

27   [10] CCGroup does not challenge OptumInsight's submission of these declarations, and the Court
     agrees that they are appropriate for consideration at the pleading stage under the incorporation by
28   reference doctrine because the Second Amended Complaint references and relies on them for the
     allegation that Symmetry engaged in fraud during the '897 reexamination.

                                          19

1    the remaining Dang patents at issue.  This analysis focuses on CCGroup's allegation that Devan

2    Padmanabhan, the only person allegedly involved in prosecuting all of those patents, *see* Opp'n at

3    6−7 (summarizing allegations), knew of a 1993 conception date and 1994 pre-filing offer of sale

4    for Dang's invention, and thus engaged in fraud on the USPTO by prosecuting those patents

5    without adequate disclosures.

6          CCGroup's opposition brief does not address in any meaningful detail the allegations that

7    support a plausible inference of Padmanabhan having such knowledge.  *See* Opp'n at 26 (asserting

8    in a conclusory fashion that "Devan Padmanabhan is also alleged to have knowledge of the

9    *Ingenix v. Symmetry* litigation").  The Second Amended Complaint alleges that Padmanabhan and

10   other Dorsey & Whitney attorneys "were privy to the source code, briefing, sworn testimony, and

11   interrogatory responses proving that Dang actually conceived of his invention in September of

12   1993" because those attorneys were members of the same firm as OptumInsight's litigation

13   counsel. SAC ¶ 160.  Later, in the context of OptumInsight's litigation against CCGroup, the

14   Second Amended Complaint alleges that Padmanabhan "knew prior to filing suit that Dang had

15   evidence that he conceived his invention in September 1993, at least as a result of Symmetry's

16   representations and disclosures in the litigation between OptumInsight and Symmetry and through

17   OptumInsight's acquisition of and merger with Symmetry," as well as that Dang and others "had

18   submitted sworn statements to the USPTO that Dang conceived his invention in August 1994."

19   *Id.* ¶¶ 175−76.  The SAC also alleges on information and belief that Padmanabhan reviewed the

20   prosecution histories of the Dang patents and discovered that Dang and others withheld materials

21   contradicting their asserted conception date, and that Padmanabhan therefore knew that the patent

22   family was invalid and unenforceable due to inequitable conduct.  *Id.* ¶ 177−78.  A paragraph of

23   the Second Amended Complaint summarizing Padmanabhan's knowledge of invalidity and role in

24   the patent prosecutions reads as follows:

25          Devan Padmanabhan, who represented OptumInsight in *Cave I*,
           managed the preparation and prosecution of the patents and
26          applications in the Dang and Seare patent families after those files
           were transferred to Dorsey & Whitney upon OptumInsight's
27          acquisition of Symmetry, and consequently Padmanabhan was
           aware of the Aetna RFP Response and the statutory bars to
28          patentability that it raised. Padmanabhan and the other Dorsey &

Whitney attorneys who participated in the prosecution of the Dang patents hid the invalidating effect of the Aetna RFP Response from the USPTO. Then, in *Cave I*, Padmanabhan affirmatively relied on the Aetna RFP Response and the affidavits from the reexamination of the '897 patent to claim that Dang conceived of his invention in 1994, as evidence both of Dang's conception and of a pre-filing offer for sale of the claimed invention. Additionally, because Padmanabhan, like Lancaster, was associated with the Dorsey & Whitney law firm, he was privy to the dated source code, briefing, sworn testimony, and interrogatory answers proving that Dang conceived his invention in September 1993, which Lancaster received in prior litigation, and which conflicted with the affidavits submitted by Rosenbaum, Dang, Portnoy, and Gardiner in the reexamination of the '897 patent. Documents and other information reflecting the existence of Symmetry's prior litigations involving the subject matter of the Dang and Seare patents that Padmanabhan prosecuted were also readily available to Padmanabhan at Dorsey & Whitney, if he was not already aware of those litigations through his work for OptumInsight or through his contact with other Dorsey & Whitney attorneys doing work for OptumInsight.

*Id.* ¶ 584(e).

The allegations that Padmanabhan engaged in fraud on the USPTO rest on two premises: (1) that various documents transferred to OptumInsight upon its acquisition of Symmetry and disclosed to Dorsey & Whitney during litigation evince a 1993 conception date and pre-filing offer of sale of Dang's invention, and (2) that Padmanabhan saw and understood the significance of such documents. The former question informs the latter, because, in the Court's view, the significance of the documents is relevant to whether one can plausibly infer that they would have been shared with Padmanabhan.

