UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAVE CONSULTING GROUP, INC., | Case No. 15-cv-03424-JCS |
| Plaintiff, | |
| v. | **ORDER REGARDING MOTION TO COMPEL** |
| OPTUMINSIGHT, INC.,, | Re: Dkt. No. 138 |
| Defendant. | |

## I.   INTRODUCTION

Plaintiff Cave Consulting Group, Inc. ("CCGroup") moves to compel production of documents that Defendant OptumInsight, Inc. contends are protected by the attorney-client privilege and the work product doctrine.  The parties agree that Symmetry Health Data Systems Inc. ("Symmetry"), a predecessor to OptumInsight, waived the privilege as to certain subject matter, but disagree on the scope and effect of that waiver.  The Court held a hearing on October 14, 2016.  As discussed below, CCGroup's motion is GRANTED IN PART AND DENIED IN PART.  OptumInsight is ORDERED to produce documents consistent with the scope of the waiver set forth below.[1]

## II.   BACKGROUND

### A.   History

This action is based on CCGroup's contention that OptumInsight obtained patents through fraud on the United States Patent and Trademark Office (the "USPTO") and enforced those patents in violation of the Sherman Act, the Lanham Act, and California common law.  *See generally* 2d Am. Compl. ("SAC," dkt. 86).  CCGroup's claims and allegations are discussed in

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

detail in the Court's Order dated September 12, 2016. *See* Order Denying Mot. to Dismiss 2d Am. Compl. ("SAC Order," dkt. 127) at 1−10.[2]  This section briefly summarizes the background relevant to CCGroup's present motion.

Both parties in this case are in the business of providing software, known as "episode of care groupers" or simply "groupers," used to group medical claims data based on discrete periods of treatment in order to better evaluate the quality and efficiency of medical care.  SAC ¶¶ 22−28; Answer (dkt. 144) ¶¶ 22−28.  In 1994, Symmetry responded to a request for proposal from Aetna, a large insurance company, by proposing to license Aetna a software grouper application.  *See* SAC Ex. A (the "Aetna RFP Response").  More than a year after the date of that response, Symmetry filed a patent application for grouper software methodology invented by Dennis Dang, which ultimately led to the issuance of U.S. Patent No. 5,835,897 (the "'897 patent").  *See* SAC ¶¶ 73, 76; Answer ¶¶ 73, 76.  CCGroup contends that Symmetry deliberately withheld information regarding the Aetna RFP response from its patent application in order to avoid the application being denied based on a prior offer of sale.  SAC ¶¶ 74−75.

Symmetry initiated a reexamination of the '897 patent in March of 2000 and disclosed the Aetna RFP Response to the USPTO in January of 2001.  SAC ¶ 94; Answer ¶ 94.

The heart of CCGroup's present argument for waiver is an affidavit that Symmetry's attorney David Rosenbaum submitted to the USPTO during the reexamination, specifically the following paragraphs describing his discussions with his clients and conclusions that he drew from those discussions:

> 3.     At my first meeting with Mr. Dang and during the time the patent application was being prepared, Mr. Dang, [Symmetry co-founder Mitchell] Portnoy and I discussed issues relating to whether the invention being claimed in the Application was subject to any statutory bars to patentability. It was determined that Symmetry's first sale of the ETG Program was licensing the ETG Program to Oxford Health Plan in October 1994. Thus, I determined there were no statutory bars to patentability.

---

[2] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 4744165 (N.D. Cal. Sept. 12, 2016).  Citations herein to the Court's previous Orders in this action refer to page numbers of the versions appearing in the Court's ECF docket.

4.      Because of the determination that there were no statutory bars, in my professional judgment, I saw no need to further investigate the issue.

5.      Around July of 2000, during routine discussions with Mr. Dang and Mr. Portnoy, I discovered that during the period from November 1993 until early 1994, Aetna's Health Insurance Consulting Group ("HIC") provided raw data to Symmetry to enable testing of the various versions of the ETG Program being coded and implemented by Dan Gardiner. To test the ETG Program, Mr. Dang monitored the outputs of the ETG Program after the data provided by HIC had been processed. In the various tests between November 1993 and October 1994, Mr. Dang noted several problems with the ETG Program and consulted with Mr. Gardiner in attempts to improve the operation of the program. Until at least July of 1994, Mr. Dang did not believe the ETG Program was capable of accurately grouping claims to clinically homogeneous and statistically stable episode treatment groups and shifting the groupings for changed clinical conditions as would be required by healthcare providers because dynamic time windows were not yet conceptualized or embodied in the ETG Program.

6.      During the discussion mentioned in paragraph five of this Affidavit, it was determined that HIC encouraged Aetna Healthplan to send Symmetry a Request for Proposal ("RFP") for the development of grouper software on May 13, 1994. After receipt of the RFP, on May 25, 1994, Mr. Portnoy sent a letter to Aetna Healthplan requesting clarification of the questions presented in the RFP. I learned that following Mr. Portnoy's May 25, 1994 letter; he sent a letter to Aetna Healthplan on May 26, 1994 stating his intent to submit a bid in response to the RFP to provide a provider profiling system to Aetna Healthplan. On June 1, 1994, Aetna provided clarification to Mr. Portnoy's questions as well as the questions of eight other health care software companies via a conference call and, on June 7, 1994, Aetna sent a letter to each of the eight companies providing written clarification of those questions discussed on the conference call. On June 12, 1994, Symmetry presented its proposal in response to the RFP, of a medical care provider profiling software system.

7.      In my professional judgment, the events leading up to the response to the RFP do not constitute a public disclosure because Symmetry's previous dealings with HIC and Aetna Healthplan and its relationship with those entities had always been confidential in nature. Similarly, to the best of my understanding, the grouper methodology described in the RFP Response does not describe the ETG Program as claimed in the Application in that it does not describe the concepts of dynamic windows or shifting. Moreover, because Mr. Dang had not yet developed these concepts as of the date the RFP Response was made, the ETG Program described in the RFP could not have been the ETG Program claimed in the Application. Thus, until at least as early as August 1994, it appears the invention was not ready for patenting. Stated otherwise, there was no invention to disclose or offer for sale.

