UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAVE CONSULTING GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>OPTUMINSIGHT, INC.,<br><br>Defendant. | Case No. 15-cv-03424-JCS<br><br>**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>Re: Dkt. Nos. 244, 280, 305, 306, 312<br><br>*Provisionally Filed Under Seal*<br><br>REDACTED PUBLIC VERSION |

## I.   INTRODUCTION

Plaintiff Cave Consulting Group, Inc. ("CCGroup") alleges that Defendant OptumInsight, Inc. obtained patents, which are related to software used to group medical claims, through fraud on the U.S. Patent and Trademark Office (the "PTO") and used those patents to exclude CCGroup from the market, through sham litigation and other efforts to advertise, assert, or enforce the patents.  CCGroup's claims are based on federal antitrust law and California's malicious prosecution doctrine.  OptumInsight and CCGroup each move to exclude certain opinions of each other's expert witnesses and for summary judgment on some or all of the claims at issue.  The Court held a hearing on August 12, 2019.  For the reasons discussed below, OptumInsight's motion for summary judgment based on statutes of limitations is DENIED, and the parties' other motions are GRANTED in part and DENIED in part.  CCGroup's malicious prosecution and antitrust claims may largely proceed—although CCGroup may recover damages only based on litigation costs and fees, not based on market effects—but the Court grants summary judgment in favor of OptumInsight as to CCGroup's Lanham Act claim.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).  Responsibility for the delay in holding a hearing and

This order is provisionally filed under seal and the parties are ordered to restrict its contents to attorneys' eyes only, in the same manner as provided for the most confidential information governed by the protective order in this case. Either party may file <u>narrowly tailored</u> proposed redactions no later than fourteen days after the date of this order, with accompanying declarations establishing <u>compelling reasons</u> to maintain the redacted information under seal. The declarations must be filed in the public record, while the proposed redactions must be filed under seal. The declarations should also address whether opposing counsel should be permitted to disclose the redacted information to their clients. In presenting reasons for sealing, the parties may not rely on the Court previously having granted permission to file underlying documents under seal, and may not incorporate by reference their previous submissions in support of sealing such documents. If neither party proposes redactions by that deadline, the order will be filed in the public record.

A case management conference to set trial dates and pretrial deadlines will occur on October 4, 2019 at 2:00 PM. The parties shall file an updated joint case management statement no later than September 27, 2019.

## II. TABLE OF CONTENTS

I. Introduction ............................................................................................................... 1

II. Table of Contents ....................................................................................................... 2

III. Background ................................................................................................................ 4

   A. Patent Prosecution, Early Disputes with Third Parties, and Corporate Merger ................. 4

   B. The Recent Grouper Market, CCGroup's Activity, and *Cave I* ....................................... 6

   C. Procedural History of the Present Action ......................................................................... 8

IV. Motions to Exclude Expert Testimony ....................................................................... 9

   A. Legal Standard for Expert Testimony .............................................................................. 9

   B. CCGroup's Expert Ryan Sullivan .................................................................................. 11

---

resolving the present motions lies in large part with the Court, both due to health issues arising around the time of the date originally planned for the hearing and due to the Court's docket. The Court apologizes to the parties for the delay.

1.      Sullivan's Opinions on the Physician Efficiency Market ............................................. 11

2.      Sullivan's Opinions on the Standalone Grouper Market ...................................... 17

C.     CCGroup's Expert Kenneth Wilson ......................................................................... 21

D.     CCGroup's Expert Bryan Bergeron ......................................................................... 24

E.     CCGroup's Expert Stephen Kunin ........................................................................... 26

F.     OptumInsight's Expert John Doll ............................................................................ 30

G.     OptumInsight's Expert Michael Dergosits .............................................................. 32

1.      Limitations of "Rebuttal" Experts ...................................................................... 32

2.      Opinions Regarding "Objective Reasonableness" ............................................ 33

3.      Opinions Regarding State of Mind ..................................................................... 36

4.      Opinions Regarding Strategic Considerations .................................................... 36

H.     OptumInsight's Expert Michael van Duren ............................................................ 37

1.      Summaries of Fact Evidence and Opinions on State of Mind ........................... 37

2.      Opinions Buttressing Credibility ........................................................................ 38

3.      Opinions Regarding "Dynamic Time Windows" ............................................... 39

I.     OptumInsight's Expert Paul Godek ......................................................................... 41

J.     OptumInsight's Expert Richard Bero ....................................................................... 43

V.   Motions for Summary Judgment ....................................................................................... 45

A.     Legal Standard for Summary Judgment Under Rule 56 ......................................... 45

B.     OptumInsight's Motion for Summary Judgment on Statutes of Limitations ................ 46

1.      Arguments Regarding Statutes of Limitations .................................................... 46

2.      Analysis of Statutes of Limitations .................................................................... 49

C.     Motions for Summary Judgment on the Merits ...................................................... 63

1.      Whether the Dang Patents Are Unenforceable by Inequitable Conduct ................ 63

2.      Whether the Aetna RFP Response Was an Invalidating Offer for Sale ................ 70

3.      Costs for Claims Associated with the Dang Patents ........................................... 71

4.      Whether the Seare Patents Are Unenforceable ................................................... 72

5.     Whether the Seare '079 Patent Was Conceived or Reduced to Practice Before the

Aetna RFP Response ........................................................................... 78

6.     Definition of the Product Market ........................................................ 78

7.     Whether OptumInsight Had Market Power ......................................... 80

8.     Antitrust Injury .................................................................................... 82

9.     Effect of Any Valid Patents ................................................................ 87

10.    Knowledge Required for *Walker Process* Claim ............................... 88

11.    Sham Litigation Claim ........................................................................ 95

12.    Malicious Prosecution Claim .............................................................. 98

13.    Lanham Act Claim .............................................................................. 99

VI.    Conclusion ................................................................................................... 102

## III.    BACKGROUND

This background section is provided solely for the convenience of the reader and is intended as a brief and uncontroversial timeline and summary of claims, leaving discussion of more specific facts and evidence for the analysis sections below. Nothing in this section, as opposed to the separate analysis sections below, should be construed as resolving any question of fact or of the sufficiency of the parties' evidence.

### A.    Patent Prosecution, Early Disputes with Third Parties, and Corporate Merger

In 1993, Dennis Dang began developing a concept for episode-of-care groupers, in conjunction with his partner Mitchell Portnoy and programmer Daniel Gardiner, while working for Symmetry Inc. (which, much later, would become OptumInsight through a merger[2]). Symmetry received a request for proposal ("RFP") from the insurance company Aetna in 1994,

---

[2] OptumInsight's briefs repeatedly distinguish between OptumInsight and Symmetry, arguing that it should not be held responsible for the conduct of its "then-adversary." *See, e.g.*, Def.'s Merits MSJ at 25 n.6. In the Court's view, for the reasons discussed in the Court's previous orders addressing the sufficiency of CCGroup's complaint and waiver of privilege, Symmetry and Ingenix are *both* predecessors to OptumInsight, and the post-merger OptumInsight is as much a successor to Symmetry as it is to Ingenix. *See Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 7475820, at *11 (N.D. Cal. Dec. 29, 2016); *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 4744165, at *15 (N.D. Cal. Sept. 12, 2016).

1    and provided a response to the RFP in June of that year describing its grouper product and offering

2    to license it to Aetna. There is some evidence that in August of 1994 Symmetry altered the

3    method that its product used to group claims, resulting in improved performance. Symmetry

4    licensed its product to a different customer later that year.

5        In August of 1995, Dang applied for a patent that would eventually be issued as U.S.

6    Patent No. 5,835,897.[3] The parties dispute whether Symmetry's June 1994 response to Aetna's

7    RFP constitutes an invalidating offer of sale more than one year before the application date.

8    Symmetry did not disclose the RFP response to the U.S. Patent and Trademark Office (the "PTO")

9    in its application.

10        Around the same time, OptumInsight's predecessor Ingenix, Inc. and inventor Jerry Seare

11    filed their own applications for patents related to medical claims analysis, with the first potentially

12    relevant application filed June 23, 1994.

13        Symmetry engaged in patent litigation against competitor MedStat in the late 1990s, during

14    which time Symmetry took the position that Dang conceived the '897 patent in 1993, and did not

15    produce the RFP response to MedStat. After that litigation settled, Symmetry initiated a

16    reexamination of the '897 patent at the PTO in 2000, during which it eventually disclosed the RFP

17    response to the PTO. In the reexamination, Symmetry took the position that Dang did not

18    conceive or reduce to practice the invention described by the '897 patent until August of 1994, and

19    that the June RFP response lacked essential aspects of that invention. The PTO accepted

20    Symmetry's position and did not invalidate the '897 patent. Dang and Symmetry later obtained a

21    number of other related patents based on the priority date of the '897 patent, including U.S. Patent

22    Nos. 6,370,511; 7,620,560; 7,774,216; 7,979,290; 8,121,869; 8,296,165; and 8,700,433

23    (collectively and including the '897 patent, the "Dang Patents").[4]

24        Ingenix and Seare filed a patent application in 1999 that would eventually issue as U.S.

25    _____

26    [3] For subsequent references, this order uses the final three digits of each patent at issue—e.g., the
     "'897 patent."

27    [4] As discussed further below, previous litigation between the parties included claims related to five
     of the Dang Patents. This order uses the term "Dang Patents" in some instances to refer only to
     those five patents, with the intent that context should make clear whether those five patents or all
28    eight patents are the subject of discussion.

Patent No. 7,222,079. The only claim of that patent was a verbatim copy of the first claim of Symmetry and Dang's '897 patent, provoking an interference proceeding between Symmetry and Ingenix. Symmetry and Ingenix also engaged in patent litigation during the early 2000s. The two companies reached a global settlement in 2007 in which Ingenix acquired Symmetry and the companies merged, later taking the name OptumInsight. After the settlement, the PTO allowed Symmetry's counsel to withdraw from the interference, Ingenix's counsel unilaterally represented that the Seare '079 patent was entitled to priority, and the PTO accepted that representation. A related patent attributed to Seare, U.S. Patent No. 7,774,252, later issued as a continuation of the '079 patent (collectively, the "Seare Patents").

## B. The Recent Grouper Market, CCGroup's Activity, and *Cave I*

CCGroup developed its own grouper product, which is one of three or four products in the grouper market in recent years—CCGroup's product, OptumInsight's product, a grouper produced by Truven (paying license fees to OptumInsight), and a grouper produced by 3M (the significance of which is disputed). OptumInsight holds a significant majority share of the market. CCGroup primarily sells a product to evaluate physician efficiency that incorporates its grouper, rather than licensing the grouper separately as a standalone product. The market for physician efficiency software includes more competitors, many of whom license OptumInsight's grouper as a component of their physician efficiency products. According to CCGroup's founder and president Dr. Doug Cave, CCGroup chose to avoid the standalone grouper market out of fear of OptumInsight enforcing its patents against CCGroup.

In 2011, OptumInsight filed a complaint against CCGroup in the U.S. District Court for the District of Minnesota alleging infringement of Dang's '897, '511, '560, '216, and '333 patents and Seare's '079 and '252 patents, and CCGroup filed an action in this district before the Honorable Edward Davila alleging that OptumInsight infringed a physician efficiency patent held by CCGroup. *See generally Cave Consulting Grp., LLC v. OptumInsight, Inc.* ("*Cave I*"), No. 11-cv-00469-EJD (N.D. Cal.). OptumInsight never served its Minnesota complaint on CCGroup and later dismissed the case without prejudice, but refused CCGroup's request that it dismiss the claims with prejudice. CCGroup added claims in *Cave I* later that year seeking declaratory

6

judgment that it did not infringe OptumInsight's patents. OptumInsight brought counterclaims for infringement of the same patents.

During litigation of *Cave I*, CCGroup obtained documents that it believed demonstrated inequitable conduct by OptumInsight's predecessor Symmetry with respect to the Dang Patents and perhaps also the later-issued Seare Patents. CCGroup amended its complaint to add allegations that the Dang Patents were unenforceable due to inequitable conduct. OptumInsight's attorneys determined that such allegations were plausible and had a significant likelihood of success. *See* Howenstine Decl. re Pl.'s MSJ Ex. 21 at DW00012206 (confidential memorandum from counsel concluding that, "[i]n summary, and subject to further investigation with Mr. Dang, it is our judgment that there is a significant likelihood that the Dang patents will be found invalid, and also unenforceable due to inequitable conduct."). Eleven months after CCGroup added its inequitable conduct claims, the parties stipulated to dismiss OptumInsight's claims for infringement of the Dang Patents with prejudice and CCGroup's declaratory judgment claims with respect to the Dang Patents without prejudice. The parties retained their claims pertaining to the Seare Patents at that time, although OptumInsight later decided to pursue its infringement claim at trial only with respect to the '079 patent, and not the '252 patent.

In 2015, Judge Davila granted summary judgment for OptumInsight that Symmetry's 1994 response to the Aetna RFP was not invalidating prior art as to the Seare patents because it was not public, among other rulings not directly relevant to the present case. *Cave I*, 2015 WL 740379, at *12–13 (N.D. Cal. Feb. 20, 2015). A jury reached a verdict later that year that OptumInsight infringed CCGroup's patent, that OptumInsight had not shown CCGroup's patent to lack adequate written descriptions, that CCGroup did not infringe the only remaining patent asserted by OptumInsight (the Seare '079 patent), that a 1994 article did not anticipate the '079 patent, and that CCGroup had not shown the '079 patent to lack an enabling disclosure. *See Cave I*, ECF Doc. No. 366 (Jury Verdict). The Federal Circuit later reversed CCGroup's victory on its infringement claims. *See generally Cave Consulting Grp., LLC v. OptumInsight, Inc.*, 725 F. App'x 988 (Fed. Cir. 2018).

Judge Davila issued the following claim construction rulings in *Cave I* regarding terms

appearing in OptumInsight's patents:

- "Validating" (and variations): Its plain meaning, which Judge Davila declined to construe but described as "a process of checking to ensure something is valid or acceptable." *Cave I*, 2013 WL 2467930, at *10.

- "Shifting" (and variations): "[W]hen later processed claims data indicates a change from one clinical condition to another, the episode is moved to the later clinical condition." *Id.* at *11.

- "Reset" (and variations): Its plain meaning, which Judge Davila declined to construe but described as "to start over." *Id.* at *13.

- "Dynamic Time Window": A "time period that can reset based upon receipt of related claim records within a predefined time period." *Id.* at *15.

- "Episode Treatment Group": A "group of medical condition(s) that have clinically similar cause(s), treatment(s) and/or diagnos(es)." *Id.* at *18.

- "Episode Treatment Category": A "classification that includes one or more Episode Treatment Groups." *Id.*

## C. Procedural History of the Present Action

CCGroup filed the present action against OptumInsight in 2015, after the jury returned a verdict in its favor in *Cave I*. The Court issued an order on April 22, 2016 granting OptumInsight's motion to dismiss CCGroup's first amended complaint for failure to meet the applicable pleading standard, but allowed leave to amend and rejected or declined to reach several of OptumInsight's more substantive arguments regarding the merits of CCGroup's claims. *See* Order Granting Mot. to Dismiss with Leave to Amend ("Order re 1st MTD," dkt. 84).[5] On September 12, 2016, the Court denied OptumInsight's motion to dismiss the second amended complaint. *See* Order Denying Mot. to Dismiss 2d Am. Compl. ("Order re 2d MTD," dkt. 127).[6]

CCGroup's operative second amended complaint includes the following claims:

---

[5] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 1611042 (N.D. Cal. Apr. 22, 2016).
[6] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 4744165 (N.D. Cal. Sept. 12, 2016).

(1) monopolization and attempted monopolization in violation of § 2 of the Sherman Act, based on a *Walker Process* theory that OptumInsight obtained patents through fraud on the PTO; (2) monopolization and attempted monopolization in violation of § 2 of the Sherman Act, based on a *Handgards* theory that OptumInsight engaged in sham litigation; (3) false advertising in violation of the Lanham Act; and (4) malicious prosecution. All of CCGroup's claims are based on the Dang '897 patent and subsequent '511, '560, '333, '216, '290, '869, '165, and '433 patents, and the Seare '079 patent and subsequent '252 patent. *See* 2d Am. Compl. ("SAC," dkt. 86) ¶ 33.

The Court later found a waiver of OptumInsight's attorney-client privilege with respect to the conception date of the '897 patent and related issues based on OptumInsight's predecessor Symmetry's disclosure of privileged information during the reexamination of that patent, and the Federal Circuit declined to disturb that ruling on a petition for mandamus. *See* Am. Order re Mot. to Compel (dkt. 161);[7] *In re OptumInsight, Inc.*, No. 2017-116, 2017 WL 3096300 (Fed. Cir. July 20, 2017).

With discovery now closed, the parties move for summary judgment. The Court granted OptumInsight permission to file a separate motion for summary judgment based on statutes of limitations. *See* Limitations MSJ (dkt. 243-8). OptumInsight has also filed a motion for summary judgment on the merits of CCGroup's claims, and CCGroup moves for partial summary judgment on certain claims and issues. *See* Def.'s Merits MSJ (dkt. 279-3); Pl.'s MSJ (dkt. 314). Each party has also filed a motion to exclude certain opinions of its opponent's expert witnesses under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Pl.'s Mot. to Exclude (dkt. 307-13); Def.'s Mot. to Exclude (dkt. 304-6).

## IV. MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A. Legal Standard for Expert Testimony

Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R.

---

[7] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2016 WL 7475820 (N.D. Cal. Dec. 29, 2016).

Evid. 702. This Rule embodies a "relaxation of the usual requirement of firsthand knowledge," *Daubert*, 509 U.S. at 592, and requires that certain criteria be met before expert testimony is admissible. The Rule sets forth four elements, allowing such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science," and grants the court "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)). Evidence should be excluded as unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Daubert*, 509 U.S. at 591. "Where an 'expert report' amounts to written advocacy . . . akin to a supplemental brief, a motion to strike is appropriate because this evidence is not useful . . . ." *Williams v. Lockheed Martin Corp.*, No. 09CV1669 WQH (POR), 2011 WL 2200631, at *15 (S.D. Cal. June 2, 2011) (citation omitted; first ellipsis in original). Moreover, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law[;] . . . instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citations and

internal quotation marks omitted). An expert nevertheless may, in appropriate circumstances, rely on the expert's understanding of the law and refer to the law in expressing an opinion regarding professional norms. *Id.* at 1016–17.

Each party has moved to exclude the opinions of its opponent's expert witnesses. The Court addresses the various experts in turn.

## B. CCGroup's Expert Ryan Sullivan

OptumInsight moves to exclude the opinions of CCGroup's damages expert Dr. Ryan Sullivan, which OptumInsight characterize as "an abstract mathematical exercise based on [hypothetical numbers,] speculation and guesswork." *See* Def.'s Mot. to Exclude at 4–6 (citation and internal quotation marks omitted). Dr. Sullivan has a Ph.D. in economics and has testified frequently as an expert. Bjorklund Decl. re Mot. to Exclude (dkt. 305-1) Ex. 1 (Sullivan Report) ¶¶ 1–8. OptumInsight does not challenge Dr. Sullivan's credentials or relevant experience.

Dr. Sullivan concludes, based on a comparison to the performance of a number of value-added resellers who licensed OptumInsight's grouper product to build physician efficiency products, that CCGroup lost $9,635,445 in the physician efficiency market due to OptumInsight's purportedly wrongful conduct related to the patents at issue. *See id.* ¶ 201. Using as a benchmark the share of the physician efficiency market that he determines CCGroup would have obtained but for OptumInsight's conduct, Dr. Sullivan concludes that CCGroup lost another $10,173,230 in the standalone grouper market—a market in which CCGroup did not, in fact, actively compete. *See id.* ¶ 200. Dr. Sullivan also briefly concludes that CCGroup's Lanham Act damages are equivalent to its antitrust damages in the physician efficiency market. *Id.* ¶¶ 206–10.

### 1. Sullivan's Opinions on the Physician Efficiency Market

OptumInsight seeks to exclude Dr. Sullivan's opinions related to business that CCGroup purportedly lost in the market for software to evaluate physician efficiency. Such products, at least as discussed in this case, rely on episode-of-care grouper software to process input data, but provide the added functionality of comparing different physicians' efficiency. *See* Sullivan Report ¶ 152. Unlike the standalone grouper market, the market for physician efficiency software includes a number of successful competitors and is not dominated by OptumInsight, although

11

many of the products in this market license and rely on OptumInsight's grouper software. *See id.* ¶¶ 153–54.

Dr. Sullivan describes only the standalone grouper market, not the physician efficiency market, as the relevant market for CCGroup's antitrust claims, and does not include makers of physician efficiency products in his list of competitors in the market. *See* Sullivan Report ¶¶ 69–80.[8] Much of the rationale for his inference that OptumInsight's patents allowed its grouper product to outperform CCGroup's grouper product also does not extend to the physician efficiency market. As discussed further below, for example, Dr. Sullivan notes that OptumInsight dominated the grouper market and maintained abnormally high profit margins, despite market participants viewing competing products (including CCGroup's) as comparable or in some respects more capable. *See id.* ¶¶ 95, 97, 102–03. In contrast, Dr. Sullivan has not identified market concentration or artificially high profit margins in the physician efficiency market, and concedes that "OptumInsight's ability to raise prices in the physician efficiency market is relatively low." *Id.* ¶ 191. Moreover, while Dr. Sullivan notes that the physician efficiency software products at issue incorporate the grouper products that make up the standalone grouper market, suggesting that the patents at issue remain relevant, CCGroup's founder Dr. Cave apparently based his business decisions on the premise that OptumInsight was less likely to enforce its grouper patents in the physician efficiency market than in the standalone grouper market, *see id.* ¶ 106, and Dr. Sullivan has identified no evidence that participants in the two markets placed similar significance on the patents. The Court has serious concerns as to whether Dr. Sullivan had sufficient grounds to assume the CCGroup's physician efficiency product was as good as or better than competing products, such that its relatively poor performance might tend to support an inference of anticompetitive effects in the market. The Court also has concerns with respect to Dr. Sullivan's

---

[8] The Court also notes that CCGroup's counsel has shied away from implicating the physician efficiency market in past phases of this case. At a hearing on a discovery dispute, addressing whether any recovery in this case might be duplicative of CCGroup's ongoing royalties awarded (but since vacated) in *Cave I*, counsel acknowledged that a royalty rate could constitute double recovery, but asserted that "the product that was the issue in that case is a physician efficiency scoring product," while "[t]he issue in this case involves the grouping product." Apr. 27, 2017 Hearing Tr. (dkt. 193) at 7:21–23; *see also id.* at 8:8–10 ("There were grouper patents going our way, and we defeated those. That's the product and the technology at issue in this current case.").

United States District Court
Northern District of California

1  failure to show any distinct changes in CCGroup's performance correlated with the *Cave I*

2  litigation, either as a result of OptumInsight's accusations of infringement or as a result of

3  CCGroup's verdict of noninfringement.  Nonetheless, the Court does not reach those issues

4  because there are other significant flaws in Dr. Sullivan's analysis that require exclusion of his

5  opinions on market damages.

6          In the physician efficiency market, Dr. Sullivan has not shown that the assumptions he

7  uses to calculate the market share of various participants in that market are based in fact or derived

8  using reliable methods.  Such market shares are relevant to his analysis because Dr. Sullivan posits

9  that CCGroup's performance in the physician efficiency market should have been similar to that of

10  a typical value-added reseller ("VAR") of such software that entered the market around the same

11  time as CCGroup—more specifically, the four VARs that entered the physician efficiency market

12  closest in time to CCGroup.  *See id.* ¶ 157.  Dr. Sullivan does not address whether those VARs are

13  similar to CCGroup in any way other than their date of market entry, nor how his conclusions

14  would differ if he had chosen some number of VARs other than four as an average reference.  *Cf.*

15  Bero Report (dkt. 307-7) 58–60 (analysis by OptumInsight's expert witness of differences

16  between CCGroup and Dr. Sullivan's four benchmark VARs).

17          Some aspects of Dr. Sullivan's explanation of his methodology are not entirely clear, but

18  the Court understands it as follows.

19          First, Dr. Sullivan used license fees that VARs paid to OptumInsight for the use of its

20  grouper as a proxy for the VARs' share of revenue in the sub-market consisting of VARs who

21  licensed OptumInsight's grouper.  Although it is not clear whether all VARs licensed the grouper

22  on the same terms, such that their shares of license fees would track their shares of sales revenue,

23  this appears to be at least a reasonable approximation, as far is it goes.

24          Determining how much of the *overall* market the VARs controlled—as compared to

25  OptumInsight, Truven, and CCGroup's own physician efficiency products, as well as another

26  competitor by the name of Verisk—apparently proves to be more difficult.  The only precise

27  figure that Dr. Sullivan cites for those other market participants is OptumInsight's determination

28

that it controlled ▮ of the market in 2011, and apparently also in 2012.[9]  *See* Sullivan Report

¶ 167 & n.405.  Dr. Sullivan also uses ▮ as an estimate for Truven's market share in 2011

because OptumInsight determined that there was no clear "market leader" or "dominant player" in

the physician efficiency market.  *Id.* ¶ 168.  Dr. Sullivan estimates Verisk's market share to be

between CCGroup's and OptumInsight's on the basis that OptumInsight identified Verisk as

having a lower market penetration than its own product in a 2010 market analysis document, and

did not list CCGroup as a major competitor.  *Id.* ¶ 169.  Dr. Sullivan therefore uses an average of

CCGroup's and OptumInsight's market shares for Verisk.  *Id.*  To estimate CCGroup's own

market share, Dr. Sullivan uses OptumInsight's revenue and ▮ market share estimate for 2011

to estimate total market revenue for that year, *id.* attach. E-1, and uses CCGroup's 2011 revenue

from its physician efficiency product to determine its share of that total, *see id.* attach. E-9.  By

subtracting his estimate of OptumInsight, Truven, Verisk, and CCGroup's combined market share

from 100%, Dr. Sullivan estimates that the VARs (as the only other market participants) together

controlled around ▮ of the physician efficiency market in 2011, and uses that figure to

determine each VAR's share of the total market based on his previous estimates of each VAR's

share of the VAR-only submarket.  Counsel for CCGroup acknowledged at the hearing that

CCGroup made no effort to determine through discovery the *actual* sales revenue or market share

of any market participant other than OptumInsight and CCGroup.

   Dr. Sullivan assumes that all of the non-VAR market participants held the same market

share he assigned them for 2011 throughout the entire relevant period from 2003 to 2017 "because

OptumInsight's share in 2011 reasonably approximates its peak share relative to VARs," without

citing any evidence to support that premise.  *Id.* ¶ 170.  He also notes that OptumInsight's

licensing revenue from the VARs increased relative to its sales of its own physician efficiency

software after 2011, "suggesting that the collective sales share of VARs relative to OptumInsight

may have increased" and his estimates might be conservative, but does not explain why it is fair to

assume that other non-VAR competitors' market shares remained the same, especially in light of

---

[9] It is not clear from Dr. Sullivan's report how OptumInsight determined this number, the degree of OptumInsight's confidence in it, or whether it is in fact reliable.

