UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAVE CONSULTING GROUP, INC., | Case No. 15-cv-03424-JCS |
| Plaintiff, | |
| v. | **ORDER REGARDING MOTION FOR RECONSIDERATION, MOTION TO PRECLUDE TESTIMONY, AND MOTION FOR RELIEF FROM SCHEDULING ORDER** |
| OPTUMINSIGHT, INC., | |
| Defendant. | Re: Dkt. Nos. 373, 381, 384 |

## I.      INTRODUCTION

In this antitrust and malicious prosecution action arising from patent infringement claims asserted in previous litigation, Plaintiff Cave Consulting Group, Inc. ("CCGroup") now moves for reconsideration of a previous order on summary judgment limiting its damages, and for relief from a scheduling order to allow CCGroup to present a new expert report on damages.  Defendant OptumInsight, Inc. moves to preclude CCGroup from calling OptumInsight's lead counsel as a witness at trial.  In addition to the parties' motions, the Court provided notice of its intent to consider entering summary judgment sua sponte under Rule 56(f) of the Federal Rules of Civil Procedure.  The Court held a hearing on January 10, 2020.  For the reasons discussed below, CCGroup's motion for reconsideration is GRANTED, but the Court now grants summary judgment imposing a substantially similar limitation on damages sua sponte under Rule 56(f).  The remaining motions are DENIED.[1]

## II.      BACKROUND

On August 28, 2019, the Court issued an order resolving the parties' motions for summary judgment and *Daubert* motions to exclude expert testimony.  *See* Order re Mots. for Summ. J. &

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

Mots. to Exclude Expert Testimony ("MSJ Order," dkts. 354 (sealed), 363 (public)).[2]  This order

assumes the parties' familiarity with the facts and history of the case, which are addressed in

greater detail in that summary judgment order.

OptumInsight had moved to exclude the opinions of CCGroup's expert witness Dr. Ryan

Sullivan, including opinions regarding damages arising from CCGroup's exclusion from the

market for standalone medical claim grouper software.[3]  Dr. Sullivan had offered a convoluted

analysis that first estimated, based on very little underlying data, the performance of certain

companies that he identified as comparable to CCGroup in the separate market for physician

efficiency software, and used a formula based on the estimated performance of those companies to

project CCGroup's performance in the standalone grouper market.  Among other rulings, the

Court excluded Dr. Sullivan's opinions on the measure of CCGroup's damages, although it

allowed opinions addressing more generally the fact of CCGroup's purported injury.  MSJ Order

at 11–21.  Based on the exclusion of those opinions, the Court also granted summary judgment for

OptumInsight on the issue of whether CCGroup could show damages caused by its exclusion from

the grouper market.  The Court allowed CCGroup to pursue antitrust damages based only on

expenses incurred in earlier litigation in which OptumInsight accused CCGroup of infringing

OptumInsight's patents.

CCGroup sought leave to file a motion for reconsideration on the basis that the Court

improperly granted judgment sua sponte on an issue not raised in OptumInsight's motion for

summary judgment, and the Court granted CCGroup leave to do so.  In granting leave, the Court

also provided notice of its intent to consider granting judgment on the issue of damages sua sponte

under Rule 56(f) of the Federal Rules of Civil Procedure if CCGroup prevailed in showing error in

the earlier ruling.  *See* Oct. 4, 2019 Order (dkt. 366).  CCGroup has now filed its motion for

reconsideration, as well as a motion seeking relief from the expert discovery deadlines imposed by

---

[2] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2019 WL 4492802 (N.D. Cal. Aug. 28, 2019).  Citations herein to the Court's previous orders in this case refer to page numbers of the versions filed in the Court's ECF docket.

[3] This order uses the terms "grouper" and "standalone grouper" interchangeably to refer to the products at issue in the relevant market for standalone medical claim grouping software.  *See* MSJ Order at 78–79.

the Court's scheduling order, to allow CCGroup to offer a new report from Dr. Sullivan presenting a different theory of damages.

Separately, OptumInsight has filed a motion seeking to preclude CCGroup from calling OptumInsight's lead trial counsel, Peter Lancaster, as a witness at trial.

## III.    RECONSIDERATION AND SUA SPONTE SUMMARY JUDGMENT

### A.    Arguments

#### 1.    CCGroup's Motion for Reconsideration

CCGroup asks the Court to vacate the portion of its previous order on summary judgment holding that CCGroup cannot recover damages based on its exclusion from the market for grouper software. *See generally* Pl.'s Mot. for Reconsideration ("Reconsideration Mot.," dkts. 373-5 (public), 373-6 (sealed)). CCGroup first argues that the Court erred in granting judgment on that issue because OptumInsight did not assert a deficiency in proof of damages (as opposed to the separate issue of antitrust injury) in its motion, but acknowledges that the Court has since provided notice of intent to grant partial summary judgment sua sponte under Rule 56(f). *See id.* at 1–3.

CCGroup cites cases recognizing wide latitude in antitrust plaintiffs' permissible means of proving damages, including one district court decision from the Western District of Oklahoma holding that the exclusion of expert testimony did not necessarily preclude the plaintiff from recovering some form of damages. *Id.* at 4–5 (citing, *e.g.*, *Champagne Metals v. Ken-Mac Metals, Inc.*, No. CIV-02-0528-HE, 2008 WL 5205204, at *14 (W.D. Okla. Dec. 11, 2008)). CCGroup concedes that "a jury may not award purely speculative damages," but contends that even without Dr. Sullivan's excluded opinions, it can offer sufficient evidence to present some reasonable basis for an estimate of damages. *Id.* at 6. According to CCGroup, its showing of antitrust injury, which the Court held sufficient, is enough for the jury to consider the question of damages, particularly given the availability of nominal damages. *Id.* at 15–16.

CCGroup identifies the following categories of evidence as capable of supporting an award of market damages: (1) evidence regarding the nature and scope of the standalone grouper market, which shows that the market is nationwide and includes few actual competitors, *id.* at 7; (2) evidence of OptumInsight's revenue and profit from the sale of its grouper product, *id.* at 7–8;

3

(3) evidence of OptumInsight's pricing of its grouper product, including OptumInsight's purported ability to maintain a higher profit margin on that product than on other products, *id.* at 8; (4) evidence that CCGroup would have been capable of licensing its grouper product to customers as early as 2003, establishing a temporal span for potential damages, *id.* at 8–9; (5) evidence that OptumInsight's conduct enforcing and threatening to enforce its patents limited CCGroup's participation in the market, *id.* at 9; (6) testimony from Dr. Sullivan—which the Court's previous order permitted—that OptumInsight's patents enabled it to dominate the standalone grouper market, among other evidence supporting the same conclusion, *id.* at 10–11; (7) testimony from Dr. Sullivan and evidence from market participants that CCGroup's grouper product was on its merits a viable competitor to OptumInsight's product, *id.* at 11–12; (8) the actual costs, pricing, and profit margins of CCGroup's product during the time period at issue, *id.* at 12–13; (9) evidence of barriers to entry and limited participation in the market for standalone groupers, *id.* at 13–14; and (10) the opinions of OptumInsight's own damages expert Richard Bero, *id.* at 14–15.

CCGroup noted at the time it filed its motion for reconsideration that it also intended to seek leave to file an amended expert report, but did not argue that the potential amended report is itself a basis for reconsideration of the Court's summary judgment order. *See id.* at 16.

### 2. OptumInsight's Opposition to Reconsideration

OptumInsight argues that the Court was correct to grant summary judgment on the issue of market damages and should not reconsider that decision. *See generally* Def.'s Opp'n to Pl.'s Mot. for Reconsideration ("Reconsideration Opp'n," dkts. 387-10 (public), 387-11 (sealed)). As a procedural matter, OptumInsight argues that CCGroup has not shown circumstances warranting reconsideration beyond mere disagreement with the Court's previous decision, which is not sufficient under this Court's local rules and past practice. *Id.* at 2–3.

While OptumInsight disputes CCGroup's characterization that the Court granted judgment on the issue of damages "sua sponte," *see id.* at 5, OptumInsight does not actually argue that it moved for summary judgment on that issue or identify any such argument in its motion for summary judgment. Instead, OptumInsight argues that CCGroup addressed the issue of damages

4

in both its summary judgment briefing and in its opposition to OptumInsight's *Daubert* motion. *Id.* at 3. According to OptumInsight, the parties' arguments regarding potential exclusion of Dr. Sullivan's opinions and the Court's reasoning in excluding those opinions put CCGroup on sufficient notice of its purported lack of evidence of market damages. *Id.* at 3–5.