OptumInsight contends that some of the materials allegedly disclosed to Padmanabhan and other Dorsey & Whitney attorneys do not actually demonstrate a 1993 conception date for the invention or inventions at issue. For example, OptumInsight argues that the briefing in the *Ingenix v. Symmetry* case concerned the conception date of a different invention (because that case involved an Ingenix patent not at issue here, not the '897 patent), and that the 1993 date on the source code indicates only when the programmer began writing it, not when it was complete. Mot. at 22−24.

Having reviewed the brief on which OptumInsight relies, the Court agrees with CCGroup

1    that—drawing reasonable inferences in CCGroup's favor, as is required at the pleading stage[11]—

2    the references to Dang conceiving his invention in 1993 refer to the invention that later became the

3    '897 patent, even though that patent was not the subject of the litigation.  *See* Lancaster Decl. Ex.

4    L at 12 ("Mr. Dang's undisputed testimony is that he first conceived of the invention, *which is*

5    *now known as ETGs*, in the summer of 1993 . . . ." (emphasis added)).  OptumInsight asserts in its

6    reply that the ETG software should not be conflated with the '897 patent, *see* Reply at 6−7, but

7    there is nothing in the pleadings to suggest a distinction between the two.  The Court understands

8    the Second Amended Complaint to allege that the ETG software marketed by Symmetry

9    embodied the claims of the '897 patent; nothing in the brief that OptumInsight offers for judicial

10   notice alters that conclusion.  The same is true of Symmetry's counsel's oral argument in that case.

11   *See* Lancaster Decl. Ex. N at 41−42.

12          As for CCGroup's allegations that Symmetry's source code for its ETG software evinces a

13   1993 conception date, OptumInsight relies heavily on deposition testimony by Symmetry

14   programmer Daniel Gardiner in the *Ingenix v. Symmetry* litigation.  *See* Mot. at 22−23 (quoting

15   Lancaster Decl. Ex. M (Gardner Dep. Tr.)).  The Second Amended Complaint does not rely on, or

16   even cite, Gardiner's deposition transcript, and OptumInsight offers no other basis for the Court to

17   consider such evidence at the pleading stage.  *See* Reply at 15 (responding to CCGroup's motion

18   to strike this and other exhibits, and asserting only that the Court may review documents

19   "encompassed by the SAC").  No matter how strongly OptumInsight believes that certain

20   allegations of the Second Amended Complaint are contrary to fact, with the exception of certain

21   narrow doctrines of judicial notice—which OptumInsight's briefs barely address—the Court's

22   review at this stage is limited to the pleadings.  The Court therefore does not consider Gardiner's

23   deposition testimony.[12]  Symmetry's brief in that litigation, which is appropriately considered at

24   this stage because the Second Amended Complaint explicitly relies on it as one basis for

25   _____

26   [11] The standard of review at this stage does not call upon to Court to determine whether a contrary
     interpretation would also be permissible, and the Court declines to do so.

27   [12] OptumInsight responds to CCGroup's challenge to its evidence by stating that "[i]t is difficult to
     tell how seriously Plaintiff intends its 'Motion to Strike.'"  Reply at 15.  Regardless of how

28   seriously CCGroup may have intended it, the Court takes the legal standard for review at the
     pleading stage seriously.

1   OptumInsight's counsel's alleged knowledge of misconduct, also discusses the 1993 date on the

2   source code, noting that Gardiner testified that the date on the source code indicates when he

3   began writing it, not when he finished it.  Lancaster Decl. Ex. L. at 11.  But the brief goes on to

4   contend that "[i]t is not a reasonable inference that a computer programmer, Mr. Gardiner

5   included, would simply start writing computer source code in 1993 without having an idea of what

6   was to be written," and that the 1993 start date is therefore evidence that Dang had at that time

7   conceived his invention and communicated it to Gardiner.  *See Id.*  The brief is therefore not

8   inconsistent with CCGroup's allegations that the source code put OptumInsight attorneys on

9   notice of a 1993 conception date for the invention later described by the '897 patent, and that the

10  source code was material to the conception date and should have been disclosed to the USPTO.[13]