Brophy Decl. Ex. B; *see also* Reply (dkt. 139) at 3−4 (reproducing these paragraphs of

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    Rosenbaum's declaration).  Symmetry also submitted an Information Disclosure Statement

2    ("IDS") and affidavits by Dang and Portnoy that discussed some of the same issues, including the

3    meetings described in Rosenbaum's affidavit.  *See* Brophy Decl. Ex. A (IDS) at 7−8, 11

4    (discussing the contents of Rosenbaum's meetings with Dang and Portnoy); *id.* Ex. C (Dang Aff.)

5    ¶ 9; *id.* Ex. D (Portnoy Aff.) ¶ 5.  Those documents are largely redundant to the portions of

6    Rosenbaum's affidavit set forth above, although the IDS also asserted that July of 2000 was when

7    "Rosenbaum first learned about the events surrounding the RFP Response and the dates thereof."[3]

8    *Id.* Ex. A at 11.

9         Disputes regarding intellectual property rights related to grouper software led to a number

10   of judicial and USPTO proceedings, including infringement litigation between Symmetry and its

11   competitor MedStat from 1998 to 2000, *see* SAC ¶¶ 79–88, Answer ¶¶ 79–88 (acknowledging

12   litigation), infringement litigation between Symmetry and OptumInsight (then known as Ingenix)

13   beginning in 2001, SAC ¶¶ 113–30, Answer ¶¶ 113–130 (acknowledging litigation), an

14   interference proceeding between Symmetry and OptumInsight, SAC ¶¶ 132–34, Answer ¶¶ 132–

15   33, and infringement litigation between OptumInsight and CCGroup, including an action that

16   OptumInsight filed but did not pursue in the District of Minnesota and an action that CCGroup

17   filed in this district (*Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 5:11-cv-00469-EJD

18   (N.D. Cal.) (hereinafter, "*Cave I*"), *see* SAC ¶¶ 173–211, Answer ¶¶ 173–211 (acknowledging

19   litigation).  All of those disputes concerned or at least touched on issues related to the present

20   litigation and Rosenbaum's disclosures to the USPTO, including the validity of the '897 patent

21   and the conception date of Dang's invention.

22        OptumInsight acquired Symmetry in 2003, and Symmetry merged into OptumInsight in

23   2007.  *See* SAC ¶ 149; Brophy Decl. Ex. J (email from OptumInsight's counsel stating that

24   "Symmetry no longer existed after the 2007 merger").

25        After obtaining a favorable verdict in *Cave I*, CCGroup filed the present action in 2015,

26   alleging that OptumInsight attempted to monopolize the market for grouper software through

27

28   ─────────────────
     [3] CCGroup contends that this statement is false, but does not argue that its purported falsity is
     itself a basis to waive or otherwise invalidate any assertion of privilege.  *See* Mot. at 6 n.3.

baseless efforts to enforce the Dang patent family, which it obtained through fraud on the USPTO. The Court dismissed CCGroup's First Amended Complaint with leave to amend, *see generally* Order Granting Mot. to Dismiss 1st Am. Compl. (dkt. 84),[4] but denied OptumInsight's motion to dismiss the operative Second Amended Complaint, *see generally* SAC Order.  CCGroup now moves to compel discovery in order to resolve the parties' dispute regarding the scope of the waiver of privilege and work product protection caused by Symmetry's disclosures to the USPTO during the reexamination of the '897 patent.

**B.      Arguments**

**1.    CCGroup's Motion to Compel**

CCGroup contends that the waiver of privilege and work product protection should be defined as encompassing:

> Privileged communications and work product of Symmetry and post-merger OptumInsight concerning Dang's conception of the ETG software and statutory bars potentially applicable to any Dang patent, including any analysis or discussion relating to the Aetna RFP response.

Mot. (dkt. 138) at 11.

CCGroup points to the documents disclosed to the USPTO during the reexamination of the '897 patent—primarily the IDS and Rosenbaum's affidavit—as "strategically disclos[ing] . . . privileged communications and an opinion from [Symmetry's] patent prosecution counsel in order to characterize the Aetna RFP Response in a way that would salvage the patentability of Dang's invention."  *Id.* at 7.  CCGroup also argues that OptumInsight "reinforced and renewed Symmetry's earlier waiver of privilege and work product" by: (1) taking over prosecution of later patents in the Dang family after it acquired Symmetry, *id.* at 7−8; (2) resubmitting the documents at issue in some of those patent prosecutions and other proceedings before the USPTO, *id.* at 9; (3) disclosing the documents and at issue and asserting a conception date consistent with them in the *Cave I* litigation, *id.* at 9−10; and (4) moving to dismiss this action on the basis that "OptumInsight was entitled to rely on such independent sworn statements," *id.* at 10 (quoting Mot.

---

[4] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 1611042 (N.D. Cal. Apr. 22, 2016).

United States District Court
Northern District of California

1   to Dismiss SAC (dkt. 103) at 27).  CCGroup contends that a number of district court decisions

2   have "recognized that a waiver of privilege in patent prosecution extends to proceedings involving

3   related patents."  *Id.* at 14.

4        According to CCGroup, any narrower scope of waiver "would allow OptumInsight to use

5   the privilege as both a sword and a shield, which is precisely what the doctrine of waiver is

6   intended to prevent."  *Id.* at 12 (citing *Phoenix Sols. Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D.

7   568, 576 (N.D. Cal. 2008)).  CCGroup contends that OptumInsight has withheld as privileged

8   documents relating to the Aetna RFP Response and Dang's conception date, including documents

9   regarding whether OptumInsight in fact relied on the reexamination materials when it decided to

10   bring infringement claims against CCGroup.  *Id.* at 13.