14

the various individual VARs' market shares fluctuating significantly. *See id.* The assumption that all non-VAR market participants held the same market shares throughout the relevant period (and thus the VARs collectively held a constant market share) is particularly tenuous in light of the fact that, as discussed below, Dr. Sullivan's own analysis indicates that CCGroup's market share changed significantly—with its peak in 2014 reaching nearly twenty times its lowest value in 2003—which contradicts his assumption. *See id.* attach. E-9.[10] Nothing in Dr. Sullivan's report rules out any of the other non-VAR market participants having similar fluctuations throughout the fifteen years at issue.

Having used this method to estimate the VARs' market share, Dr. Sullivan averages the shares of four VARs that entered the market closest to when CCGroup entered the market (but excluding from the average the VAR with the highest share in each year) to establish a benchmark for how he expects CCGroup would have performed but for OptumInsight's purportedly fraudulent patents. *Id.* ¶¶ 165–66 & attach. D-9. For reasons that are not clear, Dr. Sullivan only uses this method through 2010—when the average calculated by this method peaks—and then holds CCGroup's "but-for" market share constant for each year after that, even though continuing to apply the same formula would produce lower but-for market shares and lower damages for subsequent years. *See id.* Dr. Sullivan also appears to have used or averaged data from other years to fill in gaps for years where he lacked licensing cost data to estimate VARs' market shares, specifically 2003, 2006, and 2007. *See id.* attach. D-9. For one VAR in one year—███ in 2010—Sullivan disregards the actual license fees that his source documents reflect ███ having paid to OptumInsight and instead averages ███ market share in 2009 and 2011, based on the fact that 2010 was a contract renewal year for ███ and based on Dr. Sullivan's assumption that the documents evincing licensing revenue may not have taken that renewal into account. *See* Sullivan Report attach. D-9 n.[A]–[D]. It is not clear whether CCGroup or Dr. Sullivan conducted any investigation of whether that assumption was accurate. Using the actual reported license fees

---

[10] If, as Dr. Sullivan concludes, CCGroup's market share increased in the years after 2011, then his model's use of 2011 numbers would tend to overestimate the VARs' share for those years, and would also overstate damages for those years. *See* Sullivan Report attach. E-9.

would result in a significantly lower benchmark market share for 2010—and for all subsequent years, because Dr. Sullivan held the 2010 benchmark share constant through subsequent years.

To determine damages, Dr. Sullivan compares that benchmark to CCGroup's actual market share—which requires additional assumptions, because Dr. Sullivan lacked access to direct evidence of the size of the physician efficiency market in any year except 2011. Dr. Sullivan instead divides the estimated 2011 total revenue for the physician efficiency market as a whole[11] by OptumInsight and CCGroup's total grouper licensing revenue[12] for 2011 to determine a "ratio of physician efficiency to grouper licensing revenue," *id.* attach. E-2, and then applies that ratio to OptumInsight and CCGroup's grouper licensing revenue for other years to estimate the total revenue of the physician efficiency market, *id.* attachs. E-3, E-9. Dr. Sullivan asserts that "[t]his ratio of revenues would reasonably remain relatively constant over the damages period, as the marketplaces are similar," but provides no further explanation of whether the relative sizes of two distinct but "similar" markets can be expected to remain constant over time. *Id.* ¶ 189. Having thus estimated the size of the physician efficiency market for each year, Dr. Sullivan uses CCGroup's revenue information to determine its market share, and uses the difference between this "actual" market share and the benchmark market share discussed above to calculate damages.

Some of the assumptions on which Dr. Sullivan's benchmark damages model depends—but not nearly all of them—are as follows: (1) but for OptumInsight's patents, CCGroup could be expected to perform similarly to the four VARs that entered the physician efficiency market around the same time as CCGroup but licensed OptumInsight's grouper; (2) it is reasonable to measure that performance through 2010 by averaging the VARs' market share after excluding the highest share, but for subsequent years by holding the 2010 benchmark share constant; (3) using an average of other years' license fees to determine market share for one of those VARs (███) in 2010 is more accurate than using the value listed for that year in the source document from

---

[11] As discussed above, Dr. Sullivan calculated this number based on OptumInsight's physician efficiency revenue in 2011 and its estimate of its own market share for that year.

[12] Dr. Sullivan uses "but-for" revenue in the grouper market. *See* Sullivan Report attachs. D-6, E-3. The Court assumes for the sake of argument and for the purpose of this analysis that Dr. Sullivan's determination of the size of the grouper market rests on sufficient evidence and reliable principles.

United States District Court
Northern District of California

which Dr. Sullivan calculates market shares for other VARs and other years; (4) the ratio of total

revenue for the physician efficiency market as compared to total revenue for the grouper market

can be expected to stay constant across a fifteen-year period based only on the ratio in 2011;

(5) OptumInsight's, Truven's, Verisk's, and CCGroup's (i.e., the non-VAR market participants')

total market share in 2011 accurately reflects their total market share throughout the period, even

though Dr. Sullivan also concludes that CCGroup's market share varied significantly; (6) Truven's

and Verisk's market shares can be accurately estimated based on vague qualitative statements as to

how they compared to OptumInsight; and perhaps most importantly (7) OptumInsight's estimate

of its ▮▮▮ market share in 2011 was sufficiently accurate to serve as a key factor in nearly all of

these calculations. For most of these assumptions, neither Dr. Sullivan nor CCGroup presents any

basis to conclude that they comport with reliable and accepted methods used by economists.

OptumInsight's expert Dr. Godek asserts that many of them do not. *See* Godek Report ¶¶ 55–58.

The Court concludes that CCGroup has not met its burden to show either that "the testimony is

based on sufficient facts or data," Fed. R. Evid. 702(b), or that it "is the product of reliable

principles and methods," Fed. R. Evid. 702(c).[13]

Dr. Sullivan's conclusion regarding CCGroup's damages for OptumInsight's purported

false advertising merely incorporates his analysis of antitrust damages in the physician efficiency

market. Sullivan Report ¶¶ 206–10. Because the Court excludes Dr. Sullivan's opinions

regarding damages in the physician efficiency market as speculative and untethered to reliable

methods, Dr. Sullivan's opinions regarding damages for false advertising are also excluded.

## 2. Sullivan's Opinions on the Standalone Grouper Market

OptumInsight also seeks to exclude Dr. Sullivan's opinions regarding damages in the

---

[13] Many of the assumptions in Dr. Sullivan's analysis fill gaps resulting from CCGroup's failure in discovery to develop a factual record of the nature of the market. While CCGroup is correct that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible," *see Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927), no purported wrongdoing by OptumInsight prevented CCGroup from taking discovery from other market participants regarding their actual revenue and market share for the products at issue. Regardless, "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

1    standalone grouper market.  Not all of OptumInsight's arguments attacking these opinions are

2    persuasive, and the Court declines to exclude opinions generally attributing OptumInsight's

3    dominance of the market to its patents.  The Court concludes, however, that because Dr. Sullivan's

4    model to estimate CCGroup's but-for profit in the grouper market relies on and uses as a

5    benchmark his insufficiently-supported opinions regarding the physician efficiency market, his

6    opinions regarding the measure of damages in this market must be excluded as well.

7         OptumInsight contends that Dr. Sullivan's opinions regarding this market should be

8    excluded for lack of evidence that CCGroup would have competed in the grouper market but for

9    OptumInsight's purportedly anticompetitive activity.  As discussed in more detail below in the

10   context of the merits, the Court cannot disregard at summary judgment Dr. Cave's testimony that

11   CCGroup avoided the standalone grouper market out of fear of patent enforcement.  *See* Hull

12   Decl. re Def.'s Merits MSJ (dkt. 280-4) Ex. 7 (Cave Dep.) at 95:17–98:11.  Because a jury might

13   credit that testimony, an expert's reliance on it is not a reason to exclude the expert's opinions.

14   OptumInsight, of course, remains free to argue at trial that Dr. Cave's testimony is false and that

15   the jury should reject any expert opinions that rest on it.

16        OptumInsight notes that Dr. Sullivan testified he was unaware of any customers CCGroup

17   lost or failed to gain as a result of OptumInsight's conduct, except for one customer whose

18   business with CCGroup was purportedly delayed, and whom Dr. Sullivan was unable to identify

19   by name at his deposition.  Def.'s Mot. to Exclude at 6 (citing Bjorklund Decl. re Mot. to Exclude

20   Ex. 7 (Sullivan Dep.) at 60–61).  OptumInsight also notes that Dr. Sullivan fails to account for ▮

21   ▮▮▮▮▮▮▮▮▮▮ testimony that OptumInsight's patents played no role in ▮▮▮▮▮▮▮▮▮

22   which grouper products to use or whether to develop its own.  *Id.* at 6–7 (citing ▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮).  CCGroup contends that Dr. Sullivan's opinions regarding

24   OptumInsight's market power and ability to exclude competitors are based on sound methods and

25   supported by evidence cited in Dr. Sullivan's report.  Opp'n to Def.'s Mot. to Exclude (dkts.

26   325-16, 325-17) at 2–3.

27        The scarcity of direct evidence that customers declined to purchase CCGroup's product

28   because of OptumInsight's patents may well be a weakness of CCGroup's case.  Nevertheless,

OptumInsight's motion to exclude Dr. Sullivan's opinions does not explain why the circumstantial evidence he relies on cannot support his conclusion that CCGroup would have sold more of its products but for OptumInsight's advertisement and enforcement of its patents. As Dr. Sullivan notes in his report, OptumInsight's ETG grouper product enjoyed a dominant market share despite at least some in the industry viewing it as no better than its smaller competitors, *see* Sullivan Report ¶¶ 95, 102–03, and OptumInsight advertised and sought to enforce its patents, *id.* ¶ 104. Dr. Sullivan also concludes that OptumInsight was able to maintain a greater profit margin on its grouper product than on other healthcare analytics software.[14] *Id.* ¶ 97. Dr. Cave's testimony that that CCGroup would have sold its grouper software separately from other products and focused more on that market if not for extensive litigation in that market, including OptumInsight's patent litigation, *see id.* ¶ 106 (noting that testimony), is also relevant here, as CCGroup's choice to stay out of the market provides another mechanism, distinct from customers' decisions, to explain weaker performance than CCGroup would have experienced but for OptumInsight's purportedly fraudulent patents and efforts to enforce them. Dr. Sullivan concludes from this evidence that OptumInsight's patents caused its dominant market share. *See id.* ¶¶ 130–32.

While OptumInsight is free to attack at trial any of these foundations of Dr. Sullivan's conclusion that CCGroup would have captured a greater share of the standalone grouper market but for OptumInsight wielding its patents, none of them are so lacking in evidence that CCGroup cannot present that conclusion to the jury. Along the same lines, OptumInsight may identify to the jury the lack of specific evidence that customers considered OptumInsight's patents in making decisions regarding grouper software, but in light of circumstantial evidence that OptumInsight's patents supported its market share, the lack of direct evidence is not a reason to exclude Dr. Sullivan's opinions.[15] Alternative explanations for OptumInsight's dominant performance, such

---

[14] OptumInsight's rebuttal expert Dr. Paul Godek criticizes Dr. Sullivan's reliance on accounting profit margins, which Dr. Godek contends are widely recognized by economists as not reflecting true economic costs of production and thus are not a valid basis for establishing the existence of market power. Godek Report ¶¶ 26–34. OptumInsight's motion, however, does not argue that Dr. Sullivan's use of accounting profits is a reason to exclude his testimony, and the Court declines to reach an issue not raised in the motion. *See* Defs.' Mot. to Exclude at 4–14.

[15] OptumInsight also argues that Dr. Sullivan cannot show damages to CCGroup in the grouper market because CCGroup would have benefited from the purportedly monopolistic price increase

as its purported first-mover advantage and "network effects" related to establishing a user base, are also matters best presented to the jury through cross examination and rebuttal testimony.

OptumInsight asserts that Dr. Sullivan fails to account for the effect of other OptumInsight patents in the Seare family—U.S. Patent Nos. 6,223,164 and 5,557,514—that CCGroup does not attack as fraudulently obtained, and fails to explain the lack of effect that CCGroup's own patents had in the physician efficiency market, where CCGroup has competed and sought to assert its patents but has not obtained a dominant market position. *See* Def.'s Mot. to Exclude at 12; Reply re Def.'s Mot. to Exclude at 5–6, 12. OptumInsight has identified no evidence that those Seare patents or CCGroup's physician efficiency patents have a similar scope or effect to the patents at issue, or that market participants viewed them similarly. The Court declines to exclude Dr. Sullivan's opinions for failure to address patents that, on the current record, OptumInsight has not shown to be relevant.

Dr. Sullivan's opinion regarding the amount of CCGroup's *damages* in the grouper market, however, rests on a weaker foundation. Dr. Sullivan uses his opinion of CCGroup's *but-for* market share in the physician efficiency market as a "yardstick" of how CCGroup would have performed in the grouper market but for OptumInsight's purported anticompetitive conduct. As discussed above, Dr. Sullivan and CCGroup have not shown Dr. Sullivan's opinions regarding but-for performance in the physician efficiency market to be based on sufficient evidence or sufficiently reliable methods. Dr. Sullivan therefore cannot offer opinions on damages in the grouper market based on a but-for share of the physician efficiency market that the Court has excluded.[16]

_____

that Dr. Sullivan identifies in that market. *See* Def.'s Mot. to Exclude at 9–10. Because a jury could credit Dr. Cave's testimony that CCGroup avoided this market as a result of OptumInsight's practices at issue, and because Dr. Sullivan has sufficient grounds for his conclusion that OptumInsight dominated the market due to its patents, CCGroup's and Dr. Sullivan's theory of antitrust injury is not undermined by artificially inflated prices in a market in which CCGroup was not able to compete for customers.

[16] Even if Dr. Sullivan were to estimate damages based on CCGroup's *actual* performance in the physician efficiency market, rather than a benchmark share of the market—an alternative that neither Dr. Sullivan's report nor CCGroup's briefs suggest—the analysis would still rest on the assumption that OptumInsight's estimate of its market share in a single year can be used to calculate the total value of the physician efficiency market for each year over a period of fifteen years. CCGroup has not shown that such an assumption is founded on any accepted economic

Dr. Sullivan's opinions regarding market damages are excluded. The Court does not reach OptumInsight's argument that Dr. Sullivan failed to show sufficient similarity between the two markets to conduct a yardstick analysis.[17]

## C. CCGroup's Expert Kenneth Wilson

CCGroup's expert witness Kenneth Wilson is an attorney with a background in intellectual property litigation. *See* Bjorklund Decl. re Mot. to Exclude Ex. 3 (Wilson Report) ¶¶ 1–7. Wilson concludes that the $2,475,445.08 CCGroup seeks in attorneys' fees and costs is a reasonable estimate of the amount it actually incurred defending against OptumInsight's claims in *Cave I*, and that CCGroup did not have sufficient information before 2013 "to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraudulent conduct on which CCGroup's claims are based." *Id.* ¶¶ 14–15. Because the parties have reserved the question of the amount of attorneys' fees and litigation costs awardable as damages to be determined by the Court or a special master after trial if the jury finds such damages recoverable, with the method for presenting evidence and reaching such a determination to be proposed by the parties at that time, *see* dkt. 263, the Court reserves all issues regarding Wilson's testimony as to the reasonableness of fees to be resolved after trial if necessary.

OptumInsight broadly criticizes Wilson on the grounds that he "has never served as an expert witness" and "claims no specialized expertise other than that shared with every litigator in this case" (i.e., experience as a patent litigator). Def.'s Mot. to Exclude at 15. For obvious reasons, there is no rule that only witnesses who have previously testified as experts may testify as experts. Nor is any similarity between Wilson's experience and the experience of attorneys litigating this case a reason to exclude Wilson's opinions. An experienced patent litigator is well positioned to testify regarding fees typically incurred and investigations typically conducted in the

principle or method.

[17] Among other issues related to this aspect of Dr. Sullivan's analysis, the Court has concerns about the apparent tension between, on one hand, Dr. Sullivan's premise that the competitive physician efficiency market and the standalone grouper market are sufficiently similar to support a yardstick analysis, and on the other hand, Dr. Sullivan's assumption that no other competitors besides CCGroup and OptumInsight would enter a hypothetical competitive standalone grouper market in the absence of OptumInsight's purportedly wrongful conduct.

1    course of patent litigation.  The fact that many attorneys who have entered appearances in this case

2    could similarly have been retained as expert witnesses instead of as counsel is of no consequence.

3          OptumInsight's objections to Wilson's opinions on CCGroup's investigation and

4    knowledge of its claims (offered in relation to statute of limitations issues) largely focus on

5    Wilson's discussion of case law and other legal principles.  *See* Def.'s Mot. to Exclude at 15.

6    Legal conclusions are not an appropriate subject of expert testimony.  *See, e.g.*, *Hangarter*, 373

7    F.3d at 1016; *Williams*, 2011 WL 2200631, at *15.  Nevertheless, in some circumstances "'a

8    witness may refer to the law in expressing an opinion without that reference rendering the

9    testimony inadmissible,'" and "'may properly be called upon to aid the jury in understanding the

10   facts in evidence even though reference to those facts is couched in legal terms.'"  *Hangarter*, 373

11   F.3d at 1016 (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)).  In permitting such

12   testimony regarding "insurance industry norms" in *Hangarter*, the Ninth Circuit noted that none of

13   the statutes referenced by the expert witness "were directly at issue in the case."  *Id.*

14         "CCGroup agrees that <u>no</u> expert in this case should opine on the applicable law," Opp'n to

15   Def.'s Mot. to Exclude at 19, but argues that Wilson's opinions regarding what a reasonable

16   person in CCGroup's position would have known or investigated are proper subjects of expert

17   testimony.  *See id.* at 17–19.  The Court largely agrees.  Wilson may not testify regarding

18   applicable law.  Portions of Wilson's report are inartfully phrased in the context of a legal duty or

19   similar legal conclusions, and Wilson may not use that framework in trial testimony.  He may,

20   however, testify to the factual opinions necessarily implied by such legal conclusions.  For

21   example, rather than testify that "the mere existence of a pleading or other document in a paper

22   court file regarding litigation between two unrelated parties . . . would not *trigger a duty* to

23   investigate any information that might be disclosed in such documents," Wilson Report ¶ 81

24   (emphasis added), Wilson may testify—assuming that he believes it to be true—that a person

25   familiar with patent litigation would not typically have been prompted to obtain copies of such

26   documents under the circumstances he describes.  Moreover, for the reasons discussed below in

27   the context of CCGroup's challenge to the opinions of OptumInsight's expert Michael Dergosits,

28   while Wilson may discuss the normal procedures of investigating potential claims or patent

1    validity issues, including what facts might or might not serve as red flags to a patent attorney, he

2    may not use the framework of "reasonableness" in presenting such testimony.  *See, e.g.*, *M.H. v.*

3    *Cty. of Alameda*, No. 11-cv-02868-JST, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015).

4         The only argument in OptumInsight's motion related to Wilson's factual opinions reads as

5    follows:

> The facts that Mr. Wilson asserts that he investigated fare no better.
> For example, Mr. Wilson's report states that Plaintiff would not have
> had notice of its antitrust claims upon receiving the *Cave I* complaint
> before the bar date in part because it had no reason to review the
> patents' reexamination file. The attorney billing records Mr. Wilson
> attaches as Exhibit 3 to support his damages opinion, however,
> indicate that CCGroup counsel *in fact did* review the reexamination
> file history before the bar date. *Compare* Ex. 3 ¶¶89–92, *with* Ex. 13
> (attached to Wilson Rpt.) at 5 (February 2011 timesheets including
> Mr. Harlan's 2/16/2011 entry for "review re-examination materials;
> attention to emails from and to B. Hayden and M. Hartley regarding
> reexamination issues" and Mr. Hartley's 2/17/2011 time entry for
> "[r]eviewing file histories of Ingenix patents"). Mr. Wilson further
> rebutted his own report by testifying that "one of the things that you
> do when you first get a patent infringement lawsuit is you take a look
> at the file history." Ex. 12 (Wilson Tr.) at 175. He specifically
> conceded that "if there was a re-exam, you would look at the re-exam
> file history also. That's what a lawyer would do." *Id.* at 176.

16   Def.'s Mot. to Exclude at 16.  OptumInsight provides no citation for Wilson opining that

17   CCGroup "had no reason to review the patents' reexamination file,"[18] *see id.*, and as CCGroup

18   notes in its opposition brief, *see* Opp'n to Def.'s Mot. to Exclude at 19 n.8, such an opinion does

19   not appear in his report.  OptumInsight's reply brief does not explain the reference to an opinion

20   regarding the reexamination file in its motion, instead asserting that its "objection is directed to *all*

21   Wilson testimony about Dr. Cave's and Plaintiff's actual knowledge."  Reply re Def.'s Mot. to

22   Exclude at 8–9.  No such objection appears in OptumInsight's motion, and OptumInsight's reply

23   cites no specific factual opinions from Wilson's report as improper.  To the extent that

24   OptumInsight now purports to object—without specifics—to all of Wilson's factual conclusions,

25   that objection is overruled.

26

27

28   ───────────────────
     [18] Paragraphs 89 through 92, the only portion of Wilson's report cited in OptumInsight's argument
     regarding factual opinions, include no reference to the reexamination proceeding.

... 

**D.      CCGroup's Expert Bryan Bergeron**

CCGroup's technical expert Dr. Bryan Bergeron has a medical doctorate and decades of experience developing medical hardware and software.  *See* Bjorklund Decl. re Mot. to Exclude Ex. 5 (Bergeron Report) ¶¶ 1–20.  Dr. Bergeron opines: (1) that "all of the claims of the Dang and Seare families share an immediate and necessary relationship to one another" such that they "are patentably indistinct from one another," *id.* ¶¶ 29–33 (under the heading "Infectious Unenforceability"); (2) that OptumInsight's claim construction positions in *Cave I* contradicted Dang and Rosenbaum's statements to the PTO during the '897 patent reexamination and someone skilled in the art would recognize that contradiction, *id.* ¶¶ 34–44; (3) that Symmetry's 1994 response to Aetna's RFP teaches or renders obvious the first claim of every patent at issue, *id.* ¶¶ 45–309; and (4) that Dang conceived of "shifting" as described in the '897 patent at least as early as June 12, 1994, the date of the RFP response, *id.* ¶¶ 310–30.

OptumInsight seeks to exclude Dr. Bergeron's "opinion that infectious unenforceability applies" on the basis that "his unfounded and conclusory assumption that all eleven Dang and Seare patents are the same invention renders his opinion inadmissible."  Def.'s Mot. to Exclude at 21.  As a starting point, contrary to OptumInsight's motion, Dr. Bergeron's report does not include an "opinion that infectious unenforceability applies."  *Cf. id.*  Regardless of whether such an opinion would intrude on the role of the Court or the jury, Dr. Bergeron lacks the legal expertise to render such an opinion, and does not do so.  Although his report includes a statement of what Dr. Bergeron believes to be the legal standard for infectious unenforceability, Bergeron Report ¶ 28(d), and groups several paragraphs under the heading "Infectious Unenforceability," *id.* ¶¶ 29–33, in the absence of any explicit opinion that the doctrine applies, the Court understands these references as merely providing context for the Court and counsel as to which opinions may be relevant to that issue.  Dr. Bergeron may not testify at trial to the legal standard for infectious unenforceability, or present an opinion that the doctrine applies.

As for opinions regarding the similarity of patents and claims, OptumInsight is correct that Dr. Bergeron does not identify any reliable principles by which he determined that, for all of the patents at issue, "each claim is directed to the same invention."  *See id.* ¶ 30.  Dr. Bergeron's

detailed review of the first claim of each patent—which OptumInsight's motion largely ignores—does not assert or explain why each and every one of those claims is directed to the same invention, much less that other claims not discussed in his report are so directed, and Dr. Bergeron may not offer that particular opinion. Dr. Bergeron may, however, testify as to the *similarity* of all the claims actually addressed in paragraphs 45 through 309 of his report. Dr. Bergeron may offer an opinion that particular claims are functionally identical only for claims where his detailed review includes and explains such an opinion. *See, e.g.*, *id.* ¶ 300 ("The '079 patent has one claim which is identical to claim 1 of the '897 patent.").

OptumInsight also objects to Dr. Bergeron offering an opinion on the first claim of the '897 patent, arguing that that claim was canceled as a result of the interference proceeding the same year that CCGroup commenced operations and is therefore irrelevant. Def.'s Mot. to Exclude at 22. Dr. Bergeron's analysis of that claim remains relevant for at least two reasons. First, inequitable conduct related to that claim would necessarily render unenforceable all claims of the '897 patent, and could affect the enforceability of related patents at issue through the doctrine of infectious unenforceability. *See Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006); *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374–75 (Fed. Cir. 2005) ("[A] finding of inequitable conduct in the acquisition of even a single claim of a patent renders the remaining claims of that patent unenforceable . . . ."). Second, as Dr. Bergeron notes, the Seare '079 patent consists of a verbatim recitation of the first claim of the '897 patent, Bergeron Report ¶ 300, and Dr. Bergeron's analysis of the latter therefore can be applied to the former, as well as providing potentially useful background to aspects of other patents and claims that Dr. Bergeron compares to the '897 patent. *See, e.g.*, *id.* ¶ 283 ("As discussed above with respect to claim 1 of the '897 patent, it is my opinion that the Aetna RFP Response teaches [a similar limitation recited in the '165 patent].").

OptumInsight seeks to exclude Dr. Bergeron's opinions regarding claim construction in *Cave I* on the basis that CCGroup is bound by Judge Davila's determinations in that case. Def.'s Mot. to Exclude at 22–23. OptumInsight does not identify any opinions by Dr. Bergeron that conflict with Judge Davila's claim construction rulings. *See id.* CCGroup is not barred from

25

offering Dr. Bergeron's opinion that Dang and Rosenbaum's positions during the reexamination conflicted with positions that OptumInsight took in *Cave I*. *See* Bergeron Report ¶¶ 34–44. Such opinions are not equivalent to stating that any position OptumInsight took in *Cave I* was incorrect. Accordingly, even assuming for the sake of argument that Judge Davila's claim construction rulings are preclusive as to this case, OptumInsight has identified no opinions that must be excluded on that basis.

OptumInsight also contends that Dr. Bergeron's testimony should be excluded because OptumInsight disagrees with his opinion that various limitations including phrases such as "computer-implemented" or "computer program" were satisfied by Dang's product at the time of the RFP response, which, according to Dang's testimony, required skilled intervention of programmer Daniel Gardiner to yield useful results. *See* Def.'s Mot. to Exclude at 23–25. Judge Davila did not construe any such terms in *Cave I*, no party sought construction of any claim in this action, and OptumInsight does not cite any other source that might provide a definitive construction of the terms such that Bergeron's testimony on the subject would be impermissible. OptumInsight essentially asks the Court to construe the terms "computer-implemented," "computer program," and the like for the first time on OptumInsight's *Daubert* motion. The Court declines to do so, and DENIES the motion to exclude testimony based on OptumInsight's disagreement with Dr. Bergeron's definitions of the phrases at issue.

Regardless, as CCGroup notes in its opposition brief, Dr. Bergeron's report expresses opinions comparing several patent claims to the Aetna RFP response, not to the product that Dang and Gardiner had developed at that time. *See* Opp'n to Def.'s Mot. to Exclude at 27–28; Bergeron Report ¶¶ 45–309. OptumInsight has not explained why Dr. Bergeron's views on whether the claims encompass software that requires manual intervention undermine opinions regarding their relationship to the RFP response.