As for the merits of whether CCGroup can show market damages, OptumInsight contends that most of the evidence cited in CCGroup's motion—for example, OptumInsight's purported market dominance, the purported viability of CCGroup's product, and barriers to entry in the grouper market—goes only to the qualitative fact of antitrust injury, without providing any basis for the jury to award a non-speculative quantitative amount of damages. *Id.* at 1, 10–13. OptumInsight argues that its own performance sheds no light on how CCGroup would have performed but for OptumInsight's patents, and that CCGroup has not actually identified evidence showing the size of the grouper market as a whole. *Id.* at 10–11. OptumInsight distinguishes cases that CCGroup cites as recognizing a liberal standard for antitrust damages on the grounds that each of those cases presented a relatively straightforward comparison for the jury to calculate damages—before and after the anticompetitive conduct at issue affected the market, or in one case, performance in an noncompetitive geographic market versus a competitive geographic market—that is not found in this case. *Id.* at 5–6. OptumInsight asserts that a before-and-after comparison similar to those cases, demarcated here by CCGroup's successful defense against infringement claims in *Cave I*, would yield no damages, and that CCGroup may not base its damages on OptumInsight's performance in the grouper market rather than CCGroup's own performance. *Id.* at 7–8 & n.3.

While OptumInsight does not dispute that its own expert Richard Bero offered opinions relating to damages, it argues that CCGroup is not entitled to call an opponent's expert in its case in chief, citing cases excluding such evidence as a matter of adversarial fairness. *Id.* at 13–14, 16–17. OptumInsight also contends that Bero opined only on a *maximum* amount of damages, "an amount *above which* any damages claim would be obviously overstated" rather than an opinion as to the damages actually supported, and that he testified at his deposition that further work would be necessary to reach a reliable opinion on actual damages. *Id.* at 14–16.

5

### 3. CCGroup's Reply Regarding Reconsideration

CCGroup argues in its reply that the mere fact that arguments "touched on evidence relevant to the damages inquiry" did not allow the Court to grant judgment with respect to an issue on which OptumInsight did not move, and that CCGroup's previous arguments regarding antitrust injury and the admissibility of Dr. Sullivan's opinions did not, and had no reason to, constitute a full presentation of CCGroup's evidence on the issue of damages. Pl.'s Reply in Support of Mot. for Reconsideration (dkts. 396-2 (sealed), 396-3 (public)) at 1–3 (citing *Hoard v. Hartman*, 904 F.3d 780, 792–93 (9th Cir. 2018) (reversing summary judgment granted sua sponte as to an issue not raised in the defendant's motion)).

With respect to the Court's more recent notice of intent to consider granting partial summary judgment sua sponte under Rule 56(f), CCGroup again argues that its evidence of antitrust injury—which the Court previously recognized as sufficient to proceed to trial on that issue—is also relevant to damages. *Id.* at 3–5 ("Evidence demonstrating that a party suffered *some* harm is plainly relevant to quantifying the <u>*amount*</u> of that harm."). CCGroup also once again argues that the Court should not grant summary judgment on this issue because a jury could award nominal damages if it determines that CCGroup has not presented sufficient evidence of a particular amount of damages. *Id.* at 5. CCGroup further contends that a jury could determine its damages by "'projecting the market share which the plaintiff would have attained absent the anticompetitive activity, and then projecting the [sic[4]] plaintiff's profits accordingly,'" among other permissible methods, and suggests for the first time that the forthcoming supplemental report it seeks to present from Dr. Sullivan supports denying summary judgment as to damages. *Id.* at 6–7, 10 (quoting *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985)).

CCGroup argues that Bero not only responded to Dr. Sullivan's opinions, but offered his own affirmative opinions as to CCGroup's lost profits if a jury were to determine that anticompetitive conduct was the cause of OptumInsight increasing its market share during the

---

[4] CCGroup slightly misquotes *Dolphin Tours* in that the word "the" does not appear before "plaintiff's" in the original source, but the error is not material.

period at issue. *Id.* at 8. CCGroup concedes that Bero based his opinions on an assumption that CCGroup actually could have produced a competing product and that he characterized his damages figure as a maximum, but CCGroup contends that the Court has already recognized that there is evidence CCGroup could have competed in the standalone grouper market, and that a maximum damages figure is relevant to the jury's analysis. *Id.* According to CCGroup, the circumstances here are not analogous to cases cited by OptumInsight where courts have declined to allow a party to call an opponent's expert, such as a case where the defense expert's opinions were based on the plaintiff's expert's methodology, which the defense expert had made clear he did not believe was reliable. *Id.* at 9–10 (discussing, *e.g.*, *In re Taco Bell Wage & Hour Actions*, No. 1:07-cv-01314-SAB, 2016 WL 815634, at *4–5 (E.D. Cal. Mar. 2, 2016)).

CCGroup contends that there is sufficient evidence for the jury to estimate damages based on the revenue and profit that CCGroup would have obtained from lost sales, and that such an approach "is not a benchmark model" and does not require evidence showing the size of the market or participants' relative market shares. *Id.* at 12–13. Even if such data were required, CCGroup argues that the record contains more robust evidence of the nature of the standalone grouper market than of the physician efficiency market on which Dr. Sullivan's initial analysis relied. *Id.* at 13–14. CCGroup argues that under the circumstances of this case, where CCGroup claims that it was deterred from competing in the grouper market at all, it should not be required to identify specific sales to specific customers that it would have made but for OptumInsight's conduct. *See id.* at 14–15.

## B.     Reconsideration Is Warranted

CCGroup requests reconsideration under the Court's inherent authority and Civil Local Rule 7-9(b)(3). Reconsideration Mot. at 1. That rule provides for reconsideration of an interlocutory order to remedy a "manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." Civ. L.R. 7-9(b)(3). The rule does not fit the circumstances of this motion—CCGroup's argument for reconsideration is not that the Court disregarded arguments presented by the parties, but rather that the Court acted sua sponte on an issue *not* raised by the parties. Nevertheless, although not

squarely addressed by Local Rule 7-9, the Court concludes that reconsideration is warranted if the Court acted sua sponte without authority to do so and without notice to the parties that would have allowed for a timely objection before such action was taken.

Rule 56(f) of the Federal Rules of Civil Procedure governs sua sponte action to grant summary judgment:

> (f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:
>
> (1) grant summary judgment for a nonmovant;
>
> (2) grant the motion on grounds not raised by a party; or
>
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f). "*Sua sponte* grants of summary judgment are only appropriate if the losing party has 'reasonable notice that the sufficiency of his or her claim will be in issue.'" *Greene v. Solano Cty. Jail*, 513 F.3d 982, 990 (9th Cir. 2008) (quoting *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir. 1993)).

OptumInsight did not move—and does not argue now that it moved—for summary judgment on the issue of whether CCGroup could show a non-speculative amount of damages as a result of being dissuaded from competing in the market for grouper software. *See* Reconsideration Opp'n at 3–5 (failing to identify any part of OptumInsight's motion for summary judgment seeking a determination that CCGroup could not show damages). Although the Court expressed skepticism at the summary judgment hearing as to whether Dr. Sullivan's market damages opinions rested on a sufficient factual foundation, the Court neither raised the issue of whether CCGroup could show such damages without Dr. Sullivan's testimony nor invited a response from CCGroup on that issue. *See generally* Aug. 12, 2019 Hr'g Tr. (dkt. 371). The Court's order before the hearing identifying "a non-exhaustive list of topics that the parties should be prepared to address" also did not raise this issue. *See* dkt. 352.

In the absence of such notice either from the Court or from OptumInsight's motion, CCGroup had no occasion to address the standard for a sufficient showing of damages in antitrust cases, or whether the evidence available could meet that standard if Dr. Sullivan's damages

opinions were excluded. Granting summary judgment on that issue without prior notice to CCGroup was error, and would likely be reversible. *See Hoard*, 904 F.3d at 792–93; *Greene*, 513 F.3d at 990 ("[B]ecause Greene did not have notice and an opportunity to oppose summary judgment on those claims, summary judgment on them was inappropriate."). The Court VACATES the portion of its August 28, 2019 holding that "CCGroup cannot recover damages based on projections of its performance but for OptumInsight's conduct in . . . the standalone grouper market." MSJ Order at 102; *see also id.* at 86–87.

### C. Sua Sponte Summary Judgment Under Rule 56(f)

In granting CCGroup's motion for leave to files its motion for reconsideration, the Court also gave notice that if the motion for reconsideration were granted, the Court would consider under Rule 56(f) whether to grant summary judgment sua sponte that CCGroup lacks sufficient evidence to support an award of damages in the grouper market. *See* Oct. 4, 2019 Order. The Court allowed CCGroup to revise its proposed motion for reconsideration to include arguments and evidence opposing sua sponte judgment on that issue. *Id.* The Court now considers whether, in light of the parties' briefs and evidence filed after appropriate notice, the same outcome is warranted. *See* Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.").