11       With respect to interrogatory responses from the *Medstat* litigation, OptumInsight contends

12  that, contrary to CCGroup's allegation that during the Symmetry litigation Dorsey & Whitney

13  attorneys were "provided with the interrogatory responses and other materials from the earlier

14  MedStat litigation that identified September 1993 as the actual conception date for Dang's

15  invention," SAC ¶ 130, those materials were in fact "not provided," Mot. at 24−25.[14]

16  OptumInsight asserts that "[n]either the *Medstat* interrogatory response nor the related Dang

17  testimony was ever submitted in the *Symmetry* case," and "computer searches of court filings

18  indicate that the word 'Medstat' appears in Symmetry litigation filings only as to the fact that such

19  litigation exists and that it was settled."  *Id.* at 25.  This is a frivolous argument.  OptumInsight

20  fails to explain why the nonexistence of such materials in the *filings* of a case proves that they

---

[13] OptumInsight argues for the first time in its reply that CCGroup's allegations regarding the source code do not comply with *Exergen*'s requirement that allegations be tied to specific claims of the patents at issue.  Reply at 6−7.  That standard was crucial to the Court's previous order and was the purported basis for CCGroup's amendment.  If OptumInsight believes that the Second Amended Complaint did not sufficiently tie its allegations to specific patent claims, there is no reason it could not have raised that argument in its motion, and allowed CCGroup opportunity to respond.  The Court deems such arguments waived.  *See, e.g.*, *McMillan v. United States*, 112 F.3d 1040, 1047 (9th Cir. 1997) ("This argument was raised for the first time in the plaintiffs' reply brief and has therefore been waived.").

[14] OptumInsight notes that CCGroup "omits the time and place at which the information was allegedly provided to Dorsey," Mot. at 25, but cites no authority holding that such detail is required in pleading knowledge or intent—the issue that the alleged provision of information goes to here.  Under Rule 9(b), knowledge and intent may be alleged generally.

were not provided in discovery or through other channels, or why the Court should credit

OptumInsight's unsupported assertion of what is in the filings.  That the materials were provided

is a factual allegation of CCGroup's Second Amended Complaint, and is therefore taken as true at

the pleading stage.  A motion under Rule 12(b)(6) is not an appropriate vehicle to contest the truth

of such allegations.

The Court is satisfied that CCGroup has plausibly alleged that documents evincing a 1993

conception date of Dang's invention and a pre-filing offer for sale were provided to Dorsey &

Whitney attorneys.  The next question is whether CCGroup plausibly alleges that Padmanabhan

knew of these documents and their significance.

As the Federal Circuit noted in *Exergen*, "one cannot assume that an individual, who

generally knew that a reference existed, also knew of the specific material *information* contained

in that reference."  *Exergen*, 575 F.3d at 1330.  A number of courts have granted motions to

dismiss where allegations established only that a patent prosecutor had access to documents, and

not that the prosecutor "knew of the specific material information contained [therein] and withheld

it with the intention to deceived the USPTO."  *E.g.*, *Breville Pty Ltd. v. Storebound LLC*, No. 12-

CV-01783-JST, 2013 WL 1758742, at *6 (N.D. Cal. Apr. 24, 2013).  That is reasonable as far as it

goes, but in the Court's view, the alleged facts of this case tend to support a plausible inference

that Padmanabhan knew of the specific material information.  Here, the conception date of Dang's

invention was a central issue in various proceedings before the USPTO and in litigation.  It is

therefore plausible to infer that Dorsey & Whitney attorneys representing OptumInsight in such

litigation would have reviewed material they received with a close eye for information relevant to

the conception date.  It is also plausible to infer that upon discovering material evincing a 1993

conception date and a potential pre-filing offer for sale, those litigation attorneys would have

shared that information with their colleague—Padmanabhan—who represented OptumInsight in

prosecuting patents within the same family or, in the case of the Seare patents, directed to the

same subject matter.

The Court holds that CGroup has met its burden to plausibly allege that OptumInsight,

through Padmanabhan, engaged in fraud on the USPTO by omitting material information in its

1   prosecution of the Seare patents and later-issued Dang patents at issue.

2               2.   **Knowledge of Fraud When Bringing Litigation**

3       The next issue is whether OptumInsight's attorneys had knowledge of fraud on the USPTO

4   when they initiated infringement claims against CCGroup.