11        CCGroup also argues that the privilege log produced by OptumInsight is deficient in that it

12   fails to identify which withheld documents constitute opinions of counsel, although CCGroup

13   clarifies in its reply that its present motion does not seek relief as to any deficiency in the privilege

14   log.  *Id.* at 14; Reply at 8−9 & n.9.

15        **2.  OptumInsight's Opposition**

16        Largely echoing the position it took in discussions among counsel during previous

17   infringement litigation, OptumInsight argues that Symmetry's disclosures during the

18   reexamination effected:

19
20           a waiver of attorney-client privilege by Symmetry only with respect
           to advice concerning the absence or presence of statutory bars to
           patentability known to Symmetry, Dennis Dang or David
21           Rosenbaum during the pendency of the application that issued as the
           '897 patent, including the first sale of the ETG software and whether
22           the Aetna RFP Response dated June 12, 1994, and/or the events
           leading up to this RFP response, triggered an on-sale bar.

23   Opp'n (dkt. 129) at 4 (citing Bjorklund Decl. Ex. 1).  According to OptumInsight, the waiver

24   should effectively end in 2007, because Symmetry rather than OptumInsight waived the privilege,

25   and Symmetry "ceased to exist" in 2007.  *See* Bjorklund Decl. ¶ 3.  OptumInsight contends that

26   CCGroup's efforts to obtain a broader waiver should be denied because it would "make[] it

27   impractical or impossible for litigants to limit resort to judicial decision-making by articulating

28   good faith privilege line-drawing" if an opponent might seek a different definition later.  Opp'n at

5.

Parsing Rosenbaum's affidavit one paragraph at a time, OptumInsight argues that the second paragraph is not a waiver because it only reveals the subject matter of Rosenbaum's conversation with his clients. *Id.* at 5−6. OptumInsight argues that the third and fourth paragraphs "at most waive privilege as to Rosenbaum's knowledge of Symmetry's first sale of the invention and the presence or absence of statutory bars at the time of the '897 Patent application." *Id.* at 6. According to OptumInsight, paragraphs five through seven "do not add or subtract from the scope of the waiver," because the facts underlying the conception of Dang's invention and the Aetna RFP Response fall within OptumInsight's proposed definition as relevant to knowledge of statutory bars and whether the RFP Response triggered an on-sale bar. *Id.* at 7. OptumInsight contends that the IDS and the Dang and Portnoy affidavits are not themselves grounds for waiver—the former because "CCGroup provides no authority for the proposition that attorney argument waives privilege, outside the context of an advice-of-counsel defense," and the latter because, according to OptumInsight, those affidavits reflect only the personal opinions of their authors. *Id.* at 5, 7. Regardless, OptumInsight argues that even if those documents could serve to waive privilege, they would add nothing to the waiver effected by Rosenbaum's affidavit. *Id.*

OptumInsight argues that CCGroup overstates the scope of the waiver in several ways. First, OptumInsight contends that Symmetry did not waive privilege as to the "conception of the ETG software" because the disclosures relate only to the '897 patent—OptumInsight asserts that the ETG software changed over time and suggests that not all versions of it practice the method claimed in that patent—and that it is sufficient to allow discovery related to known statutory bars, which would encompass documents pertaining to whether Dang had conceived the '897 patent's method at the time of the Aetna RFP Response. *Id.* at 8−9 & n.8. Next, OptumInsight argues that any waiver should not extend to all statutory bars "potentially applicable," because the disclosures only related to Rosenbaum's meetings with Dang and Portnoy, and thus implicitly only concerned statutory bars that they were aware of at the time of the patent application. *Id.* at 9. OptumInsight also contends that the waiver should be limited to statutory bars applicable to the '897 patent, and not to any patent in the Dang family, because the reexamination and the disclosures at issue only

1    concerned that patent.  *Id.*  OptumInsight concedes that documents that bear on statutory bars to

2    the '897 patent could be created or obtained in later patent prosecutions, but asserts that it has

3    already produced any such documents.  *Id.* at 9−10.

4         OptumInsight also argues that a waiver of attorney-client privilege does not necessarily

5    waive work product protection, and that CCGroup has not justified any waiver of work product

6    protection here.  *Id.* at 10−12 (citing, *e.g.*, *SNK Corp. of Am. v. Atlus Dream Entm't Co.*, 188

7    F.R.D. 566, 571 (N.D. Cal. 1999); *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 929

8    (N.D. Cal. 1976)).  According to OptumInsight, CCGroup overreaches in its attempt "to use

9    Rosenbaum's . . . statement about conversations with Dang in the '897 reexamination to eliminate

10   work product protection in four separate litigations: the Symmetry-Medstat case, the series of

11   lawsuits between Symmetry and Ingenix from 2000 to 2003, *Cave I* a decade later, and this

12   litigation."  *Id.* at 11.

13        OptumInsight argues that Symmetry had no power to waive *OptumInsight*'s attorney-client

14   privilege going forward, because only OptumInsight's management could do so.  *Id.* at 12−13.

15   OptumInsight also contends that it has not itself waived any privilege, because the documents at

16   issue were public (as a result of their submission in the '897 patent reexamination by Symmetry)

17   when OptumInsight submitted them in later proceedings.  *Id.* at 13.  Although OptumInsight

18   allows that documents created during later patent prosecutions might fall within the scope of an

19   earlier waiver, it argues that the mere act of prosecuting later patents in the Dang family, or

20   asserting the same conception date claimed during the reexamination, does not expand the scope

21   of the waiver.  *Id.* at 13−14.  OptumInsight also contends that its motion to dismiss in this action

22   did not waive any privilege, because although it asserted that it "was entitled to rely upon" the

23   statements submitted in the reexamination in deciding to bring infringement claims in *Cave I*, it

24   did not disclose whether its litigation counsel actually relied on such documents.  *Id.* at 14.

25        OptumInsight concludes by arguing that fairness does not require the broad scope of

26   waiver that CCGroup seeks, noting that OptumInsight has not asserted an advice-of-counsel

27   defense and CCGroup has not established any basis for a broad waiver under the crime/fraud

28   doctrine.  *Id.* at 15.