### E. CCGroup's Expert Stephen Kunin

CCGroup's expert Stephen Kunin is an attorney with extensive experience in the "practice and procedures of the [PTO]," including having served as the Deputy Commissioner for Patent Examination Policy, among other roles at the PTO. Bjorklund Decl. re Mot. to Exclude Ex. 6

26

(Kunin Report) ¶¶ 1–16.

A great deal of Kunin's report merely summarizes other factual evidence. As but one example, selected at random:

> Further, Mr. Rosenbaum was litigation counsel for Symmetry during the period in late summer 1999 when counsel for and Symmetry principals, including Mr. Dang and Portnoy, had a number of discussions regarding the Aetna RFP Response and the potential on-sale bar. In one such discussion, Mr. Erickson's notes indicate that Mr. Kelly and Mr. Rosenbaum "agree that on-sale [questions] are outside the scope" of a reexam, and Rosenbaum said that they "may have to disclose." Erickson Tr. at 92–95. In another discussion, counsel—including Rosenbaum—discussed the Aetna RFP Response and data sent to Aetna in May 1994. Erickson Tr. 107–110.

Kunin Report ¶ 204 (alteration in original). Other portions of the report state conclusions or draw inferences that usurp the role of the jury or the Court. *See, e.g.*, *id.* ¶ 213 ("[I]f the fact finder were to conclude that inequitable conduct was committed separately with respect to the '511 Patent it would also render the '560 Patent unenforceable under the doctrine of infectious unenforceability."); *id.* ¶ 218 ("Messrs. Rosenbaum and Dang were aware of the materiality of the Aetna RFP Response because both were involved in the reexamination of the '897 patent, and [other factors that led Kunin to draw that inference.]"); *id.* ¶ 286 ("Mr. McMahon violated his duty of candor and good faith in the Dang/Seare interference by withholding [particular categories of] evidence . . . . Mr. McMahon knew of the materiality of the information."). Kunin also includes a lengthy section reciting applicable legal standards based on case law. *Id.* ¶¶ 93–109. None of these categories of material in Kunin's report are proper subjects for expert opinion testimony based on Kunin's expertise in PTO practices and procedures.

It is difficult to tell exactly what testimony CCGroup intends to offer from Kunin because CCGroup's opposition brief does not address any particular opinions that it believes are admissible. Instead, CCGroup summarizes in broad strokes as follows:

> First, Mr. Kunin will explain the practices and procedures of the Patent Office, including the duty of candor owed by individuals seeking patent protection. Second, Mr. Kunin will address facts relating to events occurring during the prosecution of the Dang and Seare patents at issue in this case. Finally, Mr. Kunin will offer his opinion—based on certain assumptions in some instances—as to

> whether the individuals involved with the Dang and Seare patents followed the Patent Office policies and procedures.

Opp'n to Def.'s Mot. to Exclude at 29.

The first category is permissible, and "OptumInsight does not object to Mr. Kunin testifying about generic PTO practices and procedures, to the extent those issues cannot be covered in jury instructions or the Judicial Center's model video on PTO procedures." Reply re Def.'s Mot. to Exclude at 12–13.

The second category, which appears to contemplate Kunin merely summarizing the facts of the case, largely would not consist of expert opinion. CCGroup may, if it determines that Kunin is the best witness to offer such testimony, use Kunin's testimony at trial to introduce and explain the procedural significance of documents filed with the PTO whose authenticity either is not or cannot reasonably be disputed. Kunin may not, however, present facts not in evidence, nor may he summarize testimony from, or evidence introduced through, other witnesses such that his testimony resembles an additional opportunity for the sort of narrative summary normally reserved for closing argument. The parties agree that "'expert witnesses may not simply summarize evidence.'" *See* Opp'n to Pl.'s Mot. to Exclude (dkt. 322-6) at 1 (quoting Pl.'s Mot. to Exclude at 2) (capitalization altered).

Kunin's proposed testimony regarding "whether the individuals involved with the Dang and Seare patents followed the Patent Office policies and procedures" presents a closer call. In offering such opinions, Kunin relies on CCGroup's version of a number of underlying facts, including the technical nature of inventions at issue and the state of mind of various individuals.

Experts may, of course, present opinions based on assumptions, with the burden falling "to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." *Williams v. Illinois*, 567 U.S. 50, 57 (2012) (plurality opinion). OptumInsight's objections to particular assumptions—for example, that the 1993 conception date Symmetry asserted for "ETG software" in litigation with Ingenix describes the same invention as the '897 patent, *see* Def.'s Mot to Exclude at 30–31; Opp'n to Def.'s Mot. to Exclude at 34–35—are, at their core, disputes regarding the appropriate interpretation of fact evidence that the jury is capable of resolving.

28

"While it was once the practice for an expert who based an opinion on assumed facts to testify in the form of an answer to a hypothetical question, modern practice does not demand this formality and, *in appropriate cases*, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts." *Williams*, 567 U.S. at 57 (emphasis added). The sheer volume of assumptions on which Kunin's opinions rest, however, which is far greater than for any of CCGroup's other experts addressed above, poses a challenge for presenting his testimony in a manner that "will help the trier of fact to understand the evidence or determine a fact in issue." *See* Fed. R. Evid. 702. Much if not most of Kunin's 87-page, 292-paragraph report consists of the factual background on which his opinions rest, and the jury might or might not agree with his understanding of those facts—both as to technical issues for which Kunin assumes Dr. Bergeron's analysis is correct, and as to inferences to be drawn regarding various individuals' knowledge and intent. Under these circumstances, allowing Kunin to state his conclusions as to whether individuals properly followed PTO procedure, leaving for OptumInsight the task of unpacking on cross examination the myriad assumptions on which those conclusions rest, and asking the jury to compare those assumptions and their implications to its own understanding of the facts may only invite confusion. The Court reserves issues of the *manner* in which experts may present their opinions for resolution at the pretrial conference, but one solution may be to require counsel to frame questions to Kunin (and perhaps certain other experts) as hypotheticals, with counsel stating as part of the question all assumptions on which the answer is to rest, in order to clarify to the jury that Kunin's assumptions—including interpretations of factual issues outside the scope of the his expertise—are not evidence.

OptumInsight also objects to Kunin's opinions regarding the standard for a party's duty of candor to the PTO, arguing that such opinions are irrelevant because that standard is lower than what the Federal Circuit requires to show inequitable conduct. Def.'s Mot. to Exclude at 31–33. As discussed in more detail below, the inequitable conduct standard—on which the jury will be instructed—involves questions of whether a misrepresentation was but-for material to patentability, whether the party in question intended to mislead the PTO, and whether a party engaged in egregious affirmative misconduct or a pattern of deceit. *See Intellect Wireless, Inc. v.*

1    *HTC Corp.*, 732 F.3d 1339, 1345 (Fed. Cir. 2013); *Therasense, Inc. v. Becton, Dickinson and*

2    *Co.,* 649 F.3d 1276, 1287, 1291–92 (Fed. Cir. 2011) (en banc).  While the PTO's duty of candor is

3    not equivalent to the inequitable conduct standard, whether a party has complied with that duty

4    may nevertheless be a factor relevant to the jury's consideration of whether the party intended to

5    deceive the PTO, whether conduct was egregious, and whether it was part of a pattern of deceit.

6    The Court therefore declines to exclude Kunin's opinions regarding the duty of candor.

7    ### F.    OptumInsight's Expert John Doll

8        OptumInsight's expert witness John Doll previously served as the Commissioner for

9    Patents, among other relevant experience, and his opinions are offered to explain PTO policies and

10   practices, the prosecution history of and relationship among patents at issue in this case, and the

11   duty of candor owed to the PTO.  Howenstine Decl. re Pl.'s Mot. to Exclude Ex. 1 (Doll Rebuttal

12   Report) ¶¶ 1–24, 27.

13       Much like Kunin, Doll's report includes an extensive factual narrative that incorporates

14   inferences Doll draws regarding parties' knowledge and intentions.  "The parties agree that

15   '[c]ourts routinely exclude as impermissible expert testimony as to intent, motive, or state of

16   mind.'"  Opp'n to Pl.'s Mot. to Exclude at 13 (quoting Pl.'s Mot. to Exclude at 9) (alteration in

17   original).  OptumInsight nevertheless identifies the following assertions, among others, as

18   testimony that it believes is permissible: (1) "Symmetry's lawyers' notes suggest a lack of

19   knowledge," Doll Rebuttal Report ¶ 94; (2) "emails . . . show that Symmetry was focused on

20   honesty," *id.* ¶ 120; (3) "Symmetry lawyers were confused by what was required," *id.* ¶ 126;

21   (4) "Symmetry later realized that it had made an error," *id.* ¶ 138.  *See* Opp'n to Pl.'s Mot. to

22   Exclude at 11–12.[19]  OptumInsight argues that such testimony is appropriate because Doll should

23   be permitted to offer testimony "as to reasonable explanations for the actions at issue."  Opp'n to

24   Pl.'s Mot. to Exclude at 13.  Doll's expertise in PTO procedures does not qualify him to speculate

25   

26   [19] It is difficult to understand how or why OptumInsight contends, for example, that the assertion
     that "Symmetry lawyers were confused" is "not an opinion on states of mind."  *See* Opp'n to Pl.'s
27   Mot. to Exclude at 12.  This is but one example of both parties overextending their positions to the
     point of absurdity.  Such arguments only serve to further complicate a case that would be
28   exceedingly complex even if the parties had been able to work in good faith to narrow the issues in
     dispute.

*why* parties appearing before the PTO took—or might have taken—certain actions, and he may not

present such testimony.  Doll may explain PTO procedures and expectations to the jury, including

whether particular conduct comports with those procedures, and the jury may use that information

to reach its own conclusions regarding the actions of the parties, including what explanations for

such actions might be reasonable.

Doll also offers opinions as to whether certain materials meet a standard of but-for

materiality with respect to patent applications at issue.  As CCGroup notes in its motion, the

Federal Circuit has held that an expert on patent law and PTO procedures "is not qualified to

testify as an expert witness on the issues of infringement or validity" unless the witness also has

"relevant expertise in the pertinent art," *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d

1356, 1361 (Fed. Cir. 2008), which there is no dispute that Doll lacks.  *See* Opp'n to Pl.'s Mot. to

Exclude at 11 ("Mr. Doll, like Mr. Kunin, lacks technical expertise.").  OptumInsight does not

address this precedent or explain why the but-for materiality standard for inequitable conduct is

less demanding of technical understanding than issues like infringement and validity.

OptumInsight also does not address the district court cases cited by CCGroup that have excluded

expert opinion on but-for materiality because even an expert with experience as a patent examiner

"cannot know what the examiner [who considered a particular patent at issue] believed or would

have done."  *Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 904 (D. Minn.

2010) (citing other district court decisions that have held the same).  The Court finds that

reasoning persuasive.  To the extent disclosed by his report, Doll may testify regarding the sort of

information that patent examiners consider and what a patent examiner might look for in

determining whether to reach a particular outcome, but opinions regarding whether particular

information was but-for material to any decision regarding the patents at issue in this case are

excluded as speculative and as usurping the role of the jury.

In general, Doll's testimony is cabined in the same way as Kunin's.  Doll may not present

inferences regarding intent or motivation, nor may he summarize other evidence regarding the

factual history of the case.  OptumInsight may use Doll's testimony to introduce and explain

documents filed with the PTO if it so chooses.  Doll may discuss PTO practices and procedures,

31

including the duty of candor.  As with Kunin, the Court may require OptumInsight's counsel to pose questions to Doll as hypothetical scenarios if they would rest on a large volume of assumptions or interpretations of fact outside of his expertise.

### G.     OptumInsight's Expert Michael Dergosits

OptumInsight offers an expert report from Michael Dergosits, an attorney with extensive experience in intellectual property litigation and patent prosecution.  *See* Howenstine Decl. re Pl.'s Mot. to Exclude Ex. 4 (Dergosits Report) ¶¶ 1–2.

#### 1.    Limitations of "Rebuttal" Experts

The parties dispute whether, as a "rebuttal" expert, Dergosits may opine on issues that CCGroup's experts did not address.  *See* Pl.'s Mot. to Exclude at 18–19; Opp'n to Pl.'s Mot. to Exclude at 2–3; Reply re Pl.'s Mot to Exclude at 7 n.5.  The Court's case management order provided one date for "[a]ll expert disclosures . . . by the party that bears [the] burden of proof on a claim or defense," and a second, later date for "[e]xpert rebuttal disclosures."  Superseding Case Mgmt. & Pretrial Order (dkt. 206) § II(C).  CCGroup does not dispute that Dergosits's opinions are offered in relation to claims on which CCGroup bears the burden of proof.  Courts that have entered similar case management orders "defin[ing] the rounds of expert disclosure based on which side had the burden of proof on an issue" have held that "a witness does not have to 'rebut' another side's specific expert witness to be considered a "rebuttal witness.'"  *Hynix Semiconductor v. Rambus*, Nos. CV-00-20905 RMW et al., 2008 U.S. Dist. LEXIS 12195, at *17 (N.D. Cal. Feb. 3, 2008); *see also FLOE Int'l Inc. v. Newmans' Mfg.*, No. 04-5120 (DWF/RLE), 2006 U.S. Dist. LEXIS 97170, at *19 (D. Minn. Feb. 23, 2006) ("When the expert report disclosure deadlines are staggered, such that the party bearing the burden of proof is afforded the opportunity to provide an initial expert report, the party which does not bear the burden of proof can still submit an expert report in 'rebuttal,' even in the absence of an initial report produced by the party which bears the burden of proof, so long as it is within the established time frame set by the Scheduling Order.").  The case management order did not grant CCGroup the power to unilaterally determine the scope of expert testimony in the case, nor is CCGroup entitled to provide a sur-rebuttal to Dergosits's report long after discovery has closed.  CCGroup had the opportunity to present expert testimony

on any topics it considered relevant in its opening expert reports. CCGroup's decision not to present expert opinions on certain topics is not in itself a reason to exclude Dergosits's opinions.

On the other hand, a portion of Dergosits's report simply discusses CCGroup's failure to offer expert testimony on certain topics. Dergosits Report ¶¶ 92–93. Dergosits's expertise is not relevant to such observations. OptumInsight's trial attorneys are capable of identifying any topics not addressed by expert testimony, either by cross examining CCGroup's experts on their failure to reach conclusions as to certain topics, or by identifying in closing argument topics on which evidence was not offered. Dergosits may not testify on this subject.[20]

### 2. Opinions Regarding "Objective Reasonableness"

The parties dispute the extent to which Dergosits may testify regarding the "objective reasonableness" of OptumInsight's claims against CCGroup in *Cave I*. CCGroup relies on a number of decisions from outside the Ninth Circuit excluding such opinions where, as here, "[t]he proposed experts are attorneys who are evaluating the merits of a legal argument by applying the facts to the law, which invades the jury's role." *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, Nos. 2:06-cv-1797 et al., 2015 WL 6750899, at *18 (E.D. Pa. Nov. 5, 2015); *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) (holding testimony "that in light of the apparent routine industry practice it was reasonable for [a party] to have believed that it was entitled to [a securities law] exemption . . . inadmissible because it concerns [the party's] legal duties"); *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:11-CV-492-RWS-KNM, 2017 WL 4173468, at *7 (E.D. Tex. Sept. 21, 2017) (excluding an opinion on reasonableness that "applies an underlying legal standard (that of materiality), and thus usurps the role of the factfinder"); *P.R. Tel. Co., Inc. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 248, 321 (D.P.R. 2016) ("The Court declines to admit the testimony of any experts regarding questions of law and objective reasonableness."); *In re Wellbutrin SR Antitrust Litig.*, Nos. 04-5525 et al., 2010 WL

---

[20] This ruling is not intended to bar any expert from asserting flaws in another expert's reasoning based on the latter expert's failure to consider information or conduct analysis that the former expert believes is relevant to the latter expert's conclusion. Such testimony is permissible. What witnesses may not do is simply list topics on which the opposing party declined to offer expert opinions.

8425189, at *6 (E.D. Pa. Mar. 31, 2010) (excluding opinions as to "whether [a party] had an objectively reasonable basis to file its 798 patent infringement suits"); *VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 427 n.4 (W.D. Pa. 1998) (holding that "lack of objective baselessness is not the sort of issue that lends itself to expert testimony").

Faced with these adverse decisions, OptumInsight provides only one case citation, to a footnote from an Eastern District of Pennsylvania case holding that expert testimony would "be helpful to the jury in assessing whether a reasonable petitioner would realistically expect that [Defendant] GSK's citizen petitions would succeed on their merits." *In re Flonase Antitrust Litig.*, 884 F. Supp. 2d 184, 193 (E.D. Pa. 2012); *see* Opp'n to Pl.'s Mot. to Exclude at 14. But as CCGroup notes in its reply, the *Flonase* court addressed testimony "on the information that was available to GSK regarding FDA practice and policy for approving ANDAs without final guidance documents" and "the state of knowledge in the pharmaceutical industry." *Flonase*, 884 F. Supp. 2d at 192–93. While the court held that such testimony might *help* a jury in assessing reasonableness, it did not address testimony explicitly *asserting* that conduct was or was not reasonable, and excluded as "impermissible" testimony that went "beyond opining on the information and knowledge available" and instead addressed GSK's state of mind. *Id.* The *Flonase* decision provides no support for OptumInsight's position.

While neither party cites any decision from within the Ninth Circuit squarely addressing opinions regarding reasonableness, decisions from this district have reached conclusions consistent with the out-of-circuit authority addressed above. In a 2018 decision, Judge Gilliam held that a patent attorney expert could not testify to the "objective baselessness" of prior lawsuits, primarily because the reasons for the purported baselessness rested on technical issues outside of the attorney's expertise. *Ojmar US, LLC v. Sec. People, Inc.*, No. 16-cv-04948-HSG, 2018 WL 3008872, at *2 (N.D. Cal. June 15, 2018). Judge Tigar addressed similar issues more generally in a case under 42 U.S.C. § 1983 concerning the death of a pretrial detainee who was receiving medical care while in custody—a very different fact pattern and legal framework, but one that, like here, required a jury to determine whether certain conduct was reasonable:

34

Despite the fact that Rule 704 generally permits expert testimony embracing an ultimate issue, courts preclude expert testimony as to what is "[r]easonable, in the context of whether excessive force was employed . . . ." 5 Handbook of Fed. Evid. § 704:1, n.14 (7th ed. 2014) (citing *Thompson v. City of Chi.*, 472 F.3d 444, 458 (7th Cir. 2006) (internal citations omitted), *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 688–89 (E.D. Mich. 2011), *Torres v. Cnty. of Oakland, et al.*, 758 F.2d 147, 151 (6th Cir. 1985), *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983), *cert. denied*, 464 U.S. 895 (1983), *Davis v. Duran*, 277 F.R.D. 362, 373 (N.D. Ill. 2011), among other cases); *see also Calloway v. Contra Costa Cnty. Jail Correctional Officers*, No. C 01–2689 SBA, 2007 WL 134581, at *24 (N.D. Cal. Jan. 16, 2007) (precluding expert testimony as to whether authorities provided an inmate "reasonable accommodations" for his disability because the opinion was as to an ultimate issue in the case—i.e., deliberate indifference—"and thus invade[d] the province of the jury."); *Berra v. Lyons*, No. 12-CV-0226-TOR, 2014 WL 585008, at *13–14 (E.D. Wash. Feb. 14, 2014) (holding, in an excessive force case, that expert could not opine as to what was "objectively reasonable," as doing so would be opining as to an ultimate legal conclusion and thereby invading the province of the jury). Thus, Defendants are correct that expert testimony using the legally significant terms "deliberate indifference" and "objective reasonableness" should be excluded. *See Gonzalez*, 2006 WL 5112757, at *2 (citations omitted).

But the cases also consistently hold that while an expert cannot testify as to "deliberate indifference" or "objective reasonableness" using those specific terms, as Plaintiffs contend, they may opine as to the appropriate standards of healthcare in a correctional facility, or generally accepted law enforcement standards, custom, or practice. *Davis*, 927 F.2d at 1484–85, *superseded by statute on other grounds*; *Glenn*, 673 F.3d at 877 (citing *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc)); *Borgerding v. California*, 370 Fed. Appx. 797, 798 (9th Cir. 2010); *Berra*, 2014 WL 585008, at *14; *Mark H. v. Hamamoto*, No. 00-00282 LEK–RLP, 2012 WL 3444138, at *3 (D. Haw. Aug. 14, 2012). Thus, experts on both sides may testify as to appropriate standards of care—which go to the ultimate issues of "deliberate indifference" and what conduct is "objectively reasonable"—so long as they do not use those "judicially defined" and "legally specialized" terms.

*M.H. v. Cty. of Alameda*, No. 11-cv-02868-JST, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015).

OptumInsight argues that Dergosits's opinions on reasonableness are necessary because "[t]he extreme complexities of this case are readily apparent" and "[t]rial would severely test the capacities of any jury." Opp'n to Pl.'s Mot. to Exclude at 14. That may be so, but the fact that the jury's task will be difficult does not justify reassigning that task to OptumInsight's expert witness. Taking into account the authority above, Dergosits—like CCGroup's expert Wilson—may offer testimony regarding typical steps a patent attorney might take to investigate and assess a potential claim, but may not testify as to whether any conduct in this case was or was not "objectively

reasonable."

### 3. Opinions Regarding State of Mind

As discussed above in the context of Doll's opinions, experts may not offer testimony as to parties' or individuals' state of mind. Much like with Doll's testimony, OptumInsight inexplicably asserts that statements by Dergosits plainly describing state of mind do not, in fact, describe state of mind. *See* Opp'n to Pl.'s Mot. to Exclude at 15–17. Many of Dergosits's opinions—for example, that certain notes "demonstrate that Symmetry was focused on accuracy," Dergosits Report ¶ 51, that "it is not a reasonable inference to impute to Mr. Lancaster knowledge of [certain] facts and arguments," *id.* ¶ 113, that "[a]pparently, Symmetry and its litigation counsel came to appreciate" certain facts, *id.* ¶ 41, and that "it would be illogical to infer or conclude that Symmetry would intentionally set out to deceive the USPTO," *id.* ¶ 49—impermissibly usurp the jury's role of inferring state of mind from conduct, documents, and other fact evidence, and are therefore excluded. Dergosits may testify to the types of investigations typically conducted by counsel bringing patent claims, the typical role of local counsel, and the like, but may not testify to any individual or entity's state of mind.

### 4. Opinions Regarding Strategic Considerations

CCGroup seeks to exclude a portion of Dergosits's report addressing "strategic considerations in patent litigation" and contrasting positions that CCGroup has taken in this litigation with its positions in a separate case between CCGroup and Truven. Pl.'s Mot. to Exclude at 18; Dergosits Report ¶¶ 92–103. OptumInsight does not address this argument in its opposition brief. With no explanation of how legal positions that CCGroup took in a different case would be relevant here, the Court excludes all of Dergosits's opinions that discuss the Truven litigation. With that exception, however, the jury's task here might be informed by Dergosits's opinions as to how patent attorneys evaluate potential causes of action and choose which patents or particular claims to assert—an area in which CCGroup does challenge Dergosits's expertise. So long as Dergosits does not suggest that a claim might legitimately be brought or pursued for reasons inconsistent with Rule 11 of the Federal Rules of Civil Procedure, he may offer opinions on how patent attorneys decide which claims to assert.

**H.     OptumInsight's Expert Michael van Duren**

CCGroup objects to the report of OptumInsight's technical expert Dr. Michael van Duren, MD, MBA in four respects.  According to CCGroup, Dr. van Duren improperly presents a narrative of fact evidence, opines on state of mind, seeks to buttress the credibility of fact witnesses, and applies an incorrect claim construction standard.

### 1.     Summaries of Fact Evidence and Opinions on State of Mind

The first two objections are straightforward, especially in light of the Court's analysis above with respect to other witnesses.  While it is possible that Dr. van Duren may have intended his factual summaries merely as context to organize his written report, he may not present such testimony at trial.  As noted above, the parties agree that "'expert witnesses may not simply summarize evidence.'"  *See* Opp'n to Pl.'s Mot. to Exclude at 1 (quoting Pl.'s Mot. to Exclude at 2) (capitalization altered).  Based on his extensive experience with medical software development, Dr. van Duren's testimony on the typical process for developing such software may be helpful to the jury, particularly to the extent that Dr. van Duren speaks to how the industry operated in the early 1990s when Dang was developing his grouper product.  Dr. van Duren may answer questions, for example, as to whether a particular timeline of development was typical, or what certain jargon meant to someone working in the field.  Dr. van Duren may not simply recite the steps that Dang took, or otherwise summarize factual evidence.

A paragraph of Dr. van Duren's report discussing the concept of "vaporware" is illustrative:

> As discussed above, in the software business sellers often claim to have a working version of software before they really do, and that is the origination of the term "vaporware." I further understand that Doug Cave testified that his marketing information included false statements that his product performed functions that it did not. [Citation.] I further understand that Cave sold a product to Humana before writing even a single line of code. [Citation.] In this regard, Dr. Bergeron testified that there is a difference between a piece that was "future ware" or a "marketing" piece that "tends to exaggerate certain areas and perhaps define capabilities that aren't there yet in order to investigate the market," on the one hand, and a "patent or recipe for how this is done" or a piece that has been "through a peer review process, even through a publisher," on the other hand. [Citation.] The language at ¶¶ 145–54 of Bergeron Dep. Ex. 3 seems particularly relevant here.

United States District Court
Northern District of California

Van Duren Report ¶ 154. Of this paragraph, only the first sentence is admissible expert testimony that would serve to share Dr. van Duren's specialized expertise with the jury. The remainder is simply a summary of other evidence that can be presented to the jury by examination of the appropriate fact witnesses (or in the case of Dr. van Duren's summary of Dr. Bergeron's opinions, by examination of Dr. Bergeron himself). This paragraph is merely one relatively typical example of factual summaries in Dr. van Duren's report. At trial, Dr. van Duren's testimony may not include such summaries.

Dr. van Duren also may not testify to any party or individual's state of mind or intent. Both parties agree that such issues are outside the scope of permissible expert testimony. As with John Doll's opinions discussed above, however, OptumInsight nevertheless asserts that Dr. van Duren should be allowed to offer a number of opinions that plainly violate this rule, such as his conclusions that the "RFP response describes episode grouping methodology *in an attempt to* create the impression to the reader that the concepts have been thoroughly considered," that a portion of it "serves to *try to show* the reader that the methodology is well thought out," that "the writers *attempt to* create a sense of confident," and that the RFP was written to exaggerate the software's then-existing capabilities. *See* Opp'n to Pl.'s Mot. to Exclude at 7–8 (quoting van Duren Report ¶¶ 58–59) (emphasis added). OptumInsight may offer testimony from the RFP response's authors if they in fact had such intent, or may ask the jury to infer such intent from the response itself and Dr. van Duren's expert testimony about how such responses are typically prepared, but Dr. van Duren may not testify to what the authors intended. Along the same lines, Dr. van Duren may not testify as to whether "it is reasonable to infer that [attorney David Rosenbaum] did not believe that the RFP response was material to the '511 patent." *See* van Duren Report ¶ 179.