#### 1. Legal Standard for Summary Judgment

A party opposing summary judgment must identify "'specific facts showing there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The party opposing summary judgment has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

United States District Court
Northern District of California

A party need not present evidence to support or oppose summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The court draws all reasonable factual inferences in favor of the party opposing summary judgment, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for that party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### 2.    Evidence of Damages

Courts have long recognized a relatively lenient standard for proving damages in antitrust cases, under which a "jury is allowed to act on probable and inferential proof in determining the amount of damages even though such an award may be an approximation." *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985); *see also, e.g.*, *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811–12 (9th Cir. 1976) ("'A study of the adjudicated cases in this area readily dispels any impression that this question of damages is governed by an application of the common law rule of reasonable certainty. The cases have long since departed from this rule in antitrust litigation.'" (quoting *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 391 (9th Cir. 1957))). That is particularly true where a defendant's "wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff." *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927). But "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

CCGroup now argues that it can show damages for lost profits based on a projection of its performance but for OptumInsight's conduct, rather than a comparison to a time period or a comparable business unaffected by the conduct. The Ninth Circuit addressed this method of proof in *Dolphin Tours*, a case on which CCGroup relies:

> Among the methods by which an antitrust plaintiff can establish lost profits are: (1) comparing the plaintiff's profits before or after the alleged anticompetitive activity with the profits made while the plaintiff was subjected to the anticompetitive activity; (2) examining the profits of a business comparable to the plaintiff's business which was not affected by the anticompetitive activity; or (3) projecting the market share which the plaintiff would have attained absent the anticompetitive activity, and then projecting plaintiff's profits accordingly. In this case Dolphin has attempted to establish its lost profits by projecting the market share that it would have attained absent the anticompetitive activity. In using this approach, Dolphin must presume the existence of rational economic behavior in the hypothetical free market. This includes a rational price differential between Dolphin's prices and defendants' prices based on all competitors attempts to maximize their own profits, and the potential entry of other competitors into the market.

> There is some tension between the principle that difficulty in proving the amount of damage should not operate to benefit a defendant whose actions have made that proof difficult, and requiring an antitrust plaintiff to anticipate a hypothetical free market in establishing the amount of his injury. However, we conclude that the burden of anticipating this hypothetical market is appropriately placed on antitrust plaintiffs.[5] In projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market such as an unnatural price differential between themselves and their competitors and limited competition from third parties because of the difficulty of entering the market. Such an approach would overestimate the profits an antitrust plaintiff would have made absent the anticompetitive activity and then under the antitrust laws treble this artificially high damage estimate.

*Dolphin Tours*, 773 F.2d at 1511–12 (footnote and citations omitted without ellipses).

In *Dolphin Tours*, the plaintiff sought to meet that standard by relying heavily on expert testimony and survey results. *Id.* at 1512. The Ninth Circuit held that evidence to be largely sufficient. *Id.* Although the plaintiff failed to account sufficiently for the potential entry of new competitors, the Ninth Circuit concluded that "[t]estimony by Dolphin's owner and by [expert witness] Dr. Mak or other economic experts could provide the jury with this information at trial," and while the plaintiff did not fully account for potential lower pricing, the Ninth Circuit determined that survey data already collected by the plaintiff provided sufficient evidence to resolve that deficiency. *Id.* at 1512–13.

---

[5] At the hearing, CCGroup argued that it cannot be the plaintiff's burden to quantify damages based on hypothetical performance in a hypothetical competitive market. The Ninth Circuit has held that it is, despite recognizing the practical challenges to doing so.

11

In a case not cited by either party here, the Ninth Circuit has recognized that expert testimony or similar evidence may in some circumstances be necessary to show antitrust damages, and has affirmed summary judgment where a plaintiff's expert's opinions on damages were excluded:

> Some sort of study estimating the amount of damages was essential to appellants' case. As this court said in *Dolphin Tours*, the plaintiffs "must provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." 773 F.2d at 1509–10. Summary judgment is appropriate where appellants have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages. *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1452 (9th Cir. 1983) (antitrust case), *cert. denied*, 464 U.S. 994 (1983).
>
> In the absence of another study besides those that the district court had properly excluded, or the possibility that Don McGlinchy could rehabilitate William McGlinchy's defective study, appellants could make no showing about the amount of damages. By eliminating these possibilities, Shell Oil defendants made their showing that the named witnesses' possible testimony would raise no genuine issue of material fact about the amount of damages appellants had sustained. *Cf. Celotex*, 106 S. Ct. at 2555–56 (White, J., concurring).
>
> Once Shell Oil defendants made this showing, the burden was on appellants to come forward with specific facts showing there was a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Matsushita*, 475 U.S. 574. Appellants did not meet this burden; they produced no evidence at all to contradict Shell Oil defendants' showing, or even to enable contradictory inferences.

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808–09 (9th Cir. 1988) (format of citations altered).

The various forms of documentary evidence that CCGroup cites here, as well as the opinions from Dr. Sullivan not excluded by the Court's previous order, go only to the fact of injury; they do not allow the jury to determine a particular *amount* of damages beyond mere speculation. OptumInsight's expert Richard Bero's report and testimony come somewhat closer, offering an opinion that CCGroup's maximum lost profits in the standalone grouper market during the period at issue were $1.9 million. Bero Report (dkt. 307-7) at 70–72. Bero relies on CCGroup's expert Dr. Sullivan's figures for OptumInsight's, CCGroup's, and Truven's real-world shares of the standalone grouper market. *See id.* Scheds. 2.1, 5.0 (citing Sullivan Report (dkt. 290-13) Attach. C-2). For a portion of the time period at issue, his report includes a meaningful

market share held by 3M, *see id.*, despite the Court's definition of a relevant product market—in reliance on Dr. Sullivan's opinion—that does not include 3M's grouper product, *see* MSJ Order at 81 n.35. While that discrepancy could probably be accounted for, and it is not clear that the underlying evidence of relative real-world shares of the standalone grouper market is deficient (as opposed to evidence regarding the physician efficiency market, the lack of which was an important factor in excluding Dr. Sullivan's initial damages opinions), the more significant flaw is that neither Bero's opinions nor any other evidence identified by CCGroup provides the jury with any basis to tease out "favorable aspects of an anticompetitive market such as an unnatural price differential between [CCGroup] and [its] competitors and limited competition from third parties because of the difficulty of entering the market," which the Ninth Circuit has held is a component of an antitrust plaintiff's burden in proving damages based on a projected market share. *See Dolphin Tours*, 733 F.2d at 1512.

That deficiency in Bero's report would not necessarily undermine the conclusion that he actually presents—it is possible to reach a reliable *maximum bound* of CCGroup's lost profits without accounting for all of the factors that might *reduce* those profits if additional competitors entered the market and prices dropped to a competitive equilibrium. Without such analysis, however, CCGroup cannot reliably repurpose Bero's opinions to show its actual damages rather than an upper limit to those damages. Assuming for the sake of argument that a jury could and would accept Bero's maximum figure, the amount by which that maximum must be discounted to estimate actual damages remains pure speculation. Even if it is possible for a jury to conduct such analysis without the benefit of expert opinions directly addressing the issue—which is far from clear—CCGroup has identified no factual evidence in this case that would enable the jury to do so.

In *Dolphin Tours*, despite identifying somewhat similar deficiencies in the plaintiff's expert report, the Ninth Circuit reversed the district court's decision to grant summary judgment, concluding that the plaintiff would likely be able to remedy those deficiencies at trial. 733 F.2d at 1512–13. This case differs from the circumstance presented by *Dolphin Tours* in at least two ways. First, the record in that case included a survey on consumer preferences that the Ninth Circuit determined would support analysis of consumer behavior at different price points, even

13

though the plaintiff had not yet presented such analysis. *See id.* No comparable data is available here. Second, the Ninth Circuit's analysis suggests that the district court had not yet considered whether the expert testimony at issue met the standard for expert opinion evidence, such that supplemental opinions could be presented at trial subject to a challenge under that standard. *See id.* at 1513 ("If Dolphin is unable to establish the validity of the Report or qualify Dr. Mak as an expert, then it may be unable to present sufficient evidence on the amount of its damages and a directed verdict or judgment notwithstanding the verdict may be appropriate."). Here, expert discovery closed long ago, the deadline for *Daubert* motions has passed, and those motions have been briefed and adjudicated. This Court does not read *Dolphin Tours* as divesting district courts of authority to set a case schedule requiring challenges to expert opinion evidence to be resolved before or in conjunction with motions for summary judgment.