5               a.   Relevance of Knowledge of Fraud

6       In the context of CCGroup's *Handards* claim, OptumInsight's knowledge of fraud—or

7   some other basis for invalidity or unenforceability—is necessary to establish bad faith in bringing

8   the infringement action.  *See Handards*, 601 F.2d at 994−96.

9       The relevance of OptumInsight's knowledge to CCGroup's *Walker Process* claim is more

10  complex.  There is no dispute that such knowledge is necessary for claims based on Symmetry's

11  patents if OptumInsight is treated as an assignee of those patents.  *Ritz Camera*, 700 F.3d at 506.

12  OptumInsight asserts in its motion that an assignment actually occurred, Mot. at 14 n.1, while

13  CCGroup contends that "the 'assignments' OptumInsight recorded with the PTO were not

14  assignments at all, but simply a document evidencing the merger between Symmetry and

15  OptumInsight," Opp'n at 10−11 n.9.  Neither party submits for judicial notice documents

16  supporting its position.  The Court therefore looks to the allegations of the Second Amended

17  Complaint, which include no reference to an assignment of patents from Symmetry to

18  OptumInsight.  *See generally* SAC.  CCGroup alleges, and the Court takes as true at this stage,

19  that OptumInsight obtained Symmetry's patents when it purchased Symmetry's stock and

20  subsequently merged Symmetry into itself.  SAC ¶¶ 138, 149.

21      The parties dispute what effect the merger has on CCGroup's *Walker Process* claim

22  against OptumInsight based on patents obtained by Symmetry.  OptumInsight's brief concedes

23  that CCGroup can state a *Walker Process* claim by pleading that "*OptumInsight* itself obtained

24  patents by fraud" as an alternative to pleading OptumInsight's knowledge of Symmetry's fraud,

25  Mot. at 14, although OptumInsight's counsel contested that point at the hearing.  OptumInsight

26  argues at the very least that the requirement of showing knowledge at the time of enforcement

27  applies equally in this case, where OptumInsight purchased and merged with Symmetry, as it

28  would apply if Symmetry had assigned its patents to OptumInsight.  *See id.*; Reply at 2.  CCGroup

United States District Court
Northern District of California

25

United States District Court
Northern District of California

1  contends that the knowledge requirement applies *only* to an *assignee* of a patent obtained through

2  fraud, and that OptumInsight is not an assignee but instead stands in the shoes of Symmetry.  *See*

3  Opp'n at 9−13.  The parties agree that no decision has addressed the precise issue of whether a

4  *Walker Process* plaintiff must allege knowledge of fraud where the defendant obtained a patent

5  through merger with the original patentee.

6          This dispute is based on the tension between the Federal Circuit's blanket statement in

7  *Nobelpharma* that "[t]he plaintiff in the patent infringement suit must . . . have been aware of the

8  fraud when bringing suit," 141 F.3d at 1069, and its later, more nuanced, statement of the rule in

9  *Ritz Camera* that "the plaintiff must show that the defendant procured the relevant patent by

10  knowing and willful fraud on the PTO *or (in the case of an assignee)* that the defendant

11  maintained and enforced the patent with knowledge of the fraudulent manner in which it was

12  obtained," 700 F.3d at 506 (emphasis added).

13          Both cases cite and rely on *Walker Process* itself, the relevant portions of which read as

14  follows:

15              Walker's counterclaim alleged that Food Machinery obtained the
                patent by knowingly and willfully misrepresenting facts to the
16              Patent Office. Proof of this assertion would be sufficient to strip
                Food Machinery of its exemption from the antitrust laws.[5] By the
17              same token, Food Machinery's good faith would furnish a complete
                defense. This includes an honest mistake as to the effect of prior
18              installation upon patentability—so-called 'technical fraud.'

19              [Footnote 5:] This conclusion applies with equal force to an assignee
                who maintains and enforces the patent with knowledge of the
20              patent's infirmity.

21  *Walker Process*, 382 U.S. at 177 & n.5.  A plain reading of the Supreme Court's opinion does not

22  require a plaintiff to show knowledge of fraud at the time of enforcement if the enforcing party is

23  the original patent owner—the fact that the defendant "obtained the patent [through fraud] . . .