United States District Court
Northern District of California

### 3. CCGroup's Reply

CCGroup disputes OptumInsight's suggestion that CCGroup did not push back on OptumInsight's narrower proposed scope of waiver in *Cave I*, instead asserting that it maintained objections to that scope until OptumInsight withdrew its claims that CCGroup infringed the Dang patents. Reply at 1 n.1. CCGroup also clarifies that its argument for waiver of work product protection is not based merely on waiver of attorney-client privilege, but rather on its contention that Symmetry disclosed Rosenbaum's legal opinions and that "the subject matter of the disclosed privileged communications necessarily also embraces work product." *Id.* at 2 n.4. According to CCGroup, the subject matter of the material disclosed encompasses on its face "the timing of Dang's conception of the ETG software and the potential effect of the Aetna RFP Response on patentability." *Id.* at 4.

In response to OptumInsight's argument that different versions of the ETG software may not have practiced the method claimed in the '897 patent, CCGroup argues that the inventions claimed in each of the Dang patents describe the same ETG software, as evidenced by: (1) OptumInsight's interrogatory response asserting the same conception date for all Dang patents except one, for which it did not know the conception date; and (2) OptumInsight's infringement contentions in *Cave I* asserting that all of the Dang patents at issue had the same priority, and that all of the asserted claims "cover the Symmetry Treatment Group grouper, and all products that incorporate it." *Id.* at 5−6 (citing Brophy Reply Decl. Exs. J & K). CCGroup also argues that case law supports extending a waiver of privilege regarding patent prosecution to the "same subject matter in the prosecution of continuation and divisional applications." *Id.* at 6−7.

Turning to the issue of whether the waiver should encompass material related to all "potentially applicable" statutory bars to patentability or merely those bars that Symmetry and Rosenbaum were aware of at the time the application was pending, CCGroup acknowledges that the subject matter of the reexamination documents, and the "critical issue" here, is "when Dang conceived the ETG software, and whether the Aetna RFP Response implicates the on-sale bar." *Id.* at 7. CCGroup nevertheless takes issue with OptumInsight's proposed scope of waiver to the extent that it could be construed as excluding later-created documents that speak to those issues.

9

*Id.* at 7−8.

CCGroup argues that the Court has previously held that Symmetry's conduct can be imputed to post-merger OptumInsight, and that such a holding leads to the conclusion that any waiver by Symmetry also applies to OptumInsight after the date of the merger. *Id.* at 13 (citing SAC Order at 27). CCGroup also restates its argument that OptumInsight itself has placed the contents of the reexamination documents at issue in more recent litigation and USPTO proceedings, and that OptumInsight should therefore be subject to the same waiver as Symmetry. *Id.* at 14.

A portion of CCGroup's reply details documents withheld by OptumInsight that CCGroup believes should have been produced. *Id.* at 8−12. CCGroup does not explicitly ask the Court to compel production of specific documents, and the Court understands this section of the brief as intended merely to illustrate that the differences between the parties' proposed definitions of the waiver have real consequences to the case. *See id.* Because no party asks the Court to determine the status of specific documents, this Order does not address in detail CCGroup's arguments regarding documents withheld by OptumInsight.

CCGroup also notes its recent discovery that OptumInsight "has not logged any privileged communications or work product in response to CCGroup's request for 'the complete prosecution files' for the Dang and Seare patents," based on OptumInsight's view that the request only covers publicly filed documents—an interpretation that CCGroup disputes. *Id.* at 15. CCGroup does not request any relief for that issue. *See id.*

### 4. OptumInsight's Objection and Motion to Strike

One week after CCGroup filed its reply, OptumInsight filed an "Objection to Reply Evidence and Motion to Strike New Evidence and Argument." *See* Objection (dkt. 142). OptumInsight asks that the Court strike sections II and V of CCGroup's reply—dealing with specific documents not produced and patent prosecution documents not logged as privileged—or in the alternative, that the Court allow OptumInsight to file a surreply addressing the issues first raised therein. *Id.* at 1. OptumInsight contends that those sections "seek[] *new relief* outside of the relief requested in the motion," and are therefore improper. *Id.* at 2−3. The Court does not

construe the sections at issue as seeking any relief beyond a definition of the scope of waiver and finds them irrelevant to that request. Both of the requests for relief in OptumInsight's objection are therefore denied as moot.

## III.     ANALYSIS

### A.     Legal Standard

The scope of civil discovery is generally governed by Rule 26(b)(1) of the Federal Rules of Civil Procedure:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). CCGroup's present motion to compel turns on whether attorney-client privilege and work product protection have been waived as to certain documents.

#### 1.  Protections from Discovery

The attorney-client privilege is the oldest common law privilege protecting confidential communications. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The purpose of the attorney-client privilege is to permit attorneys to provide sound legal advice and effective advocacy by encouraging "full and frank communications between attorneys and their clients." *United States v. Mett*, 178 F.3d 1058, 1062 (9th Cir. 1999) (citing *Upjohn*, 449 U.S. at 389).

The work product doctrine, codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." *See In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004). "Proper preparation of a client's case demands that [an attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). This doctrine is distinct from the

United States District Court
Northern District of California

attorney-client privilege, and is in fact "not a privilege but a qualified immunity protecting [certain material] from discovery." *See Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1494 (9th Cir. 1989).

### 2. Waiver

A party may waive either of these protections by disclosure of protected material. When such disclosure is made in a federal proceeding or to a federal office or agency, as is the case here, waiver extends to additional undisclosed protected material so long as:

> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).