### 2. Opinions Buttressing Credibility

CCGroup also objects to testimony that it contends is offered to buttress the credibility of fact witnesses. "[E]xpert testimony cannot be offered to buttress credibility." *United States v. Komisaruk*, 885 F.2d 490, 494 (9th Cir. 1989); *see also United States v. Verduzco*, 373 F.3d 1022, 1035 (9th Cir. 2004)). An overly strict reading of that rule, however, could bar expert testimony

38

relating to any issue for which there is also testimony from fact witnesses, and the Court declines to construe the prohibition so broadly. *Komisaruk*, *Verduzco*, and the cases from which they derive their rule relate largely to opinions on reasonableness or state of mind, or direct testimony as to whether a party or witness's statement is truthful. *See, e.g.*, *Verduzco*, 373 F.3d 1035; *Komisaruk*, 885 F.2d at 494. Dr. van Duren's experience with medical software development provides him with background knowledge that the jury lacks and that may be helpful to the jury's understanding of the development of Dang's episode of care grouper, and thus may be relevant to whether documents and testimony from fact witnesses explaining that development process are credible and accurate. Providing such background is therefore appropriate, while directly opining on whether other people's statements—whether in documents or in testimony—are credible usurps the role of the jury. So long as the factual assumptions on which he bases his opinions are clear, Dr. van Duren may address whether a particular timeline or course of conduct is consistent with the typical process of medical software development in the early 1990s. Dr. van Duren may not testify that "the IDS and affidavits present a reasonable explanation for the development of Symmetry's ETG software," both because it is a direct assessment of the credibility of other statements in the record, and because, as discussed above in the context of Michael Dergosits's opinions, expert witnesses should avoid legally-charged standards such as "reasonableness."

### 3. Opinions Regarding "Dynamic Time Windows"

Finally, CCGroup objects to Dr. van Duren's opinion that the RFP response does not provide an enabling disclosure of a "dynamic time window," arguing that by using Judge Davila's construction of that term in *Cave I*, Dr. van Duren improperly conflates the narrower "meaning to a person with ordinary skill in the art" standard used for infringement claims and most other district court proceedings under *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), with the "broadest reasonable construction" standard used to determine whether information is material to the PTO as recognized in *Therasense, Inc. v. Becton Dickinson & Co.*, 649 F.3d 1276, 1291–92 (Fed. Cir. 2011) (en banc). Pl.'s Mot. to Exclude at 23–24. According to CCGroup, because Dr. van Duren offered no opinion on the broadest reasonable construction of the term, his opinion on whether the RFP response discloses "dynamic time windows" based on Judge Davila's

39

construction of that claim is irrelevant. *Id.* (citing *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006), for the rule that expert opinions "based on an impermissible claim construction" are subject to exclusion). OptumInsight argues that Dr. van Duren properly used Judge Davila's construction under the *Phillips* standard because he offered his opinions to rebut Dr. Bergeron's opinions based on the same construction, and because, at least according to OptumInsight,[21] district courts have used the *Phillips* standard in the context of *Walker Process* claims. *See* Opp'n to Pl.'s Mot. to Exclude at 9–10.

The two standards are distinct, *see generally Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016) (addressing the Patent Trial and Appeal Board's authority to use the "broadest reasonable construction" standard rather than the *Phillips* standard), and CCGroup is likely correct that the "broadest reasonable construction" standard applies to materiality for a *Walker Process* claim, *see TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1307 (Fed. Cir. 2016) (acknowledging that the *Therasense* standard for showing inequitable conduct "may be nearly identical" to the *Walker Process* standard for showing fraud). In this case and on this record, however, it is a distinction without a difference.

As the plaintiff, CCGroup has the burden of proof on its claims. CCGroup has not argued or identified evidence showing that any particular construction of "dynamic time windows" broader than Judge Davila's construction is reasonable. Instead, CCGroup relies on Dr. Bergeron's opinion that the RFP response disclosed "dynamic time windows" as Judge Davila construed the term, noting that if the RFP response meets that standard, it necessarily also satisfies the more permissive "broadest reasonable construction" standard. *See* Reply re Pl.'s Mot. to Exclude at 10–11 (citing Bergeron Report ¶ 27).

While some terms in a patent claim may lend themselves to more than one reasonable interpretation, such that the "broadest reasonable construction" could be broader than the term's "meaning to a person with ordinary skill in the art," other terms might have only one reasonable

---

[21] CCGroup disputes OptumInsight's characterization of the cases OptumInsight cites for this proposition. Because there is no argument or evidence to support any reasonable construction of "dynamic time windows" broader than Judge Davila's construction under *Phillips*, the Court need not resolve the issue.

interpretation, such that there is no difference in construction between the two standards. CCGroup visualizes the relationship between the two constructions as a "target," with Judge Davila's *Phillips* construction as the bullseye, but additional space outside the bullseye that would also meet the "broadest reasonable construction" standard. *See id.* at 11. By offering no alternative construction to Judge Davila's that is reasonable, however, CCGroup has not shown that there is in fact any space on the "target" other than the "bullseye." Solely as a matter of logical possibility, Judge Davila's construction of "dynamic time windows" might well be the *only* reasonable construction. CCGroup has not shown that any other reasonable construction exists, and it is not OptumInsight's burden to do so. At least based on the current record, CCGroup therefore cannot prevail on its position that the RFP response disclosed "dynamic time windows" unless it establishes such disclosure based on Judge Davila's construction of the term—the reasonableness of which neither party disputes. Because Judge Davila's construction is the only construction shown to be reasonable, Dr. van Duren's decision to base his opinions on that construction is no reason to exclude those opinions.

## I. OptumInsight's Expert Paul Godek

CCGroup seeks to exclude certain opinions of OptumInsight's economic damages expert Dr. Paul Godek offered in rebuttal to CCGroup's expert Dr. Sullivan. Many of the opinions at issue relate to CCGroup's performance in the physician efficiency market. Because the Court excludes Dr. Sullivan's opinions on that market for the reasons stated above, Dr. Godek's opinions critiquing Dr. Sullivan on the issue of the physician efficiency market are excluded as well.

CCGroup addresses two specific purported deficiencies. First, CCGroup argues that Godek improperly uses actual conditions before and after the conclusion of the *Cave I* trial, where CCGroup successfully defended against OptumInsight's infringement claims, to suggest that OptumInsight's patents had little if any effect on CCGroup's share of the standalone grouper market. Pl.'s Mot. to Exclude at 25–26. According to CCGroup, Dr. Godek did not conduct a sufficiently rigorous analysis to present that comparison as either a "yardstick" or a "before-and-after" model, and specifically failed to satisfy the rule that "the 'before and after' theory, may be used only where there has been some showing that the market conditions in the two periods were

41

similar but for the impact of the violation." *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1206–07 (9th Cir. 1975) (citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 259–63 (1946)); *see* Reply re Pl.'s Mot. to Exclude at 12–14 & n.10.  It is not obvious that Dr. Godek, in his role as a rebuttal expert identifying potential weaknesses in Dr. Sullivan's analysis, is required to meet the same standard as if he were seeking to establish his own model of damages. Regardless, despite the *Sunkist* court's statement that a showing of similarity but for the violation is required, both *Sunkist* and the Supreme Court decision on which it relied held that a jury could reasonably infer causation from a plaintiff's decline in fortune and a defendant's wrongful acts with a tendency to cause such decline.  *See Bigelow*, 327 U.S. at 264; *Sunkist*, 526 F.2d at 1207. Here, the converse is true: there is at least some reason to conclude that any cloud cast by OptumInsight's patents dissipated when CCGroup obtained a verdict of noninfringement, yet CCGroup's share of the grouper market remained essentially the same in the years after that verdict.  *See* Gobek Decl. ¶¶ 78–79 & Chart 2.  With no evidence offered to suggest that some new adverse market force arose at the same time, a jury might reasonably infer that the patents did not have a large effect on CCGroup's performance.  The Court declines to exclude Godek's testimony presenting this theory.

Second, CCGroup seeks to exclude Dr. Godek's opinions that CCGroup, which did not pay license fees to OptumInsight, had a cost advantage over other competitors who paid such fees—an advantage that CCGroup would lack in the hypothetical but-for world where OptumInsight had not obtained, enforced, or advertised its patents—and benefited from any higher prices that OptumInsight was able to charge and that competitors were forced to charge to cover their costs.  According to CCGroup, that theory is flawed for failing to account both for the fact that CCGroup avoided competing in the standalone grouper market, and thus derived no benefit from high prices in that market, and for the harm that CCGroup purportedly suffered from customers avoiding its products due to the perception that they infringed OptumInsight's patents. Pl.'s Mot. to Exclude at 26–27.  The extent to which and reasons why CCGroup avoided competing in the grouper market are issues of fact as to which the jury could reasonably reach a variety of conclusions, as is the extent to which competitors' purchasing decisions were affected

42

1    by OptumInsight's patents. Moreover, even assuming that both factors are present, neither

2    necessarily precludes in their entirety the potential benefits to CCGroup that Dr. Godek identifies,

3    and a jury might conclude that such benefits are relevant to the question of whether CCGroup

4    suffered an injury. While CCGroup may of course cross examine Dr. Godek about factors it

5    believes he failed to consider, the Court declines to exclude his opinions on these subjects.

6    **J.    OptumInsight's Expert Richard Bero**

7    CCGroup argues that OptumInsight's financial expert Richard Bero, CPA, CVA,

8    improperly presents opinions on the scope of certain patents—a matter that falls outside of his

9    expertise as an accountant and valuation analyst—in discussing the effects that other grouper

10   patents and purportedly non-infringing grouper products have on CCGroup's potential damages.

11   Pl.'s Mot. to Exclude at 27–28. OptumInsight offers Bero's opinions to rebut Dr. Sullivan's

12   opinions regarding market damages and Wilson's opinions regarding reasonable attorneys' fees.

13   *See* Bero Report at 1 ("I have been asked to analyze and provide expert opinions on damages

14   issues [and] to respond to the claimed damages included in the Report[s] of Ryan Sullivan, Ph.D.

15   [and] Kenneth B. Wilson . . . ."). Because the Court excludes Dr. Sullivan's opinions on damages

16   for the reasons discussed above and therefore grants summary judgment for OptumInsight on the

17   issue of market damages for the reasons discussed below, and because the parties have reserved

18   any calculation of damages based on attorneys' fees (as discussed in Wilson's report) for

19   resolution by the Court or a special master after trial, it is not clear whether OptumInsight will

20   seek to use Bero's testimony at trial. To the extent that any of Bero's opinions relate solely to

21   market damages, they are excluded as not relevant to any issue remaining in the case.

22   Because some of Bero's opinions might be relevant to issues of market power and antitrust

23   injury, however, the Court addresses CCGroup's specific objections to his report. OptumInsight

24   agrees that Bero is not a technical expert, but contends that CCGroup cannot argue that Bero's

25   opinions require technical expert evidence showing that the patents apply to CCGroup's product,

26   when CCGroup itself has not made such a showing or even allegation with respect to the patents at

27   issue in its claims, and in fact obtained a judgment of non-infringement with respect to one such

28   patent. *See* Opp'n to Pl.'s Mot. to Exclude at 21–22. OptumInsight asserts, however, that Bero

"has not opined and will not opine on what processes do or do not infringe patents, or how the claims of one patent relate to the claims of another." *Id.* at 21. In its reply, CCGroup identifies and seeks to exclude several opinions that it contends cross that line:

> (1) that "there have been non-infringing alternatives available," (2) "there have been and continue to be non-infringing groupers" including "the '463 patent technology / early Cave grouper, Ingenix's Clinical Care Groups, . . . and 3M's grouper(s)," (3) that 3M is "a different, later, non-infringing competitor," and (4) OptumInsight has had at least two additional Non-Accused Grouper Patents that . . . would have produced the consequences of which CCGroup complains."

Reply re Pl.'s Mot. to Exclude at 15 (citing Bero Report at 50–51). CCGroup is correct that such statements, presented in that manner, would be impermissible coming from Bero, although at least some of CCGroup's quotations appear to come from headings or similar language intended to organize Bero's explanation of why such facts, if shown by other evidence, would be significant. *See* Bero Report at 50–51. To the extent such other evidence exists, Bero may offer opinions on how it would affect the significance of OptumInsight's patents to the parties' commercial performance, so long as the assumptions on which he bases such opinions are clear to the jury.

The significance of the OptumInsight patents identified in CCGroup's complaint is not that CCGroup's product actually infringed them. With respect to the only patent that OptumInsight asserted through trial in *Cave I*, CCGroup obtained a judgment of non-infringement. What matters instead, according to CCGroup's theory of the case, is that market participants *believed* that CCGroup's products infringed the patents, or at least that OptumInsight would assert such a claim. If (as Dr. Cave indicates in his declaration) CCGroup believed that, then the patents might have caused CCGroup to avoid the standalone grouper market. If customers believed it, they might have avoided CCGroup's products. That OptumInsight in fact brought claims asserting that CCGroup infringed most of the patents at issue in CCGroup's complaint provides at least some evidence to support an inference that market participants might have believed CCGroup's products risked infringing those patents.

Along the same lines, to the extent there is any evidence supporting an inference that market participants believed CCGroup's products infringed other OptumInsight patents besides

44

those addressed in CCGroup's complaint, or at least that selling or using the products risked provoking patent litigation, Bero may offer his opinions on the significance of such "additional Non-Accused Grouper Patents" to the parties' performance in the market. *See* Bero Report at 51. Similarly, to the extent there is evidence besides Bero's report that other grouper products did not infringe—or perhaps more importantly, were not perceived as infringing—OptumInsight's patents, Bero may present his opinions on the significance of such "non-infringing alternatives." *See id.* at 50–51. Bero may not, however, present or rely on his own opinions on the scope of any patent, including whether a patent would have applied or could have been perceived as applying to CCGroup's products, or whether a particular alternative product was "non-infringing."

## V.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Legal Standard for Summary Judgment Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

**B.    OptumInsight's Motion for Summary Judgment on Statutes of Limitations**

Although this Court generally limits each party in a case to a single motion for summary judgment, the Court granted OptumInsight leave to file a separate motion seeking summary judgment based on statutes of limitations. *See generally* Limitations MSJ. For the reasons discussed below, that motion is DENIED. CCGroup also briefly requests summary judgment on the timeliness of its claims, which the Court GRANTS in part. *See* Pl.'s MSJ at 39–40.

### 1.    Arguments Regarding Statutes of Limitations

#### a.    OptumInsight's Motion

OptumInsight contends that all of CCGroup's claims are barred by applicable statutes of limitations. *See generally* Limitations MSJ. According to OptumInsight, the four-year statute of limitations for CCGroup's antitrust claims has long expired because the limitations period began to run in 2003, when CCGroup was formed and alleges that its injury began, which was around twelve years before CCGroup filed this action in July of 2015. *Id.* at 14. To the extent that CCGroup's Sherman Act sham litigation claim is based on OptumInsight's Minnesota complaint filed in January of 2011, OptumInsight argues that the limitations period still expired months before CCGroup brought the present action. *Id.* at 15–16. OptumInsight contends that, to be timely, CCGroup's antitrust claims must have accrued by July 24, 2011—four years before CCGroup filed this case. *Id.* at 14.

OptumInsight argues that California's three-year statute of limitations for fraud applies to CCGroup's Lanham Act false advertising claim, and that it expired before CCGroup brought its claim because the final document identified by CCGroup dates to February of 2012, which is more than three years before CCGroup filed this action. *Id.* at 16–17.

OptumInsight contends that the Court should apply California's one-year limitations period for actions against attorneys to CCGroup's malicious prosecution claim, even though the claim is against OptumInsight rather than any attorney defendant, because the two-year personal injury statute of limitations often applied to malicious prosecution claims only applies to injury to an individual, not a corporate entity like CCGroup. *Id.* at 17–18. Because CCGroup's claim accrued in April of 2014 when OptumInsight voluntarily dismissed claims in *Cave I*, OptumInsight argues that it is barred under the one-year limitations period. *Id.*

According to OptumInsight, CCGroup cannot rely on the doctrine of fraudulent concealment to toll those limitations periods. *Id.* at 18–25. OptumInsight argues that the alleged concealment does not meet the test for that doctrine because OptumInsight's purported fraud on the PTO was not directed at CCGroup and because it is not distinct from CCGroup's underlying claim of misconduct. *Id.* at 20–22. OptumInsight also contends that CCGroup had constructive notice of the basis for its claims because the facts at issue here appeared in the public record of another case and because Dr. Cave served as an expert witness to defend against inequitable conduct claims regarding the Dang and Seare patents in yet another case, yet CCGroup made no effort to investigate the validity of the patents before the onset of litigation with OptumInsight. *Id.* at 22–25.

b.    CCGroup's Opposition

CCGroup argues that the statute of limitations for its antitrust claims should be tolled based on fraudulent concealment. Limitations Opp'n (dkt. 254-18) at 7–24. According to CCGroup, OptumInsight's failure to disclose evidence suggesting a 1993 conception date to the PTO during patent prosecution, reexamination, and interference proceedings support tolling. *Id.* at 9–12. CCGroup argues that the concealment need not be independent of the fraud on the PTO, and that there is no evidence CCGroup had actual knowledge of its claims before OptumInsight

47

produced relevant documents in 2013. *Id.* at 12–15. CCGroup also contends that OptumInsight's active concealment of the earlier conception date precludes summary judgment based on constructive knowledge, and that OptumInsight has not identified facts that would trigger suspicion of CCGroup's present claims. *Id.* at 15–21. Accordingly, CCGroup argues that diligence is not at issue because it lacked constructive notice, but even if CCGroup were required to have acted diligently to uncover the purported fraud, whether it did so is a disputed issue of fact. *Id.* at 21–23.

CCGroup also argues that even without the benefit of tolling for fraudulent concealment, its claims are timely because CCGroup brought this action within four years after OptumInsight asserted counterclaims in *Cave I*, which CCGroup contends was a distinct injury separate from any earlier harm, including the action OptumInsight filed and dismissed in Minnesota. *Id.* at 23–24.

Finally, CCGroup argues that its Lanham Act claim is timely because CCGroup did not learn of the facts underlying the claim until January 2013, that its malicious prosecution claim is timely under "the otherwise-applicable two-year statute of limitations" because it is not brought against an attorney, and that the beginning of that limitations period should be measured from the final disposition of appeal in *Cave I*, not from dismissal of claims based on the Dang Patents. *Id.* at 25.

### c. OptumInsight's Reply

OptumInsight contends that CCGroup has a heavy burden to prove fraudulent concealment and cannot meet that burden on the current record. Limitations Reply (dkt. 261) at 2–4. According to OptumInsight, CCGroup cannot prevail on that argument because it has identified no affirmative acts of concealment distinct from the purported fraudulent conspiracy to mislead the PTO, and because omission in the face of a duty to disclose can only support tolling where that duty was owed to the plaintiff itself, not to a third party like the PTO. *Id.* at 4–7. OptumInsight also argues that the burden is on CCGroup to show a lack of constructive knowledge—not on OptumInsight to show its existence—and that CCGroup has not met that burden because it failed to submit a declaration asserting lack of knowledge or that Dr. Cave did not review documents

available in the *Medstat* litigation. *Id.* at 7–9, 10–11. OptumInsight also argues that publicly available marketing materials included essentially the same statements regarding invention in 1993 that CCGroup contends establish OptumInsight's knowledge of fraud, and that CCGroup was therefore on notice. *Id.* at 9–10. As for diligence, OptumInsight argues that CCGroup cannot meet its burden because Dr. Cave admitted that he and CCGroup made no effort before litigation to determine whether the patents at issue were valid. *Id.* at 11–12.

OptumInsight contends that CCGroup cannot rely on the filing date of OptumInsight's counterclaims in *Cave I* to bring the injury within the four-year statute of limitations because those counterclaims were "part of the same dispute" as the Minnesota action that OptumInsight filed and dismissed, and because OptumInsight's assertions of infringement were compulsory counterclaims to CCGroup's claims for declaratory judgment against OptumInsight. *Id.* at 12–14. Neither OptumInsight's Minnesota complaint nor CCGroup's *Cave I* complaint were filed within four years before CCGroup brought this action. *Id.*

OptumInsight renews the arguments in its motion regarding the statutes of limitations for CCGroup's Lanham Act and malicious prosecution claims. *Id.* at 14.

OptumInsight also moves to strike expert reports submitted by CCGroup, arguing that they contain improper (and incorrect) attorney argument regarding questions of law, and noting that CCGroup served Dr. Kenneth Wilson's supplemental report five days after the expert disclosure deadline. *Id.* at 14–15.[22]

### 2. Analysis of Statutes of Limitations

#### a. Statute of Limitations for Antitrust Claims

At least significant portions of CCGroup's antitrust claims would be barred by the normal application of the relevant statutes of limitations. An antitrust claim must be brought within four

---

[22] CCGroup seeks leave to file a surreply arguing that the opinions of OptumInsight's expert witness Michael Dergosits, whose rebuttal report OptumInsight properly served after the deadline for CCGroup's opposition brief on limitations issues, support CCGroup's position regarding lack of constructive notice. OptumInsight opposes that request and, in the alternative if the Court were to allow the surreply, requests leave to file a short response. Because, as discussed below, the Court need not rely on the surreply to deny OptumInsight's motion with respect to fraudulent concealment, CCGroup's request to file the surreply is DENIED AS MOOT.

years from the date that the cause of action accrues, generally without regard for when the plaintiff discovers its claim. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1059–60 (9th Cir. 2012) (citing, *e.g.*, 15 U.S.C. § 15b).

CCGroup relies on the doctrine of fraudulent concealment as a basis for tolling the four-year antitrust statute of limitations.

> A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence. *Hennegan v. Pacifico Creative Serv., Inc.,* 787 F.2d 1299, 1302 (9th Cir. 1986). "[The plaintiff] carries the burden of pleading and proving fraudulent concealment; it must plead facts showing that [the defendant] affirmatively misled it, and that [the plaintiff] had *neither actual nor constructive knowledge* of the facts giving rise to its claim despite its diligence in trying to uncover those facts." *Conmar* [*Corp. v. Mitsui & Co. (U.S.A.), Inc.,* 858 F.2d 499, 502 (9th Cir. 1988)] (citing *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249–50 (9th Cir. 1978)) (emphasis added). "A fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983).
>
> If a defendant proves that the plaintiff had actual or constructive knowledge of the facts giving rise to the claim, the doctrine of fraudulent concealment does not apply. *Id.* "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Beneficial Standard Life Ins.* [*Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988)]. It is enough that the plaintiff "should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim." *Conmar*, 858 F.2d at 502; *see also GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007) ("Full knowledge often awaits discovery, and the very notion of 'inquiry notice' implies something less than that").

*Id.* at 1060 (alterations in internal quotation in original). "'Ordinarily, a defendant has an extremely difficult burden to show that [fraudulent concealment allegations are] barred as a matter of law.'" *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 487, 489 (C.D. Cal. 1991) (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406 (9th Cir. 1987)) (alteration in original). In the *Petroleum Products* case, Judge Tashima denied a motion for summary judgment even where "the underlying facts [were] essentially undisputed," because "the issue depends on the inferences to be drawn from these facts—intent to conceal, actual

knowledge and constructive knowledge"—and "[w]hat inferences properly to draw from the facts are factual issues" that "reasonable jurors could resolve . . . in [the] plaintiffs' favor." *Id.*

Where a doctrine of tolling is applicable, it "simply *stops the clock* until the occurrence of a later event that permits the statute to resume running." *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1195 (9th Cir. 2001) (en banc).

### i. Fraudulent Concealment Through Affirmative Misrepresentation

According to CCGroup, OptumInsight's[23] alleged misrepresentations to the PTO constitute affirmative action sufficient to invoke this doctrine, and CCGroup did not become aware of the alleged fraud on the PTO underlying all of its current claims until OptumInsight produced documents in 2013 during the litigation of *Cave I.* Limitations Opp'n at 1. OptumInsight contends that there is no evidence on which a reasonable jury could find that OptumInsight engaged in affirmative concealment separate from the alleged antitrust violation itself, that CCGroup was diligent in investigating and discovering the basis for its claims, or that CCGroup in fact was not aware of the basis for its claims. Limitations Reply at 2.

Starting with the issue of whether "the defendant used fraudulent means," *see Wood*, 705 F.2d at 1521, to the extent that OptumInsight argues that any misrepresentation must have been "directed to CCGroup" to support tolling based on fraudulent concealment, *see* Limitations Reply at 2, such a standard is not consistent with Ninth Circuit precedent. In *Conmar*, for example, the Ninth Circuit held that a "jury could believe that the filing of false customs forms [related to the price of imported steel] was affirmative conduct sufficient for a finding of fraudulent concealment" by defendant Mitsui & Co., and that Mitsui's statements to the press also provided a separate basis for such a finding after an affidavit was unsealed accusing the defendant of "a complicated scheme to dump [steel wire at below-market prices] by splitting with the customer the

---

[23] The Court uses the term "OptumInsight" here to include not only the company in its current form, but also its predecessors Ingenix and Symmetry. For the reasons stated in the Court's previous orders and the Federal Circuit's decision on appeal, OptumInsight stands in the shoes of both Ingenix and Symmetry for all relevant purposes. *See* Order re 2d MTD at 27–28; Am. Order re Mot. to Compel at 18–19; *In Re: OpumInsight*, 2017 WL 3096300, at *3 (noting with approval "the widely accepted notion that that a successor company ordinarily stands in the shoes of the previously merged corporations").

difference between nominal and actual exchange rates, then falsely reporting the rates to the Customs Service." *Conmar*, 858 F.2d at 500, 505. The plaintiffs in that case were contractors that competed with one of Mitsui's customers, and there is no indication that either the customs forms or the press statement had any more direct relation to those plaintiffs than OptumInsight's purported misrepresentation to the PTO had to CCGroup here. OptumInsight's purported misrepresentations need not have been made directly to CCGroup to support fraudulent concealment.

The parties disagree as to whether, or to what degree, distinction is necessary between a defendant's alleged concealment and the underlying conduct that gives rise to a plaintiff's claim. Judge Koh addressed this issue in some detail in *In re Animation Workers Antitrust Litigation*, holding that the Ninth Circuit has not adopted either the "separate and apart" standard requiring entirely distinct conduct, or the "self-concealing" standard under which "the mere existence of a secret conspiracy is enough to prove fraudulent concealment," but instead a standard under which there must be some "affirmative act" of concealment, where the fact that such an act was taken in furtherance of an underlying conspiracy is not disqualifying. 123 F. Supp. 3d 1175, 1196–1200 (N.D. Cal. 2015). Judge Koh's reasoning and interpretation of Ninth Circuit decisions including *Conmar*, 858 F.2d 499, and *E.W. French & Sons, Inc. v. Gen. Portland, Inc.*, 885 F.2d 1392 (9th Cir. 1989), is persuasive: in *Conmar*, the fraudulent customs forms that the court held to be sufficient were submitted in furtherance of the alleged steel dumping conspiracy, *see* 858 F.2d at 505, and the use of "plain white envelopes" to mail price information to competitors in *E.W. French* similarly constituted part of the price-fixing conspiracy that gave rise to the claim in that case, *see* 885 F.2d at 1399–1400. *See Animation Workers*, 123 F. Supp. 3d at 1196–97.