As in *McGlinchy*, the Court concludes that to the extent CCGroup seeks damages for lost profits based on a projection of its market share but for OptumInsight's conduct, "[s]ome sort of study estimating the amount of damages was essential to [CCGroup's] case." *McGlinchy*, 845 F.2d at 808.[6] The record available after Dr. Sullivan's damages opinions are excluded does not provide a sufficient basis for the jury to reach a reasonable estimate, without relying on speculation, of the market share and profits that CCGroup would have captured in a hypothetical competitive market. The Court therefore GRANTS summary judgment sua sponte on this issue pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. CCGroup may not recover lost profits damages, although it may seek nominal damages if the jury determines that OptumInsight's wrongful conduct excluded CCGroup from the market for standalone grouper software.

## IV. MOTION FOR LEAVE TO AMEND THE SCHEDULING ORDER

### A. Arguments

#### 1. CCGroup's Motion to Amend the Scheduling Order

CCGroup moves to amend the Court's scheduling order to allow CCGroup to serve an

---

[6] The Court declines to follow the Western District of Oklahoma's decision denying summary judgment on damages without analysis of whether any available evidence could show damages. *See Champagne Metals*, 2008 WL 5205204, at *14.

14

amended expert report by Dr. Sullivan including a modified damages analysis that CCGroup contends would satisfy the *Daubert* standard and this Court's previous order excluding Dr. Sullivan's initial opinions. *See generally* Mot. for Relief from Case Mgmt. Schedule (dkt. 384). CCGroup proposes an amended schedule in which CCGroup would serve its amended report by January 24, 2020 or fourteen days after the Court grants the motion, OptumInsight would serve a rebuttal report by February 24, 2020 or thirty days after service of CCGroup's report, and the parties would complete supplemental expert witness depositions limited to the new subject matter of Dr. Sullivan's amended report no later than March 9, 2020 or fourteen days after service of OptumInsight's rebuttal report. *Id.* at 1. CCGroup does not argue that the potential amended report should itself be considered in the Court's analysis of the motion for reconsideration of whether to allow CCGroup to pursue market damages at all, and concedes that if the Court denies the motion for reconsideration, Dr. Sullivan's proposed amended opinions would not be relevant at trial and the motion to amend the scheduling order would be moot. *Id.* at 8.

The amended report would be limited to CCGroup's damages in the standalone grouper market and would not address damages in the physician efficiency market. *Id.* at 4 & n.3. Dr. Sullivan would base CCGroup's but-for performance in the standalone grouper market on the performance of non-party Truven—the only other participant in that market besides CCGroup and OptumInsight, selling a product under license from OptumInsight—with adjustments to account for differences between Truven and CCGroup. *Id.* at 4. In the apparent absence of direct evidence of Truven's performance, Dr. Sullivan would extrapolate the number of "covered lives" served by Truven's product from: (1) OptumInsight's standalone grouper revenue; (2) OptumInsight's revenue per covered life; (3) OptumInsight's market share; and (4) unspecified "other evidence of [Truven's product's] market penetration during the damages period." *Id.* Dr. Sullivan would then use the estimated number of covered lives for Truven's product to calculate CCGroup's but-for revenue. *Id.* CCGroup argues that this methodology would avoid reliance on estimates of CCGroup's performance in the physician efficiency market—one of the issues that led the Court to exclude Dr. Sullivan's initial opinions on damages—and that Dr. Sullivan can address the Court's concern that his earlier damages estimates showed no effect from the previous litigation in

15

which OptumInsight accused CCGroup of infringing its patents and CCGroup obtained a verdict of non-infringement. *Id.* at 5 & n.5.

According to CCGroup, there is good cause to permit the amended report because "the jury would certainly benefit from Dr. Sullivan's proposed amended opinions in evaluating the evidence and determining the appropriate quantum of damages," permitting the amendment would "help ensure that CCGroup receives full and adequate compensation for its private antitrust injury," and it would "also further the policy of deterring antitrust violations." *Id.* at 2, 7. CCGroup argues that courts have frequently allowed plaintiffs to amend expert reports to attempt to cure defects that led to the exclusion of damages opinions. *Id.* at 2, 5–6 (citing *Finjan, Inc. v. Sophos, Inc.*, No. 3:14-cv-1197-WHO, 2016 WL 4268659, at *4 (N.D. Cal. Oct. 15, 2016); *Dig. Reg of Tex, LLC v. Adobe Sys., Inc.*, No. 4:12-cv-01971-CW, 2014 WL 4090550, at *4 (N.D. Cal. Aug. 19, 2014); *Golden Bridge Tech. v. Apple, Inc.* ("*Golden Bridge I*"), No. 5:12-cv-04882-PSG, 2014 WL 2194501, at *7 (N.D. Cal. May 18, 2014); and *Dynetix Design Sols., Inc. v. Synposys, Inc.*, No. 5:11-cv-5973-PSG, 2013 WL 4538210, at *5 (N.D. Cal. Aug. 22, 2013); as well as decisions from other districts). CCGroup also notes that Dr. Sullivan would testify regardless of the outcome of this motion, with his testimony limited, if the motion is not granted, to opinions regarding the nature of the standalone grouper market, that OptumInsight dominated that market due to its patents, and that CCGroup would have attained a greater share of the market but for OptumInsight wielding its patents. *Id.* at 6–7.

CCGroup acknowledges that diligence is the key issue in considering a request to amend a scheduling order, and contends that it acted diligently in filing this motion—which it filed on November 11, 2019—in time to be heard on the same day as the motion for reconsideration. *Id.* at 3, 7–8. According to CCGroup, the proposed amended report only became potentially relevant after October 4, 2019, when the Court granted CCGroup's motion for leave to file its motion for reconsideration, and thus indicated that damages for exclusion from the standalone grouper might remain an issue in the case despite the August 28, 2019 summary judgment order. *Id.* at 8. CCGroup also argues that OptumInsight would "not be materially prejudiced by the proposed adjustment to the schedule" in light of the June 1, 2020 trial date, and that the default schedule set

by Rule 26 of the Federal Rules of Civil Procedure would permit expert disclosures up to March 1, 2020, ninety days before the start of trial. *Id.* at 3, 8.

### 2. OptumInsight's Opposition to Amending the Scheduling Order

OptumInsight argues that CCGroup has not shown good cause to amend the scheduling order because it has not shown diligence, either in attempting to meet the initial expert disclosure deadline, or in filing its present motion within a reasonable time after the Court excluded Dr. Sullivan's damages opinions. Opp'n to Pl.'s Mot. for Relief from Case Mgmt. Schedule ("Scheduling Opp'n," dkt. 391) at 4–5. According to OptumInsight, CCGroup had all of the information on which Dr. Sullivan now relies well before the January 22, 2018 extended expert disclosure deadline and the May 30, 2018 extended expert discovery deadline. *Id.* at 1, 5. OptumInsight notes the repeated discovery extensions in this case, and the fact that CCGroup took no fact depositions until October 17, 2017, nearly two years after the Court first set a schedule in 2015, and only ten days before the then-operative fourth extended fact discovery deadline, which was subsequently extended one more time to December 15, 2017. *Id.* at 5. OptumInsight also contends that CCGroup failed to meet expert discovery deadlines—failures to which OptumInsight did not object at the time. *Id.* at 6.

OptumInsight contends that CCGroup has failed to meet not only the "good cause" and diligence standards of Rule 16 of the Federal Rules of Civil Procedure, but also Rule 37(c)(1)'s requirement that allowing evidence not timely disclosed must be either "substantially justified" or "harmless." *Id.* at 3. OptumInsight argues that it would be prejudiced by incurring additional attorneys' fees and facing reduced time to prepare for trial if the motion were granted and an additional round of *Daubert* motions were needed to address the supplemental report, which OptumInsight has not yet seen, but which it believes would likely rely on underlying data and methods similarly deficient to Dr. Sullivan's original report. *Id.* at 12–14. According to OptumInsight, the months remaining before trail do not negate that prejudice. *Id.* at 9 (citing *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005)). OptumInsight notes that the trial was continued to its current date to accommodate a schedule conflict of CCGroup's counsel, and argues that it would be unfair for such an accommodation to lead to additional

17

discovery and evidence for OptumInsight that would have been unavailable had the trial been set on a schedule similar to the one in place before the Court vacated the trial and hearing dates to consider the parties' summary judgment motions, which had included only fourteen weeks between the summary judgment hearing and the trial. *Id.* at 9.