24  would be sufficient to strip [the defendant] of its exemption from the antitrust laws." *Id.* at 177.

25  The next sentence, discussing good faith as a defense, refers in context to a defendant's good faith

26  in *prosecuting* the patent, not the state of mind of other agents of the defendant in later enforcing

27  it.  Accordingly, as presented in *Walker Process*, the rationale for stripping a patent enforcer of

28  antitrust immunity is the enforcer's wrongful conduct.  In the case of an original patentee, the

26

1    initial wrongful conduct in obtaining the patent through fraud is sufficient.  In the case of an

2    assignee, to whom courts would not normally impute the assignor's earlier misconduct, the

3    Supreme Court indicated that some other misconduct by the assignee itself is necessary, i.e.,

4    enforcing the patent with knowledge that it was fraudulently obtained.

5           The rules stated in *Nobelpharma* and *Ritz Camera* are inconsistent: the former would

6    require an antitrust plaintiff to show that *any* party enforcing a patent knew at the time of

7    enforcement that it was fraudulently obtained, the latter would only require that where the enforcer

8    was an assignee.  Based on this Court's reading of *Walker Process*, the rule of *Ritz Camera* better

9    follows the standard set by the Supreme Court.  In *Nobelpharma*, the enforcing party was an

10   exclusive licensee, and later an assignee, of the patent.  141 F.3d at 1062 & n.5.  The generalized

11   rule stated in that case therefore applied to the facts at hand, and the court had no occasion to

12   address how it would apply to an original patentee.  In *Ritz Camera*, the Federal Circuit clarified

13   the rule and reaffirmed the Supreme Court's holding that knowledge of fraud is required for a

14   *Walker Process* claim only where the party enforcing the patent is an assignee.  This Court

15   therefore holds that, to state a claim under *Walker Process*, CCGroup need not allege that

16   OptumInsight knew of fraud in the prosecution of patents that OptumInsight itself prosecuted.

17          That conclusion does not in itself resolve the issue of what is required for a *Walker*

18   *Process* claim based on patents originally obtained by Symmetry before it merged into

19   OptumInsight, but it is a starting point.  The corporation that continues after a merger generally

20   stands in the shoes of both constituent corporations—under Delaware law, the resulting or

21   continuing corporation "possess[es] all the rights, privileges, powers and franchises as well of a

22   public as of a private nature, and [is] subject to all the restrictions, disabilities and duties of each of

23   such corporations so merged or consolidated."  Del. Code Ann. tit. 8, § 259(a).  OptumInsight

24   contends that a merger does not as a matter of law confer *knowledge* to the continuing corporation,

25   Mot. at 15–16, but under the analysis above, knowledge of fraud is necessary only where the party

26   enforcing the patent is not itself culpable for the fraud on the USPTO.  While OptumInsight has

27   argued that a patent obtained through merger should be treated the same as if it were obtained

28   through assignment, a mere assignee does not take on "all the restrictions, disabilities and duties"

United States District Court
Northern District of California

27

1    of the assignor.  The Court holds that it is appropriate to treat a post-merger corporation as

2    standing in the shoes of its predecessors with respect to a predecessor's fraud on the USPTO,

3    based on the principle that the predecessor's conduct, rather than its knowledge of such conduct, is

4    imputed to the successor.

5         If CCGroup succeeds in demonstrating that Symmetry obtained its patents through fraud

6    on the USPTO, CCGroup therefore need not also show that OptumInsight was aware of that fraud

7    to state a *Walker Process* claim based on the enforcement of those patents.[15]  Because CCGroup

8    has plausibly alleged that the patents at issue were obtained through fraud on the USPTO,

9    OptumInsight's motion to dismiss CCGroup's *Walker Process* claim is DENIED.

10                  b.   Allegations Regarding Knowledge of Fraud

11        Although the Court holds that knowledge of fraud at the time of enforcement is not

12   required for CCGroup's *Walker Process* claim, such knowledge is necessary to CCGroup's

13   alternative *Handgards* claim.  OptumInsight contends that based on *Exergen* and other authority,

14   CCGroup must plausibly allege that an individual responsible for filing OptumInsight's

15   infringement claims had the requisite knowledge of fraud on the USPTO.  Mot. at 16−19; Reply at

16   4−6.  CCGroup disagrees that it has any such burden at the pleading stage, and argues that the