"The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter." *Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 454 F. Supp. 2d 957, 963 (N.D. Cal. 2006) (quoting *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005)), *aff'd*, No. C 02-3378 JSW, 2006 WL 2329460 (N.D. Cal. Aug. 9, 2006). "Federal courts have generally concluded that the information, once disclosed to a party opponent, waives the attorney-client privilege as to future proceedings." *Bittaker v. Woodford*, 331 F.3d 715, 730 n.2 (9th Cir. 2003) (O'Sclannlain, J., concurring) (collecting authority and citing, *e.g.*, *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416–18 (Fed. Cir. 1997) ("Once the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums.").[5] The party asserting privilege bears the "burden to show that fairness does not require waiver of the privilege over documents relating to the same subject matter as the documents

---

[5] At the hearing, OptumInsight's counsel argued that any waiver should be limited to the proceeding in which the disclosure was made, i.e., the reexamination. Such an approach is contrary to authority, and the Court is aware of no decision holding that Rule 502 of the Federal Rules of Evidence abrogates such authority. Where, as here, other proceedings included similar issues to the proceeding where the waiver occurred, fairness dictates that waiver not be so narrowly limited.

United States District Court
Northern District of California

1  disclosed." *Theranos, Inc. v. Fuisz Techs., Ltd.*, No. C 11-5236 PSG, 2013 WL 2153276, at *3

2  (N.D. Cal. May 16, 2013).

3        Because the attorney client privilege and the work product doctrine are distinct theories of

4  protection with different purposes, waiver of one does not necessarily waive the other.  *See, e.g.*,

5  *SNK Corp.*, 188 F.R.D. at 571.  "The work product [doctrine] provides protection against

6  adversaries and is not as easily waived as the attorney-client privilege."  *Nidec Corp. v. Victor Co.*

7  *of Japan*, 249 F.R.D. 575, 580 (N.D. Cal. 2007).  Waiver occurs only "where disclosure of the

8  otherwise [protected] documents is made to a third party, and that disclosure enables an adversary

9  to gain access to the information."  *Id.* at 578 (quoting *United States v. Bergonzi*, 216 F.R.D. 487,

10  495−96 (N.D. Cal. 2003)).  "However, work product waiver is not a broad waiver of all work

11  product related to the same subject matter like the attorney-client privilege.  Instead, work-product

12  waiver only extends to 'factual' or 'non-opinion' work product concerning the same subject matter

13  as the disclosed work product."  *In re EchoStar Comm'ns Corp.*, 448 F.3d 1294, 1302 (Fed. Cir.

14  2006) (citing *In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988)).[6]

15        **B.    Waiver of Privilege by Reexamination Disclosures**

16        There is no real dispute that Symmetry disclosed privileged information in the

17  reexamination of the '897 patent, and thus waived its privilege with respect to communications

18  regarding statutory bars to patentability to at least some extent.  *See* Opp'n at 4, 16 (setting forth

19  OptumInsight's proposed scope of the waiver and discussing its production of documents

20  consistent with that scope).  The Court is not fully persuaded by either party's proposed definition

---

[6] The parties dispute whether Federal Circuit or Ninth Circuit law applies to the present dispute. "Federal Circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, if those materials relate to an issue of substantive patent law." *EchoStar*, 448 F.3d at 1298 (quoting *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1307 (Fed. Cir. 2001)).  In the Court's view, the question of whether disclosure in a patent reexamination procedure of attorney-client communication for the purpose of patent prosecution and reexamination waives privilege and work product protection of related protected material prepared during patent litigation, prosecution, and reexamination is sufficiently specific to patent law to apply Federal Circuit precedent.  The question is not particularly significant, however, as the parties have identified no material difference between Federal Circuit and Ninth Circuit law with respect to the issues in dispute.  Assuming that Federal Circuit law applies to the present motion, the Court finds the reasoning of Ninth Circuit decisions cited herein persuasive and consistent with Federal Circuit law.  Conversely, to the extent that Ninth Circuit law might apply, the Court finds the Federal Circuit authority cited herein persuasive and consistent.

United States District Court
Northern District of California

1    of the scope of waiver.

2        The most obvious flaw in OptumInsight's proposed definition is that it limits waiver to the

3    "absence or presence of statutory bars to patentability *known . . . during the pendency of the*

4    *application* that issued as the '897 patent," Opp'n at 4, when Rosenbaum's affidavit plainly

5    describes attorney-client communication regarding potential bars to patentability not only in

6    preparation for filing the application, but also "during routine discussions" in or around "July of

7    2000"—more than a year after the '897 patent was issued in November of 1998.  *See* Brophy

8    Decl. Ex. B (Rosenbaum Aff.) ¶¶ 2, 5−7.

9        In the Court's view, however, describing the "subject matter" of the two disclosed

10   conversations as what Rosenbaum and his clients were aware of at the time is a stilted and overly

11   restrictive definition, regardless of what period of time is used for that analysis.  In a technical

12   sense, the subject matter of any conversation could be described as limited to what the participants

13   knew at the time, but OptumInsight cites no authority defining the subject matter of a privilege

14   waiver in that manner.  Such an approach would run counter to the waiver doctrine's basis in

15   fairness: allowing a party to disclose and rely on privileged communications about a given issue so

16   long as they are favorable to its interests and yet fall back on privilege as soon as the party or its

17   counsel becomes aware of (and communicates) a less favorable aspect of the same issue would be

18   a clear case of improperly using privilege as both a shield and a sword.  *See Echostar*, 448 F.3d at

19   1301 (justifying the subject matter rule on the basis that "selective waiver of the privilege may

20   lead to the inequitable result that the waiving party could waive its privilege for favorable advice

21   while asserting its privilege on unfavorable advice"); *see also, e.g.*, *Chevron Corp. v. Pennzoil

22   Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client

23   communications may not be used both as a sword and a shield.").  The relevant subject matter is

24   therefore the *issues* that Rosenbaum, Dang, and Portnoy discussed in the privileged

25   communications disclosed in the reexamination, and is not limited to what they knew about those

26   issues at the time.