That "affirmative act" standard is in some way complicated by the Ninth Circuit's statements in several opinions that fraudulent concealment requires "fraudulent conduct '*above and beyond* the wrongdoing upon which the plaintiff's claim is filed.'" *Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006) (quoting *Santa Maria v. Pac. Bell*, 202 F.3d 1170 (9th Cir. 2000)[24])

---

[24] Less than two years after it was decided, *Santa Maria* was overruled on other grounds by the en banc court in *Socop-Gonzalez*, which rejected its approach of requiring a plaintiff to file within a

1    (emphasis added in *Guerrero*); *see also Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044,

2    1052 (9th Cir. 2008) (quoting *Guerrero*).  Judge Koh addressed that rule in *Animation Workers*,

3    holding that, at least in antitrust cases, nothing more than an affirmative act of concealment is

4    required:

5            To the extent there may be any ambiguity as to whether the "above
             and beyond" language in *Guerrero* requires a plaintiff to allege
6            fraudulent acts that are "separate and apart" from the underlying
             conspiracy itself, the Court finds that the Ninth Circuit, at least in
7            antitrust actions,[12] has required only "affirmative acts" of
             concealment. Reading *Guerrero* against the Ninth Circuit's decisions
8            in *Conmar*, *E.W. French*, and *Volk*, the Court concludes that these
             cases stand for the proposition that a plaintiff must allege active,
9            affirmative acts of fraudulent concealment that entail more than
             passive silence, but those affirmative acts may be intertwined with the
10           underlying antitrust conspiracy.[13]

11           [footnote 12:] Defendants contend that the Ninth Circuit has not
             explicitly held that the standard for fraudulent concealment differs in
12           antitrust actions. While that may be the case, the Court is not
             persuaded that *Guerrero* abrogated the long line of Ninth Circuit
13           authority finding that affirmatively misleading acts that were also in
             furtherance of the conspiracy could establish fraudulent concealment.
14
             [footnote 13:] While not relevant here, the Court does note that silence
15           may be sufficient to show fraudulent concealment where there is an
             affirmative duty to disclose, e.g., a fiduciary duty. *Conmar*, 858 F.2d
16           at 505 ("Passive concealment of information is not enough to toll the
             statute of limitations, unless the defendant had a fiduciary duty to
17           disclose information to the plaintiff.") (internal citation omitted).

18   *Animation Workers*, 123 F. Supp. 3d at 1198 & nn.12, 13.

19           CCGroup contends that OptumInsight engaged in affirmative acts of concealment through

20   misrepresentations to the PTO and failure to disclose information that OptumInsight was obligated

21   to disclose to the PTO, focusing on the reexamination and interference proceedings.  Limitations

22   Opp'n at 7–12.  CCGroup cites, for example, the December 29, 2000 affidavit of David

23   Rosenbaum and the January 2, 2001 affidavit of Dennis Dang, both of which state that Dang did

24   not fully conceive of the dynamic time window and shifting functions of the '897 patent until

25   August of 1994—after Symmetry provided its response to Aetna's RFP—which CCGroup asserts

26   to be false.  *Id.* at 8 & n.6; Brophy Decl. re Limitations Exs. 10, 11.  CCGroup also points to

27

28   reasonable time after a tolling period ended rather than allowing any remaining time in the statute
     of limitations to run from that point.  *Socop-Gonzalez*, 272 F.3d at 1195–96.

1    OptumInsight's representation in the interference proceeding in 2003, after the Ingenix-Symmetry

2    merger, that the application that led to the '079 Seare patent had priority over the '897 Dang

3    patent, and cites OptumInsight's failure to disclose in that proceeding documents indicating that

4    Dang conceived his invention in 1993.  Limitations Opp'n at 11–12.

5         Assuming for the sake of argument that, based on the "above and beyond" language in

6    *Guerrero* and other non-antitrust fraudulent concealment cases, a single misrepresentation to the

7    PTO cannot serve both as the basis for a *Walker Process* claim and as the affirmative act of

8    fraudulent concealment, the *repeated* representations that CCGroup characterizes as false here

9    nevertheless meet the test for fraudulent concealment.  A contrary holding would have the

10   perverse result that, having lied to the PTO once, a party remains free to lie to the PTO on later

11   occasions without implicating the fraudulent concealment doctrine when lies to other parties

12   would.  The Court perceives no justification for such a rule and declines to endorse it in the

13   absence of authority so holding.

14        Aside from citations to the "above and beyond" language discussed above, OptumInsight's

15   primary argument for imposing such a rule is that endorsing CCGroup's position would

16   effectively "create an unbounded 'discovery rule' for any antitrust claim based on inequitable

17   conduct," undermining the "injury rule" generally applied to antitrust statutes of limitations.

18   Reply re Limitations at 4.  OptumInsight cites *Hexcel* for the general rule, but *Hexcel* itself, while

19   stating that courts "do not require a plaintiff to actually discover its antitrust claims before the

20   statute of limitations begins to run," goes on to recognize fraudulent concealment as an exception

21   to that rule, albeit not applicable on the facts of that case due to the plaintiff's constructive

22   knowledge of its claims.  *See Hexcel*, 681 F.3d at 1059–60.  Nothing in *Hexcel* suggests that the

23   background "injury rule" bars fraudulent concealment tolling based on a defendant's repeated

24   misrepresentations to the PTO.

25        Although OptumInsight contends, in response to CCGroup's motion for summary

26   judgment, that a jury *could* find in its favor on the underlying questions of inequitable conduct (or

27   in other words, a jury could find that Dang, Rosenbaum, McMahon, and others were honest and

28   candid with the PTO), OptumInsight does not seek summary judgment on that basis.  Because a

jury could find to the contrary—that OptumInsight's personnel repeatedly misrepresented Dang's conception date to the PTO—OptumInsight is not entitled to summary judgment on the "affirmative act" element of fraudulent concealment.

ii. Fraudulent Concealment Through Omission

The parties also dispute whether omissions of documents and information that OptumInsight was obligated to disclose to the PTO can meet the standard of an affirmative act of concealment. Generally, "defendants' 'silence or passive conduct does not constitute fraudulent concealment.'" *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1095 (9th Cir. 2005) (quoting *Volk*, 816 F.2d at 1416). Courts have nevertheless repeatedly recognized that omissions in the face of a *fiduciary* duty to disclose *to the plaintiff* can support fraudulent concealment. *E.g.*, *id.* at 1096; *Conmar*, 858 F.2d at 505. The 1978 decision at the root of many citations for this rule in the Ninth Circuit frames the issue somewhat more broadly as whether "the relationship of the parties imposes a duty upon the defendant to make disclosure." *Rutledge*, 576 F.2d at 250. Some decisions have therefore presented a fiduciary duty as merely an example of the sort of duty that would render an omission sufficient to support tolling. *Animation Workers*, 123 F. Supp. 3d at 1198 n.13 ("While not relevant here, the Court does note that silence may be sufficient to show fraudulent concealment where there is an affirmative duty to disclose, e.g., a fiduciary duty."). At least with respect to the circumstances presented here, a broader scope is consistent with the purpose of the fraudulent concealment doctrine, because competitors could reasonably be expected to rely on others in their industry complying with their duties of candor to the PTO. *See* 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."). Accordingly, while the purported affirmative misrepresentations discussed above are sufficient to deny summary judgment on the issue of affirmative acts of concealment, the Court also holds that a finder of fact could find that element of the test satisfied by OptumInsight's failure to disclose evidence suggesting a 1993 conception date of the '897 patent during the reexamination and subsequent administrative proceedings. *See, e.g.*, Brophy Limitations Decl.

55

Ex. 5 at 3 (interrogatory response stating conception "at least as early as September 1993"); *id.* Ex. 6 (Dang Sept. 1999 Dep. II) at 275:23–276:1 (stating that Dang conceived his inventions in "probably 1993").

iii. Actual or Constructive Knowledge of Claims

With respect to CCGroup's awareness and diligence, "[t]he determination of whether a plaintiff knew or should have known of a cause of action presents a question for the trier of fact," and is "tested by an objective standard." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987). There is no dispute that CCGroup's founder Dr. Cave has long been aware of OptumInsight's patents and products. *See, e.g.*, Lancaster Limitations Decl. Ex. A (Cave Aug. 2017 Dep. I) at 81:25–82:15. The question is not whether CCGroup had knowledge of the patents, however, but whether CCGroup "had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Beneficial Standard*, 851 F.2d at 275.

OptumInsight argues in its reply that summary judgment should be granted on this issue because CCGroup failed to submit a sworn statement by Dr. Cave denying knowledge of the basis for CCGroup's claims. CCGroup later submitted with its own motion for summary judgment a declaration by Cave comprehensively disavowing such knowledge and that he had reviewed documents indicating an earlier conception date. *See generally* Cave Decl. (dkt. 290-11). While it is unclear why CCGroup failed to include this declaration with its opposition to OptumInsight's limitations motion, the Court is not inclined to ignore relevant information that is now in the record and grant summary judgment based on a legal fiction that Cave failed to deny knowledge.

Certain documents available before the initiation of this action suggested that Dang conceived his invention in 1993. First, Symmetry provided an interrogatory response to Medstat in 1999 stating that the '897 patent was conceived no later than 1993. Lancaster Limitations Decl. Ex. T. That interrogatory response was filed as an attachment to a declaration in the District of Arizona in February of 2000. *Id.* Second, an Ingenix white paper dated 2006 listed 1993 as the "Introduction of Version 1.0 of ETGs." Lancaster Limitations Decl. Ex. X at CCG001518. CCGroup's attorneys emailed the first page of that white paper to OptumInsight's attorneys on

56

March 25, 2011—indicating that CCGroup's attorneys had actually reviewed those documents several months more than four years before CCGroup brought this action. *See* Lancaster Limitations Decl. Ex. W.

The existence of the interrogatory response, even in a public court filing, does not establish constructive knowledge. OptumInsight acknowledges that "public information that the plaintiff had no reason to know about may not suffice to provide knowledge of an antitrust claim." Limitations MSJ at 23 (citing *Conmar*, 858 F.2d at 504). To obtain the interrogatory response, which was filed in the *Medstat* case before the District of Arizona adopted (or at least fully adopted) electronic case records, OptumInsight wrote to the clerk of that court, requested a copy of the declaration to which it was attached, and paid a fee of nearly $200 for it to be retrieved and copied. *See* Lancaster Limitations Decl. Ex. V. Given that there is no evidence that CCGroup would have known or could have easily determined which if any document contained evidence of the conception date, discovering the interrogatory response likely would have required CCGroup to request most if not all documents filed in the case, pay a far higher fee, and review a voluminous case file. It is not clear what should have prompted CCGroup to conduct that sort of fishing expedition. To the extent that OptumInsight suggests that mere knowledge of the patents, or the combination of such knowledge with CCGroup's purported fear of enforcement by OptumInsight, should have prompted CCGroup to conduct a comprehensive investigation of whether the patents were obtained through fraud that would have included the *Medstat* case file, *see* Limitations MSJ at 7–8, that is at most a question best left to a finder of fact, which could reasonably find to the contrary.

The white paper indicating a 1993 "introduction" date for the first version of the ETG product presents a somewhat closer call. *See* Lancaster Limitations Decl. Ex. X at CCG001518. CCGroup argues that the white paper is "consistent with the false affidavits OptumInsight submitted to the Patent Office during the '897 Reexam, which posit the existence of an early version of the ETG software that did not practice the methodology claimed in the Dang Patents." Limitations Opp'n at 20 (internal quotation marks omitted). OptumInsight accurately notes that there is some tension between this argument and CCGroup's position that statements about the

origin of the ETG software evince an earlier conception date for the specific invention embodied

in the '897 patent—and certainly with an argument that CCGroup presented in the context of an

earlier motion at the pleading stage that the white papers themselves contradicted the later

conception date. *See* Limitations Reply at 9–10 & n.4 (citing Limitations Opp'n at 10; Opp'n to

Mot. to Dismiss SAC (dkt. 119) at 18). Nevertheless, CCGroup's current arguments rely on a

more comprehensive set of statements and documents than merely the white paper, much if not

most of which were not available to CCGroup before the limitations period, *see* Limitations Opp'n

at 10, and the question at the pleading stage of what inferences *could* be drawn from a document

differs from the current question on OptumInsight's summary judgment motion of what inferences

*must* be drawn against CCGroup. Whether the white paper put CCGroup on notice of an earlier

conception date, whether it should have sparked an investigation, and whether a reasonable

investigation would have revealed evidence such as the interrogatory response in *Medstat* are all

questions on which a finder of fact could reasonably side with CCGroup.

OptumInsight also contends that Dr. Cave should have known at least enough to spur an

investigation as a result of serving as an expert witness for Ingenix in the *Ingenix v. Symmetry*

case, where Cave reviewed materials including at least some of the prosecution files for the Seare

'164 patent and at least one brief referencing Ingenix's efforts to provoke an interference between

the Dang '897 patent and the Seare '079 patent. *See* Limitations MSJ at 8–10 (citing, *e.g.*,

Lancaster Limitations Decl. Exs. C (Cave Dep.), H (Cave's expert report), N & O (Symmetry's

briefs)). The materials that Cave reviewed included accusations that Ingenix's patent counsel

Gorman engaged in misconduct prosecuting one or more Seare patents, but the misconduct alleged

there related to prior art not at issue here, not to the claims in this action. *See* Limitations MSJ at

9–10; Lancaster Limitations Decl. Ex. N at 8; *id.* Ex. O at 7 ¶ 16. OptumInsight asserts that Cave

reviewed "'some deposition testimony,' including Dang's deposition," Limitations MSJ at 10, but

in the portion of Cave's own deposition cited by OptumInsight for that point, Cave testifies only

that he reviewed "some" testimony, with no mention of Dang's deposition specifically and

certainly no indication that Cave read the particular testimony regarding a 1993 conception date at

issue here. Lancaster Limitations Decl. Ex. C (Cave Dep.) at 6:19–21. Cave states in his

declaration that he was not aware of that testimony.  Cave Decl. ¶ 6.

What inferences CCGroup and its lawyers should have drawn from the white paper, and whether they reasonably should have conducted an investigation that would have encompassed district court filings in previous litigation involving the patents at issue, are questions to be resolved by a finder of fact.[25]  OptumInsight is not entitled to summary judgment on the issue of whether CCGroup had constructive knowledge of its claims sufficiently early to render those claims untimely.  *See Petroleum Prods.*, 782 F. Supp. at 489 (denying summary judgment on fraudulent concealment where issues such as "intent to conceal, actual knowledge and constructive knowledge" turned "on the inferences to be drawn from [undisputed] facts").[26]

> b.   Statute of Limitations for Malicious Prosecution Claim

The parties agree that California law governs the statute of limitations for CCGroup's fourth claim, for malicious prosecution, but dispute which California statute applies.  *See* Limitations MSJ at 17; Limitations Opp'n at 25.  The parties also disagree as to when the limitations period began: OptumInsight starts the clock with its voluntary dismissal of *Cave I* claims based on the Dang Patents in April of 2014, while CCGroup contends that the limitations period would not begin until the resolution of OptumInsight's appeal in that case.[27]  Limitations MSJ at 17; Limitations Opp'n at 25.

OptumInsight invokes the one-year statute of limitations set by section 340.6(a) of the California Code of Civil Procedure, which applies to actions "against an attorney for a wrongful

---

[25] OptumInsight argues separately that it is entitled to summary judgment on CCGroup's fraudulent concealment argument because CCGroup was not diligent in investigating the validity of the patents at issue.  Limitations MSJ at 24–25; Limitations Reply at 11–12.  In the context of fraudulent concealment, diligence is merely a component of constructive knowledge, and is only required where a plaintiff "'*had enough information* to warrant an investigation which, if reasonably diligent, *would have led to the discovery* of the fraud.'"  *See Hexcel* at 1060 (quoting *Beneficial Standard*, 851 F.2d at 275) (emphasis added).  As discussed above, questions of fact remain as to whether CCGroup had such information before the limitations period and whether a diligent investigation would have revealed the basis for its claims.

[26] Because the Court concludes that OptumInsight is not entitled to summary judgment on the issue of fraudulent concealment, the Court need not resolve on this motion whether, if CCGroup fails to prevail on that issue at trial, any antitrust claim would remain for acts occurring within four years before CCGroup brought this action.

[27] The Federal Circuit issued its opinion in the *Cave I* appeal on March 21, 2018, and after denying a petition for rehearing en banc, issued its mandate in favor of OptumInsight on August 22, 2018.  The Supreme Court denied a petition for certiorari on January 7, 2019.

United States District Court
Northern District of California

act or omission, other than for actual fraud, arising in the performance of professional services."
Cal. Civ. Proc. Code § 340.6(a); *see* Limitations MSJ at 17–18 (erroneously citing the California
Civil Code, which contains no such section). CCGroup relies on "the otherwise-applicable two-
year statute of limitations." Limitations Opp'n at 25. CCGroup does not identify the statute
setting that limitations period, but OptumInsight interprets CCGroup's argument as referencing
section 335.1 of the Code of Civil Procedure, which applies to actions "for assault, battery, or
injury to, or for the death of, an individual caused by the wrongful act or neglect of another." Cal.
Civ. Proc. Code § 335.1; *see* Limitations Opp'n at 25; Limitations Reply at 14. The Court is
aware of no other potentially applicable two-year limitations statute on which CCGroup might be
relying for this argument.

By a strict reading of their express terms, neither statute would apply here. Section 335.1,
although applied by the California courts to some malicious prosecution claims brought by
individual plaintiffs, does not by its terms encompass CCGroup, a corporation, because it extends
only to claims for "injury to . . . an individual." Cal. Civ. Proc. Code § 335.1. Section 340.6(a),
although also applicable to malicious prosecution claims, applies only in an "action against an
attorney," which OptumInsight is not. Cal. Civ. Proc. Code § 340.6(a). The Court is not aware of
any directly analogous decision by the California courts addressing the statute of limitations
applicable to a malicious prosecution claim where the plaintiff is not an individual and the
defendant is neither an attorney nor a law firm.

OptumInsight concedes that "California applies a two-year *personal injury* statute of
limitations," rather than section 340.6(a), "to malicious prosecution claims brought by individuals
against parties other than attorneys," but argues that because CCGroup is not an individual,
section 340.6(a) should nevertheless apply here. Limitations MSJ at 17–18. While that argument
might carry weight if courts viewed the personal injury statute, section 335.1, as an exception to
section 340.6(a), courts have in fact taken the opposite view of the relationship between the two
statutes, holding that, where applicable, "the more specific statute of limitations under section
340.6 overrides the general catch-all statute provided by section 335.1." *Vafi v. McCloskey*, 193
Cal. App. 4th 874, 881 (2011); *id.* at 879 ("It has previously been held that section 335.1 governs

claims for malicious prosecution generally."); *see also Foxen v. Carpenter*, 6 Cal. App. 5th 284, 296 (2016) (citing *Vafi* with approval for the proposition that the "more specific statute of limitations at section 340.6(a) applied to [a] claim for malicious prosecution against an attorney, rather than general statute applicable to malicious prosecution claims generally"). Because the California courts apply section 340.6(a), as the more specific statute, to the subset of malicious prosecution claims that are brought against attorneys, it follows that section 340.6(a) *does not apply* where the defendant is not an attorney. And while the California Supreme Court has recognized that section 340.6(a) encompasses claims against law firms as well as individual attorneys, it reached that conclusion by interpreting the term "attorney," not by disregarding it. *See Beal Bank, SSB v. Arter & Hadden, LLP*, 42 Cal. 4th 503, 509 (2007) ("[T]he term 'attorney' in section 340.6 may embrace the entire partnership, law corporation, or other legal entity the client retains."). OptumInsight cites no case applying section 340.6 to a claim against a litigant itself, rather than against an attorney or firm that represented the litigant. Even accepting for the sake of argument OptumInsight's contention that "CCGroup's sole factual basis for its malicious prosecution claim is the activity of OptumInsight's attorneys," that would not render section 340.6 applicable to a claim against a non-attorney defendant.

CCGroup provides no explanation of why section 335.1 should apply in this case despite that statute's language limiting it to claims for injury to individuals. OptumInsight raises a legitimate argument that the statute should not apply to claims asserting injury to a corporation. "In ordinary usage the word 'individual' denotes a natural person not a group, association or other artificial entity." *City of Los Angeles v. Animal Def. League*, 135 Cal. App. 4th 606, 623 (2006), *disapproved on other grounds by City of Montebello v. Vasquez*, 1 Cal. 5th 409, 420 n.10 (2016). In at least one case, however, a California appellate court has applied section 335.1 to a claim by a corporation, albeit without addressing the statutory language regarding injury to individuals, and this Court is aware of no decision holding that it is unavailable to corporate plaintiffs, whether in the context of malicious prosecution claims or otherwise. *See Roger Cleveland Golf Co., Inc. v. Krane & Smith, APC*, 25 Cal. App. 4th 660, 668, 675–683 (2014), *disapproved on other grounds*

*by Lee v. Hanley*, 61 Cal. 4th 1225, 1239 (2015).[28]

"In the absence of a pronouncement by the highest court of a state, the federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently." *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983). *Roger Cleveland* is therefore a strong indication that section 335.1 can apply to malpractice claims brought by corporations, despite the statutory language suggesting otherwise. Under the circumstances here, however, the Court need not conclusively resolve this question. Having determined above that section 340.6(a) does not apply, the remaining choice is not between section 340.6(a) and section 335.1, but rather whether to apply section 335.1 or neither of those statutes. Section 343 of the California Code of Civil Procedure provides a four-year statute of limitations "when no other more specific limitation period is applicable." *Brandenburg v. Eureka Redevelopment Agency*, 152 Cal. App. 4th 1350, 1358–59 (2007) (emphasis omitted). Even accepting OptumInsight's view that the limitations period began in April of 2014, CCGroup's July 2015 complaint in this case was timely under either the two-year period of section 335.1 or, in the absence of any suggestion that some other statute of limitations could apply, the four-year period of section 343. Because section 340.6(a) does not apply, CCGroup's malicious prosecution claim is not barred by the statute of limitations, and OptumInsight's motion for summary judgment on that basis is DENIED.

c. Statute of Limitations for Lanham Act False Advertising Claim

Because the Lanham Act does not include an explicit statute of limitations, courts borrow the statute of limitations applicable to similar claims under state law. The Ninth Circuit has held, and the parties here agree, that California's three-year statute of limitations for fraud is applicable to Lanham Act claims for false advertising. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002); Limitations MSJ at 16; Limitations Opp'n at 25. "[T]he state

---

[28] The court in *Lee* disapproved of the *Roger Cleveland* decision to the extent that it limited section 340.6(a) to "a professional negligence statute" and declined to apply it to a claim brought by someone other than the client of a defendant attorney, but *Lee* does not indicate that the *Roger Cleveland* court was wrong to apply section 335.1 to a claim by a corporate plaintiff, or that section 340.6(a) applies to claims against non-attorney defendants. *See Lee*, 61 Cal. 4th at 1233–39.

limitations period runs from the time the plaintiff knew or should have known about his [Lanham

Act] § 43(a) cause of action." *Jarrow Formulas*, 304 F.3d at 838. This test is equivalent to the

constructive knowledge portion of the fraudulent concealment analysis above, but without a

requirement that the defendant engage in affirmative acts of concealment. Because, for the

reasons discussed above, a finder of fact could reasonably conclude that OptumInsight's document

production in *Cave I* was the first time that CCGroup had actual or constructive knowledge of the

purported fraud on the PTO that (according to CCGroup) renders OptumInsight's advertising

false, OptumInsight is not entitled to summary judgment on this claim based on the statute of

limitations.

\* \* \*

For the reasons discussed above, OptumInsight's motion for summary judgment based on

statutes of limitations is DENIED. CCGroup also briefly requests summary judgment on

OptumInsight's statute of limitations defenses. *See* Pl.'s MSJ at 39–40. Because issues of fact

remain as to when CCGroup should have known about the conduct at issue and whether CCGroup

is entitled to tolling based on fraudulent concealment, that request is DENIED as to the antitrust

and Lanham Act claims. The Court GRANTS CCGroup's motion with respect to the statute of

limitations for its malicious prosecution claim, and holds that that claim is timely.

## C.    Motions for Summary Judgment on the Merits

### 1.    Whether the Dang Patents Are Unenforceable by Inequitable Conduct

CCGroup argues that it is entitled to summary judgment that the Dang Patents are

unenforceable due to inequitable conduct during the reexamination of Dang's '897 patent in 2000.

Pl.'s MSJ at 8–28. OptumInsight does not seek summary judgment on this issue. The Federal

Circuit has described the standard for establishing inequitable conduct as follows:

> "To prove inequitable conduct, the challenger must show by clear and
> convincing evidence that the patent applicant (1) misrepresented or
> omitted information material to patentability, and (2) did so with
> specific intent to mislead or deceive" the U.S. Patent and Trademark
> Office (PTO). *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511,
> 519 (Fed. Cir. 2012). "When the patentee has engaged in affirmative
> acts of egregious misconduct, such as the filing of an unmistakably
> false affidavit, the misconduct is material." *Therasense, Inc. v.*

63

*Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc).

*Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1341–42 (Fed. Cir. 2013).[29]  "[A] finding of inequitable conduct in the acquisition of even a single claim of a patent renders the remaining claims of that patent unenforceable, even those without the taint of inequitable conduct." *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374–75 (Fed. Cir. 2005).  In some circumstances, "inequitable conduct 'early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application'" through the doctrine of infectious unenforceability. *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (quoting *Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990)).

CCGroup asserts that OptumInsight's predecessor Symmetry made the following purportedly unmistakably false assertions to the PTO: (1) that Dang had not conceived the concepts of "dynamic time windows" and "shifting" until August of 1994, which was after Symmetry responded to Aetna's RFP in June of that year, *id.* at 15–20; (2) that the invention was not ready for patenting until August 24, 1994, including both that it was not reduced to practice and the RFP response was not an enabling disclosure, *id.* at 20–25; and (3) that Symmetry's attorney Rosenbaum did not learn of the Aetna RFP response until July of 2000, when he in fact

---

[29] OptumInsight argues that the standard for showing fraud on the PTO in a *Walker Process* claim is distinct from the *Therasense* inequitable conduct standard, and that a showing of egregious misconduct cannot substitute for a showing of but-for materiality in the context of *Walker Process*.  Opp'n to Pl.'s MSJ at 8.  The Federal Circuit has not yet resolved whether the standards are identical, and the parties have not identified a case explicitly considering this question that turned on its answer.  *See TransWeb*, 812 F.3d at 1307 ("After *Therasense,* the showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability *may* be nearly identical." (emphasis added)).  Before *Therasense*, a "finding of *Walker Process* fraud require[d] higher threshold showings of both intent and materiality than does a finding of inequitable conduct."  *Nobelpharma*, 141 F.3d at 1070–71.  Since that decision, however, both inequitable conduct and *Walker Process* require a showing of but-for materiality.  *See id.*; *Therasense*, 649 F.3d at 1291.  The *Therasense* court's rationale for considering affirmative egregious misconduct inherently material—including the inference that parties would not engage in such conduct if it were not material, and precedent holding "'there is no room to argue that submission of false affidavits is not material'"—would seem to apply equally in the *Walker Process* context.  *See Therasense*, 649 F.3d at 1292–93 (quoting *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983)).  As discussed below, CCGroup has not established beyond any question of material fact that OptumInsight engaged in affirmative egregious misconduct, and CCGroup is therefore not entitled to summary judgment regardless of whether such misconduct would in itself satisfy the standard for materiality.

learned of it at least as early as August of 1999, *id.* at 26.