OptumInsight cites a number of cases in which similar requests were denied. *Id.* at 2–3, 7–9 (citing *Burnham v. United States*, 544 F. App'x 660, 660–61 (9th Cir. 2013); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1358 (Fed. Cir. 2005); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-cv-01393, 2019 U.S. Dist. LEXIS 21976, at *10–15 (N.D. Cal. Feb. 6, 2019); *Unwired Planet, LLC v. Apple Inc.*, No. 13-cv-04134-VC, 2017 U.S. Dist. LEXIS 20928, at *3–4 (N.D. Cal. Feb. 14, 2017); *Golden Bridge Tech. v. Apple Inc.* ("*Golden Bridge II*"), No. 5:12-cv-04882-PSG, 2014 U.S. Dist. LEXIS 76339, at *1–2 (N.D. Cal. June 1, 2014); *Network Prot. Scis., LLC v. Fortinet, Inc.*, No. C 12-01106 WHA, 2013 WL 5402089, 2013 U.S. Dist. LEXIS 138890, at *25–26 (N.D. Cal. Sept. 26, 2013); *Nat'l Union Fire Ins. Co. v. Elec. Transit, Inc.*, No. C 04-03435 JSW, 2007 U.S. Dist. LEXIS 86949, at *9–12 (N.D Cal. Nov. 14, 2007)). According to OptumInsight, all but one of the cases cited by CCGroup are distinguishable because they were patent infringement cases in which expert testimony was needed to determine the *minimum* damages, equivalent to a reasonable royalty, allowed by 35 U.S.C. § 284. *Id.* at 11. OptumInsight contends that CCGroup is not entitled to any similar minimum amount of damages on its antitrust claims here, and that CCGroup would not be left without a remedy without Dr. Sullivan's supplemental report, because CCGroup could still recover treble its attorneys' fees from the *Cave I* litigation if it prevails here. *Id.* at 11–12. OptumInsight distinguishes CCGroup's only non-patent-infringement case on the basis that—according to OptumInsight—it involved an unsettled area of law and a controversial damages theory that had been accepted by some courts and rejected by others, while CCGroup failed to show that any court had ever accepted a theory comparable to Dr. Sullivan's original opinions in this case and failed to "marshal[] necessary evidence and present[] a coherent damages calculation" to support an a theory of market damages using accepted methodology. *Id.* at 12 (discussing *Fidelitad, Inc. v. Insitu, Inc.*, No. 2:13-cv-03128, 2016 WL 4265749 (E.D. Wash. Aug.

11, 2016)).

### 3.    CCGroup's Reply Regarding Scheduling

CCGroup argues in its reply that the Court's *Daubert* order excluding Dr. Sullivan's original opinions presents good cause for allowing an amended report, and that failure to do so would impose "unnecessarily draconian and punitive outcomes that would violate the strong policy favoring decisions on the merits."  Reply in Support of Mot. for Relief from Case Mgmt. Schedule (dkt. 394) at 2–3.  CCGroup contends that Dr. Sullivan had no reason to present his new opinions in his initial report because he believed that his initial opinions were sound, and CCGroup had no reason to expect that the Court would reject those opinions until the order doing so was issued.  *Id.* at 3.  Although CCGroup disagrees that Rule 37(c)(1) applies here—because if the Court altered the scheduling order, there would be no untimely disclosure—CCGroup argues that the same analysis it presents with respect to Rule 16 would also warrant excusing a late disclosure under Rule 37.  *Id.*

According to CCGroup, the patent infringement cases that OptumInsight seeks to distinguish did not rely on the specific circumstances of minimum reasonable royalty damages in their analysis, and CCGroup argues that its inability to present expert testimony on a permissible theory of damages here would be analogous to those cases.  *Id.* at 4.  CCGroup also argues that *Fidelitad* is not distinguishable, because the court in that case held that there was *no* substantial ground for disagreement on whether the original opinions were permissible, and did not indicate that any unsettled legal issue factored into its analysis.  *Id.* at 4–5.  CCGroup distinguishes the cases cited by OptumInsight on the grounds that *Network Protection Sciences*, *Golden Bridge II*, *ePlus*, and others involved requests to supplement expert reports on the eve of or during trial, and the court in *Golden Bridge* had already granted one request to revise an expert report before denying a subsequent request.  *Id.* at 5–6.  CCGroup contends that *National Union Fire* is inapposite because it concerned a party seeking to add opinions regarding defenses wholly unaddressed in the expert's initial report, and that Dr. Sullivan's initial report here did not overreach in the same manner as report at issue in *Unwired Planet*.  *Id.* at 6.

CCGroup argues that the months remaining before trial are sufficient to negate any

19

significant prejudice to OptumInsight, and that there would be sufficient time to brief and hear a new *Daubert* motion. *Id.* at 7–8. CCGroup also suggests that "after reviewing Dr. Sullivan's amended report, even OptumInsight [might] agree that there is no legitimate basis to challenge his revised opinions." *Id.* at 8.

CCGroup's reply includes the following brief response to OptumInsight's arguments that CCGroup did not diligently pursue discovery and required numerous extensions of discovery deadlines:

> Finally, OptumInsight devotes two pages of its Response to calumnies aimed at biasing the Court against CCGroup. *See* [Scheduling Opp'n] at 5–7. These misrepresentative statements regarding CCGroup's conduct throughout the litigation are irrelevant and do not bear in any way on the issue now before the Court. Rather than engage in the grueling exercise of correcting the record, CCGroup requests that the Court simply disregard these aspersions as an unfortunate byproduct of the parties' heated litigation.

*Id.* at 4.

### B. Legal Standard for Relief from a Scheduling Order

Deviations from scheduling orders are governed by Rule 16 of the Federal Rules of Civil Procedure, which provides that such orders "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Ninth Circuit has established a standard for such modification that focuses on the diligence of the party seeking relief from a deadline:

> Unlike Rule 15(a)'s liberal amendment policy . . . , Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16 advisory committee's notes (1983 amendment). Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citations omitted). Courts look to a party's diligence not only in complying with the scheduling order after it has been issued, but also "in creating a workable Rule 16 scheduling order," as well as "in seeking amendment of the Rule 16 order, once it became apparent that [the party] could not comply with

the order." *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 607 (E.D. Cal. 1999).[7]

## C. CCGroup Is Not Entitled to Relief from the Scheduling Order

After a number of delays and extensions, expert discovery closed in this case on May 30, 2018, nearly three years after the case was filed. *See* May 3, 2018 Order on Stipulation (dkt. 276). OptumInsight is correct that nothing prevented CCGroup from obtaining the new report it seeks to offer from Dr. Sullivan before that deadline. The delay arises from CCGroup and Dr. Sullivan's decision to present a single initial theory of damages in the standalone grouper market, resting like a house of cards on a convoluted analysis of how CCGroup might have performed in the physician efficiency market that in turn relied on weak underlying data and assumptions, which the Court ultimately determined was not sufficiently reliable to present to the jury. *See* MSJ Order at 11–17, 20–21. The decision to exclude those opinions was not a close call, and CCGroup does not argue that Dr. Sullivan's initial theory can be rehabilitated with minor changes. Instead, CCGroup proposes to introduce an entirely new measure of damages based on a comparison to Truven's performance in the standalone grouper market, relying on data that was available when Dr. Sullivan prepared his initial opinion.

While CCGroup is correct that other courts have in some instances allowed plaintiffs to offer new expert reports after opinions on damages were excluded, at least some of those cases are readily distinguishable. In *Finjan, Inc. v. Sophos, Inc.*, for example, Judge Orrick allowed leave to amend a report, as part of the same order in which he precluded the report, where the means for resolving its deficiencies were apparent, where Judge Orrick believed the amendments could be completed within nine days from the date of his order, and where it appears that no more than an abbreviated subsequent *Daubert* challenge was anticipated, given that trial was set to begin less than two weeks after the amended report was due. 2016 WL 4268659, at *1, *4, *6. Similarly, in *Digital Reg of Texas, LLC v. Adobe Systems, Inc.*, Judge Wilken anticipated that the plaintiff could

---

[7] The Court has addressed this standard previously in this case, striking evidence offered by CCGroup from a fact witness not disclosed before the close of discovery. Order re Discovery Dispute (dkt. 272) at 2–3, *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-cv-03424-JCS, 2018 WL 1938555, at *1–2 (N.D. Cal. Apr. 25, 2018).

provide "a revised damages report curing only the problems identified in [Judge Wilken's] order," by two days after the date of the order. 2014 WL 4090550, at *4. In contrast, no means of remedying Dr. Sullivan's damages opinions was apparent from his initial report, CCGroup's proposed supplemental report would introduce an entirely different theory of damages, and OptumInsight has presented at least credible arguments that Dr. Sullivan's proposed reliance on *OptumInsight's* financial data to estimate *Truven's* financial performance—not to mention his as-yet-unspecified methods of adjusting Truven's estimated performance to account for differences between Truven and CCGroup—will warrant a thorough rebuttal report and full briefing on a *Daubert* motion.