17   standard for pleading scienter of a person committing fraud on the USPTO does not apply to the

18   separate issue of pleading the state of mind of a person later initiating litigation in a *Walker*

19   *Process* or *Handgards* claim.  Opp'n at 16−17.  Assuming for the sake of argument that

20   OptumInsight is correct,[16] the Court's analysis above in the context of OptumInsight's patent

21   prosecution applies equally to this issue.  CCGroup alleges that Padmanabhan represented

22

23   [15] Even if this were not so, CCGroup has plausible alleged such knowledge as discussed below.
     [16] Counsel for OptumInsight suggested at the hearing that the Court had already considered this
24   issue in its previous Order by treating *Exergen* as harmonizing the standards for inequitable
     conduct and *Walker Process* fraud.  The harmonization at issue there was the sort of conduct
25   before the USPTO that supports a claim, and whether the Federal Circuit's statement in
     *Nobelpharma* that "inequitable conduct is a broader, more inclusive concept than the common law
26   fraud needed to support a *Walker Process* counterclaim," 141 F.3d at 1069, remains accurate in
     light of *Exergen* and, more significantly, *Therasense*.  *See* Order at 20 n.14.  This Court did not at
27   that time assume that *Exergen's* pleading standard for *knowledge of material misrepresentation* by
     the person *prosecuting a patent* in the context of establishing inequitable conduct also applies in
28   the context of a *Walker Process* claim to the separate issue of pleading *knowledge of past fraud on*
     *the USPTO* by the person later *initiating litigation*.

*United States District Court*
*Northern District of California*

OptumInsight in bringing claims against CCGroup.  *See, e.g.*, SAC ¶¶ 174, 584(d)−(e).  For the same reasons that it is plausible Padmanabhan knew of fraud on the USPTO when he prosecuted patents for OptumInsight, it is also plausible that he knew of such fraud when he filed claims against CCGroup.

CCGroup also alleges that Lancaster played a role in bringing those claims with knowledge of the infirmity of the patents.  *See id.*  OptumInsight asserts that Lancaster had no role in initiating that litigation, and submits billing records that, it contends, support that assertion. Mot. at 25−26; Lancaster Decl. Ex. H.  OptumInsight cites no authority that would permit the Court to consider those billing records at the pleading stage, and CCGroup's motion to strike that exhibit is therefore granted.  Lancaster's involvement in initiating the *Cave I* litigation is a factual allegation that is taken as true at the pleading stage.  For the same reasons applicable to Padmanabhan, CCGroup has plausibly alleged that Lancaster—who played a more direct role than Padmanabhan in the earlier litigation where significant documents were allegedly obtained, *see* SAC ¶¶ 584(d), (e)—knew of fraud on the USPTO at the time that OptumInsight filed claims against CCGroup.

\* \* \*

OptumInsight's present motion does not attack any other element of CCGroup's *Walker Process* and *Handgards* claims, i.e., "all the elements otherwise necessary to establish a Sherman Act monopolization charge."  *See Ritz Camera*, 700 F.3d at 506.  Because CCGroup plausibly alleges fraud on the USPTO and knowledge of such fraud when OptumInsight brought its claims in *Cave I*, OptumInsight's motion to dismiss CCGroup's *Walker Process* and *Handgards* claims is DENIED.

### C.    Malicious Prosecution and Lanham Act Claims

OptumInsight's motion to dismiss CCGroup's malicious prosecution and Lanham Act claims rests entirely on its arguments for dismissing the antitrust claims. Mot. at 29−30. Although OptumInsight hints at other weaknesses of the Lanham Act claim, such as whether the statements in question constitute advertising and whether the claim is barred by the statute of limitations, it elects not to pursue those arguments.  *Id.* at 29 n.6.  OptumInsight's motion to

United States District Court
Northern District of California

1 | dismiss these remaining claims is DENIED for the same reasons as the antitrust claims discussed
2 | above.

3 | **IV.     CONCLUSION**

4 |         Although CCGroup faces a demanding burden of proof going forward, its allegations meet
5 | the pleading standard to survive a motion to dismiss.  Accordingly, for the reasons discussed
6 | above, OptumInsight's motion to dismiss CCGroup's Second Amended Complaint is DENIED.

7 |         **IT IS SO ORDERED.**

8 | Dated: September 12, 2016

9 |

10 | JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California