27        CCGroup's proposal would broadly encompass communications regarding *any* statutory

28   bar potentially applicable.  Although Rosenbaum's affidavit broadly states his conclusion that

United States District Court
Northern District of California

14

1    "there were no statutory bars to patentability," the only conversations described therein or in any

2    of the other documents at issue relate to the possibility that a previous sale or disclosure by

3    Symmetry could have barred patentability under the then-effective language of 35 U.S.C.

4    § 102(b).  *See* Brophy Decl. Ex. B (Rosenbaum Aff.) ¶¶ 3−7; *see also id.* Ex. A (IDS) at 7, 11; *id.*

5    Ex. C (Dang Aff.) ¶ 9; *id.* Ex. D (Portnoy Aff.) ¶ 5.  There is no disclosure of discussions

6    regarding other potential statutory bars, such as a preexisting foreign patent, and it would be a

7    stretch to say that communications dealing with that sort of unrelated statutory bar fall within the

8    same subject matter as the disclosures at issue.  CCGroup's reply therefore describes the subject

9    matter of the disclosure more accurately than its motion: "The subject matter of these materials is

10   the conception date of the ETG software, and/or the effect of the Aetna RFP Response on

11   patentability, and that subject matter should therefore define the scope of the waiver."  Reply at 7.

12   To that definition, the Court adds OptumInsight's concession that "the first sale of the ETG

13   software" also falls within the scope of the waiver.  *See* Opp'n at 4; *see also* Brophy Decl. Ex. B

14   (Rosenbaum Aff.) ¶ 3 (stating that during attorney-client discussions of potential bars to

15   patentability, "[i]t was determined that Symmetry's first sale of the ETG Program was licensing

16   the ETG Program to Oxford Health Plan in October 1994").  Rosenbaum's disclosures also

17   encompass other relevant topics of attorney-client communication, including the capabilities of the

18   ETG software at the time of the Aetna RFP Response, communications regarding the Aetna RFP

19   and response, and the extent to which Symmetry's communications with Aetna were confidential.

20   *See* Brophy Decl. Ex. B (Rosenbaum Aff.) ¶ 7.

21        The parties also dispute whether the subject matter should be limited to the patentability of

22   the '897 patent or encompass the patentability of *any* patent in the Dang family.  *See* Mot. at 11;

23   Opp'n at 9−10; Reply at 5−7.  There is no indication in the materials submitted during the

24   reexamination that the attorney-client discussions described therein included any discussion of

25   bars to patentability of any patent except the '897 patent.  *See generally* Brophy Decl. Ex. B

26   (Rosenbaum Aff.) (describing two meetings, one in preparation for filing the application that led

27   to issuance of the '897 patent and the other during the early stages of the reexamination of the

28   '897 patent).  While some of the evidence presented in CCGroup's reply does tend to suggest a

United States District Court
Northern District of California

15

close affinity among the Dang patents, the Court is not prepared to hold on this record that the patents are sufficiently coterminous that a bar to patentability of one would necessarily apply to all—particularly where CCGroup saved the bulk of its argument and evidence on the subject for its reply, depriving OptumInsight of an opportunity to respond.  Instead, the Court limits the aspect of the waiver pertaining to patentability to the patentability of the '897 patent.  Of course, to the extent that communications and documents fall within the categories described above and discuss statutory barriers affecting the Dang patent family as a whole (rather than just the '897 patent), such materials are relevant to the '897 patent and fall within the scope of the waiver.

Synthesizing the analysis above, Symmetry's attorney-client privilege is waived as to communications pertaining to: (1) the conception date of the ETG software and the '897 patent; (2) the first sale of the ETG software; (3) the effect of that sale on the '897 patent; (4) Aetna's request for proposal and Symmetry's response thereto; (5) the confidentiality of Symmetry's communications with Aetna; (6) capabilities of the ETG software at the time of the RFP and response, and (7) bars to patentability of the '897 patent based on Symmetry's communications with or disclosures to Aetna.  In order to allow OptumInsight to fairly and effectively defend itself in the present action, the Court finds that communications and materials generated after April 28, 2014—the date claims based on the '897 patent were dismissed from the *Cave I* litigation[7]—fall outside the scope of the waiver.  *See* Fed. R. Evid. 502(a)(3) (limiting waiver to documents that "ought in fairness be considered together").

**C.      Waiver of Work Product Protection by Reexamination Disclosures**

The parties agree that waiver of the attorney-client privilege does not necessarily waive the separate protection of the work product doctrine.  *See* Opp'n at 10−12; Reply at 2 n.4; *see also SNK Corp.*, 188 F.R.D. at 571; *Nidec Corp.*, 249 F.R.D. at 580.  Both parties' briefs fail to address meaningfully an important threshold issue: whether any of the material disclosed in the reexamination was subject to the work product doctrine to begin with.  The Court is aware of no authority holding that disclosure of material or information that is not itself protected by the work

---

[7] *See Cave I*, No. 5:11-cv-0469-EJD, ECF Dkt. No. 116 (N.D. Cal. Apr. 28, 2014) (Order on Stipulation).

United States District Court
Northern District of California

1    product doctrine can serve to waive that protection for other material.

2           "Where the issue has been addressed directly, there is a general consensus among courts

3    that the work product doctrine does not apply to patent prosecution work because patent

4    prosecution is not an adversarial, litigation-type proceeding, but a wholly *ex parte* proceeding

5    before the PTO." *In re Method of Processing Ethanol Byproducts & Related Subsystems ('858*

6    *Patent Litig.*, No. 1:10-ML-02181-LJM, 2014 WL 2938183, at *7 (S.D. Ind. June 30, 2014); *see*

7    *also, e.g.*, *Dynetix Design Sols. Inc. v. Synopsys Inc.*, No. CV 11-05973 PSG, 2013 WL 3584994,

8    at *1 (N.D. Cal. July 11, 2013).  Where materials prepared during patent prosecution were created

9    with "with an eye towards litigation," however, they can fall within the scope of the work product

10   doctrine.  *Dynetix Design*, 2013 WL 3584994, at *1; *see Ethanol Byproducts*, 2014 WL 2938183,

11   at *8.