Among other representations along the same lines, Symmetry presented an August 1994 conception date in its Information Disclosure Statement (the "IDS") to the PTO for the reexamination:

> In August of 1994 Mr. Dang conceived of a new ETG construct that first chronologically groups each claim record into an ETG episode having a specific clean period, and then, if a later presented claim record warrants, based on the diagnosis or treatment coded on the later presented claim, potentially shifts the episode into another ETG to reflect the patient's changed condition. The episode's clean period for the purposes of grouping the next record thus could be reset to a new ETGs [sic] specific clean period. Hence, the window of time in which records could group to an episode can change as each record is grouped, *i.e.*, it is dynamic. Thus, the use of the dynamic time window allows for the shifting of an episode from one ETG to another ETG to reflect a patient's changed condition.

Howenstine Decl. re Pl.'s MSJ Ex. 65 (IDS) at 5.  There is some evidence from which a jury could conclude that Dang in fact conceived the ETG invention described by the '897 patent, including the dynamic time window and shifting features addressed in the passage above, before August of 1994.  For one thing, CCGroup's expert witness Dr. Bergeron opines that the June 12, 1994 RFP response described the dynamic time windows claimed in the patent.  *See* Bergeron Report ¶¶ 77–91.  Dang also testified in a 2013 deposition that the RFP response described the concepts of dynamic time windows and shifting, that the ETG software was functional at the time of the RFP response, and that Dang had conceived the invention in 1993.  Howenstine Decl. re Pl.'s MSJ Ex. 7 (Dang Dep.) at 31:16–32:2, 42:13–22, 47:1–5, 79:20–80:25.  According to Dang, the ETG software at that time "accomplishes the concepts that [he] had."  Lancaster Opp'n Decl. Ex. 10 (Dang Dep.) at 210:25–211:1.  Symmetry provided an interrogatory answer to MedStat stating that, for the '897 patent, "the earliest date of conception presently known to Symmetry is at least as early as September 1993."  Howenstine Decl. re Pl.'s MSJ Ex. 67.  If a jury credits that evidence, which is only some of the evidence CCGroup cites in its motion on this point, *see* Pl.'s MSJ at 16–20, it would follow that the assertion to the PTO that Dang did not conceive of shifting

and dynamic time windows until August of 1994 was false.[30]  The same evidence could indicate that statements asserting a lack of reduction to practice and enabling disclosures were false, and that the invention was in fact ready for patenting at the time of the RFP response.

The question on CCGroup's motion for summary judgment, however, is not whether a jury could reasonably find it its favor, but whether a jury could reasonably find to the contrary.  Other evidence in the record tends to suggest that the invention described in the '897 patent was not conceived, not disclosed, or not reduced to practice until after the RFP response, consistent with Symmetry's representations during the reexamination.  For example, despite Symmetry's interrogatory response in the Medstat litigation stating that the '897 patent was invented no later than 1993, Dang testified in a deposition in the same case that he invented dynamic time windows in 1994.  Lancaster Opp'n Decl. Ex. 7 (Dang Dep.) at 35:21–36:2.  In a 2013 deposition in *Cave I*, Dang testified that although the RFP response disclosed a form of "dynamic time windows and shifting," *id.* Ex. 10 (Dang Dep.) at 113:1–8, the methods that Symmetry's prototype product used at the time of the RFP response constituted "a different kind of program" from the method conceived in August, and while the earlier product "included windows that you could call dynamic, . . . it wasn't dynamic in the same fashion," *id.* at 118:4–16, 210:24–25.  Dang and Mitchell Portnoy both testified that the earlier version of the software attempted to group patients' claims by examining the full array of claims for "gaps" or "clean periods" exceeding a certain threshold between claims, while the later version processed claims chronologically, repeatedly resetting the length of what "clean period" would be necessary to end a treatment group based on the nature of the most recently processed claim.  *Id.* at 120:7–10; *id.* Ex. 18 (Portnoy Dep.) at 111:21–112:24.

Portnoy testified in 2017 that during the time Symmetry was working with Aetna in the summer of 1994, "we had an idea of what we wanted to do, but we couldn't do anything yet."

---

[30] A jury might also interpret Dang's demeanor when pressed about the discrepancies between the positions taken in the reexamination and his testimony in *Cave I* as suggesting an effort to rationalize earlier positions that he was not comfortable fully defending.  Lancaster Opp'n Decl. Ex. 10A (videos of Dang's deposition testimony, particularly the video file "DD-P115, L19.mp4," corresponding to testimony at 115:19–120:10 of Exhibit 10).

Lancaster Opp'n Decl. Ex. 18 (Portnoy Dep.) at 68:11–12.  One of Symmetry's attorney's handwritten meeting notes from June of 2000 includes the phrase "Aetna RFP – Symmetry didn't group data until 8/94."  Lancaster Opp'n Decl. Ex. 32 at MCEC00028447.  To the extent that Symmetry was producing grouped data around the time of the RFP, Portnoy testified that the software produced inaccuracies that Symmetry's personnel manually corrected to hide the software's deficiencies:

> A. . . . We had a general idea of how the methodology is supposed to work, but getting the software to do what we wanted it to do was not so easy. When you look at the data -- when you look at the output from the data and you were to – it's a verbose answer. I'm sorry.
>
> If you look at the detail data for one episode of care and you look at that data within the context of all the other episodes that the patient may be treating for, if you look at the data the way let's say a client would be looking at the data, then you have to make certain that the data is arranged in such a way that the face validity matches what you would expect to do.
>
> So when you -- when we outputted this data from Aetna, you have to look at thousands and thousands of records to make certain that is the -- is the software that we're currently using, is it producing the effect that we want it to produce? And you have to look at all the detail claims to see that does the fifth record really belong to that last episode, or is this something new?
>
> So there was all these manipulations going on during this time frame where -- it's embarrassing -- what you do at that stage is "Okay. Well, this doesn't really -- this claim says this ETG, but it's not. It really belongs with the last one." So we'd make the change manually. We were doing that thousands and thousands of thousands of times to make certain that when someone actually looked at the data in some of this detailed way they could see that, "Oh, yeah, this does make sense" even if the grouper's output wasn't acting properly. Does that make sense?
>
> **Q. So was it you and Dennis went through millions of lines of tables?**
>
> A. Dennis did.
>
> **Q. And you made these determinations on a line-by-line basis?**
>
> A. In many -- well, certainly -- it was not the millions and millions of records for all of this, but clearly when it came to this ETG, 388, I mean, we're taking the client along with us. So we're looking at all the records for these episodes so that when you look at the detail they all make sense.

Lancaster Opp'n Decl. Ex. 18 (Portnoy Dep.) at 110:18–112:10.  A jury could take that testimony

1    to mean not only that the software required human intervention at that time, but that the

2    intervention required to produce an acceptable result relied on subjective judgment calls of which

3    claims best fit which treatment groups, rather than any process resembling the method claimed in

4    the '897 patent.

5            Taking together the evidence offered by OptumInsight, including the expert opinions of

6    Dr. van Duren, a jury might reasonably determine that the '897 patent was not conceived, reduced

7    to practice, or described in an enabling disclosure before Dang prepared detailed flowcharts in

8    August of 1994, as Symmetry represented to the PTO in the reexamination.  Even if the RFP

9    response is ultimately found to disclose the claims of the '897 patent, a jury might still find that

10   the Symmetry personnel involved with the reexamination genuinely *believed* that the differences

11   in method from the RFP response to the late August flowcharts made the difference for when the

12   patent was conceived, such that in taking that position, they lacked the "specific intent to mislead

13   or deceive" the PTO necessary for a finding of inequitable conduct.  *See Intellect Wireless*, 732

14   F.3d at 1341–42.

15           CCGroup's motion presents Rosenbaum's purportedly false statement about when he

16   learned of the RFP response primarily as evidence of Symmetry's general intent to deceive the

17   PTO; it is not clear from the motion whether CCGroup believes this purported misrepresentation

18   could in itself constitute inequitable conduct sufficient to render the Dang Patents unenforceable.

19   In its reply, CCGroup more clearly argues that Rosenbaum's affidavit is "an unmistakably false

20   statement."  Reply re Pl.'s MSJ at 12–13.  To the extent that CCGroup relies on this purported

21   falsehood as a separate instance of inequitable conduct—and to the extent that CCGroup should be

22   permitted to do so in its reply after failing to clearly present such an argument in its motion—it is

23   not entitled to summary judgment on that issue.

24           There is evidence that Rosenbaum was aware of the RFP response in 1999, and

25   OptumInsight does not appear to dispute such awareness in its briefs.  *See* Howenstine Decl. re

26   Pl.'s MSJ Ex. 46 (notes from a meeting between Rosenbaum and Portnoy in August of 1999).

27   Contrary to the CCGroup's characterization of Rosenbaum's declaration in its motion, however,

28   Rosenbaum did not clearly state in his declaration to the PTO that he first became aware of the

RFP response in July of 2000.

While a reader might be forgiven for coming away with that impression, the only discoveries that Rosenbaum explicitly attributes to that month are "that during the period from November 1993 until early 1994, Aetna's Health Insurance Consulting Group ('HIC') provided raw data to Symmetry to enable testing of the various versions of the ETG Program being coded and implemented by Dan Gardiner," and that "it was determined that HIC encouraged Aetna Healthplan to send Symmetry a Request for Proposal ('RFP') for the development of grouper software on May 13, 1994." Howenstine Decl. re Pl.'s MSJ Ex. 64 (Rosenbaum Affidavit) ¶¶ 5, 6. CCGroup does not identify unambiguous evidence that Rosenbaum clearly knew either of those specific facts—that HIC provided raw data to Symmetry *during the dates stated*[31] or that it "encouraged" Aetna to send the RFP—before July of 2000. Other aspects of the history of Symmetry's work with Aetna, including Symmetry's response to the RFP, are presented simply as fact, without an explicit statement that Rosenbaum first learned those facts in 2000, although such discovery might well be implied by presenting those facts just after facts Rosenbaum states that he learned in 2000. *See id.* While the provision of technically accurate information "in a very misleading way" can support an inference of intent to deceive, the Court hesitates to hold that such an inference is *required* at summary judgment. *Cf. Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d 1334, 1349 (Fed. Cir. 2008) (affirming the inference of deceptive intent from misleading statements after a bench trial). Moreover, CCGroup does not argue that the timing of Rosenbaum's discovery of information that Symmetry disclosed to the PTO—albeit perhaps later than it should have—would have been material to the outcome of the reexamination, and it is not clear that Rosenbaum's perhaps misleading-but-factually-accurate affidavit qualifies as

---

[31] On this issue in particular, Rosenbaum's affidavit at best walks a very fine line. Rosenbaum's 1999 meeting notes indicate that, with respect to the RFP response:

"- opportunity came about b/c [illegible, possibly 'of'] Aetna
provided DATATA [sic]
- to support development"

Howenstine Decl. re Pl.'s MSJ Ex. 46. Nevertheless, the meeting notes do not reflect the entirety of the information Rosenbaum claimed to have first learned in 2000, because the notes do not include the dates that data was shared, which arguably would have been particularly relevant to a reexamination considering, among other things, the timeline of Dang's conception as compared to the RFP response.

"unmistakably false" such that it would constitute presumptively material "egregious misconduct." *See Therasense*, 649 F.3d at 1292. CCGroup therefore is not entitled to summary judgment on the issue of inequitable conduct based on Rosenbaum's statement of when he discovered certain facts.

A portion of CCGroup's motion in the section addressing inequitable conduct regarding the Dang Patents suggests that Symmetry engaged in misconduct with respect to its discovery obligations during litigation against MedStat from 1998 to 2000. Pl.'s MSJ at 10–13. CCGroup does not argue that violations of OptumInsight's discovery obligations would render the patents unenforceable, and the Court declines to address the issue of whether such violations occurred. Instead, CCGroup argues that Symmetry's conduct during that litigation, which CCGroup characterizes as seeking to avoid disclosure of the RFP response, supports an inference that Symmetry considered the RFP response damaging and misled the PTO regarding its significance. Pl.'s MSJ at 27. Such an inference might well be possible, but it is far from clear enough to warrant summary judgment. As one example of another possible interpretation of the facts, even if Symmetry's view of the RFP response was exactly as it represented to the PTO during the reexamination, it might still have sought to avoid disclosing it to Medstat for fear that Medstat would draw the same conclusions that CCGroup draws here—for the purpose of this hypothetical, incorrect conclusions—and thus be less inclined to settle the case on terms favorable to Symmetry. Such a scenario might well raise questions as to the propriety of Symmetry's litigation conduct, but would not show that Symmetry deceived the PTO.

While there is evidence to support CCGroup's position that Symmetry engaged in inequitable conduct in the reexamination of the '897 patent, the evidence is not so clear that a jury could draw no other reasonable conclusion. CCGroup is not entitled to summary judgment on this issue. Because CCGroup is not entitled to judgment that even the '897 patent is unenforceable, the Court does not reach the issue of whether any subsequently-issued patent is tainted by the doctrine of infectious unenforceability.

### 2. Whether the Aetna RFP Response Was an Invalidating Offer for Sale

CCGroup seeks summary adjudication that Symmetry's response to Aetna's RFP served as an offer for sale invalidating the '897 patent. Before the enactment of the America Invents Act

("AIA") in 2011, and thus at all times relevant to the application for and issuance of the '897 patent, 35 U.S.C. § 102(b) provided that a patent would not issue for an invention "on sale in this country, more than one year prior to the date of the application for patent in the United States." Because the June 1994 RFP response predated the August 1995 patent application by more than a year, the patent would be invalid under then-existing § 102(b) if the RFP response constituted an offer for sale of the invention described in the application. *See generally Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1371–79 (Fed. Cir. 2016) (discussing the on-sale bar to patentability).

As discussed above the Court holds that a jury could find that the '897 patent had not yet been conceived at the time of the RFP response. If the '897 patent had not yet been conceived, it could not have been offered for sale. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67–68 (1998) (holding that "the invention must be ready for patenting" to trigger the on-sale bar). A jury could also credit Dr. van Duren's opinion that the RFP response does not describe the invention disclosed in the '897 patent. *See* van Duren Report ¶¶ 69–71, 78, 87–134. CCGroup's request for summary judgment on this issue is DENIED.

### 3. Costs for Claims Associated with the Dang Patents

Although OptumInsight does not seek summary judgment with respect to the validity or enforceability of the Dang Patents, it raises one argument with respect to those patents, perhaps incongruously, in the context of its arguments regarding claim preclusion and the Seare patents. *See* Def.'s Merits MSJ at 15; Reply re Def.'s Merits MSJ at 11. When OptumInsight voluntarily dismissed counterclaims for infringement of the Dang Patents in *Cave I* and CCGroup dismissed its declaratory judgment claims with respect to those patents, the parties agreed that each would "bear its own costs with respect to the claims dismissed by this stipulation." Bjorklund Decl. re Def.'s Mot. to Exclude Ex. 14. In filing that stipulation, CCGroup waived any claim to recover its costs incurred with respect to the Dang Patent claims in *Cave I*, and cannot now recover those costs as antitrust damages, malicious prosecution damages, or otherwise. The parties have not addressed the extent to which the costs for the Dang claims can be distinguished and separated from other costs not waived, and this order does not reach that issue.

The "costs" waived by the stipulation exclude attorneys' fees:

> CCGroup and OptumInsight also agree and stipulate that this dismissal shall not affect the rights or defenses of either party concerning any motion made for recovery of attorneys' fees under 35 U.S.C. § 285 in this matter, including any motion based in whole or in part on the dismissed claims.

Bjorklund Decl. re Def.'s Mot. to Exclude Ex. 14. Although the stipulation does not explicitly address whether attorneys' fees could be sought as damages in a separate action, the usual practice in adjudicating litigation expenses is to distinguish between "attorneys' fees" and "costs," and the stipulation indicates that the parties did not intend to deviate from that practice in its use of only the word "costs" to describe the expenses that each party would bear. The stipulation therefore does not bar CCGroup from recovering damages based on its attorneys' fees incurred litigating claims based on the Dang Patents in *Cave I*.

### 4. Whether the Seare Patents Are Unenforceable

Both parties seek summary judgment on the enforceability of the Seare patents at issue. OptumInsight moves for judgment on this issue solely on a theory of claim preclusion, while CCGroup moves for judgment on the merits of its position that inequitable conduct during the interference between the Seare '079 patent and the Dang '897 patent renders unenforceable the '079 patent and the subsequent Seare '252 patent.

#### a. OptumInsight's Motion: Claim Preclusion

OptumInsight moves for judgment with respect to the validity and enforceability of the Seare patents only on the basis of claim preclusion. In *Cave I*, Judge Davila held on summary judgment that Symmetry's response to the Aetna RFP was not invalidating prior art as to the '079 patent because the RFP response was not public, and the jury found in OptumInsight's favor on the questions of whether certain other materials not at issue here invalidated the '079 patent. *See Cave I*, 2015 WL 740379, at *15; *Cave I*, ECF Doc. No. 366 (Jury Verdict). This Court previously held at the pleading stage that CCGroup's claims were not barred by claim preclusion:

> "The general concept of claim preclusion [also known as res judicata] is that when a final judgment is rendered on the merits, another action may not be maintained between the parties on the same 'claim,' and defenses that were raised or could have been raised in that action are extinguished." *Hallco Mfg. Co., Inc. v. Foster*, 256 F.3d 1290, 1295

(Fed. Cir. 2001) (citing Restatement (Second) of Judgments §§ 18–19). "Claim preclusion requires (1) an identity of parties or their privies, (2) a final judgment on the merits of the first suit, and (3) the later claim to be based on the same set of transactional facts as the first claim such that the later claim should have been litigated in the prior case." *Bowers Inv. Co., LLC v. United States*, 695 F.3d 1380, 1384 (Fed. Cir. 2012).

This doctrine requires a close identity of *claims*. The Federal Circuit has held, for example, that where a prior judgment established "both that [a] patent was valid and that [a party] infringed," claim preclusion does not bar an invalidity defense when the same party is later sued for infringing the same patent with a different device unless the second allegedly infringing device is "essentially the same" as the earlier device found to infringe. *See Hallco*, 256 F.3d at 1295–96 (summarizing *Foster v. Hallco Mfg. Co.*, 947 F.2d 469 (Fed. Cir. 1991)). Even if the invalidity defense would rest on the same basic facts in the second case as in the first, the defense is not precluded under this doctrine if the *claims* are not substantially the same. "While defenses to a 'claim' are extinguished by application of the doctrine of claim preclusion, the facts related to the defense do not in themselves constitute the transaction or 'claim.'" *Foster*, 947 F.2d at 479.

While there is overlap on some issues, all of CCGroup's claims in this case—two antitrust claims, a false advertising claim, and a malicious prosecution claim—rely on key alleged facts that fall outside the scope of the claims in *Cave I*, such as OptumInsight's market dominance and its alleged efforts to enforce and advertise its patents. The cases cited in OptumInsight's Reply and supplemental brief do not fit the facts of this case. *See, e.g.*, *Cummins, Inc. v. TAS Distrib. Co., Inc.*, 700 F.3d 1329, 1336 (Fed. Cir. 2012) (applying principles of Illinois res judicata law not applicable to the present case, which has no connection to Illinois); *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1380 (Fed. Cir. 2008) (applying claim preclusion in a second suit asserting infringement of the same patent by "essentially the same" product as in a previous infringement suit); *Crystal Imp. Corp. v. AVID Identification Sys., Inc.*, 582 F. Supp. 2d 1166 (D. Minn. 2008) (holding that claim preclusion barred the second of two antitrust actions, with no suggestion that an earlier infringement action barred either of the antitrust actions). The Court concludes that claim preclusion does not apply here.

Order re 1st MTD at 11–12. Although the Court previously analyzed the issue based on Federal Circuit precedent because the parties believed at the time that the Federal Circuit would hear any appeal of this case, the Ninth Circuit's standard for claim preclusion is substantially similar. *See, e.g.*, *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) ("The doctrine is applicable whenever there is '(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties.'" (citation omitted)). The Court also rejected OptumInsight's related argument that CCGroup's claims were compulsory counterclaims in *Cave*

*I*, relying on the Ninth Circuit's rule "that a 'claim that patent infringement litigation violated an antitrust statute is a permissive, not a mandatory, counterclaim in a patent infringement case, and is not barred in a subsequent suit by failure to raise it in the infringement suit.'" *Id.* at 14–15 (quoting *Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 536–37 (9th Cir. 1995)).

To the extent OptumInsight's motion could be construed as seeking to preclude CCGroup's claims here based on OptumInsight's own infringement claims in the prior action, that argument is barred by *Hydranautics*. OptumInsight distinguishes that case on the basis that it did not involve an affirmative "claim of patent invalidity or fraud," and emphasizes that it "is *not* relying on" the compulsory counterclaim rule. Reply re Def.'s Merits MSJ at 8–9. Taking into account the rule of *Hydranautics* and OptumInsight's characterization of its theory in its reply, the Court understands OptumInsight's claim preclusion argument as founded solely on CCGroup's declaratory judgment claim in *Cave I*.

"The central criterion in determining whether there is an identity of claims between the first and second adjudications is whether the two suits arise out of the same transactional nucleus of facts." *Owens*, 244 F.3d at 714 (citation and internal quotation marks omitted). As noted above, the Court previously held that claim preclusion did not apply here because CCGroup's claims in this action required proof of a number of facts outside the scope of any claim in *Cave I*, such as OptumInsight's market power or its intent in bringing infringement claims. The only case OptumInsight cites from the Ninth Circuit for applying claim preclusion where a mere subset of the issues relevant to an antitrust claim were previously litigated is an unpublished, nonprecedential decision applying Ohio preclusion law to bar antitrust claims based on a default judgment previously entered on Ohio contract claims. *See Cent. Garden & Pet Co., Inc. v. The Scotts Co.*, 85 F. App'x 633 (9th Cir. 2004).

While neither case is directly analogous, the precedential holding of *Hydranautics* is more applicable than *Central Garden*. Both the doctrine of claim preclusion and the compulsory counterclaim rule addressed in *Hydranautics* look to the factual overlap between the claims. *Owens*, 244 F.3d at 714; *Hydranautics*, 70 F.3d at 536. An infringement claim necessarily implicates the validity and enforceability of a patent, such that CCGroup's declaratory judgment

74

claim in *Cave I* does not overlap with the issues in CCGroup's current claims any more than OptumInsight's infringement claims did, nor any more than the infringement claims held not preclusive in *Hydranautics* overlapped with the subsequent antitrust claims. CCGroup's declaratory judgment claim does not change the fact that, had CCGroup chosen to bring its present claims in *Cave I*, that court might well have "sever[ed] the issues and resolve the infringement [and declaratory judgment] case first." *See Hydranautics*, 70 F.3d at 536. The declaratory judgment claim also does not alter the *Hydranautics* court's rationale that allowing antitrust claims to be brought separately from underlying patent claims ensures that the regional circuits will hear appeals of those claims, avoiding the development of "a difference between the antitrust law generally applicable within each regional circuit, and antitrust law in predatory patent infringement cases." *See id.* Finally, just as in *Hydranautics*, Judge Davila was not called upon to decide in *Cave I* "whether [OptumInsight] obtained its [Seare] patent[s] fraudulently," *see id.* at 537, because CCGroup raised only arguments related to prior art—not fraud or inequitable conduct—in support of its claim for declaratory judgment. *See Cave Consulting Grp., LLC v. OptumInsight, Inc.*, No. 5:11-cv-00469-EJD, 2015 WL 740379, at *13 (N.D. Cal. Feb. 20, 2015). A holding that CCGroup's present claims are barred by its *Cave I* declaratory judgment claim would therefore conflict with the reasoning of *Hydranautics*, which remains binding precedent in this circuit. OptumInsight's motion of summary judgment on the issue of claim preclusion is DENIED.[32]

### b. Inequitable Conduct Regarding the Seare Patents

The only claim of the Seare '079 patent is identical to the first claim of the Dang '897 patent. OptumInsight (then Ingenix) applied for the '079 patent in 1999, claiming a priority date

---

[32] In the time since briefing on the present motions closed, the Federal Circuit reversed aspects of the *Cave I* verdict unrelated to this case and remanded to the district court. Judge Davila entered a new judgment in the case consistent with the Federal Circuit's holding, and also included judgment in favor of OptumInsight on CCGroup's declaratory judgment claim—reflecting issues decided before the appeal but not included in the original judgment. CCGroup filed a motion to alter judgment and a notice of appeal, and this Court requested supplemental briefing on any preclusive effect of the amended judgment. OptumInsight declined to oppose CCGroup's motion to alter judgment, having concluded that the issue did not warrant the resources necessary to contest it, and elected to base its arguments regarding preclusion on only the original form of judgment in *Cave I*. *See* Def.'s Response to June 18, 2019 Order (dkt. 348).

in June of 1994 based on an earlier Seare patent not directly at issue in this case, and provoking an interference with the '897 patent to determine priority. In an interference under the pre-AIA statutory framework, "priority of invention [went] to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).

After Ingenix and Symmetry merged, the PTO determined that Ingenix was the real party in interest for both patents and on that basis issued the following order to show cause:

> Accordingly, it is
>
> ORDERED that judgment will be entered against junior party Dang, unless within four weeks of the date of this communication Ingenix, Inc. shows good cause why judgment should not be entered against the junior party; and
>
> FURTHER ORDERED that the response to the show cause order may be in the form of an election by Ingenix, Inc., made by a corporate officer or counsel after a thorough investigation of the applicable facts, which party should prevail on priority with respect to the subject matter of the count in this interference, and the election shall expressly state that it is made on behalf of Ingenix, Inc. as the real party in interest of both application 09/437,567 [later issued as the '079 patent] and Patent No. 5,835,897.

Howenstine Decl. re Pl.'s MSJ Ex. 122 at PTO00001034. Attorney Kevin McMahon asserted that the Seare '079 patent was entitled to priority:

> Based on a thorough investigation of the relevant facts, Lead Counsel for the Party Seare reports that the Party Seare is entitled to priority with respect to the subject matter of the count of the present interference. Ingenix, Inc., the real party in interest of both Seare application 09/437,567 and Dang Patent No. 5,835,897, therefore hereby elects that the Party Seare should prevail on priority with respect to the subject matter of such count.

*Id.* at PTO00001028. On October 9, 2003, the PTO entered judgment against Dang on the basis that "Ingenix Inc. has elected that the senior party should prevail in this interference." *Id.* at PTO00000876.