In other cases, courts have denied such requests. Judge Alsup explained his reasons for doing so as follows:

> This leaves the follow-on question of whether [the plaintiff] should be permitted an opportunity to have a second bite at the apple. Over the course of many years and more than a dozen patent trials, the undersigned judge has concluded that giving a second bite simply encourages overreaching on the first bite (by both sides). A second bite may be appropriate where the expert report can be salvaged with minimal disruption to an orderly trial, but where the report is not even close, there is a positive need to deny a second bite in order to encourage candor in the first place. To this must be added the fact that the trial date is only four days away and the parties and the Court have built their calendars around that date. To start over with a new royalty analysis would impose prejudice on the defense as well and disrupt the Court's calendar, which is burdened with other trials set far into the future. Possibly, plaintiff can cobble together a royalty case based on other disclosed witnesses and evidence. Possibly not. If not, it is a problem clearly of plaintiff's own overreaching and it will not be allowed a second bite at the apple.

*Network Prot. Scis.*, 2013 WL 5402089, at *8.

Judge Alsup's reasoning with respect to candor in parties' initial expert reports is persuasive. Moreover, even assuming that Dr. Sullivan believed his initial analysis to be well founded and CCGroup's attorneys believed that zealous representation called for pursuing such an ambitious theory of damages, nothing prevented CCGroup from offering its newly proposed approach—which Dr. Sullivan apparently also believes is well founded—as an alternative measure of damages at the outset, in case the Court held Dr. Sullivan's primary theory unreliable or the jury found it unconvincing. Withholding this alternative method until the first theory was

excluded gives rise to concerns of fairness and candor, because had the initial theory *not* been excluded, there would have been no indication to the jury, the Court, or OptumInsight that Dr. Sullivan was also willing to endorse this wholly different approach to calculating damages—an approach that, although not addressed in CCGroup's briefs, likely results in a different total amount.

CCGroup was not diligent in ensuring the expert opinions on damages that it timely disclosed were well founded on reliable methods, or that the approach it now seeks to use instead was disclosed as an alternative theory. As discussed at the summary judgment hearing, to the extent that Dr. Sullivan intended to build a damages model based on the physician efficiency market, CCGroup was not diligent in pursuing third party discovery—during the years that fact discovery was open—to obtain the actual data needed to support such a model, or for that matter to support a new theory based on Truven's performance without needing to extrapolate from data specific to OptumInsight, which controlled a far larger share of the market.[8] CCGroup also was not diligent in waiting to propose a new theory in its present motion seeking relief from the scheduling order on November 11, 2019, two and a half months after the Court excluded Dr. Sullivan's initial damages opinions, three and half months after the Court indicated in a pre-hearing order that it was considering doing so, and almost a year and half after OptumInsight filed its *Daubert* motion raising serious issues as to the reliability of Dr. Sullivan's initial report. Because CCGroup "was not diligent, the inquiry should end." *See Johnson*, 975 F.2d 604, 609. The motion for relief from the scheduling order is therefore DENIED.

Even if the Court were to go beyond CCGroup's diligence to consider the issue of prejudice, that too supports denying the motion. The proposed new damages report would require a rebuttal report from OptumInsight, new expert depositions by both sides, and a new round of

---

[8] *See, e.g.*, Aug. 12, 2019 Hr'g Tr. at 23:13–20 ("THE COURT: But why didn't he use actual numbers? MR. BROPHY: There are none. THE COURT: What do you mean, 'there are none'? MR. BROPHY: This is the most information that we can get about -- THE COURT: You couldn't get Truven's sales? MR. BROPHY: We assume -- we could have gotten Truven's sales possibly."); *id.* at 31:17–25 ("MR. BROPHY: . . . Verisk, there was evidence that Verisk was smaller. We didn't know how much smaller, admittedly. There was no data for Verisk. So we averaged between CCGroup and -- THE COURT: And just to be clear, it's because you didn't try to get that data, not because it's not available? MR. BROPHY: That's correct.").

*Daubert* briefing on whether to exclude one or both party's new expert opinions. CCGroup's proposed schedule would call for an exchange of reports and completion of depositions by March 9, 2020. If the parties were allowed eleven days from that deadline to file any new *Daubert* motions on March 20, 2020, briefing and hearing those motions on the usual five-week track set by the Court's local rules would result in a hearing on April 10, 2020, less than a month before the final pretrial conference in a case that will require complex trial preparation even without placing the issue of damages in flux. While the Court does not doubt that the parties could meet such a schedule if required to do so, and the prejudice is not so severe as in *Network Protection Sciences* where trial was only four days away, the burden that proceeding with a new damages theory at this stage would place on OptumInsight remains significant and weighs against granting CCGroup's motion.

OptumInsight argues that CCGroup must also meet Rule 37(c)(1)'s requirement that evidence not timely disclosed can be allowed only where it is "substantially justified" or "harmless." *See* Scheduling Opp'n at 3. Because the Court concludes that CCGroup has not shown diligence and is not entitled to relief under Rule 16—which is the only relief that CCGroup seeks—the Court need not reach that alternative standard. Nevertheless, for the reasons discussed above, the Court concludes that a belated offering of CCGroup's alternative damages theory is not substantially justified, and that filling the remaining time before trial with a new round of expert discovery and *Daubert* briefing is not harmless.

## V.    MOTION TO PRECLUDE TESTIMONY

### A.    Arguments

#### 1.    OptumInsight's Motion to Preclude Lancaster's Testimony

OptumInsight argues that CCGroup should be precluded from calling OptumInsight's lead trial attorney Peter Lancaster as a witness, or otherwise referring to his participation in OptumInsight's purportedly anticompetitive conduct, because it has "failed to identify evidence of Mr. Lancaster's involvement in the actions about which it complains" and forcing OptumInsight to either disqualify Lancaster or explain his dual role as a witness and advocate to the jury would be prejudicial. *See* Mot. to Preclude Pl. from Calling Peter Lancaster (dkts. 381-10 (sealed), 381

(public)) at 1–2. According to OptumInsight, Lancaster's role in litigation between OptumInsight's predecessors Ingenix and Symmetry is irrelevant "[s]ince the Court has ruled that OptumInsight must be assumed to have the knowledge of Symmetry for the purposes of CCGroup's *Walker Process* claim,"[9] and regardless, "Lancaster naturally has no memory of a single brief or a single statement by an opposing party in a case in which he served as local counsel in 2001 and 2002." *Id.* at 2.

OptumInsight contends that billing records, privilege logs, and deposition testimony from other lawyers demonstrate that Lancaster had no involvement in the decision to file infringement claims and counterclaims against CCGroup, with Lancaster only becoming involved after those claims were filed and not taking part in the decision to dismiss claims based on the Dang patents. *Id.* a 4–6. According to OptumInsight, CCGroup asked Lancaster few substantive questions at his own deposition in this case in 2017, and Lancaster confirmed his lack of relevant involvement both at that deposition and in a subsequent declaration. *Id.* at 6–7. OptumInsight notes that CCGroup never amended its Rule 26 disclosures to identify Lancaster as a witness, and did not otherwise indicate that it planned to call him as a witness until OptumInsight asked in October of 2019. *Id.* at 8.

OptumInsight argues that CCGroup has not met its burden to show compelling reasons to call OptumInsight's trial counsel as a witness, *id.* at 8–12, nor even a basic showing that Lancaster can offer relevant testimony under Rule 402 of the Federal Rules of Evidence, *id.* at 15–17, noting that neither CCGroup nor the Court referenced Lancaster's purported involvement in the facts of the case in the context of briefing and resolving the parties' motions for summary judgment, *id.* at 16, 17. OptumInsight also contends that CCGroup has waived any right to call Lancaster as a witness by failing to promptly move for his disqualification as counsel, *id.* at 12–15, and that allowing CCGroup to call Lancaster as a witness would be unduly prejudicial under Rule 403, *id.*

---

[9] This assertion, also repeated elsewhere in OptumInsight's motion, misstates the Court's holding. Rather than holding that knowledge can be assumed, the Court has held that knowledge of fraud is a necessary element of a *Walker Process* claim *only* where the defendant is a subsequent assignee of the patent, and thus is not a necessary element of CCGroup's claim here because OptumInsight—standing in the shoes of Symmetry—is the same party that allegedly obtained patents through fraud on the PTO. *See* MSJ Order at 88–95.

at 17–18. According to OptumInsight, "permitting CCGroup to make evidentiary references to Mr. Lancaster" would be similarly prejudicial, and OptumInsight asks the Court to preclude CCGroup from "(1) referencing Mr. Lancaster's role in the underlying facts during its opening and closing statements, (2) referencing Mr. Lancaster in its witness examination (or eliciting testimony regarding Mr. Lancaster's role), or (3) offering documents that include Mr. Lancaster's name." *Id.* at 18–19. OptumInsight's proposed order would, as an alternative to precluding such documents entirely, require CCGroup to "redact his name from the document before it is offering [sic]." *See* dkt. 381-5.