12          Certain types of patent proceedings can themselves trigger work product protection.

13   Several courts have held that interferences, for example, sufficiently approximate adversarial

14   litigation to warrant such protection.  *See, e.g.*, *In re Natta*, 410 F.2d 187, 192–93 (3d Cir. 1969);

15   *Ethanol Byproducts*, 2014 WL 2938183, at *7 n.8 (citing *Natta*); *Conner Peripherals, Inc. v. W.*

16   *Digital Corp.*, No. C93-20117 RMW/EAI, 1993 WL 726815, at *4 (N.D. Cal. June 8, 1993)

17   (collecting authority).  This Court is aware of only a handful of decisions addressing whether

18   materials prepared for patent reexaminations are subject to work product protection, and those

19   tend to turn on context-specific factors.  *E.g.*, *Applied Telematics, Inc. v. Sprint Commc'ns Co.*,

20   L.P., No. CIV. A. 94-4603, 1996 WL 539595, at *5 (E.D. Pa. Sept. 18, 1996) (finding work

21   product protection applicable where a patent holder initiated a reexamination because of

22   communications with a competitor concerning the validity of the patent, and immediately before

23   filing infringement claims against another competitor); *Oak Indus. v. Zenith Elecs. Corp.*, 687 F.

24   Supp. 369, 375 (N.D. Ill. 1988) (finding work product protection applicable where a

25   reexamination was initiated while litigation concerning "the same central issue" was already

26   pending); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 116 F.R.D. 533, 544 (N.D. Cal. 1987)

27   (finding work product protection applicable to an adversarial reexamination initiated by a

28   competitor); *see also Broadband iTV, Inc. v. Hawaiian Telecom*, No. 15-MC-80053 HRL, 2015

United States District Court
Northern District of California

United States District Court
Northern District of California

1  WL 1778432, at *3 (N.D. Cal. Apr. 17, 2015) (holding the newer inter partes review process

2  sufficiently adversarial to warrant protection in light of legislative intent to "convert[] inter partes

3  reexamination from an examinational to an adjudicative proceeding" (quoting legislation

4  postdating the events at issue in the present case)).

5      In light of the deluge of infringement litigation that commenced soon after Symmetry

6  successfully obtained the '897 patent and continued through and beyond Symmetry's successful

7  reexamination, the Court concludes that both the application and the reexamination were

8  conducted with an eye towards litigation, and thus fall within the scope of work product

9  protection. *See Oak Indus.*, 687 F. Supp. at 375 (finding work product protection applicable to

10  USPTO proceedings based on contemporary related litigation). Such protection is waived by

11  Symmetry's disclosure of the process by which Rosenbaum reached his legal conclusion that the

12  '897 patent was not subject to a statutory bar as a result of the Aetna RFP Response and "decided

13  to file the information . . . in the . . . Information Disclosure Statement." *See* Brophy Decl. Ex. B

14  (Rosenbaum Aff.) ¶¶ 5−8. Where Symmetry presented its counsel's investigation and legal

15  conclusion as a sword to persuade the USPTO to rule in its favor in the reexamination, it cannot

16  also rely on the work product doctrine as a shield to bar discovery of documents prepared or

17  gathered during that investigation and that serve as a basis for that legal conclusion, nor other

18  material related to the same subject matter. *Cf. EchoStar*, 448 F.3d at 1304 (discussing waiver of

19  work product protection where a client asserts an advice of counsel defense). Such waiver is

20  limited to the same scope as the attorney-client privilege waiver discussed above, including the

21  cutoff date of April 28, 2014. Moreover, work product protection is waived only as to "'factual'

22  or 'non-opinion' work product"; there is no waiver as to counsel's "mental impressions,

23  conclusions, opinions, or legal theories." *See id.* at 1302 (citation omitted).

24      **D.    Effect of Merger**

25      OptumInsight contends that Symmetry had no authority to waive any privilege belonging

26  to OptumInsight, and that the scope of the waiver therefore effectively ended in 2007 when

27  Symmetry "ceased to exist." Opp'n at 12−13; Bjorklund Decl. ¶ 3. CCGroup argues that after

28  merging Symmetry into itself, OptumInsight stands in the shoes of Symmetry with respect to

waiver of privilege.  Neither party cites authority regarding the application of privilege waivers to post-merger corporations.

With respect to all times before the two corporations merged in 2007, OptumInsight is of course correct that Symmetry had no authority to waive any privilege belonging to OptumInsight. The Court nevertheless agrees with CCGroup that Symmetry's waiver is imputed to OptumInsight after the merger.  As discussed in the Court's previous Order, "[t]he corporation that continues after a merger generally stands in the shoes of both constituent corporations."  SAC Order at 27 (citing Del. Code Ann. tit. 8, § 259(a)).  The Delaware merger statute makes no meaningful distinction between the effect of merging two corporations to create a new corporation and the effect of merging one corporation into another—in either case, the resulting or continuing corporation "possess[es] all the rights, privileges, powers and franchises as well of a public as of a private nature, and [is] subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated."  Del. Code Ann. tit. 8, § 259(a).[8]  Here, one "restriction" or "disability" of Symmetry at the time of the merger was that it had waived certain document protections as set forth above.  Under § 259(a), that disability passes to the continuing corporation—post-merger OptumInsight—with respect to communications taking place or material created after the date of the merger.

### E.    Subsequent Use of the Reexamination Documents by OptumInsight

CCGroup argues, and OptumInsight disputes, that OptumInsight's submission of documents from the reexamination in other patent prosecutions "reinforced and renewed" the waiver and imputed it to OptumInsight.  *See* Mot. at 7−10; Opp'n at 13−14.  CCGroup fails to present a persuasive reason why continued use of the same documents disclosed during the reexamination would alter the nature of the initial waiver in any significant way.  After Symmetry

---

[8] The symmetric treatment of, on one hand, merging two corporations to a new corporation, and on the other hand, merging one corporation into another illustrates a bizarre result that would come from adopting OptumInsight's proposed framework.  If OptumInsight and Symmetry had merged to create a new corporation, it would follow from OptumInsight's argument that *both* corporations ceased to exist at that time and the resulting corporation would not be subject to any privilege waiver by *either* of its constituents.  That sort of loophole would be inconsistent with the general rule that "[o]nce the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums."  *See Genentech*, 122 F.3d at 1416.