CCGroup moves for summary judgment that the Seare '079 patent is unenforceable due to inequitable conduct because McMahon's assertion of priority was false, and that the Seare '252 patent is subject to infectious unenforceability. Pl.'s MSJ at 28–33. CCGroup concedes that the

"details of the decision-making process during [McMahon's] investigation of priority remain veiled," but argues that McMahon's exposure to documents and testimony indicating a 1993 conception date for the Dang '897 patent show that he knew Dang should have had priority. Pl.'s MSJ at 30–31. As an attorney for Ingenix in its litigation against Symmetry, McMahon had deposed Dang in 2002, at which time Dang stated that he "came up with the idea of developing what has now become the Episode Treatment Groups . . . probably sometime in the spring, summer of 1993." Howenstine Decl. re Pl.'s MSJ Ex. 125 (Dang Dep.) at 27:19–24. In the context of the interference, McMahon sent an email to Symmetry's attorney Douglas Erickson on May 9, 2003 indicating that "[o]nce the acquisition closes" and the PTO asks Ingenix to determine priority, Ingenix would need to review any documents not previously produced evincing an early conception date of Dang's invention, "and to discuss their significance with Dennis [Dang] and/or Gardiner." Howenstine Decl. re Pl.'s MSJ Ex. 86. Erickson's notes from that period indicate that Dang, Gardiner, and Portnoy were in fact available to assist McMahon's investigation. Howenstine Decl. re Pl.'s MSJ Ex. 38 (Erickson Dep.) at 158:6–159:18. According to CCGroup, "this group knew and could prove that Dang conceived in 1993 and had developed the ETG software before Seare's June 23, 1994 filing date." Pl.'s MSJ at 31.

As discussed above in the context of the enforceability of the Dang Patents, a jury might agree that Dang conceived the invention described by the '897 patent in 1993, but might conversely determine that Dang did not conceive aspects of the invention until Dang prepared detailed flowcharts in August of 1994, or at least that Dang and others involved genuinely believed that changes to the methodology around that time established the date of conception. If a jury reached the latter conclusion, it would follow that the Symmetry personnel available to meet with McMahon would presumably have told him that August 1994 was the correct conception date, and McMahon could reasonably have relied on that representation. CCGroup does not argue that the correct priority date for Seare's '079 patent was any later than the June 23, 1994 filing date of the earlier Seare patent from which Ingenix claimed priority. A jury could therefore conclude that McMahon's representation of priority was correct, or at least made in good faith, and CCGroup is not entitled to summary judgment that the Seare patents are unenforceable due to

inequitable conduct.[33]

### 5. Whether the Seare '079 Patent Was Conceived or Reduced to Practice Before the Aetna RFP Response

In the alternative to a ruling that the Seare patents are unenforceable, CCGroup seeks summary adjudication that the Seare '079 patent was not conceived or reduced to practice before the date of Symmetry's response to Aetna's RFP, on the basis that "OptumInsight has not presented any evidence and cannot present any evidence that such conception or reduction to practice occurred before the June 12, 1994 Aetna RFP Response." Pl.'s MSJ at 33. Although OptumInsight does not address this aspect of CCGroup's motion specifically in its opposition brief, it is not OptumInsight's burden to present such evidence. CCGroup, as plaintiff, has the burden to prove its claims, but presents no evidence that Seare first conceived or reduced to practice the '079 patent after the Aetna RFP response. CCGroup's expert Stephen Kunin stated at his deposition that he "d[id]n't have any information about Seare's conception date." Lancaster Decl. re Opp'n to Pl.'s MSJ Ex. 15 (Kunin Dep.) at 161:20–162:1. CCGroup is not entitled to summary judgment on this issue based on a lack of evidence.

In resolving this aspect of CCGroup's motion, the Court need not reach the parties' dispute as to whether to exclude evidence that OptumInsight first identified in an amended interrogatory response on the last day of discovery as purportedly showing an earlier Seare conception date. *See* Pl.'s MSJ at 29 n.25; Opp'n to Pl.'s MSJ at 31–32 & n.9; Reply re Pl.'s MSJ at 15.

### 6. Definition of the Product Market

CCGroup seeks summary adjudication "that the relevant market for purposes of CCGroup's Sherman Act claims is the U.S. market for software that groups claims data into episodes of care," excluding "groupers that only process certain subsets of medical claims data

---

[33] OptumInsight did not seek summary judgment on the validity of the Seare '079 patent. The Court considered at the hearing whether OptumInsight might nevertheless be entitled to judgment based on CCGroup's failure to present evidence of Seare's conception date. A jury might reasonably conclude from this record that McMahon lacked a reasonable basis for his representation to the PTO if the jury agrees with CCGroup that Dang conceived his invention in 1993 or early 1994, and if McMahon had no evidence to suggest a conception date for the '079 patent earlier than Seare's filing date. The Court declines to grant summary judgment for OptumInsight on this issue.

(such as services provided in hospital visits)." Pl.'s MSJ at 35–36. CCGroup relies on Dr.

Sullivan's expert report, among other evidence such as internal documents from competitors in the

industry, to support this market definition. *See id.* at 35–37.

As briefly summarized in a 2013 decision by Judge Beeler:

> [An antitrust plaintiff] must establish that [the defendant] has market power in a "relevant market," meaning a relevant product market and a relevant geographic market. *See Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 42–43 (2006) (tying); *Forsyth v. Humana*, 114 F.3d 1467, 1476–77 (9th Cir. 1997) (monopolization and attempted monopolization); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (monopolization); *Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1044–45 & n. 3 & n. 4 (9th Cir. 2008) (standards the same under Sections 1 and 2). The relevant product market identifies the products or services that compete with each other, and the relevant geographic market identifies the area where the competition in the relevant product market takes place. *See Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1392 (9th Cir. 1984). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962).

*Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1174 (N.D. Cal. 2013). Courts often look to "whether

a hypothetical monopolist could impose a 'small but significant nontransitory increase in price'

('SSNIP') in the proposed market," or whether consumers would respond to such an increase by

substituting other products, suggesting that the correct market definition must be broad enough to

include such products. *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778

F.3d 775, 784 (9th Cir. 2015). Dr. Sullivan's report addresses those considerations. *See* Sullivan

Report ¶¶ 69–80.

OptumInsight asserts in its *Daubert* motion that "there is a substantial question whether

either the Grouper 'Market' or the Physician Efficiency 'Market' is a 'market' as antitrust

economists use the term," but "accepts that usage for the purposes of [its *Daubert*] motion."

Def.'s Mot. to Exclude at 4 n.1. Despite calling the market definition into question (but declining

to challenge it) in that motion, OptumInsight does not address the issue at all in its opposition to

CCGroup's motion for summary judgment. Because OptumInsight has identified no evidence that

the relevant market is anything other than the grouper market as defined by Dr. Sullivan, the Court

GRANTS CCGroup's motion for summary adjudication of this issue.

### 7.  Whether OptumInsight Had Market Power

A plaintiff bringing a Sherman Act claim for monopolization or attempted monopolization must establish that the defendant has power in the relevant market.  CCGroup seeks summary judgment that OptumInsight has such power in the relevant market defined above.  Although some of OptumInsight's arguments regarding, for example, antitrust injury address similar issues, OptumInsight has not specifically moved for summary judgment that it lacks market power.

> Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986). The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run. *See Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1232 (8th Cir. 1987), *cert. denied*, 484 U.S. 1026 (1988); *Ball Memorial Hosp.*, 784 F.2d at 1335.

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  "A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors."  *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 977 (9th Cir. 1999) (quoting *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990)).

CCGroup argues that it is entitled to judgment on this issue based on OptumInsight's large majority share of the market, Dr. Sullivan's conclusion that OptumInsight's profit margin ██ ████████████████████████████████████████, and barriers to entry including OptumInsight's patents, customers' aversion to changing products, and contracts lasting several years.  Pl.'s MSJ at 37–39.  OptumInsight contends that high market share alone does not establish market power, that Dr. Sullivan was wrong to rely on accounting profit margins to show market power, that "there is no evidence that OptumInsight excluded competitors or had the ability to do so," that "the mere possession of patents does not imply the existence of monopoly power," and that customers' reluctance to change products due to mere inertia is not a cognizable barrier to

80

entry. Opp'n to Pl.'s MSJ at 34–35; *see generally* Godek Decl. re Pl.'s MSJ (dkt. 316-4).[34]

OptumInsight's dominant market share is not in dispute. The question, then, is whether either this is "a market with low entry barriers" or there is "other evidence of [OptumInsight's] inability to control prices or exclude competitors" such that an inference of market power is not warranted. *See W. Parcel Exp.*, 190 F.3d at 977. Some potential sources of barriers to entry are "(1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Rebel Oil*, 51 F.3d at 1439.

A jury might or might not credit Dr. Cave's testimony that CCGroup avoided the grouper market out of fear of OptumInsight's patents. *See* Hull Decl. Ex. 7 (Cave Dep.) at 95:11–98:11. A jury also could agree with Dr. Godek that Dr. Sullivan's reliance on accounting profits is improper. Other evidence of entry barriers, however, presents a closer call of whether CCGroup is entitled to summary adjudication of this issue. While the existence of patents alone does not establish market power, the record here reflects that OptumInsight sought to enforce its patents against both of its competitors in the grouper market as defined above (Truven and CCGroup)[35]— and OptumInsight's pre-merger predecessors sought to enforce their patents against each other— and that of those two competitors, Truven █████████████████████ and CCGroup does not control any significant share of the market. *See* Howenstine Decl. re Pl.'s MSJ Ex. 91 (Zielinski Dep.) at 69:18–22.[36] According to OptumInsight's employee Cheri Jo Zielinski, OptumInsight took the position that "somebody couldn't build a grouper technology without using [OptumInsight's] patents." Howenstine Decl. re Pl.'s MSJ Ex. 103 (Zielinski Dep.) at 99:2–8.

---

[34] Much of this declaration reads like a supplemental brief summarizing case law, and is therefore improper. The Court nevertheless considers the declaration in resolving this issue.

[35] Because the market is defined as only including "full scope" groupers, 3M's hospital-care-specific grouper does not fall within the relevant market.

[36] "Q: ████████████████████████████████████████████ A: Not to my knowledge." (In context, Zielinski's response indicates she is not aware of ████████████████████████████████████████████, not that she believes the questioner's premise to be incorrect.)

OptumInsight itself also asserts in its own motion for summary judgment that the "parties agree that once a customer chooses a grouper, the costs of switching make a new sale difficult," and that customers are therefore "sticky." Def.'s Merits MSJ at 38. The case that OptumInsight cites for the proposition that customer "inertia" is not cognizable as a barrier to entry—in addition to being unpublished and nonprecedential—does not in fact so hold. *See Epicenter Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x 910, 911 (9th Cir. 2003) (concluding that customers' "inertia, their desire to continue with a single vendor as long as they are getting good service and quality, and some undefined moral commitment" could "[p]erhaps" be "sufficient to create a small, though leaky, entry barrier").

At the hearing, counsel for CCGroup declined the Court's invitation to argue that CCGroup is entitled to summary adjudication of this issue. Counsel stated that CCGroup did not object to trying this issue to a jury. The Court therefore DENIES CCGroup's motion for summary judgment with respect to market power and instead leaves the issue for resolution at trial.

### 8. Antitrust Injury

"Antitrust injury" is a necessary element of an antitrust claim. *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). "'Antitrust injury' means 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" and "consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)). The Ninth Circuit also requires "that 'the injured party be a participant in the same market as the alleged malefactors, meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Id.* (quoting *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003)). At least in some circumstances, however, a potential market entrant thwarted from entering a market by the defendant's violations can also establish antitrust injury. *See, e.g.*, *In re*

*Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1464 (9th Cir. 1993).[37]

OptumInsight's arguments on the issue of antitrust injury relate to whether CCGroup suffered any injury that the antitrust laws were intended to prevent, and whether CCGroup actually participated in the market for standalone grouper software.

OptumInsight contends that it is entitled to summary judgment that CCGroup suffered no antitrust injury in part based on the deposition testimony of Yuri Alexandrian, CCGroup's Chief Operating Office and Rule 30(b)(6) witness for, among other issues, the topics of: (1) anti-competitive acts by OptumInsight other than actual or threatened litigation against CCGroup; and (2) damages to CCGroup resulting from OptumInsight's enforcement of patents and other alleged wrongdoing. *See, e.g.*, OptumInsight Merits Reply at 13; Hull Decl. Ex. 2 (Alexandrian Aug. 2017 Dep. I) at 10:1–22. The testimony at issue relates to the following exchange in a deposition taken in other litigation then pending between CCGroup and Truven:

> Q. In terms of potential clients, can you tell me all the reasons that you have heard that a potential client has decided not to go with CCGroup?
>
> A. Having existing product that offers similar functionality. Budgets, not having the funding to bring us on at the time. Those two would be the primary reasons we hear.
>
> Q. Any other reasons you've heard?
>
> A. I don't believe so.

Hull Decl. Ex. 1 (Alexandrian Jan. 2017 Dep.) at 139:13–21. After testifying in a deposition related to this litigation that he did not know clients' decision processes and did not want to speculate, Alexandrian later confirmed his testimony in the Truven litigation to be correct, stating that it was "true of what I hear and had nothing to do with customers having other reasons." Hull Decl. Ex. 2 (Alexandrian Aug. 2017 Dep. I) at 50:1–51:5. OptumInsight's counsel observed that

[37] OptumInsight does not challenge whether CCGroup had sufficient "intention and preparedness" to enter the standalone grouper market based on the factors used by the Ninth Circuit to assess whether potential competitors thwarted from entering a market have suffered antitrust injury. *See Dual-Deck Video*, 11 F.3d at 1465. CCGroup's development of a grouper product and separate licensing of that product in at least some isolated circumstances shows that CCGroup had the capacity to compete in the market, if not that CCGroup actually competed in it. *See, e.g.*, Howenstine Decl. re Opp'n to OptumInsight's Merits Mot. (dkt. 318-1) Ex. 26 at CCG0010309 ("CHP has elected to License only the Cave Grouper™ module for this Amendment 3.").

"none of us can always read somebody else's mind" and that "all you can do is provide the information that you have," and Alexandrian agreed with those statements. *Id.* at 51:6–13.

Dr. Cave testified similarly in a deposition in *Cave I*: asked whether "anybody ever bring[s] up [concerns that] you're a small company and they're a big company," Dr. Cave responded that customers expressed such concerns "when we started out," but because CCGroup had since become profitable, "[t]hat doesn't come up . . . . That's not an issue. It hasn't been an issue." Hull Decl. Ex. 6 (Cave Mar. 2014 Dep. II) at 362:5–18.

The testimony from Cave and Alexandrian highlighted by OptumInsight describes only what Dr. Cave and Alexandrian heard from CCGroup's customers or potential customers. Neither witness "admitted" that concerns about OptumInsight's patents or market dominance had no effect on customers' decisions. To the contrary, Alexandrian testified that he could not know all of the reasons for customers' decisions, and OptumInsight's lawyer acknowledged that such complete knowledge would be impossible. While Dr. Cave and Alexandrian's failure to identify customers who expressed such concerns might be relevant evidence to be weighed by a finder of fact, it does not definitively establish that no customers were in fact influenced by OptumInsight's size or patents. The fact that Dr. Cave testified in the *Cave I* trial that CCGroup debriefed clients that left for other vendors, *see* OptumInsight Merits Reply at 14 (citing Hull Decl. Ex. 85 (*Cave I* trial transcript) at 408), does not change the fact that neither Dr. Cave nor Alexandrian could have perfect knowledge of customers' motivations.

Along the same lines, OptumInsight argues that the Court should disregard Dr. Cave's testimony that CCGroup avoided the standalone grouper market out of fear of patent litigation. *See* Defs.' Reply re Merits MSJ at 14. Dr. Cave testified as follows at his deposition:

> When we got going in 2003, 2004, the focus was not on the grouper, was on the efficiency methodology, and because it's a very we felt, litigious market, we wanted to fly under the radar screen. . . . I had no idea the ETG patents, the Seare patents may not be valid. But when I got the company going, I think we would have marketed it in a different way, if it was knowing that those patents weren't valid. Instead we focused on the efficiency side to fly under the radar.

> [. . .]

> I know that our whole focus was let's not rock the boat in the grouper market because of how litigious it was, and let's go for the efficiency side and that's as much as we really thought about.
>
> [. . .]
>
> So we were aware that there was a couple different patent families to just to stay away from.

Hull Decl. Ex. 7 (Cave Dep.) at 95:17–96:3, 97:12–16, 98:10–11.

While courts have held that a party's "'uncorroborated and self-serving' testimony" alone cannot defeat summary judgment, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002), that rule has not been applied in the manner OptumInsight seeks here. In *Villiarimo*, for example, the Ninth Circuit stated the rule but applied it only to exclude testimony for which the plaintiff failed to show personal knowledge. *See id.* at 1059 n.5. *Villiarimo* cites for this rule a D.C. Circuit case that in turn reviews cases disregarding self-serving testimony offered in the face of conclusive proof, the plaintiff's own contradictory statements, or other overwhelming evidence to the contrary. *See Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128–29 (D.C. Cir. 1989), *overruling on other grounds recognized by Belton v. Wash. Metro. Area Transit Auth.*, 20 F.3d 1197, 1200 (D.C. Cir. 1994). Indeed, the Ninth Circuit has more recently clarified that "because a party's own testimony will nearly always be 'self-serving,' the mere self-serving nature of testimony permits a court to discount that testimony where it 'states only conclusions and not facts that would be admissible evidence.'" *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (quoting *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015)). The Ninth Circuit went on to reiterate the general rule that a court "may not engage in '[c]redibility determinations'" on summary judgment, and held that the district court erred in disregarding the self-serving and uncorroborated testimony of a prison inmate who was under the influence of methamphetamine at the time of the events in question. *Id.* (quoting *Anderson*, 477 U.S. at 255) (alteration in original).

Dr. Cave's testimony that CCGroup avoided the standalone grouper market out of fear of patent litigation is a factual statement regarding his own motivations. While there appears to be no other evidence to corroborate directly that such fear in fact motivated CCGroup, it is consistent with the fact that OptumInsight's predecessors had previously sued competitors for infringing

85

1    patents related to grouper software.  Much of the evidence that OptumInsight cites as contradicting

2    Dr. Cave's testimony merely shows, entirely consistent with that testimony, that Dr. Cave and

3    CCGroup sought to stay out of the standalone grouper market.  *See* Def.'s Merits MSJ at 30–31

4    (citing, e.g., Hull Decl. Ex. 28 (email from Dr. Cave stating, "We are not going to take this

5    approach (only offer the grouper).")).  To the extent some evidence might suggest other reasons

6    why CCGroup declined to pursue sales of a standalone grouper—for example, an email stating

7    that CCGroup preferred being "an 'add on' company that has a great niche" over trying to be "a

8    vendor replacement company,"[38] Hull Decl. Ex. 34—weighing that evidence against Dr. Cave's

9    testimony is the role of the jury, not a question for the Court to decide on summary judgment.  *See*

10   *Manley*, 847 F.3d at 711 (quoting *Anderson*, 477 U.S. at 255).

11        Based at least on Dr. Cave's testimony, a jury could conclude that OptumInsight's

12   purportedly anticompetitive conduct regarding its patents drove CCGroup away from competing

13   in the standalone grouper market, thus reducing competition in that market and depriving

14   CCGroup of market share and revenue that it otherwise would have captured.  OptumInsight is not

15   entitled to summary judgment on the issue of antitrust injury in the grouper market.[39]

16        As discussed above in the context of OptumInsight's *Daubert* motion, the Court excludes

---

[38] Even this statement is arguably consistent with Dr. Cave's testimony, to the extent that Cave might have preferred that CCGroup serve as "an 'add on' company" at least in part because he believed competing as "a vendor replacement company" would increase the risk of OptumInsight seeking to enforce its patents against CCGroup.

[39] Two other arguments by OptumInsight on the issue of antitrust injury warrant only a cursory response.  First, OptumInsight argues in its motion, but does not pursue in its reply, that judicial estoppel should preclude CCGroup from showing antitrust injury because, according to OptumInsight, CCGroup's theory relies on positions contrary to those it has taken in past litigation.  *See* Def.'s Merits MSJ at 36–37.  The Ninth Circuit "has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position," and OptumInsight makes no showing that any court relied on CCGroup's purportedly inconsistent prior positions.  *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001).  Second, OptumInsight contends that its decision to license its patents to the Centers for Medicare and Medicaid Services ("CMS") at no charge in 2010 to develop a public grouper (the development of which was called for by the Affordable Care Act) establishes that OptumInsight lacked intent to monopolize the grouper market.  Def.'s Merits MSJ at 37.  It is not self-evident that allowing the government to develop its own grouper to administer public benefits programs negates the possibility of intent to monopolize the market for licensing such products to insurers and other private entities such that OptumInsight should be entitled to summary judgment on the issue.  The significance, if any, of OptumInsight's decision to license its patents to CMS is for the jury to decide.

Dr. Sullivan's opinions regarding effects of OptumInsight's patents on the physician efficiency market. CCGroup identifies no other evidence of injury in that market, and the Court grants partial summary judgment in OptumInsight's favor that CCGroup experienced no antitrust injury in the market for physician efficiency software, as opposed to the standalone grouper market. Moreover, with Dr. Sullivan's market damages opinions for both markets excluded, CCGroup has offered no evidence from which a jury could calculate damages in either market, and the Court grants summary judgment for OptumInsight that CCGroup cannot recover such damages. CCGroup's antitrust damages, if any, are limited to those based on its litigation costs and attorneys' fees.

Because the Court concludes that a jury could find that CCGroup experienced antitrust injury (even if not ascertainable damages) as a result of exclusion from the grouper market, this order does not reach the question of whether attorneys' fees and litigation costs alone can be sufficient to establish antitrust injury. *Cf., e.g.*, *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 WL 13058, at *5 (N.D. Cal. Jan. 3, 2006) ("A claim of injury in the form of attorneys' fees in defending against a patent infringement suit is not an injury to 'competition' or the type of injury that the antitrust laws were designed to protect against, but is rather a purely individual economic injury to Sherwin Williams that has no effect on competition in the relevant market.").

### 9. Effect of Any Valid Patents

OptumInsight contends that the validity of *any* of its patents defeats CCGroup's claims, because CCGroup's theory of damages is that it avoided the standalone grouper market out of fear of OptumInsight's Seare and Dang patent families generally, and any valid patent in those families would have been sufficient to deter CCGroup from entering the market. Specifically, OptumInsight argues that CCGroup cannot prevail on any claim for damages because CCGroup does not dispute the validity of the Seare '164 patent, which does not appear in CCGroup's complaint and was not asserted in OptumInsight's unserved Minnesota complaint or in *Cave I*. As discussed above in the context of OptumInsight's motion to exclude Dr. Sullivan's opinions, OptumInsight identifies no evidence that the '164 patent is similar in scope to the patents at issue

in CCGroup's complaint, that CCGroup's grouper product infringes the '164 patent, that CCGroup or any other market participant viewed the '164 patent as similar in effect to the other patents or as encompassing CCGroup's grouper, or that CCGroup avoided the standalone grouper market based on fear of the '164 patent.[40]  In short, OptumInsight has not shown that the '164 patent is relevant, and is not entitled to summary judgment based on CCGroup's failure to address that patent in its complaint.  OptumInsight's motion for summary judgment based on the '164 patent is DENIED.  To the extent that Dr. Cave's testimony that CCGroup avoided the standalone grouper market based on OptumInsight's patents generally, including the Seare family, could be understood as including *all* of the Seare patents, *see* Hull Decl. Ex. 7 (Cave Dep.) at 95:17–96:3, 97:12–16, 98:10–11, OptumInsight remains free to present that argument to the jury and examine Dr. Cave on the subject, but such an interpretation is not so clear and unambiguous as to support summary judgment.

In contrast to the '164 patent (and the '514 patent, which similarly has not been shown to be relevant), OptumInsight is correct that CCGroup's theory of damages does not distinguish among the patents actually addressed in CCGroup's complaint, several of which OptumInsight asserted against CCGroup in the Minnesota complaint and *Cave I*, and all of which share certain overlapping similarities according to CCGroup's expert Dr. Bergeron.  It is difficult to see how CCGroup would distinguish between the effects of those patents if it ultimately shows that some, but not all, of them are invalid.  Because OptumInsight is not entitled to summary judgment regarding the validity of any of those patents, however, the Court need not decide at this time whether the validity of a single patent at issue would prevent CCGroup from recovering any damages.

### 10. Knowledge Required for *Walker Process* Claim

OptumInsight asks the Court to reconsider its previous interpretation of the scienter required to support antitrust liability for enforcement of a fraudulently obtained patent under

---

[40] At the hearing, OptumInsight cited testimony by Dr. Cave that his work related to the '164 patent put him on notice of the patents at issue and the purported litigiousness of the industry. Such testimony does not establish that Dr. Cave chose to avoid the standalone grouper market for fear that his product infringed (or would be accused on infringing) that patent in particular.

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

OptumInsight Merits Mot. at 5–10.  In that case, the Supreme Court described the viability of such claims as follows:

> Walker's counterclaim alleged that Food Machinery obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office. Proof of this assertion would be sufficient to strip Food Machinery of its exemption from the antitrust laws.[5] By the same token, Food Machinery's good faith would furnish a complete defense. This includes an honest mistake as to the effect of prior installation upon patentability—so-called 'technical fraud.'
>
> [Footnote 5:] This conclusion applies with equal force to an assignee who maintains and enforces the patent with knowledge of the patent's infirmity.

*Walker Process*, 382 U.S. at 177 & n.5.

The question here is whether a plaintiff must show that a defendant that actually procured a patent through fraud, as opposed to an assignee,[41] actually knew of that fraud later when the defendant enforced the patent.  The Federal Circuit has stated inconsistent rules as to this issue.  In declining to dismiss CCGroup's Second Amended Complaint, the Court compared the rule stated in *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998), that to support a *Walker Process* claim "[t]he plaintiff in the patent infringement suit must also have been aware of the fraud when bringing suit," with the disjunctive statement in *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012), that "the plaintiff must show that the defendant procured the relevant patent by knowing and willful fraud on the PTO *or (in the case of an assignee)* that the defendant maintained and enforced the patent with knowledge of the fraudulent manner in which it was obtained" (emphasis added).  This Court held that because *Ritz Camera* better tracked the Supreme Court's language in *Walker Process*, and because *Nobelpharma* in fact involved an assignee enforcing a patent (and thus stated the rule undeniably applicable to the facts before it), a plaintiff bringing a *Walker Process* claim must only prove that the patent holder had knowledge of fraud on the PTO at the time of enforcement if the patent

---

[41] The Court previously held that OptumInsight stands in the shoes of its predecessor Symmetry in this respect, and the analysis here assumes for the moment that CCGroup can show that the patents at issue were obtained through fraud.

holder was an assignee, rather than the party that committed such fraud. Order re 2d MTD at 25–28.

OptumInsight asks the Court to revisit that issue based on the following passage from a 2016 decision by the Federal Circuit that was not presented in the parties' briefs on the motion to dismiss:

> In order to prevail on a *Walker Process* claim, the antitrust-plaintiff must show two things: first, that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained *and enforced the patent with knowledge of the fraudulent procurement*; and second, all the other elements necessary to establish a Sherman Act monopolization claim. *See Ritz Camera & Image v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012).

*TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016) (emphasis added). Unlike *Nobelpharma*, the patent holder in *TransWeb* was not a subsequent assignee but rather obtained the patent at issue itself. *See id.* at 1304. Although the statement of the rule is arguably dicta because the Federal Circuit did not address knowledge (the defendant did "not challenge the sufficiency of the evidence supporting the jury's *Walker Process* fraud finding beyond challenging the inequitable conduct finding," and the court's analysis focused on the market definition), the rule as stated cannot be reconciled with that set forth in *Ritz Camera*.