### 2. CCGroup's Opposition to Precluding Lancaster's Testimony

Relying on a statement by the Ninth Circuit that the "'reasoning behind the advocate-witness rule does not contemplate that a material witness will be able to exempt himself from the rigours of the fact-finding process by electing to proceed as an advocate,'" CCGroup contends that Lancaster is a relevant witness because he represented Ingenix in its litigation against Symmetry (both of which later merged to become OptumInsight), where he received briefs and attended hearings addressing evidence that—according to CCGroup—indicates Dang conceived his invention before the conception date that he represented to the PTO, and Lancaster is the only lawyer who was involved in both that litigation and *Cave I*. Pl's Opp'n to Def.'s Mot. to Preclude (dkts. 385-2 (public), 385-3 (sealed)) at 1–2 (quoting *United States v. Prantil*, 764 F.2d 548, 554 (9th Cir. 1985)). CCGroup argues that the evidence of the earlier conception date establishes that Dang's patents are invalid, *id.* at 3–5, and that the jury must weigh Lancaster's denials of relevant participation and knowledge against the circumstances of his involvement. *Id.* at 2.

CCGroup does not dispute that Lancaster joined the *Cave I* litigation team after OptumInsight's infringement counterclaims had been filed, but argues that Lancaster's involvement in the case, beginning more than two years before OptumInsight agreed to dismiss claims for infringement of the Dang patents, is nevertheless relevant. *Id.* at 6. CCGroup notes that Lancaster had already entered his appearance in *Cave I* when OptumInsight served interrogatory responses contradicting the conception date that Dang and Symmetry had asserted in the earlier litigation between Symmetry and Ingenix. *Id.* at 7. CCGroup contends that Lancaster's

26

purported knowledge of the earlier conception date—or even his receipt of such information, if a jury credits his denial that he remembered it—is relevant to both the subjective and objective prongs of CCGroup's malicious prosecution and sham litigation claims, and might also be relevant to CCGroup's *Walker Process* claim if this Court's ruling on the elements of such a claim is reversed on appeal. *Id.* at 7–10.

In response to OptumInsight's argument that Lancaster's involvement in *Cave I* primary concerned claim construction, CCGroup contends that OptumInsight's claim construction positions in that case contradicted Dang's representations to the PTO and were consistent with the information that that Lancaster obtained in the Symmetry litigation. *Id.* at 11.

CCGroup also argues that OptumInsight cannot claim undue prejudice because it "should have recognized as soon as this case was filed—before Mr. Lancaster was retained—that he was personally involved in events giving rise to CCGroup's claims," and OptumInsight acknowledged the potential issue in a motion to dismiss filed early in the case. *Id.* at 2, 11–12. According to CCGroup, OptumInsight's knowledge at the outset that Lancaster would be a witness constitutes extraordinary circumstances sufficient to allow his testimony, although CCGroup does not concede that a standard of "extraordinary circumstances" or "compelling need," as applied by the Ninth Circuit in criminal cases, applies to this civil case. *Id.* at 11–13. Even if Lancaster's *testimony* is subject to such a standard, CCGroup contends that it would not apply to the documentary evidence of Lancaster's involvement that OptumInsight seeks to exclude. *Id.* at 13.

CCGroup asserts that OptumInsight did not object to CCGroup taking Lancaster's deposition, arguing that OptumInsight's failure to seek a protective order at that time undermines OptumInsight's present argument that the "sanctity of the attorney-client relationship" would be threatened by trial testimony. *Id.* at 2, 12–13.

According to CCGroup, there is no need for it to move to disqualify Lancaster because the issue "will resolve itself":

> CCGroup has not moved to disqualify Peter Lancaster from acting as OptumInsight's trial counsel. CCGroup does not need to. In its Motion, OptumInsight tacitly concedes—as it expressly conceded in the parties' meet-and-confer—that if the Court denies its request to exclude all evidence regarding Mr. Lancaster from trial, then Mr.

27

> Lancaster will not represent OptumInsight at trial. OptumInsight does not argue that California Rule of Professional Conduct 3.7 permits Mr. Lancaster to serve as both fact witness and advocate at trial, or that OptumInsight desires him to do so. Thus, the question of Mr. Lancaster's ability to act as trial counsel will resolve itself once the Court determines whether OptumInsight is entitled to have the evidence at issue excluded from trial—an issue governed by Fed. R. Evid. 401 and 403, not Rule 3.7.

*Id.* at 2; *see also id.* at 14–15.

### 3.  OptumInsight's Reply Regarding Lancaster's Testimony

OptumInsight argues that CCGroup has no basis to dispute the heightened standard applicable to calling an opponent's attorney as a witness, asserting that the Ninth Circuit has applied that standard in civil as well as criminal cases, and that courts have recognized a high bar to not only calling an opposing attorney to testify at trial, but also to taking opposing counsel's deposition. Def.'s Reply Mem. in Supp. of Mot. to Preclude (dkt. 389) at 1–3.  OptumInsight contends that courts apply particularly strict scrutiny where a party seeks to disqualify an opposing attorney by calling that attorney as a witness. *Id.* at 3–4.

According to OptumInsight, Lancaster's testimony is not relevant in light of the Court's previous holding that employees' knowledge can be imputed to an employer. *Id.* at 4–5. OptumInsight argues that other attorneys who served as outside counsel to OptumInsight or its predecessors have greater knowledge than Lancaster of the relevant facts—such as Kevin McMahon, who was one of the lead attorneys in the Symmetry case and in the interference proceeding between the Dang and Seare patents, among others—and that Lancaster therefore has "no 'necessary' evidence that cannot be obtained from another source." *Id.* at 5–6.

### B.  Legal Standard for Calling Opposing Attorneys as Witnesses

The parties dispute whether CCGroup has a heightened burden to justify calling Lancaster as a witness due to his role as OptumInsight's trial attorney.  Much of the case law addressing calling an advocate as a witness rests on rules of professional conduct barring an attorney from serving in both roles for the same case, subject to narrow exceptions. *See, e.g.*, *United States v. Prantil*, 764 F.2d 548, 552–53 (9th Cir. 1985) ("The advocate-witness rule prohibits an attorney from appearing as both a witness and an advocate in the same litigation."); *Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1048–50 (9th Cir. 1985) (cited by

United States District Court
Northern District of California

OptumInsight as addressing the standard for calling an attorney as a witness, but in fact addressing the standard for disqualification).  In California, that strict rule no longer exists: a trial attorney may testify as a witness so long as the attorney's client provides informed written consent to the attorney serving in both roles.  State Bar of Cal. Rule 3.7(a)(3).[10]  There are also special considerations that support a heightened standard for allowing trial attorney testimony in criminal cases that do not necessarily translate to the context of civil cases.  *See Prantil*, 764 F.2d at 553 (discussing, for example, the risk of "the prestige and prominence of the prosecutor's office . . . being attributed to testimony by a testifying prosecutor").

That being said, the Court recognizes that a lawyer serving in dual roles as both an advocate and a witness risks some degree of distortion of the trial process and confusion for the jury, even in a civil case.  The California rule's requirement for informed consent from the client implicitly acknowledges that requiring a lawyer to testify as a witness can create some risk of prejudice to the client's case.  When a party calls its opponent's counsel as a witness, the party forces the opponent to choose between, on one hand, the prejudice of replacing its attorney, and on the other hand, whatever prejudice might result from the attorney wearing both of those hats at trial.  The standard for allowing a party to call its opponent's trial attorney as a witness must therefore be at least somewhat higher than the standard for other witnesses.  The Court assumes for the sake of argument that the "compelling need" standard that the Ninth Circuit has applied in criminal cases applies equally to civil cases.  *See e.g.*, *United States v. Lorenzo*, 995 F.2d 1448, 1452 (9th Cir. 1993) ("A federal prosecutor may testify at a trial in which he is participating only if there is a compelling need." (citing *United States v. Tamura*, 694 F.2d 591, 601 (9th Cir. 1982)).