1   disclosed the documents to the USPTO, they were publicly available and no longer contained

2   privileged information, because the disclosure itself waived the privilege as discussed above.  Pre-

3   merger OptumInsight's used of the documents would not implicate its own privilege or work

4   product protection, because any privilege that had once attached to the documents belonged to a

5   different entity, Symmetry.  After the merger, OptumInsight stands in the shoes of Symmetry and

6   is therefore already subject to Symmetry's waiver.  The waiver remains in effect, *see Genentech*,

7   122 F.3d at 1416, but it is not expanded by the fact that OptumInsight continued to use the now-

8   public documents from the reexamination.

9         **F.   Reliance on the Reexamination Documents in the Present Action**

10        In its motion to dismiss the Second Amended Complaint in this action, OptumInsight

11   asserted that in reaching its decision in to assert claims in *Cave I* alleging that CCGroup infringed

12   the Dang patents, OptumInsight "was entitled to rely upon" the statements submitted in the

13   reexamination supporting a 1994 conception date and the absence of statutory bars to patentability.

14   Mot. to Dismiss SAC at 27.  CCGroup construes that assertion as representing that OptumInsight

15   in fact relied on those documents.  Mot. at 10.  In context, however, OptumInsight's motion to

16   dismiss did not include any firm assertion regarding how its counsel reached the decision to bring

17   infringement claims, or present any evidence to that effect.  One of the issues before the court on

18   that motion was whether CCGroup's Second Amended Complaint stated a claim that

19   OptumInsight brought its infringement claims in bad faith or with knowledge that the Dang

20   patents were unenforceable.  OptumInsight argued—unsuccessfully—that the mere existence of

21   the reexamination documents would provide an objectively reasonable basis for OptumInsight's

22   counsel to conclude that the Dang patents were enforceable, and thus rendered any claim to the

23   contrary implausible.  The Court disagreed, holding that CCGroup plausibly alleged that

24   OptumInsight's litigation counsel knew that the reexamination documents presented a false date of

25   conception for Dang's invention.  *See* SAC Order at 20−24.  Whether OptumInsight's litigation

26   attorneys in fact relied on the reexamination documents was not before the Court at the pleading

27   stage.  Because the relevant portion of OptumInsight's motion to dismiss dealt only with the

28   plausibility of CCGroup's allegations, the Court finds that it does not reveal privileged

United States District Court
Northern District of California

20

1    communications or protected work product related to the decision to bring infringement claims,

2    and thus does not alter the scope of the waiver.  The Court notes, however, that if OptumInsight

3    intends to introduce evidence of its attorneys' decision making process that led to those claims,

4    such an approach might waive OptumInsight's attorney-client privilege and work product

5    protection as to communications and documents related to that decision.

6    **G.    OptumInsight's Privilege Log**

7        CCGroup asserts that OptumInsight's privilege log is deficient in that it does not identify

8    opinions of counsel.  Mot. at 13−14.  In response, OptumInsight asserts only that "[t]his motion is

9    *not* about whether OptumInsight has satisfied its obligation to claim and identify privileged

10   documents, because CCGroup does not contend that OptumInsight's 900+-page privilege log fails

11   to satisfy that obligation," and that "[a]ny attempt by CCGroup to raise any such issues for the

12   first time in its reply brief would be improper."  Opp'n at 2, 3 n.3.  CCGroup clarifies in its reply

13   that its motion is not intended to challenge the privilege log because any such argument would be

14   "premature . . . without agreement or a ruling on the scope of the waiver."  Reply at 8−9 n.9.  This

15   Order therefore does not resolve the adequacy of OptumInsight's log, except to observe that

16   OptumInsight's apparent position that it is not "required to specifically identify which items on the

17   privilege log are 'opinions of counsel,'" *see* Brophy Decl. Ex. J (email from counsel dated Sept. 6,

18   2016) at 2, is not consistent with its representations at the hearing before the Court on July 8,

19   2016:

20           THE COURT: - - regardless of whether it was related to your
             decision, are you going to produce or log any opinions from counsel,
21           formal or informal, on the enforceability of the Dang patents?

22           MR. VITT: Yes.

23           THE COURT: Does that solve your problem, for Cave?

24           MR. BROPHY: It does, your Honor, and thank you very much for
             that.
25
             THE COURT: Great. Okay. So I guess the minutes will reflect that
26           the defendants agree to log or produce formal or informal opinions
             of counsel regarding the enforceability of the Dang patents.
27
     July 8, 2016 Tr. (dkt. 143) 6:24−7:10; *see also* Civil Minute Order (dkt. 111).  An agreement to
28

log opinions of counsel is of little value if such opinions cannot be identified from the log. However, because CCGroup does not seek relief on this issue in its present motion, *see* Reply at 8−9 n.9, the Court declines to resolve the issue at this time.

## IV.    CONCLUSION

For the reason stated above, the Court holds that Symmetry waived its attorney-client privilege and work product protection as to communications and material generated before April 28, 2014 pertaining to: (1) the conception date of the ETG software and the '897 patent; (2) the first sale of the ETG software; (3) the effect of that sale on the '897 patent; (4) Aetna's request for proposal and Symmetry's response thereto; (5) the confidentiality of Symmetry's communications with Aetna; (6) capabilities of the ETG software at the time of the RFP and response,and (7) bars to patentability of the '897 patent based on Symmetry's communications with or disclosures to Aetna.  The waiver of work product protection encompasses only "non-opinion" work product.

**IT IS SO ORDERED.**

Dated: October 25, 2016

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California