OptumInsight also cites a 2012 law review article by Herbert Hovenkamp for the proposition that "'*Walker Process* refers to actions and states of mind at the time a patent infringement action is filed,'" and that there could be "'relative innocence at the time of an infringement suit if . . . the persons within the firm who were guilty of the inequitable conduct are no longer available, and the persons who file the infringement suit are unsuspecting.'" OptumInsight Merits Mot. at 9 (quoting Herbert Hovenkamp, *Competition for Innovation*, 2012 Colum. Bus. L. Rev. 799, 828–29). The only *Walker Process* case from the Federal Circuit that Professor Hovenkamp cites in the relevant portion of his analysis, however, did not consider the issue of knowledge at the time of enforcement. *See* Hovenkamp, 2012 Colum. Bus. L. Rev. at 827–29 & n.68 (citing *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337 (Fed. Cir. 2007)). In *Dippin' Dots*, the Federal Circuit held that the plaintiff did not present sufficient evidence "that the omission in this case [*to the PTO*] was fraudulent," and the jury's "finding of fraud *on the PTO*

[was] therefore reversed." 476 F.3d at 1348 (emphasis added). The Federal Circuit did not hold that a party that obtained a patent through fraud must also be aware of that fraud at the time of enforcement to be held liable—to the contrary, the Court stated that "[f]raudulent acquisition of the asserted patent strips the *Walker Process* defendant of its antitrust immunity," and that "[i]f a patentee asserts a patent claim and the defendant can demonstrate the required fraud on the PTO, as well as show that 'the other elements necessary to a § 2 case are present,' the defendant-counterclaimant is entitled to treble damages under the antitrust laws." *Id.* at 1346, 1348 (footnote omitted). *Dippin' Dots* therefore provides no support for Professor Hovenkamp's conclusion that scienter must be shown at the time of enforcement even where the party enforcing the patent itself defrauded the PTO.[42] The other law review article on which OptumInsight relies cites only Hovenkamp for this proposition, providing no independent analysis or support in case law. *See* OptumInsight Merits Mot. at 9; Gideon Mark & T. Leigh Anenson, *Inequitable Conduct & Walker Process Claims After Therasense & the America Invents Act*, 16 U. Pa. J. Bus. L. 361, 398–99 & n.238 (2014). At least one other commentator appears to have assumed that showing fraud on the PTO serves as an *alternative* to showing bad faith litigation:

> [T]he antitrust claim (often asserted as a counterclaim to a patent infringement action) has over the last quarter of a century grown to become a fixture of patent litigation based on *either or both* the bad faith, unfounded assertion of patent claims, or the acquisition of a patent by fraud. These claims are sometimes referred to as *Walker Process*-type claims (when enforcement of a patent obtained by fraud is alleged) or *Handgard*-type claims (when enforcement of a patent known to be invalid is alleged), after the cases that first recognized them.

James B. Kobak, Jr., *Professional Real Estate Investors and the Future of Patent-Antitrust Litigation: Walker Process and Handgards Meet Noerr-Pennington*, 63 Antitrust L.J. 185, 185–86 (1994) (emphasis added).

A Federal Circuit case later reversed on procedural grounds by the Supreme Court[43] is among the clearest decisions that fraud on the PTO in itself destroys antitrust immunity for patent

---

[42] Perhaps recognizing this, OptumInsight has not itself cited *Dippin' Dots* in support of its argument on the issue of scienter. *See* OptumInsight Merits Mot. at 5–10.

[43] The Supreme Court reversed because the "respondent failed to renew its preverdict motion as specified in Rule 50(b)." *Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 407 (2006).

enforcement, without a need to show scienter at the time of enforcement. *Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006). For reasons that are not clear, OptumInsight cites this case as supporting its position that "not every lawsuit involving a patent obtained by fraud establishes the knowledge element necessary for an antitrust violation." OptumInsight Merits Mot. at 9. Both in its statement and application of the *Walker Process* rule, *Unitherm* makes no mention of a scienter-at-enforcement element. *See, e.g.*, *id.* 375 F.3d at 1356 ("Nearly forty years ago, the Supreme Court recognized that an inventor who obtains a patent by defrauding the patent office deserves no immunity."). After reviewing evidence from which the jury could have concluded that the patentee defrauded the PTO, with no discussion of the patentee's state of mind during enforcement, the Federal Circuit concluded as follows:

> Unitherm has thus met the first and most basic requirement for bringing a *Walker Process* claim. Unitherm has shown that, as a matter of Federal Circuit antitrust law, ConAgra attempted to enforce a patent that it obtained through fraud on the PTO. *ConAgra is therefore stripped of its antitrust immunity* and susceptible to antitrust liability—provided that Unitherm can show that ConAgra's behavior met all other necessary elements of a § 2 claim subject to Tenth Circuit law.

*Id.* at 1362 (emphasis added). The court ultimately reversed the judgment in favor of Unitherm on its antitrust claim because there was insufficient economic evidence of market definition and antitrust damages. *Id.* at 1363–65.[44]

Other cases that OptumInsight cites have no bearing on this issue. *E.g.*, *FMC Corp. v Manitowoc Co.*, 835 F.2d 1411, 1418 (Fed. Cir. 1987) (holding that the plaintiff "failed to establish inequitable conduct," without addressing scienter during enforcement).

OptumInsight correctly notes that, in light of a recent Federal Circuit decision, the Ninth Circuit would likely be the proper forum for any appeal of this action. *See* OptumInsight Merits Reply at 2 n.2 (citing *Xitronix Corp. v. KLA-Tencor Corp.*, 882 F.3d 1075 (Fed. Cir. 2018)).

---

[44] One perhaps distinguishing factor of *Unitherm*, as compared to other cases considering *Walker Process*, is that the patentee's enforcement efforts consisted of notifying others in the industry that the patentee "intend[ed] to aggressively protect all of [its] rights under [the] patent" at issue and soliciting licensing fees—not actual litigation. *See id.* at 1344.

Because the existing body of *Walker Process* case law comes primarily from the Federal Circuit, the analysis above focuses on Federal Circuit decisions. The limited Ninth Circuit authority addressing *Walker Process* claims provides little clarity as to whether knowledge of fraud at the time of enforcement is necessary. *E.g.*, *Cataphote Corp. v. DeSoto Chem. Coatings, Inc.*, 450 F.2d 769, 772 (9th Cir. 1971) ("To recover under *Walker*, DeSoto must prove that (1) the Poole patent was procured by knowing and willful fraud practiced by Cataphote on the Patent Office; and (2) all the elements necessary to establish a § 2 violation are present. Good faith is a complete defense."). In *Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories, Inc.*, 552 F.3d 1033 (9th Cir. 2009), the Ninth Circuit reversed a grant of summary judgment, holding that a jury could reasonably have determined that the patentee defrauded the PTO, with no discussion of whether there was evidence of bad faith at the time of enforcement, although the court quoted with approval the Federal Circuit's statement in *Nobelpharma* that "'[t]he plaintiff in the patent infringement suit must also have been aware of the fraud when bringing suit.'" *Kaiser Found. Health Plan*, 552 F.3d at 1047–53. In a 1995 decision, however, the Ninth Circuit stated a version of the rule more closely resembling *Ritz Camera*, drawing a distinction between enforcement by patentees and enforcement by assignees:

> If the patent was obtained by "intentional fraud," and not merely "technical fraud," *see Walker Process,* 382 U.S. at 176, 179, then a reversed judgment based upon that fraud, where the plaintiff obtained the patent by intentional fraud *or* was an assignee who knew of the patent's infirmity, would not demonstrate probable cause for a patent infringement suit. *See Walker Process*, 382 U.S. at 177.

*Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 538 (9th Cir. 1995) (emphasis added) (adopting as law dicta from *Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), that "[i]n a case involving a fraudulently-obtained patent, that which immunizes the predatory behavior from antitrust liability (the patent) is, in effect, a nullity because of the underlying fraud").

Based on this Court's review of precedent, it appears that while decisions of the Federal Circuit and Ninth Circuit addressing *Walker Process* claims have stated facially contradictory rules as to whether a plaintiff must show knowledge of fraud by an original patentee at the time of enforcement, no decision of either court has explained the rationale for its view of that issue. This

93

1   Court is also unaware of any Ninth Circuit or Federal Circuit case where this distinction was

2   determinative of the outcome.

3           Lacking clear guidance to the contrary from the appellate courts, this Court stands by its

4   previous conclusion that, under *Walker Process*, a party who obtained a patent through fraud on

5   the PTO—as opposed to a subsequent assignee of the patent—lacks antitrust immunity for

6   enforcing that patent as a result of such fraud, without need to show knowledge of that fraud at the

7   time of enforcement.  This approach is consistent with precedent holding that *Walker Process*

8   provides a basis for destroying a patentholder's antitrust immunity that is distinct from and

9   alternative to the sham litigation standard described by the Supreme Court in *Professional Real*

10  *Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* ("*PRE*"), 508 U.S. 49, 60 (1993).  *See*

11  *Nobelpharma*, 141 F.3d at 1071 ("*PRE* and *Walker Process* provide *alternative* legal grounds on

12  which a patentee may be stripped of its immunity from the antitrust laws; both legal theories may

13  be applied to the same conduct. . . . Each provides its own basis for depriving a patent owner of

14  immunity from the antitrust laws; either or both may be applicable to a particular party's conduct

15  in obtaining and enforcing a patent." (emphasis added)); *see also TransWeb*, 812 F.3d at 1311

16  (summarizing *Nobelpharma* as "reason[ing] that the objective baselessness and subjective bad

17  faith requirements for sham litigation laid out in *PRE* are one way that a party can lose antitrust

18  immunity, while the 'very specific conduct that is clearly reprehensible' and defined in *Walker*

19  *Process* is another way.").  If a *Walker Process* plaintiff were required in every case to show

20  knowledge of fraud on the PTO at the time that the patentholder brought an infringement action,

21  *Walker Process* claims would be merely a subset of sham litigation claims, rather than an

22  alternative doctrine.

23          OptumInsight argues that courts should not impose the "draconian sanction of treble

24  antitrust damages" based on "the actions of individuals lacking *Therasense*-type intent."  Reply re

25  Def.'s Merits MSJ at 3.  But the Court's holding here does not do so—a plaintiff still must

26  establish "*Therasense*-type intent" with respect to the original fraud on the PTO, and the antitrust

27  damages caused by using the wrongfully obtained patent to exclude competitors logically flow

28  from that original fraudulent conduct.

The Court also stands by its conclusion that post-merger OptumInsight stands in the shoes of both Symmetry and Ingenix, and thus is not merely a subsequent assignee of any patent at issue. Because, as discussed in the preceding sections, OptumInsight is not entitled to summary judgment on the issue of inequitable conduct or fraud on the PTO, it is not entitled to summary judgment on CCGroup's *Walker Process* claim.

### 11. Sham Litigation Claim

In *Handgards v. Ethicon*, the Ninth Circuit held that a plaintiff could bring a Sherman Act claim where a defendant "prosecuted infringement actions in bad faith, that is, with knowledge that the patents, though lawfully-obtained, were invalid." 601 F.2d 986, 994, 996 (9th Cir. 1979). The Supreme Court elaborated on the standard for antitrust actions based on sham litigation in *PRE*, holding that to strip a defendant of its immunity under the *Noerr-Pennington* doctrine, a plaintiff must establish two elements, as well as the basis for an underlying antitrust claim:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.
>
> Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," . . . through the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon," . . . . This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability.
>
> Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.

*PRE*, 508 U.S. at 60–61.

The parties agree that the *PRE* standard governs CCGroup's *Handgards* claim. *See, e.g.*, Def.'s Merits MSJ at 10, 23 (characterizing the *Handgards* claim as "sham litigation" and citing *PRE*); Opp'n to Def.'s Merits MSJ at 11, 19 n.18 (same); Reply re Def.'s Merits MSJ at 7–8

(same).  The parties dispute, however, whether true bad faith is required.  In CCGroup's view, *PRE* requires only *objective* unreasonableness and an intent to use the process of a lawsuit to interfere with a competitor, and CCGroup need not show that OptumInsight or any of its employees actually believed that its claims were unlikely to succeed.  CCGroup contends that to the extent *Handgards* required actual "knowledge that the patents, though lawfully-obtained, were invalid," 601 F.2d at 994, such a requirement should be disregarded as in conflict with the standard that the Supreme Court articulated in *PRE*, or considered no more than an example of circumstances that could satisfy that standard.  *See* Opp'n to Def.'s Merits MSJ at 19 & n.18. OptumInsight argues that *Handgards* requires CCGroup to show OptumInsight knew the patents were invalid at the time of *Cave I*, and that to hold otherwise would "ignore[] the 'sham' component of sham litigation claims."  Reply re Def.'s Merits MSJ at 7–8; *see* Def.'s Merits MSJ at 9–10.

In the apparent absence of any case assessing antitrust liability for sham litigation without a showing that the party bringing the claim knew it to be baseless, the Court would hesitate to allow such a claim to proceed.  But this Court need not decide whether an antitrust claim based on a patent infringement lawsuit could ever be viable under *PRE* without a showing that the party claiming infringement actually knew the patents at issue were invalid, because even assuming such knowledge were required, CCGroup has presented evidence from which a jury might infer that agents or employees of OptumInsight knew that the patents were obtained through fraud.

If a jury determines that Dang conceived his invention earlier than OptumInsight's predecessor Symmetry represented to the PTO, it would follow that, at the very least, Dang's colleague and programmer Daniel Gardiner knew of the earlier conception date and the falsity of Symmetry's representations to the PTO.  Gardiner remained an OptumInsight employee at all times relevant to this case.  *See generally* Howenstine Decl. re Pl.'s MSJ Ex. 78 (Gardiner Rule 30(b)(6) Dep.).[45]  Moreover, while OptumInsight's outside counsel Devan Padmanabhan testified

---

[45] The parties do not address in any detail the standard for imputing an employee's knowledge to a corporation in the context of a sham litigation claim.  As a general rule, an agent's knowledge will be imputed to the principal, so long as the knowledge is material to the agent's duties. Restatement (Third) of Agency § 5.03 (Am. Law Inst. 2006); *see, e.g.*, *United States v. Pac. Gas*

that he relied on the reexamination's conclusion that the RFP response was not disqualifying and that he was not aware of evidence from earlier litigation indicating an earlier conception date, a jury is not required to credit his testimony. If it did not, it might infer from the investigation that Padmanabhan undertook of the patents at issue in preparation for filing OptumInsight's claims in *Cave I* that Padmanabhan in fact discovered evidence of the earlier conception date.[46] The Court therefore DENIES OptumInsight's motion for summary judgment with respect to OptumInsight's sham litigation claim.

After briefing closed on the present motions, OptumInsight brought to this Court's attention the Southern District of New York's order in *Olaf Sööt Design, LCC v. Daktronics, Inc.*, 325 F. Supp. 3d 456 (S.D.N.Y. 2018). That decision granted summary judgment that a party claiming willful infringement had not presented evidence that the defendants willfully infringed, despite the defendants having acquired a company that had experience with the patent at issue, and despite the defendants' outside counsel having attached a copy of the patent to an email apprising the defendants that an application for a different patent had been rejected. *See id.* at 462–64. The court noted that the plaintiff failed to cite authority imputing an acquired corporation's knowledge to the acquirer, or imputing outside counsel's knowledge to a client, for the purpose of willful infringement, and that the attorney had indicated to the client that the patent was not prior art. *Id.* at 463–64. The inferences a jury might draw from circumstantial evidence of exposure to relevant information generally depend on the sui generis facts of each particular case. Moreover, this Court respectfully disagrees with aspects of the *Olaf Sööt*'s court's analysis, some of which appear to depend on inferences in favor of the party seeking summary judgment. *See, e.g., id.* at 463

---

& *Elec. Co.*, No. 14-cr-00175-TEH, 2015 WL 9460313, at *3 (N.D. Cal. Dec. 23, 2015) (addressing case law applying a "collective knowledge" standard based on the Restatement in the context of corporate criminal liability). OptumInsight has not argued that any relevant knowledge that Gardiner might have had was immaterial to his duties.

[46] OptumInsight argues that *Therasense* bars such inferences. Reply re Def.'s Merits MSJ at 5. The Federal Circuit held in *Therasense* that negligence was not sufficient to show intent to deceive the PTO for the purpose of establishing inequitable conduct. *See* 649 F.3d at 1290–91. That case acknowledges that intent may be inferred from circumstantial evidence, does not address knowledge of the infirmity of a previous litigation claim in the context of a sham litigation claim, and, as far as this Court is aware, has not been cited by the Ninth Circuit for any purpose. *Therasense* does not set the standard for whether OptumInsight was aware that its judicial counterclaims in *Cave I* lacked merit.

United States District Court
Northern District of California

(concluding that the defendant "could [not] have" "reviewed the email attachment, let alone [the patent's] individual claims" because it "did not have any patent prosecution attorneys on staff"). The *Olaf Sööt* decision does not alter this Court's conclusion that OptumInsight is not entitled to summary judgment on CCGroup's sham litigation claim.

### 12. Malicious Prosecution Claim

California courts generally require a plaintiff bringing a claim for malicious prosecution to "'plead and prove that the prior action (1) was *commenced* by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was *brought* without probable cause [citations]; and (3) was *initiated* with malice [citations].'" *Zamos v. Stroud*, 32 Cal. 4th 958, 965 (2004) (quoting *Crowley v. Katleman*, 8 Cal. 4th 666, 676 (1994)) (alterations in original).[47] In *Zamos*, the California Supreme Court clarified that a party's continued prosecution of an action after discovering that it lacks probable cause can also support a malicious prosecution claim against that party, even if there was sufficient reason to believe that probable cause existed at the outset of the case. *Id.* at 966–70. "Probable cause, moreover, must exist for every cause of action advanced in the underlying action. '[A]n action for malicious prosecution lies when but one of alternate theories of recovery is maliciously asserted . . . .'" *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 292 (2006) (quoting *Crowley*, 8 Cal. 4th at 678; *Bertero v. Nat'l Gen. Corp.*, 13 Cal. 3d 43, 57 n.5 (1974)) (alterations in original).

CCGroup is entitled to pursue its malicious prosecution claim for much the same reasons as the sham litigation claim discussed above. Moreover, because a California malicious prosecution claim can lie where a party *continues* to prosecute an action despite discovering a lack of probable cause, and where only one claim of many is maliciously asserted, CCGroup need not establish that OptumInsight knew that all of the patents at issue were invalid when it brought its counterclaims in *Cave I*. The memorandum from OptumInsight's counsel concluding that the Dang Patents were likely invalid and that the potential recovery did not justify the cost of the litigation, dated more than six months before OptumInsight dismissed its claims based on the

---

[47] The parties agree that CCGroup's malicious prosecution claim is governed by California law. *See, e.g.*, Def.'s Merits MSJ at 25.

Dang Patents, constitutes sufficient evidence to deny OptumInsight's motion for summary

judgment as to this claim. *See* Howenstine Decl. re Pl.'s MSJ Ex. 21.

### 13. Lanham Act Claim

The Ninth Circuit has identified the following elements of a claim for false advertising

under the Lanham Act:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
>
> (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
>
> (3) the deception is material, in that it is likely to influence the purchasing decision;
>
> (4) the defendant caused its false statement to enter interstate commerce; and
>
> (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (citing 15 U.S.C.

§ 1125(a)(1)(B); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)).

OptumInsight moves for summary judgment on the grounds that statements about patent

protection are not false if the patents have not been definitively held invalid, and that CCGroup

has not shown damages. Def.'s Merits MSJ at 38–40.

The entirety of CCGroup's opposition to OptumInsight's motion for summary judgment on

this claim reads as follows:

> CCGroup's Lanham Act false advertising claim is based on OptumInsight advertising and promoting the ETG software as being patent protected, and specifically as being protected by Dang and Seare patents at issue in this case. OptumInsight's argument about the technical truth of these statements ignores that "[f]alsity includes both literally false statements and literally true statements that are likely to mislead consumers." *Metal Life, Inc. v. Brady Constr. Innovations, Inc.*, 558 F. Supp. 2d 1084, 1093 (C.D. Cal. 2007). While CCGroup acknowledges that OptumInsight cites non-binding authority to the effect that statements about patent protection are not actionable absent an actual determination of invalidity or unenforceability, CCGroup submits that this is not the correct result on the facts of this case, where OptumInsight both claimed patent protection and committed

the conduct that renders the patents unenforceable. Furthermore, in view of the evidence connecting CCGroup's lost profits to the dominant market position OptumInsight obtained on the back of the patents at issue, the extent of CCGroup's damages presents at least a genuine issue of material fact for the fact-finder. Accordingly, OptumInsight's request for summary judgment on this claim should be denied.

Opp'n to Def.'s Merits MSJ at 40.

"On summary judgment, 'it is not [the court's] task . . . to scour the record in search of a genuine issue of triable fact.' . . . Rather, "[w]e rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.'" *Californians for Renewable Energy v. Cal. Pub. Utils. Comm'n*, 922 F.3d 929, 935–36 (9th Cir. 2019) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)) (some alterations in original). This portion of CCGroup's brief cites no evidence whatsoever—it does not identify the advertisement on which the claim is based, nor evidence of injury, nor evidence indicating that such injury was caused by the advertisement. That alone is a reason to grant summary judgment for OptumInsight on CCGroup's Lanham Act claim.

Aside from the deficiency of CCGroup's opposition brief, OptumInsight is entitled to judgment on this claim because its statements were true—OptumInsight in fact held the patents that it claimed it held, and CCGroup has offered no evidence to suggest that the patents did not encompass OptumInsight's products. As far as this Court is aware, every court to consider the issue has held that statements concerning patent protection do not violate the Lanham Act unless a patent has actually been invalidated, despite the patent having been obtained through fraud. *See Farnam Cos., Inc. v. Stabar Enters., Inc.*, No. CV05-1520PHXNVW, 2005 WL 3334348, at *12 (D. Ariz. Dec. 8, 2005) ("Even where a court determines that a patent was obtained through inequitable conduct such as fraud on the Patent Office, the patent is not technically invalidated. *Zenith* [*Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1349 (Fed. Cir. 1999)]. Stabar's statements that its Shed-Stop formula was the subject of a valid U.S. patent were therefore technically true and did not violate the Lanham Act."); *IMCS, Inc. v. D.P. Tech. Corp.*, 264 F. Supp. 2d 193, 197 (E.D. Pa. 2003) ("Even if a patent was obtained through fraud and even if upon examination, a court would invalidate that patent, until such a determination of invalidity is made,

the patent is considered valid and enforceable. As such, Plaintiff's statements as to the contemporaneous existence of the patent are true and are not misleading. Therefore, those statements could not violate the Lanham Act § 43(a)."). OptumInsight's motion for summary judgment as to CCGroup's Lanham Act claim is therefore GRANTED.

Even if that were not the case, OptumInsight would likely be entitled to summary judgment on this claim because CCGroup cannot show damages as a result of OptumInsight's purportedly false advertising. The only potential evidence of such damages is Dr. Sullivan's expert report, in which Dr. Sullivan asserts that CCGroup's damages as a result of false advertising are the same as its antitrust damages in the physician efficiency market. *See* Sullivan Report ¶¶ 206–10. As discussed above, the Court finds that Dr. Sullivan's opinions attributing CCGroup's relative lack of success in the physician efficiency market to OptumInsight's conduct—as well as his opinions regarding damages in the standalone grouper market—are not based on "sufficient facts or data" or "reliable principles and methods," and thus excludes them for failure to satisfy Rule 702 of the Federal Rules of Evidence. Without that expert opinion, CCGroup has no evidence that it suffered any harm as a result of any advertising by OptumInsight. Even if CCGroup could show damages in either product market as a result of the patents, it identifies no evidence tying such damages to *advertising* by OptumInsight. Courts routinely grant summary judgment on Lanham Act claims where a plaintiff fails to show injury as a result of the advertising at issue—at least where, as here, the plaintiff does not seek injunctive relief to remedy prospective harm. *See, e.g.*, *Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*, No. 14-cv-02864-JD, 2016 WL 4182402, at *4 (N.D. Cal. Aug. 8, 2016); *Brosnan v. Tradeline Sols., Inc.*, 681 F. Supp. 2d 1094, 1101 (N.D. Cal. 2010); *IGT v. All. Gaming Corp.*, No. 2:04-cv-01676-RCJ, 2010 WL 4867555, at *6 (D. Nev. Nov. 29, 2010) ("However, Bally has provided no evidence that it lost the sale to Multimedia Games specifically because of the press release."). Because there are other sufficient reasons for granting OptumInsight summary judgment on this claim as discussed above, however, the Court need not reach the question of whether CCGroup's failure to show damages as a result of OptumInsight's purportedly false statements would also warrant granting OptumInsight's motion.

## VI.    CONCLUSION

The Court excludes and allows expert testimony as discussed above, and grants summary judgment on the following claims and issues:

- CCGroup filed its malicious prosecution claim within the applicable statute of limitations;

- CCGroup cannot recover damages based on *costs* associated with litigating infringement or enforceability of the Dang Patents in *Cave I*;

- The relevant product market is "the U.S. market for software that groups claims data into episodes of care," as described in more detail above;

- Judgment is granted in favor of OptumInsight on CCGroup's Sherman Act claims to the extent that they are based on injury in the market for physician efficiency software;

- CCGroup cannot recover damages based on projections of its performance but for OptumInsight's conduct in either the physician efficiency market or the standalone grouper market;

- Judgment is granted in favor of OptumInsight on CCGroup's Lanham Act claim.

The parties shall file proposed redactions within fourteen days of this order. A case management conference will occur on October 4, 2019 at 2:00 PM, and the parties shall file an updated joint case management statement no later than September 27, 2019.

**IT IS SO ORDERED.**

Dated: August 28, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4    CAVE CONSULTING GROUP, INC.,          Case No.: 15-cv-03424-JCS

5              Plaintiffs,                 SEALED
                                           **CERTIFICATE OF SERVICE**
6         v.

7    OPTUMINSIGHT, INC.,

8              Defendants.

9

10   I, the undersigned, hereby certify that:

11   (1)   I am an employee in the Office of the Clerk, U.S. District Court, Northern District of
           California; and
12

13   (2)   On 8/28/2019, I SERVED a true and correct copy(ies) of the attached, by placing said
           copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by
14         depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an
           interoffice delivery receptacle located in the Clerk's office.
15

16

17   Marc W. Vander Tuig
     Armstrong Teasdale LLP
18   7700 Forsyth Blvd.
     Suite 1800
19   St. Louis, MO 63105-1847

20   Peter Lancaster
     Dorsey and Whitney LLP
21   50 South Sixth Street
     Suite 1500
22   Minneapolis, MN 55402

23   Richard Louis Brophy
     Armstrong Teasdale
24   7700 Forsyth Blvd. Suite 1800
     St. Louis, MO 63102

25   Shannon L Bjorklund
     Dorsey and Whitney LLP
26   50 South Sixth Street, Suite 1500
     Minneapolis, MN 55402
27

28
     *Service_Certificate _CRD*
     *rev. August 2018*

Dated: 8/28/2019

Susan Y. Soong
Clerk, United States District Court

By: *Karen L. Hom*

Karen Hom, Deputy Clerk to
the Honorable Joseph C. Spero