---

[10] In disqualifying attorneys likely to serve as witnesses, some courts have expressly disregarded the California rule's allowance for client consent in favor of the narrower exceptions allowed by the corresponding ABA model rule, or held that consent can be overcome by a showing of prejudice to the opponent.  *See Caluori v. One World Techs., Inc.*, No. CV 07-2035 CAS (VBKx), 2012 WL 2004173, at *5 & nn.3, 4 (C.D. Cal. June 4, 2012) (discussing California authority). Neither party here argues that Lancaster could not serve as both a witness and OptumInsight's attorney if OptumInsight were to consent to him doing so.  To the extent that such a dual role might prejudice *CCGroup*, CCGroup has waived any objection by failing to bring a timely motion to disqualify Lancaster as OptumInsight's counsel.

## C. CCGroup May Call Lancaster as a Witness

OptumInsight does not dispute that Lancaster was at least exposed to arguments or evidence indicating an earlier conception date in the *Symmetry* litigation. Such exposure could support an inference that Lancaster retained knowledge of the earlier date when he represented OptumInsight in *Cave I*. Lancaster denies such knowledge or recall, but it is for the jury, and not for this Court, to decide whether to credit his denial.[11] The question, then, is whether Lancaster's purported (and disputed) knowledge of the earlier conception date is sufficiently relevant to CCGroup's claims to allow CCGroup to call him as witness.

OptumInsight contends that the Court's previous holdings render Lancaster's testimony irrelevant. With respect to CCGroup's *Walker Process* claim, OptumInsight is correct, although to be precise, the Court held that knowledge of fraud at the time of enforcement is not an element of that claim, not that such knowledge was is imputed to OptumInsight from *Symmetry*. Because CCGroup need not prove for this claim any knowledge of fraud by OptumInsight at the time of *Cave I*, Lancaster's testimony on the subject is not needed.

The relevance of Lancaster's knowledge to CCGroup's sham litigation and malicious prosecution claims, however, remains in dispute. The Court previously addressed the standard for imputing employees' knowledge to their employer in a footnote of the summary judgment order, after noting that programmer Dan Gardiner, who worked with Dang when he developed his invention and remained an OptumInsight employee at all relevant times, could be expected to know Dang's conception date—whatever the true date might have been. *See* MSJ Order at 96 & n.45. That footnote reads in full as follows:

> The parties do not address in any detail the standard for imputing an employee's knowledge to a corporation in the context of a sham litigation claim. As a general rule, an agent's knowledge will be imputed to the principal, so long as the knowledge is material to the agent's duties. Restatement (Third) of Agency § 5.03 (Am. Law Inst. 2006); *see, e.g.*, *United States v. Pac. Gas & Elec. Co.*, No. 14-cr-00175-TEH, 2015 WL 9460313, at *3 (N.D. Cal. Dec. 23, 2015) (addressing case law applying a "collective knowledge" standard

---

[11] Evaluating Lancaster's credibility as a witness is not the Court's role, and nothing in this order should be construed as impugning—or otherwise commenting on—Lancaster's credibility either as a potential witness or as an advocate.

based on the Restatement in the context of corporate criminal liability). OptumInsight has not argued that any relevant knowledge that [programmer Daniel] Gardiner might have had was immaterial to his duties.

*Id.* at 96 n.45.

Lacking meaningful argument on the issue, and relying on an inference that a jury might or might not draw from Gardiner's working relationship with Dang, the Court applied that broad standard to deny summary judgment on CCGroup's sham litigation and malicious prosecution claims. If OptumInsight now disputes the application of that rule, it may argue for a narrower standard in crafting jury instructions, but Lancaster's purported knowledge of Dang's conception date—allegedly while representing OptumInsight in *Cave I*—remains potentially highly relevant to those claims.[12]

There is no evidence that Lancaster represented OptumInsight at the time that it *filed* infringement claims and counterclaims against CCGroup. Assuming there remains an active dispute as to whether OptumInsight can be deemed to have known Dang's true conception date from sources other than Lancaster, however, his testimony is relevant at least to CCGroup's malicious prosecution claim, which under California law can be based on the continued prosecution of a baseless claim, and not only on the initial decision to bring such a claim. *See* MSJ Order at 98 (citing *Zamos v. Stroud*, 32 Cal. 4th 958, 966–70 (2004)). Given Lancaster's status as apparently the only lawyer to represent OptumInsight in both the Symmetry litigation (where evidence of an early conception date was offered) and *Cave I*, CCGroup would not be able to present to the jury this purported vector of relevant from the Symmetry case to the *Cave I* litigation team without Lancaster's testimony. Such circumstances establish compelling reasons to allow CCGroup to call Lancaster as a witness despite his status as OptumInsight's attorney.

Such a holding does not resolve the question of whether Lancaster must be disqualified from his role as trial counsel. Under the California Rules of Professional Conduct, which both parties agree apply here despite Lancaster's status as member of the Minnesota Bar, Lancaster

---

[12] If OptumInsight were to stipulate that it can be deemed to have had knowledge during *Cave I* of Dang's true conception date—whatever the jury might determine that date to have been—Lancaster's testimony would likely be unnecessary and the Court might reconsider allowing CCGroup to call him as a witness.

may continue to represent OptumInsight also despite testifying as witness so long as he "obtain[s] written consent from the client." State Bar of Cal. Rule 3.7(a)(3); *see also* Minn. Ct. Prof. Rule 8.5(b)(1) (stating that the rules of the jurisdiction in which a matter is pending govern an attorneys' conduct with respect to that matter). The Court therefore declines to construe CCGroup's opposition brief as a motion to disqualify Lancaster,[13] and declines to apply standards relevant to such a motion, because the outcome that CCGroup seeks—calling Lancaster as a witness—would not require his disqualification. Whether Lancaster may continue to serve as trial counsel despite his concurrent status as a witness is for Lancaster and OptumInsight to decide.

The Court recognizes that requiring OptumInsight to choose between, on one hand, replacing its trial counsel, and on the other, having the same lawyer who presents its case to the jury also appear as a witness, imposes some degree of prejudice. Nevertheless, under the circumstances here, such prejudice is not sufficient to preclude Lancaster's testimony either under the standard for calling opposing counsel as witness or under Rule 403 of the Federal Rules of Evidence. As discussed above, Lancaster served in a unique role as the only attorney to represent OptumInsight in both the Symmetry case and *Cave I*. Precluding his testimony would effectively prevent CCGroup from presenting its theory that matters disclosed in the Symmetry case placed the *Cave I* trial team on notice of a conception date earlier than Dang disclosed to the PTO. Moreover, Lancaster's potential relevance to this case was clear from the early stages of this case. Even before CCGroup expressly named Lancaster in an amended complaint, CCGroup based its claims in large part on OptumInsight's conduct in *Cave I*. OptumInsight nevertheless chose Lancaster—one of the attorneys who represented OptumInsight in *Cave I*—as the lead attorney to defend against those claims.

The Ninth Circuit has recognized that "the reasoning behind the advocate-witness rule does not contemplate that a material witness will be able to exempt himself from the rigours of the fact-finding process by electing to proceed as an advocate." *Prantil*, 764 F.2d at 554. Precluding

---

[13] OptumInsight is likely correct that at this late stage of the case, CCGroup has waived its ability to seek Lancaster's disqualification by failing to file such a motion. The Court therefore does not reach the issue of whether allowing Lancaster to both represent OptumInsight and testify as a witness might prejudice CCGroup.

testimony where a party knew, at the time that it chose its attorney, that the attorney might have factual knowledge relevant to the case would allow parties to "deprive an adversary of the benefits of [the attorney's] testimony by electing to [retain the attorney] as an advocate and not as a witness." *See id.* In selecting Lancaster as its trial counsel, OptumInsight took on the risk that he might be called to testify. Under the circumstances of this case, any prejudice to OptumInsight as a result of that risk coming to fruition does not warrant denying CCGroup the right to call a witness who played a unique role in the facts giving rise to its claims. OptumInsight's motion is therefore DENIED, and the Court declines to preclude either Lancaster's testimony or the introduction of evidence referencing his involvement.

## VI. CONCLUSION

For the reasons discussed above, CCGroup's motion for reconsideration is GRANTED, and the Court vacates the portion of its previous summary judgment order precluding CCGroup from recovering damages for its exclusion from the grouper market, on the basis that judgment on that issue was entered sua sponte without sufficient notice. Nevertheless, having now given notice and considered the parties' arguments and evidence, the Court GRANTS summary judgment on that issue sua sponte, except that CCGroup may recover nominal damages.

CCGroup's motion for relief from the scheduling order and OptumInsight's motion to preclude CCGroup calling Peter Lancaster as a witness are DENIED.

**IT IS SO ORDERED.**

Dated: January 10, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge